```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    IN RE:                         Videotape
      NEURONTIN MARKETING, SALES  :  Deposition of:
 4    PRACTICES AND PRODUCTS       :
      LIABILITY LITIGATION         :  MICHAEL TRIMBLE
 5                                 :
      ------------------------------
 6    THIS DOCUMENT RELATES TO:

 7    Smith, et al. v Pfizer, et al.

 8    Case No. 05-cv-11515-PBS

 9

10

11         TRANSCRIPT of testimony as taken by and

12    before PATRICIA A. SANDS, a Shorthand Reporter

13    and Notary Public of the States of New York and

14    New Jersey, at the offices of Lanier Law Firm,

15    126 East 56th Street, New York, New York, on

16    Tuesday, September 2, 2008, commencing at 9:15

17    in the forenoon.

18

19

20         REPORTING SERVICES ARRANGED THROUGH:
           VERITEXT/NEW JERSEY REPORTING COMPANY
21              25B Vreeland Road, Suite 301
             Florham Park, New Jersey 07932
22      Phone: (973) 410-4040    Fax: (973) 410-1313

23

24

25
```

```
 1  APPEARANCES:
 2
 3  FINKELSTEIN & PARTNERS
    436 Robinson Avenue
 4  Newburgh, New York 12550
    BY: ANDREW G. FINKELSTEIN, ESQ.
 5  For the Plaintiff
    800 634-1212
 6
 7  THE LANIER LAW FIRM
    Tower 56
 8  126 East 56th Street, 6th Floor
    New York, New York 10022
 9  BY: KENNETH SOH, ESQ.
    For the Plaintiff
10  212 421-2800
11
    SHOOK, HARDY & BACON, LLP
12  2555 Grand Boulevard
    Kansas City, Missouri 64108-2613
13  BY: LORI CONNORS McGRODER, ESQ.
    For the Defendant
14  816 474-6550
15
16  ALSO PRESENT:
17   Adam DiCola, Videographer
18
19
20
21
22
23
24
25
```

```
 1          E X H I B I T S, continued.
 2
 3  NUMBER     DESCRIPTION                    PAGE
 4  TRIMBLE
 5
 6  Exhibit 10   Expert reports              128
 7  Exhibit 11   Gabapentin papers           129
 8  Exhibit 12   Questionaire                130
 9  Exhibit 13   Re GABA receptors           132
10  Exhibit 14   PubMed article              134
11  Exhibit 15   Questionaire                140
12  Exhibit 16   APA Guidelines              214
13  Exhibit 17   Cato's medical records      286
14  Exhibit 18   McComb's records            311
```

```
              I N D E X

 WITNESS                        DIRECT
 PROFESSOR MICHAEL TRIMBLE

   Ms. McGroder                 6

              E X H I B I T S

 NUMBER     DESCRIPTION                     PAGE
 TRIMBLE

 Exhibit 1   Declaration                    37
 Exhibit 2   Aid memoir                     37
 Exhibit 3   Fromson letter                 40
 Exhibit 4   Table 15 & pg 37 of report     89
 Exhibit 5   Table 7.20                     95
 Exhibit 6   Graphic                        97
 Exhibit 7   Article                        112
 Exhibit 8   Literature                     113
 Exhibit 9   Notes                          117
```

```
 1  PROF. MICHAEL TRIMBLE,
 2  Institute of Neurology
    Queen Square
 3  London WCIN3CB,
    having been sworn, was examined
 4  and testified as follows:
 5
 6
 7      THE VIDEO OPERATOR: Please standby.
 8      We are on the record. My name is
 9  Adam DiCola of Veritext Services. The
10  date today is September 2, 2008, and the
11  time is approximately 9:15 a.m.
12      This deposition is being held in the
13  office of Lanier Law Firm, located at 126
14  East 56th Street, New York, New York.
15      The caption of this case is Smith et
16  al., versus Pfizer, et al., in the United
17  States District Court, District of
18  Massachusetts. Case number
19  05-cv-11515-PBS.
20      The name of the witness is Michael
21  Trimble.
22      At this time the attorneys will
23  identify themselves and the parties they
24  represent, after which our court reporter,
25  Patricia Sands, will swear in the witness
```

2 (Pages 2 to 5)

## Page 6

1  and we can proceed.
2      MR. FINKELSTEIN: Andrew Finkelstein,
3  Finkelstein & Partners, on behalf of the
4  Smith family.
5      MR. SOH: Ken Soh, from the Lanier
6  Law Firm on behalf of the plaintiffs.
7      MS. McGRODER: Lori McGroder, of
8  Shook, Hardy & Bacon, on behalf of Pfizer.
9      MS. STEVENSON: Jennifer Stevenson,
10 of Shook, Hardy & Bacon on behalf of
11 Pfizer.
12         - - -
13         Witness sworn
14         - - -
15 DIRECT EXAMINATION
16 BY MS. McGRODER:
17     Q   Professor Trimble, good morning.
18     A   Good morning.
19     Q   We've met before; correct?
20     A   Twice.
21     Q   Good to see you.
22     A   Thanks.
23     Q   Thanks for being here.
24         I understand your opinion in this case to
25 be that -- and these are your words not mine:

## Page 7

1  "In the absence of a recognizable
2  psychiatric disorder, the spontaneous and
3  impulsive nature of Richard Smith's suicide
4  requires explanation. As outlined in my
5  concurrent report, Gabapentin is associated
6  with changes of brain chemistry, which I find
7  with a reasonable degree of scientific and
8  medical probability, leads to impulsive
9  suicidal acts. It is, therefore, my opinion
10 that it is more likely than not, Gabapentin was
11 a substantial factor in Mr. Smith committing
12 suicide."
13     As we sit here today, do you stand by that
14 opinion?
15     A   I do.
16     Q   Please define for me what you mean by
17 "spontaneous and impulsive" in nature.
18     MR. FINKELSTEIN: Objection as to
19 form.
20     THE WITNESS: If something is
21 impulsive, it arises unexpectedly and
22 quite quickly. And impulsive acts often
23 have disastrous consequences. So, uhm,
24 also aggressive acts lead to personal,
25 interpersonal damage.

## Page 8

1      So there's sudden spontaneous events
2  that, to a large extent, are unpredicted
3  and not perhaps predictable by a third
4  person. That was the impulsive part.
5      The first part was spontaneous, which
6  means happens out of the blue.
7  Spontaneous.
8  BY MS. McGRODER:
9      Q   So it's your opinion that Mr. Smith's
10 suicide happened out of the blue?
11     MR. FINKELSTEIN: Objection.
12     THE WITNESS: It is my opinion that
13 Mr. Smith's suicide happened out of the
14 blue.
15 BY MS. McGRODER:
16     Q   Is there any peer reviewed published
17 literature in the world demonstrating that
18 Neurontin causes impulsive suicide behavior?
19 In other words, suicide that happened out of
20 the blue?
21     MR. FINKELSTEIN: Objection.
22     THE WITNESS: Could you just rephrase
23 that, because there were two questions
24 embedded into one.
25     MS. McGRODER: Well, I don't think

## Page 9

1  so, but sure, I'll --
2      THE WITNESS: Well, the one related
3  to suicidal behavior, and the other
4  related to impulsivity in the same
5  sentence.
6  BY MS. McGRODER:
7      Q   Well, is it your opinion that Mr.
8  Smith's suicidal behavior was impulsive?
9      A   Yes.
10     Q   Okay, so my question is: Is there
11 any peer reviewed published literature in the
12 world that demonstrates or states that
13 Neurontin causes impulsive suicidal behavior?
14     A   Yes.
15     Q   And can you please identify for me
16 what literature you're referring to?
17     A   If you look in my report, I cite
18 several references that have to do with
19 impulsive aggressive behavior in patients
20 receiving Gabapentin.
21     Q   And did those patients commit suicide
22 in the literature to which you are referring?
23     A   Those patients committed aggressive
24 acts. I haven't read those reports recently, I
25 don't believe they related directly to suicide,

Page 258

1 you're missing.
2    THE WITNESS: It's a single dose?
3 This is a single-dose study?
4 BY MS. McGRODER:
5    Q  Yes, let's talk single dose for now.
6    A  Okay, because that's crucial,
7 obviously, but I don't know, uhm -- I don't
8 know if that's even been looked at. It
9 probably has, but with the short half life, it
10 probably would clear within 24 hours.
11    Q  Is it not important to your opinion
12 in the Smith case to know how long it takes for
13 Neurontin to clear from the system following
14 the last dose?
15    A  That's a different question, though.
16 The question as to what happens when you take a
17 single dose is very different to somebody who
18 takes multiple doses, because the body becomes
19 saturated with the product. And if you stop
20 taking the drug, you will still get the product
21 emerging from fatty tissue, for example.
22    So the delay, when you've been taking the
23 drug chronically, is very different.
24    Q  Okay, let's say you have been taking
25 Gabapentin for two months.

Page 259

1    A  Okay.
2    Q  And you take your last dose.
3    A  Okay.
4    Q  How long before there is no
5 appreciable Gabapentin in your system?
6    A  I would say several days, at least.
7    Q  And on what do you base your opinion
8 that it would be several days at least?
9    A  On what I've just said, that the drug
10 has to come out of the body tissue, body
11 system. But that is a guess. As far as I
12 know, it's not been looked at.
13    Q  What is the point at which the drug
14 would have no clinical effect following last
15 ingestion?
16    A  That is a different question again.
17    Q  Yes, that's why I asked it.
18    A  If you have a drug which acts on the
19 brain and influences brain neurochemistry, you
20 may well have an effect on the central nervous
21 system which by far outlasts the effect of the
22 amount of the blood, of what's in the blood.
23    So once you have got the blood into the
24 brain, you're talking again about a different
25 system to just looking at what comes out when

Page 260

1 you stop the drug from the blood stream.
2    Q  All right, and so my question is
3 related to clinical effects. So maybe you
4 tried to answer my question and I just didn't
5 understand your answer.
6    But my question is: How long after your
7 last ingestion of Gabapentin would you expect
8 there to be any clinical effect -- let's say,
9 let's say you're taking Gabapentin for pain
10 reduction -- how long after your last dose of
11 Gabapentin would you have clinical, the
12 clinical effect of pain reduction?
13    MR. FINKELSTEIN: Objection.
14    I don't know that there's any
15 efficacy that it's ever been established
16 that Gabapentin has any effect --
17    MS. McGRODER: Objection to form is
18 fine.
19    MR. FINKELSTEIN: -- on pain
20 reduction.
21    THE WITNESS: I do not know the
22 literature on the use of Gabapentin in
23 chronic pain.
24 BY MS. McGRODER:
25    Q  All right, well, let's talk about an

Page 261

1 epileptic, then. Do you know the literature on
2 epilepsy and Gabapentin?
3    A  I do.
4    Q  Okay, so let's assume that somebody's
5 on Gabapentin for epilepsy, and they take their
6 last dose.
7    A  Okay.
8    Q  They just decide I'm not taking this
9 drug anymore.
10    A  Yup.
11    Q  They've taken their last dose.
12    How long after the last dose will the
13 person no longer have seizure control, or have
14 the clinical benefit of the drug?
15    A  As far as I'm aware, if you stop
16 Gabapentin, you do not get a rebound of
17 seizures, withdrawal seizures.
18    What you do get with some other
19 anti-epileptic drugs -- the point of that is to
20 say that the lingering anti-epileptic effect
21 must go on several days.
22    Q  And is there any literature that
23 supports your opinion that there is lingering
24 effect that goes on for several days?
25    A  Well, I have not read a literature

| Page 262 | Page 264 |
|---|---|
| 1  that suggests rebound seizures when you stop -- | 1  twice a day. And at some point it was |
| 2  I'm sorry -- I have not read a literature that | 2  increased to 300 milligrams three times a |
| 3  suggests withdrawal seizures on Gabapentin, and | 3  day. |
| 4  I have not read a literature on psychological | 4  BY MS. McGRODER: |
| 5  effects, if I could put it like that. In other | 5    Q  So is the maximum does that Mr. Smith |
| 6  words, like benzodiazepine withdrawal syndrome, | 6  ever ingested 900 milligrams per day? |
| 7  which, again, suggests that it is cleared | 7    A  900 milligrams a day. |
| 8  slowly rather than very rapidly from the brain. | 8    Q  Did he, in fact, take Neurontin three |
| 9    Q  And so you're relying on literature | 9  times a day at 300 milligrams? |
| 10  that addresses the lack of rebound seizures to | 10    A  My understanding is, from the |
| 11  support an opinion that the clinical effects of | 11  depositions, that that was, indeed, the case. |
| 12  Neurontin would there be for several days? | 12    Q  And what depositions are you relying |
| 13       MR. FINKELSTEIN: Objection. | 13  on for your understanding that he, in fact, |
| 14       THE WITNESS: Correct, yes. Yes, | 14  ingested Neurontin three times a day? |
| 15    correct. | 15    A  The family, depositions particularly, |
| 16  BY MS. McGRODER | 16  I suppose Ruth Smith, but also if I remember |
| 17    Q  At least in an epileptic population? | 17  from what I read yesterday, there was some |
| 18    A  In an epilepsy population; correct. | 18  other family members. His daughters, I don't |
| 19    Q  Other than that, do you have any | 19  know which one it was, would say that he was a |
| 20  basis for your statement that the clinical | 20  reliable patient who took medications |
| 21  effects would last for several days following | 21  prescribed. |
| 22  your last ingestion of Gabapentin? | 22    Q  Did any family member actually |
| 23    A  Only that that is a general effect of | 23  observe, personally observe Mr. Smith take |
| 24  drugs that affect the central nervous system, | 24  Neurontin ever? |
| 25  that they tend to last, outlast the blood | 25    A  I cannot answer that question. |

| Page 263 | Page 265 |
|---|---|
| 1  levels. | 1    Q  You cannot answer because you don't |
| 2    Q  When did Mr. Smith take his first | 2  know? |
| 3  dose of Gabapentin? | 3    A  It's not within the depositions, I |
| 4    A  Well, we've already discussed that | 4  don't believe. I don't know is the answer. |
| 5  was in my report. Let me go back to the dates. | 5    Q  So your testimony is that none of the |
| 6  (Reviewing document.) I want to get the dates | 6  family members have testified to whether they |
| 7  in correct. My belief it was the 9th of March. | 7  personally observed Mr. Smith taking |
| 8  The 9th or March 2004. | 8  Gabapentin? |
| 9    Q  And when did he take his last dose? | 9    A  I would like to be slightly cautious, |
| 10    A  That I do not know. | 10  because I read a large number of depositions |
| 11    Q  And why do you not know when he took | 11  yesterday and I read them in the past, and I |
| 12  his last dose? | 12  may be incorrect, but I do not know of any |
| 13    A  Because he -- well, I don't know. I | 13  deposition which has said that Mr. Smith was |
| 14  have no idea when he took his last dose. | 14  observed three times a day taking his |
| 15    Q  Is there any information in the | 15  medication, by any family member. |
| 16  record, based on your review, that indicates | 16    Q  Well, you read Mrs. Smith's |
| 17  when Mr. Smith took his last dose of Neurontin? | 17  deposition a while ago, before you offered your |
| 18    A  No. | 18  report; correct? |
| 19    Q  What dose of Neurontin did Mr. Smith | 19    A  That's correct. |
| 20  take? | 20    Q  The rest of the depositions you just |
| 21       MR. FINKELSTEIN: When? | 21  read yesterday; right? That's the testimony |
| 22       MS. McGRODER: You can tell me if | 22  you gave. |
| 23    it's different every time. | 23    A  Yes. |
| 24       THE WITNESS: It appears that he was | 24    Q  Well, did you reread them, or did you |
| 25    started on that date on 300 milligrams | 25  read them for the first time yesterday? |

VERITEXT CORPORATE SERVICES (800) 567-8658

Case 3:05-cv-00444   Document 19-1   Filed 12/04/09   Page 5 of 19 PageID #: 55

Page 266

1    A   Well, I read them for the first time
2  yesterday.
3    Q   Right. And in those depositions you
4  did you not find any testimony of the family
5  members wherein they stated I did not
6  personally observe Mr. Smith take Neurontin,
7  you didn't see that in those depositions you
8  read yesterday?
9        MR. FINKELSTEIN: Objection.
10       THE WITNESS: I did not observe or I
11   did observe?
12 BY MS. McGRODER:
13   Q   Did not. Do you want me to restate
14 the question?
15   A   I think so.
16   Q   In the depositions that you read
17 yesterday and in the Ruth Smith deposition that
18 you read a year ago, you didn't find any
19 references to family members giving testimony
20 that they did not personally observe Mr. Smith
21 take Neurontin?
22       MR. FINKELSTEIN: Objection.
23       THE WITNESS: They did not personally
24   observe -- I don't recall any family
25   member saying they did not observe

Page 267

1    Mr. Smith taking Neurontin.
2  BY MS. McGRODER:
3    Q   Okay, so the evidence that you have
4  that Neurontin was, in fact, ingested by
5  Mr. Smith comes from Ruth Smith's deposition
6  testimony?
7    A   And his own words, of course.
8  Mr. Smith's own words.
9    Q   Okay, and what else? Anything else?
10   A   The fact that he had the medication,
11 not strong evidence, but he had the medication
12 at his home. And, well, his own words.
13   Q   Anything else? I just want to make
14 sure we've talked about everything that you
15 believe supports your opinion that he took
16 Neurontin.
17   A   Well, there is also the fact that he
18 underwent a mental state change, which needs to
19 be explained -- well, after he went on to the
20 Gabapentin, which we know ultimately led to his
21 suicide, so the mental state change, as a
22 behavioral neurologist, leads me to ask the
23 questions: What was the trigger factor that
24 lead to these events? And the alteration of
25 his mental state has to be included as the

Page 268

1  potential factor.
2    Q   That's your opinion?
3    A   Uh hum.
4    Q   Which is fine. I'm talking about
5  evidence in the record that he actually
6  ingested Neurontin. And we've talked about
7  Mr. Smith's deposition, we've talked about
8  statements that Mr. Smith made, and that
9  Neurontin was in the home; correct?
10   A   Correct.
11   Q   Anything else?
12   A   Not that I read in the depositions,
13 no.
14   Q   What was Mr. Smith's Gabapentin level
15 at the time of his suicide?
16   A   Sadly -- well, not sadly. The
17 autopsy never included any biochemical
18 analysis.
19   Q   Well, he didn't have an autopsy; did
20 he?
21   A   Okay, I'm sorry. Blood was not taken
22 to look to see what -- well, they didn't
23 measure -- actually it was taken, blood was
24 taken, but they didn't measure Gabapentin.
25   Q   Other than a post-mortem blood

Page 269

1  screen -- well, let me articulate it
2  differently.
3      Setting aside a post-mortem blood screen
4  that doesn't identify Gabapentin -- well,
5  withdrawn.
6      It's true that you have no evidence as you
7  sit here today that Mr. Smith had Gabapentin in
8  his body at the time of his suicide?
9        MR. FINKELSTEIN: Objection.
10       THE WITNESS: There is no evidence
11   that Mr. Smith had Gabapentin inside his
12   body in terms of biochemical evidence,
13   that is correct.
14 BY MS. McGRODER:
15   Q   What was Mr. Smith's active serotonin
16 level at the time of his suicide?
17   A   I really am not even going to
18 counsel -- I'm not going to counsel even
19 answering that question.
20   Q   You don't know?
21   A   Of course I don't know.
22   Q   You don't know if he had an increased
23 serotonin level or a decreased serotonin level
24 at the time of his suicide; do you?
25   A   Of course not.

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                         Continued
      IN RE:                               Videotape
 4    NEURONTIN MARKETING, SALES   :       Deposition of:
      PRACTICES AND PRODUCTS       :
 5    LIABILITY LITIGATION         :       MICHAEL TRIMBLE
                                   :
 6    -----------------------------

 7    THIS DOCUMENT RELATES TO:

 8    Smith, et al. v Pfizer, et al.

 9    Case No. 05-cv-11515-PBS

10

11

12

13           TRANSCRIPT of testimony as taken by and

14    before PATRICIA A. SANDS, a Shorthand Reporter

15    and Notary Public of the States of New York and

16    New Jersey, at the offices of Lanier Law Firm,

17    126 East 56th Street, New York, New York, on

18    Wednesday, September 3, 2008, commencing at

19    9:16 in the forenoon.

20

21

22          REPORTING SERVICES ARRANGED THROUGH:
            VERITEXT/NEW JERSEY REPORTING COMPANY
23              25B Vreeland Road, Suite 301
              Florham Park, New Jersey 07932
24     Phone: (973) 410-4040      Fax: (973) 410-1313

25
```

APPEARANCES:

FINKELSTEIN & PARTNERS
436 Robinson Avenue
Newburgh, New York 12550
BY: ANDREW G. FINKELSTEIN, ESQ.
For the Plaintiff
800 634-1212

THE LANIER LAW FIRM
Tower 56
126 East 56th Street, 6th Floor
New York, New York 10022
BY: KENNETH SOH, ESQ.
For the Plaintiff
212 421-2800

SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
BY: LORI CONNORS McGRODER, ESQ.
For the Defendant
816 474-6550

ALSO PRESENT:
Adam DiCola, Videographer

INDEX

| WITNESS | DIRECT |
|---|---|
| PROFESSOR MICHAEL TRIMBLE | |
| Ms. McGroder | 344 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| TRIMBLE | | |
| EXHIBIT 19 | Shell report | 352 |
| EXHIBIT 20 | Neurogurgical records | 399 |
| EXHIBIT 21 | UMC notes | 404 |
| EXHIBIT 22 | Juurlink article | 455 |
| EXHIBIT 23 | Police report | 482 |
| EXHIBIT 24 | Medical examiner's report | 489 |
| EXHIBIT 25 | Suicide note | 497 |
| EXHIBIT 26 | Photo | 508 |
| EXHIBIT 27 | Wood letter | 539 |

PROF. MICHAEL TRIMBLE,
Institute of Neurology
Queen Square
London WCIN3CB,
having been previously sworn, was
examined and testified as follows:

THE VIDEO OPERATOR: Please standby. We are on the record. My name is Adam DiCola of Veritext Corporate Services. The date today is September 3, 2008, and the time is approximately 9:16 a.m. This deposition is being held in the office of Lanier Law Firm, located at 126 East 56th Street, New York, New York.

The caption of this case is Smith, et al., versus Pfizer, et al., in the United States District Court, District of Massachusetts, Case Number 05-CV-11515-PBS.

The name of the witness is Professor Michael Trimble.

At this time the attorneys will identify themselves and the parties they represent, after which our court reporter, Patricia Sands, will swear in the witness

and we can proceed.

MR. FINKELSTEIN: Andrew Finkelstein, on behalf of the Smith family.

MR. SOH: Ken Soh, on behalf of the Smith family as well.

MS. McGRODER: Lori McGroder, of Shook, Hardy & Bacon, on behalf of Pfizer.

MS. STEVENSON: Jennifer Stevenson, of Shook, Hardy & Bacon, also on behalf of Pfizer.

THE WITNESS: We did this yesterday.

CONTINUED DIRECT EXAMINATION
BY MS. McGRODER:
Q   Professor Trimble, you know you're still under oath; correct?
A   Correct.
Q   Did you do anything last night to prepare for the continuation of your deposition this morning?
A   Last night and this morning I read through my bundle of Mr. Smith's notes.
Q   And those would be the medical records marked as Exhibit --
A   The ones that you had yesterday.

Page 345

1  Q   The ones that you brought with you;
2  correct?
3  A   Correct.
4  Q   I think those were marked as
5  Exhibit 12?
6  A   Correct.
7  Q   And what of interest did you find in
8  the medical records that you brought with you?
9  A   I was really refreshing my memories
10 of the notes. I searched in vain for the
11 script that you kindly showed me yesterday,
12 which revealed that he had been on
13 escitalopram, which I had not seen before. And
14 I -- it gave me some comfort.
15 Q   Did you review that same set of
16 medical records before your deposition
17 testimony yesterday?
18 A   Correct.
19 Q   And then you reviewed them again this
20 morning or last night?
21 A   Well, both.
22 Q   Okay. What else did you do to
23 prepare for your deposition today?
24 A   Tried to relax, really. I don't
25 think I did anything. I didn't do any extra

Page 346

1  reading or anything like that.
2  Q   How much time did you spend meeting
3  with lawyers for the plaintiffs in preparation
4  for your deposition?
5  A   Between today and yesterday?
6  Q   No, ever.
7  A   This deposition?
8  Q   Yes, of course.
9  A   I arrived here Sunday, and I was with
10 Mr. Soh and Mr. Finkelstein for -- I can't
11 remember, but it was a holiday, so I guess it
12 was about three hours in the morning maybe.
13 Q   On Monday the holiday?
14 A   Monday the holiday, yes.
15 Q   Okay.
16 A   I think people were anxious to get
17 away for the holiday.
18 Q   Is that the full extent of meetings
19 that you had with lawyers to prepare for your
20 deposition?
21 A   This deposition, that's correct.
22 Q   Okay. And what did you discuss on
23 Monday?
24 A   Who was going to do this deposition.
25 Q   What was the speculation?

Page 347

1  A   I was thinking it might be Mr. Hooper
2  again.
3  Q   Were you disappointed?
4  A   Not at all. Not at all. I don't
5  think we discussed anything in specifics, but I
6  was given that large bundle of depositions to
7  read. And that really consumed the rest of my
8  day.
9  Q   What --
10 A   But I don't think it was specific in
11 terms of preparing for a deposition. I mean,
12 this is the fourth deposition I've done, so I
13 know what to expect.
14 Q   Sure.
15 A   And so there was nothing specific.
16 And as far as I know, there was no new
17 information that had been brought forward in
18 this case, except that bundle of depositions
19 which you had, which I then took away and spent
20 the rest of the afternoon reading.
21 Q   Right. And my question really wasn't
22 limited to your preparation for how to give a
23 deposition, it was what did you do to prepare
24 to give a deposition in the Smith matter.
25 So what did you discuss with respect to

Page 348

1  the Smith case?
2  A   I don't think we discussed anything
3  specific, you know, in terms of was there any
4  alteration in my opinion or if anything new
5  cropped up. I don't think that there was
6  anything like that.
7  Q   Well, generally what did you talk
8  about in the Smith case? You did talk about
9  the Smith case; correct? I mean, you're here
10 to give a deposition about the Smith case.
11 A   If I recall rightly, that we spent
12 quite some time talking about FDA hearing. And
13 Mr. Finkelstein -- I had, of course, read it,
14 but Mr. Finkelstein had the DVD. And he showed
15 me some excerpts from that, because I was
16 interested, actually.
17 And, ah, we discussed the fact that
18 Dr. Katz referred to the causal link between
19 taking these antiepileptic compounds and
20 suicide. And there was some other snippets
21 that he also showed me in relationship to that.
22 But I don't -- I don't think there was
23 anything particular about the Smith case in
24 itself.
25 Q   Well, just generally then, what did

3 (Pages 345 to 348)

Page 357

BY MS. McGRODER:
Q  And you see at the end of this note that Dr. Shell concludes that his pain may be coming from his back; correct?
A  Correct.
Q  And that he might benefit from a second opinion and, thus, Dr. Shell recommends that he see Dr. Mackey; correct?
A  That's correct.
Q  Doctor Mackey is a surgeon; right? Do you know?
A  I understand that he is, but I can't guarantee that.
Q  So if you turn the page to TOA 004.
A  Yes.
Q  Mr. Smith is back in the office on February 12 for a visit with Dr. Mackey; correct?
A  Correct.
Q  And the record says: "He is status post lumbar laminectomy and fusion, using what appears to be local bone. Last fall he began to have increasing left lower extremity pain."
Do you see that?
A  Yes.

Page 358

Q  "He denies any weakness. The pain has not improved despite muscle relaxants and pain medication."
Correct?
A  Correct.
Q  So he's reporting the same symptoms to Dr. Mackey; right?
A  With the exception of the razor blades.
Q  Right. But he just says the pain has not improved, so presumably it's the same pain?
A  I don't think you could presume that.
Q  You don't?
A  No.
Q  Well, the pain he reported on the preceding visit to this same office was that he had pain that felt like razor blades; right?
A  He does not state that in this report that you just showed me.
Q  Okay, but my question is: The pain that he reports on the preceding visit to this same office is pain that felt like razor blades; correct?
A  That is correct.
Q  Okay. And this note says that pain

Page 359

has not improved despite muscle relaxants and pain medication; correct?
A  That is correct.
Q  And the muscle relaxants and pain medication that he was on, according to the preceding note, include Dextra and Flexeril; right?
A  Correct.
Q  Would you agree with me that despite conservative pain therapy at this point, Mr. Smith's pain was not improving?
A  That's correct.
Q  Would you agree with me that the fact that conservative therapy is not improving his pain at this point, is similar to the circumstances in 2003, where he tried conservative therapy before he received surgery for his back pain?
A  I agree the situation is very similar.
Q  If you will go to page TOA 00015, it's about two pages back.
A  I have that.
Q  This is a February 17, 2004 plan of care.

Page 360

A  Yes, I have that.
Q  Do you see that?
A  I have that.
Q  And do you see under the "Problems & Goals" under problem number 1, it says: "Chief complaint: Pain. Aggravating factors: Activities Walking 0 to 10 minutes."
Do you see that?
A  Yes.
Q  Does that tell us that Mr. Smith had pain with activities such as walking 10 minutes or less?
A  That's correct.
Q  Okay. And if you will look at problem number 2, it says: "Chief complaint: Pain. Current Severity: 7 out of 10."
A  Correct.
Q  Right?
A  That's correct.
Q  And so thinking back to the spring of 2003, before he had lumbar laminectomy surgery, he rated his pain 8 on a scale of 1 to 10. Do you recall that?
A  Yes.
Q  And here he is rating his pain 7 on a

Page 397

1  surgery and he can't have surgery?
2      MR. FINKELSTEIN: Objection.
3      THE WITNESS: According to
4  Dr. Mackey, that is correct.
5  BY MS. McGRODER:
6   Q   And Dr. McCombs?
7   A   Yes, and McCombs, that is correct.
8   Q   Did you consider the fact that
9  Mr. Smith was no longer a candidate for surgery
10 to help his pain in 2004 when you formed your
11 opinions in this case?
12  A   My understanding is that he was
13 actually scheduled to see yet another surgeon
14 the day after he died, Dr. Chang, I think it
15 was. So his searching for another opinion had
16 not ceased.
17  Q   Okay. That wasn't my question. My
18 question was: Did you consider the fact that
19 Mr. Smith was told by two surgeons in March
20 of 2004 that he was no longer a candidate for
21 surgery to help him with his pain when you
22 formed the opinions that you came to in this
23 case?
24  A   Not especially, no.
25  Q   That wasn't important to your

Page 398

1  opinion?
2      MR. FINKELSTEIN: Objection.
3      THE WITNESS: Not especially, no.
4  BY MS. McGRODER:
5   Q   Okay, if you go to Exhibit 15, page
6  FMB 52, which is an April 15, 2004 note.
7   A   Right.
8   Q   Let me give you the actual exhibit.
9  Here, use this.
10  A   Yeah. I'll give you that back.
11  Q   These are the medical records of
12 Dr. Berklacich.
13  A   Right.
14  Q   I'm sure we're butchering that name,
15 but that's the best I can do.
16  A   Okay.
17  Q   And look for April 15, 2004.
18     MR. FINKLESTEIN: What's the Bates
19  number?
20     MS. McGRODER: It is FMB 52, actually
21  it's the last page.
22     THE WITNESS: Oh, the very bottom.
23 BY MS. McGRODER:
24  Q   Yes.
25  A   15 4 04, yes.

Page 399

1   Q   Yes, April 15, 2004. The note says:
2  "Per Dr. Berklacich, do not --"
3   A   Reschedule.
4   Q   "-- reschedule appointment".
5   A   Yes.
6   Q   Do you know what that's about?
7   A   No.
8   Q   If you -- did you read the deposition
9  of Dr. Berklacich?
10  A   Yes.
11  Q   Did you take any notes other than the
12 notes in Exhibit 2 on the basis of your review
13 of depositions?
14  A   No.
15  Q   Did you make notes in the depositions
16 themselves?
17  A   No.
18     (Exhibit 20 marked for
19 identification.)
20  Q   I'm going to hand you now, Professor
21 Trimble, what we're marking as Exhibit 20 to
22 your deposition.
23  A   Okay.
24  Q   If you would look the third to the
25 last page.

Page 400

1      MR. FINKLESTEIN: Just so --
2      MS. McGRODER: I'm getting there.
3      MR. FINKLESTEIN: I mean, all I want
4   you to do is establish it was already an
5   exhibit. That's all.
6  BY MS. McGRODER:
7   Q   These are records of Neurosurgical
8  Associates. Do you see that?
9   A   I do.
10  Q   And there is an exhibit reference at
11 the top on the front page that says Exhibit 1,
12 if you look on the very front.
13  A   Yes.
14  Q   And that exhibit reference does not
15 relate to this deposition?
16  A   Okay.
17  Q   Just for the record, that relates to
18 the deposition of Ruth Smith where this exhibit
19 was used.
20  A   Okay.
21  Q   Okay. And turning to the third to
22 the last page, you will see that this is a copy
23 of Dr. McCombs record.
24  A   Yes. Yes, I have that.
25  Q   Okay.

16 (Pages 397 to 400)

Page 401

1  A   We discuss discussed this already.
2  Q   Yes, yes, we did.
3  A   Yes.
4  Q   And this copy has handwriting on it?
5  A   Yes.
6  Q   That we've been told is Mr. Smith's
7  handwriting; right?
8  A   Correct.
9  Q   And we talked about that a little
10 yesterday, do you recall?
11 A   Correct.
12 Q   That there was some medical records,
13 and I think you your testimony you don't know
14 why Mr. Smith got his medical records or wrote
15 on them?
16 A   Correct.
17 Q   And in this record, it says -- there
18 is a circle around the word Dr. Howell.
19 A   Correct.
20 Q   And then there is an arrow that goes
21 down to the handwritten note.
22 A   That's correct.
23 Q   By Mr. Smith. And the note says,
24 which is consistent with your testimony, "I
25 have never seen Dr. Howell"; right?

Page 402

1  A   That's correct.
2  Q   And then it says: "Dr. Mackey called
3  and said that Dr. Howell would not see me,
4  because I had seen Dr. Hampf, February 27th,
5  2003, and did not let him do my surgery".
6     Do you see that?
7  A   Yes, I do.
8  Q   And then the next note is: "I pray
9  that Dr. Hampf will consider seeing me and
10 giving me his opinion".
11    Do you see that?
12 A   That's correct.
13 Q   Did you know that Dr. Hampf was
14 affiliated with Dr. Berklacich?
15 A   No.
16 Q   Dr. Hampf is Dr. Berklacich's
17 partner, did you know that?
18 A   I didn't know that.
19 Q   So looking back now to Exhibit 15, on
20 the last page. The record that we were looking
21 at that says --
22 A   Yes.
23 Q   "Do not reschedule an appointment".
24 A   Yes.
25 Q   Are you aware that refers to

Page 403

1  Dr. Hampf and Dr. Berklacich stating in the
2  record they will not reschedule an appointment
3  with Mr. Smith?
4  A   That's correct.
5  Q   Do you know what Mr. Smith's reaction
6  was to that?
7  A   No.
8  Q   Based on the handwritten note of
9  Mr. Smith, do you think he wanted to see
10 Dr. Hampf?
11    MR. FINKELSTEIN: Objection.
12    THE WITNESS: He was seeking more, he
13 was still seeking more opinions and he
14 does discuss Dr. Hampf in that handwritten
15 note.
16 BY MS. McGRODER:
17 Q   And Dr. Hampf is a surgeon; right?
18 A   I do not know. I accept that he may
19 be, but I do not know.
20 Q   Okay. And this also is different
21 from Mr. Smith's experience in the spring of
22 2003; correct?
23 A   In the sense that --
24 Q   In the sense that in 2003 Mr. Smith
25 did have the opportunity to go and see

Page 404

1  Dr. Berklacich and Dr. Hampf to get an opinion
2  about surgery; right?
3  A   That's correct.
4  Q   Now, in 2004, Mr. Smith is still
5  experiencing severe pain, and he does not have
6  the opportunity to go in and see Dr. Hampf and
7  Dr. Berklacich for an opinion about surgery;
8  correct?
9     MR. FINKELSTEIN: Objection.
10    THE WITNESS: That's correct.
11    MS. McGRODER: We are now marking,
12 Professor Trimble, notes from the
13 University Medical Center as Exhibit 21.
14    (Exhibit 21 marked for
15 identification.)
16 BY MS. McGRODER:
17 Q   Do you recognize these notes?
18 A   (Referring to document.) They have a
19 familiarity.
20 Q   Do you think you have seen these
21 before?
22 A   I only said that because there's a
23 lot of them look the same.
24 Q   Format?
25 A   If you would like to take me to the

Page 421

1  Mr. Smith's ability to self manage his pain, or
2  cope with his pain?
3      A   Well, it tells me that he is moving
4  in the right direction and getting better. If
5  I could refer back.
6      Q   Well, this is talking about how he
7  felt after today's treatment in terms of his
8  pain; right?
9      A   And it says that he's mobilizing
10 better.
11     Q   Where does it say that?
12     A   Didn't we just read that?
13     Q   Well, after ROM mobility, what does
14 that say?
15     A   I thought this said that his mobility
16 was --
17     Q   I simply don't know.
18     A   Increased -- there is an arrow which
19 says increased.
20     Q   I see that.
21     A   And then "mobility noted".
22     Q   What is the word after "increased"?
23     A   I think it says "dressing".
24     Q   Increased dressing?
25     A   Could be.

Page 422

1      Q   Mobility noted? So he might be able
2  to dress himself after this physical therapy
3  treatment?
4      A   That suggests to me that he is moving
5  forwards and getting better.
6      Q   Now, my question to you, before you
7  move on is: Is there anything on UMC 082 that
8  talks about Mr. Smith's ability to cope with
9  his pain?
10     A   Well, may I just --
11     Q   First you need to answer my question
12 about UMC 082, then you can talk about what you
13 want to talk about, but first answer my
14 question.
15     A   There's nothing about coping there.
16     Q   Okay.
17     A   But I'm just looking for the word
18 "coping" in the reference that you previously
19 showed me.
20     Q   Well, we already discussed what HEP
21 stood for; right?
22     A   Well, it's help; isn't it? But I
23 don't see the word "coping" on that page.
24     Q   Okay.
25     A   That's what I'm saying.

Page 423

1      Q   Okay, that's my question. So this
2  page, UMC 082, doesn't address -- well, first
3  it doesn't say that Mr. Smith is not having
4  pain; right?
5          It just says his pain has improved after
6  this physical therapy treatment?
7      A   Correct.
8      Q   And secondly, it doesn't say anything
9  about his ability to cope with his pain;
10 correct?
11     A   That is correct. That is correct.
12     Q   Anything else?
13     A   Thirtieth of April. Fourth of May,
14 Pain Center physiotherapy services.
15         MS. McGRODER: Professor Trimble,
16 before we discuss this record we are about
17 to run out of videotape.
18         THE WITNESS: Okay.
19         MS. McGRODER: Let's just take a
20 short break.
21         MR. FINKELSTEIN: We're running an
22 hour and fifteen, why don't we just take a
23 break?
24         MS. McGRODER: Perfect.
25         THE VIDEO OPERATOR: Please standby.

Page 424

1          We are going off the record, the time
2  is 10:37 a.m. This concludes videotape
3  number 1.
4          (Recess.)
5          THE VIDEO OPERATOR: Please standby.
6          We are back on the record, the time
7  is 10:59 a.m. This is the beginning of
8  tape number 2.
9  BY MS. McGRODER:
10     Q   Professor Trimble, we left off
11 talking about the physical therapy records from
12 the University Medical Center in Exhibit 21.
13         Were you able to find any record among
14 this set that states Mr. Smith did not -- that
15 states Mr. Smith was coping well with his pain?
16     A   Well, the word "coping" does not
17 appear in any of these records.
18     Q   Okay. If I could turn your attention
19 to UMC 0076.
20     A   (Referring to document.)
21     Q   That would be about three pages from
22 the back. You know what, use the exhibit, if
23 you don't mind.
24     A   Yes.
25     Q   That might be easier.

1  A  Yes.
2  Q  Use this one. And using your set of
3  records.
4  A  Sorry, which was this number?
5  Q  0076 -- no, I'm sorry, 076.
6  A  Yes.
7  Q  This record is dated May 4, 2004.
8  A  Yes.
9  Q  And at the top right, you see that
10 there is a pain scale there of 0 to 10?
11 A  That's correct.
12 Q  And 7-8 says "excruciating"; right?
13 A  Yes.
14 Q  And 7-8 on the pain scale is checked
15 marked; correct?
16 A  That's correct.
17 Q  Okay, so the assessment of Mr. Smith
18 on May 4, 2004 is excruciating pain?
19 A  That's correct.
20 Q  And the quality of his pain is
21 checked as sharp; right?
22 A  Correct.
23 Q  And then there is an arrow that says
24 "down to knee".
25 A  Correct.

1  Q  And if you look at the little diagram
2  of the human body to the left, it says "knees
3  and ankles hurt left and right".
4  A  That's correct.
5  Q  You know what, maybe that's left is
6  greater than right?
7  A  It's probably left greater than
8  right, yes.
9  Q  In any event, they apparently both
10 hurt?
11 A  That's correct.
12 Q  And then on other -- it appears to
13 say doing backbends?
14 A  That's correct.
15 Q  Okay. And then it says: "No
16 triangle in pain". That triangle means change;
17 correct?
18 A  I take this to mean that he gets no
19 change in his pain when he does backbends.
20 Q  Right. And would that be the pain
21 that's reported as excruciating in the box on
22 the upper right?
23 A  Yes.
24 Q  Okay.
25 A  Well, I accept that's probably right.

1  Q  Okay. And if you turn two more
2  pages.
3  A  Well, can we finish that notation?
4  "Felt good."
5  Q  Right, "after last visit".
6  A  "After last visit".
7  Q  Difficult to sleep.
8  A  Difficulty to sleep.
9  Q  Okay, anything else you want to talk
10 about on that?
11 A  Not on that page.
12 Q  All right. Then let's turn to
13 page 74, go two more pages.
14 A  (Referring to document.) This is
15 moving on a bit in time.
16 Q  Yes, it is. And we'll come back and
17 fill in the blanks, but on this physical
18 therapy note, this is actually two days later,
19 it's dated May 6, 2004?
20 A  Uhm hum.
21 Q  And it says "no change in pain";
22 right?
23 A  Correct.
24 Q  So we can assume that since he was
25 seen on May 4, and now it's two days later on

1  May 6th and the note says "no change in pain"
2  that Mr. Smith is still experiencing
3  excruciating pain?
4  A  That's one interpretation. The other
5  interpretation is that his pain had been
6  getting better because of what we have just
7  read. His flexibility was getting better.
8     And that he was, if we look at page 00077,
9  "Pain tolerated by today's treatment good".
10 His irritation is said to be moderate. His
11 mobility is said to be increasing with increase
12 lumbar extension noted. Pelvic alignment good.
13 And his strength and endurance, I read that as
14 good, but it's a little unclear what it is.
15 Q  I read that as down arrow apostrophe
16 D, decreased?
17 A  I don't read it as that. I don't see
18 an arrow.
19 Q  You don't see that first line as an
20 arrow pointing down?
21 A  No.
22 Q  Well, it certainly doesn't say the
23 word "good"?
24 A  You see, I accept -- well, I think
25 we'll have to accept an ambiguity. The other

Page 437

1  are filling out the discharge summary. And
2  it's dated 6/30, but this reports the same
3  thing as we just read in the May 6, 2004 note;
4  correct?
5      A   I will accept that.
6      Q   And then it says under "Comments:
7  Patient voiced concern that something serious
8  is going on". Do you see that?
9      A   Yes.
10     Q   He's going to another neurologist;
11 right?
12     A   Correct.
13     Q   Mr. Smith was concerned at some point
14 after May 6, 2004 when he asked to be
15 discharged and before his death, that something
16 very serious was going on. You don't disagree
17 with that; right?
18         MR. FINKELSTEIN: Objection.
19         THE WITNESS: By this point in time
20     he was taking Neurontin.
21 BY MS. McGRODER:
22     Q   And this note doesn't say anything
23 about Neurontin; does it?
24     A   At this point in time he was taking
25 Neurontin.

Page 438

1      Q   That's not my question, Professor
2  Trimble. Did you hear my question?
3      A   Would you repeat the question.
4      Q   Yes. My question is: There is
5  nothing in this note about taking Neurontin?
6      A   That is correct.
7      Q   And at this point in time, sometime
8  after May 6 and sometime before he dies, he is
9  reporting to the therapist, presumably on May
10 6, because that's the last time they saw him,
11 that he's concerned that something serious is
12 going on with his health; right?
13     A   Something series is going on, I don't
14 think --
15     Q   Well, what's his health problem,
16 Professor Trimble?
17     A   Well, he says something serious is
18 going on.
19     Q   Yes, he does.
20     A   It does not say anything about
21 serious going on with his health.
22     Q   Okay. All right, then. Can you
23 please turn to Exhibit number 18.
24     A   Can I give you that one back.
25     Q   Put it in the pile.

Page 439

1      A   Okay.
2      Q   Do you have Exhibit 18 in front of
3  you?
4      A   No, I don't think --
5      Q   (Referring to documents.) There you
6  go.
7      A   Thank you. (Referring to document.)
8      Q   Now, if you will turn to page 006,
9  DPM 006, just the third to the last page.
10     A   Okay.
11     Q   By the way --
12     A   We've seen this one before.
13     Q   Well, we have seen -- we have talked
14 about the top two notes, we haven't talked
15 about the handwritten note at the bottom.
16 Okay?
17     A   Yes.
18     Q   Have you ever seen that handwritten
19 note before?
20     A   Yes.
21     Q   All right. Did you take into
22 consideration, when forming your opinion in
23 this case, that Mr. Smith, at or around May 6,
24 2004 was concerned that something serious was
25 going on?

Page 440

1      A   It's a statement that he makes, which
2  I take into consideration as reflecting on his
3  mental state.
4      Q   I'm not asking you --
5      A   Not on his physical state.
6      Q   I'm not asking you how you took it
7  into consideration, I'm asking you if you did.
8      A   Yes.
9      Q   Did you take that statement into
10 consideration when you formed your opinions in
11 this case?
12     A   Yes.
13     Q   And is that statement referenced
14 anywhere in your report?
15     A   Not directly.
16     Q   Not at all?
17     A   Not at all, no. That's agreed.
18     Q   In this May 4 note --
19     A   May 4.
20     Q   I'm sorry, May 5.
21     A   The one at the bottom, yes, okay.
22 (Reviewing document.)
23     Q   Before we get there, Professor
24 Trimble, let me ask you this:
25         If Mr. Smith was not concerned about his

26 (Pages 437 to 440)

1 physical health and his pain --
2    A   Uh hum.
3    Q   Why would he be telling the physical
4 therapist that he was going to see a
5 neurologist?
6       MR. FINKELSTEIN: Objection.
7       THE WITNESS: Oh, I think he was
8    concerned to get further treatment. And
9    as we know, he had made plans to see
10    somebody else the day after he died.
11 BY MS. McGRODER:
12    Q   And that person was a neurologist;
13 right?
14    A   That person was either -- well,
15 neurologist or neurosurgeon, yes.
16    Q   Okay.
17    A   But I don't know exactly, yes.
18    Q   Okay. On the 5/5/04 note in
19 Exhibit 18 the handwriting says "Patient
20 called, complaint of pricking".
21    Do you see that?
22    A   Yes.
23    Q   Slash "sticking feeling in buttock
24 and legs. He states that he is taking Advil,
25 Neurontin, Lortab with no relief"; right?

1    A   Correct.
2    Q   So the conservative therapy he's
3 getting, including his physical therapy, is not
4 give him any relief; right?
5    A   That's correct. In this note.
6    Q   And the next line says: "He is
7 having physical therapy at present, but that
8 hasn't helped so far"; right?
9    A   Correct.
10    Q   So right now with conservative
11 therapy, including medications and physical
12 therapy, he is not getting any pain relief?
13    A   That is incorrect.
14    Q   The last recorded pain scale reported
15 by Mr. Smith on May 6, 2004, states that he is
16 rating his pain at a scale of 7-8, which is
17 characterized as excruciating pain; correct?
18    A   That is correct.
19    Q   Is there any other pain scale after
20 May 6 2004 in which Mr. Smith rates his pain?
21    A   Not that I know of.
22    Q   Okay. And then the next part of the
23 May 5, 2004 note says "ESI --" we have talked
24 about that; right?
25    A   Those are the, probably the facet,

1 F-A-C-E-T, injections.
2    Q   Well, in fact, they are epidural
3 steroid injections; right?
4    A   Yes.
5    Q   That's what ESI stands for?
6    A   Yes.
7    Q   "ESI has been authorized by
8 George --" something -- "but patient does not
9 want to do that now"; right?
10    A   Correct.
11    Q   "Will call back if he decides to take
12 advantage of ESI at later date".
13    A   Correct.
14    Q   Correct?
15    A   That's correct.
16    Q   There is one more line on this
17 handwritten note. And you can see a trace of
18 it at the bottom.
19    A   Yeah, I have never seen the --
20    Q   You've never seen it?
21    A   No.
22    Q   Nor I. Is it possible that Mr. Smith
23 thought an epidural steroid injection would not
24 help him?
25    A   It's possible.

1    Q   Are these statements made on May 5,
2 2004 similar to the statements he made in March
3 of 2003 before he had lumbar surgery?
4    A   There is a similarity there, yes.
5    Q   Did you consider the fact that
6 Mr. Smith called his physician on May 5, 2004
7 to report that he was in pain, and that his
8 medications, his physical therapy were not
9 helping him when you formed your causation
10 opinion in this case?
11    A   I did. Yes, I did.
12    Q   And if you turn to Exhibit 20.
13    A   (Referring to document.)
14    Q   The second to the last page.
15    A   (Referring to document.)
16    Q   These are the handwritten notes of
17 Mr. Smith on his medical records.
18    A   Yes.
19    Q   Now, let me just ask you something
20 timing wise. If you turn to the second to the
21 last page.
22    A   Excuse me, I'm not --
23    Q   Go one more page.
24    A   This one here?
25    Q   There you go.

Page 445

1  A  Yes.
2  Q  May 5, 2004?
3  A  Yes.
4  Q  That's the same date as the record we
5  just read --
6  A  That's correct.
7  Q  -- from Dr. McComb's office; correct?
8  A  That's correct.
9  Q  And it says "Called to Gloria at
10 McCombs about pricking. She called back, they
11 have nothing to offer but injections at White
12 Bridge Road".
13 A  Correct.
14 Q  So Mr. Smith understood that the
15 doctor's office had nothing to offer him except
16 these steroid injections?
17 A  That's correct.
18 Q  And so this note is written on
19 5/5/04, the same day he makes the phone call.
20 And if you go to the preceding page, it's
21 written after the March 31, 2004 note; correct?
22 A  That's correct.
23 Q  So would you assume from this that
24 Mr. Smith obtained his medical record at some
25 point after March 31, 2004?

Page 446

1  A  Yes.
2  Q  Okay. And then the last note he
3  makes, is the same day he makes the phone call
4  to McComb's office?
5  A  That's correct.
6  Q  And the McCombs record isn't included
7  in this set in Exhibit 20; right?
8  A  That's correct.
9  Q  Did you consider when you formed your
10 causation opinion in this case about Neurontin,
11 that Mr. Smith learned on May 5, 2004 that
12 McCombs office has nothing to offer him except
13 epidural steroid injections?
14 A  I did.
15 Q  Do you believe, do you have the
16 opinion today that Mr. Smith had severe chronic
17 pain on May 5, 2004?
18 A  He was continuing to suffer from
19 chronic pain, that's correct.
20 Q  Had Mr. Smith had epidural steroid
21 injections in the past?
22 A  I don't believe so, but I may be
23 incorrect. I don't believe he had.
24 Q  Did you go back to look to see
25 whether the epidural steroid injections

Page 447

1  Mr. Smith had in the past were helpful to him?
2     MR. FINKELSTEIN: Objection.
3     THE WITNESS: Being not orthopaedic
4  and not even being certain of the exact
5  meaning of those terms, I do not have a
6  comment to make about his epidural steroid
7  injections.
8  BY MS. McGRODER:
9  Q  Well, you did not go and look up what
10 an epidural steroid injection is before you
11 gave your opinions in this case?
12 A  I know what they are, but I'm not an
13 orthopaedic expert, and I have no idea of the
14 expectations of those treatments, or, indeed,
15 how they are given.
16 Q  Did you look through the medical
17 records of Mr. Smith to determine whether he
18 ever got any relief whatsoever from an epidural
19 steroid injection?
20 A  I do not know if he ever had any
21 relief from an ESI.
22 Q  And that was not important to your
23 consideration of what the cause was of
24 Mr. Smith's suicide?
25 A  No.

Page 448

1  Q  Again, at this point, in 2004, this
2  can be differentiated from Mr. Smith's
3  experience in 2003, because at this time
4  there's nothing, Mr. Smith reports there is
5  nothing that can help him; right?
6  A  He has made appointment to see
7  another neurologist. Which he would not have
8  done if he did not think there was another
9  avenue to explore. So I don't agree there was
10 nothing.
11 Q  Well, in Mr. Smith's perception on
12 May 5, 2004, he says they have nothing to offer
13 but injections; right?
14 A  That particular office had nothing to
15 offer but injections.
16 Q  And he didn't want injections; right?
17 A  He did not want any further
18 injections.
19 Q  And surgery is not an option for him
20 at this point; correct?
21 A  That appears to be the case.
22 Q  Do you know who made the appointment
23 for Mr. Smith with Dr. Chang?
24 A  No.
25 Q  Do you know whether Mr. Smith made

28 (Pages 445 to 448)

1  that appointment?
2  A  I do not know who made the
3  appointment.
4  Q  Do you know whether Mr. Smith wanted
5  to go to the appointment?
6  A  I do not know whether Mr. Smith
7  wanted to go to the appointment.
8  Q  Do you know who found the
9  neurosurgeon, Dr. Chang, for Mr. Smith to see?
10  A  I think it was a family member, but I
11  do not know exactly who it was.  In the
12  depositions that I read, I remember somebody
13  referring to it, but I don't know which family
14  member it was.
15  Q  You were not aware, then, that it was
16  his daughter, Gail, who identified Dr. Chang as
17  a possible physician for Mr. Smith to see?
18  A  I have just said it was within the
19  depositions that I read the other day, and it
20  was a family member, one of his daughters.
21  Maybe she had heard of this person from
22  somebody else.  Does that sound right?  It was
23  a family member anyway.
24  Q  Do you know whether it was Gail who
25  made the appointment with Dr. Chang?

1  A  No, I don't.
2  Q  On May 5, 2004, when Mr. Smith makes
3  this handwritten notation, you agree that his
4  understanding was he was not a candidate for
5  surgery?
6  A  That's correct.
7  Q  In the past, at any time when
8  Mr. Smith had orthopaedic or neuropathic joint
9  and pain problems, did he ever find relief from
10  conservative therapy?
11      MR. FINKELSTEIN:  Objection.
12      THE WITNESS:  Well, I have just taken
13   you through some references where he was
14   getting relief from his physical therapy
15   in the two weeks prior to his death.
16  BY MS. McGRODER:
17  Q  And those are the records that we
18  just talked about --
19  A  Correct.
20  Q  -- where Mr. Smith in the end said
21  you know what, these don't help me after I
22  leave here, and so I want to discontinue;
23  correct?
24  A  That is correct.
25  Q  Okay.  And so now I'm talking, you

1  know, think back on Mr. Smith's medical
2  history, when he --
3  A  Yes.
4  Q  -- has full knee replacements, full
5  hip replacements, lumbar surgery, surgery on,
6  ah, a hernia repair, in Mr. Smith's medical
7  history, would you agree would me that the best
8  treatment Mr. Smith had and the ones he found
9  most effective were surgical?
10      MR. FINKELSTEIN:  Objection.
11      THE WITNESS:  He got relief from his
12   surgical interventions, that is correct.
13  BY MS. McGRODER:
14  Q  Would you agree with me that
15  Mr. Smith felt hopeless after he learned that
16  surgery was not an option?
17      MR. FINKELSTEIN:  Objection.
18      THE WITNESS:  The term "hopeless" is
19   reflecting on Mr. Smith's mental state,
20   and it may well be that he had an
21   alteration of his mental state at this
22   time, and that helplessness was a part of
23   that.
24  BY MS. McGRODER:
25  Q  Would you agree with me that

1  Mr. Smith believed or perceived his pain to be
2  severe and unrelenting between January of 2004
3  and May 13, 2004?
4  A  I have emphasized that there were
5  fluctuations in the way that he perceived his
6  treatments, and also there were fluctuations in
7  the severity of his pain.
8  Q  Would you agree with me that
9  Mr. Smith considered his pain as excruciating
10  on the last medical record in which his pain is
11  described?
12  A  That is correct.
13  Q  And the date of that record is May 4,
14  2004?
15  A  That is correct.
16  Q  Are you aware, Professor Trimble,
17  that the peer reviewed literature states that
18  the presence of one or more chronic pain
19  conditions is uniquely associated with suicide
20  ideation and suicide attempts?
21      MR. FINKELSTEIN:  Objection.
22      THE WITNESS:  I think yesterday I
23   have made it clear that pain, in and of
24   itself, cannot be considered a risk factor
25   for suicide.

Page 497

1  MS. McGRODER: I'm handing you now
2  what we have marked as Exhibit 25, which
3  is the suicide note.
4  (Exhibit 25 marked for
5  identification.)
6  THE WITNESS: Thank you.
7  BY MS. McGRODER:
8  Q  Could you please read the suicide
9  note into the record.
10  A  The first sentence has most of the
11  letters underlined. "Pain has taken over my
12  mind and body".
13  Q  Can I stop you, I'm sorry, Professor
14  Trimble. Can you just hold that suicide letter
15  up, and show the jury. Just next to your face,
16  so they can see it, that's fine.
17  A  (Witness complies.)
18  Q  Thank you. And so that they can see
19  how that first sentence "Pain has taken over my
20  mind and body" is underlined. Okay, thank
21  you.?
22  MR. FINKELSTEIN: Okay, you can read.
23  A  "I need back surgery. Left and right
24  rotator cuffs, right bicep torn, back surgery
25  to correct pain in the legs. Forgive me, I

Page 498

1  cannot go on like this. I cannot have my body,
2  the temple of the holy spirit, cut on any more.
3  I have talked to God all night, and he
4  understands".
5  Q  Does the fact that Mr. Smith wrote a
6  suicide note suggest absence of impulsivity or
7  presence of impulsivity?
8  MR. FINKELSTEIN: Objection.
9  THE WITNESS: In terms of the timing
10  of it, it implies that he wrote this in
11  the morning of his suicide. It was done
12  immediately prior to his suicide. So that
13  would suggest the impulsivity of it all.
14  BY MS. McGRODER:
15  Q  And how do you know that he did it
16  immediately prior to his suicide?
17  A  Well, he had talked to God all night,
18  and his suicide was in the very early morning.
19  Q  So is it possible he wrote the
20  suicide note at 4:00 a.m.?
21  A  It's possible.
22  Q  Is that early in the morning?
23  A  It's early in the morning.
24  Q  What about 3:00 a.m., is 3:00 a.m.
25  early in the morning?

Page 499

1  A  It depends on what time you're used
2  to getting out of bed. But my understanding is
3  this family were early risers.
4  Q  So Mr. Smith might have written this
5  note at 3:00 a.m.?
6  A  He might have written it at 3:00 a.m.
7  Q  Might he have written it at 2:00
8  a.m.?
9  A  He says I have talked to God all
10  night.
11  Q  So maybe 2:00 a.m. is too early?
12  A  I would have thought so.
13  Q  So Mr. Smith committed suicide at
14  approximately 5:00 a.m.; correct?
15  A  Correct.
16  Q  So it's possible that Mr. Smith, you
17  would agree with me, wrote this note as much as
18  two hours before he committed suicide?
19  A  That's possible.
20  Q  If he wrote the note two hours before
21  the suicide, does that suggest the presence of
22  impulsivity or absence of impulsivity?
23  A  Presence, I would consider.
24  Q  So an impulsive suicide can be
25  considered, in your opinion, for two hours

Page 500

1  prior to the suicide?
2  A  Well, he -- that's a time scale you
3  have given me, two hours would be fine. To
4  assume that things were reaching a peak, and he
5  writes the suicide note, and --
6  Q  Well, how long -- I'm sorry. Were
7  you finished?
8  A  Then he goes on and does it.
9  Q  How long before a suicide --
10  withdrawn.
11  If a person who is contemplating
12  suicide -- withdrawn.
13  With a person who is contemplating
14  suicide, how long before the suicide can the
15  impulse last, in your opinion?
16  MR. FINKELSTEIN: Objection.
17  THE WITNESS: I really don't know.
18  Impulsivity implies actions coming
19  out of the blue, but it doesn't
20  necessarily imply an immediate time.
21  Obviously, it implies some time
22  restriction, but the word "impulsive"
23  doesn't necessarily imply everything
24  happens instantaneously within 5 minutes.
25

41 (Pages 497 to 500)