# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    IN RE:                          Videotape
      NEURONTIN MARKETING, SALES   :  Deposition of:
 4    PRACTICES AND PRODUCTS       :
      LIABILITY LITIGATION         :  MICHAEL TRIMBLE
 5                                 :
      -----------------------------
 6    THIS DOCUMENT RELATES TO:

 7    Smith, et al. v Pfizer, et al.

 8    Case No. 05-cv-11515-PBS

 9

10

11          TRANSCRIPT of testimony as taken by and

12    before PATRICIA A. SANDS, a Shorthand Reporter

13    and Notary Public of the States of New York and

14    New Jersey, at the offices of Lanier Law Firm,

15    126 East 56th Street, New York, New York, on

16    Tuesday, September 2, 2008, commencing at 9:15

17    in the forenoon.

18

19

20         REPORTING SERVICES ARRANGED THROUGH:
           VERITEXT/NEW JERSEY REPORTING COMPANY
21              25B Vreeland Road, Suite 301
              Florham Park, New Jersey 07932
22     Phone: (973) 410-4040    Fax: (973) 410-1313

23

24

25
```

```
 1  APPEARANCES:
 2
 3  FINKELSTEIN & PARTNERS
    436 Robinson Avenue
 4  Newburgh, New York 12550
    BY:  ANDREW G. FINKELSTEIN, ESQ.
 5  For the Plaintiff
    800 634-1212
 6
 7  THE LANIER LAW FIRM
    Tower 56
 8  126 East 56th Street, 6th Floor
    New York, New York 10022
 9  BY:  KENNETH SOH, ESQ.
    For the Plaintiff
10  212 421-2800
11
    SHOOK, HARDY & BACON, LLP
12  2555 Grand Boulevard
    Kansas City, Missouri 64108-2613
13  BY:  LORI CONNORS McGRODER, ESQ.
    For the Defendant
14  816 474-6550
15
16  ALSO PRESENT:
17    Adam DiCola, Videographer
18
19
20
21
22
23
24
25
```

```
 1         E X H I B I T S, continued.
 2
 3  NUMBER     DESCRIPTION                PAGE
 4  TRIMBLE
 5
 6  Exhibit 10  Expert reports             128
 7  Exhibit 11  Gabapentin papers          129
 8  Exhibit 12  Questionaire               130
 9  Exhibit 13  Re GABA receptors          132
10  Exhibit 14  PubMed article             134
11  Exhibit 15  Questionaire               140
12  Exhibit 16  APA Guidelines             214
13  Exhibit 17  Cato's medical records     286
14  Exhibit 18  McComb's records           311
```

```
                 I N D E X

    WITNESS                      DIRECT
    PROFESSOR MICHAEL TRIMBLE

    Ms. McGroder                   6

                 E X H I B I T S

    NUMBER     DESCRIPTION                PAGE
    TRIMBLE

    Exhibit 1   Declaration                37
    Exhibit 2   Aid memoir                 37
    Exhibit 3   Fromson letter             40
    Exhibit 4   Table 15 & pg 37 of report 89
    Exhibit 5   Table 7.20                 95
    Exhibit 6   Graphic                    97
    Exhibit 7   Article                   112
    Exhibit 8   Literature                113
    Exhibit 9   Notes                     117
```

```
 1       PROF. MICHAEL TRIMBLE,
 2       Institute of Neurology
         Queen Square
 3       London  WCIN3CB,
         having been sworn, was examined
 4       and testified as follows:
 5
 6
 7            THE VIDEO OPERATOR:  Please standby.
 8       We are on the record.  My name is
 9       Adam DiCola of Veritext Services.  The
10       date today is September 2, 2008, and the
11       time is approximately 9:15 a.m.
12            This deposition is being held in the
13       office of Lanier Law Firm, located at 126
14       East 56th Street, New York, New York.
15            The caption of this case is Smith et
16       al., versus Pfizer, et al., in the United
17       States District Court, District of
18       Massachusetts.  Case number
19       05-cv-11515-PBS.
20            The name of the witness is Michael
21       Trimble.
22            At this time the attorneys will
23       identify themselves and the parties they
24       represent, after which our court reporter,
25       Patricia Sands, will swear in the witness
```

          with the Gabapentin. And probably 24, 48
          hours, two days.
     BY MS. McGRODER:
     Q    What is the half life of Neurontin?
     A    Six hours. Depending on age, of
     course.
     Q    What's the half life in elderly
     individuals?
     A    The half life is much extended in
     elderly individuals.
     Q    And what's your basis for saying
     that?
     A    The half life of all drugs is
     extended in elderly individuals, because they
     have less efficient mechanisms to clear the
     drug from the system.
     Q    You are aware, Dr. Trimble, that
     Neurontin is not metabolized by the liver;
     correct?
          MR. FINKELSTEIN: Objection.
          THE WITNESS: No, it's the kidney
          that is, begins to fail as you get older.
     BY MS. McGRODER:
     Q    So short of kidney failure --
     A    Well, it's not failure, it's just

     that older kidneys don't get rid of the drugs
     so efficiently.
     Q    So are there data that support your
     opinion, other than this principle, this, I
     guess you would call it pharmacologic
     principles you're relying on, are there data
     that support that it takes longer for elderly
     to eliminate Gabapentin than other age groups?
     A    I'm not certain if there are specific
     studies on the elimination rate of Gabapentin
     specifically in the elderly, but I don't see
     why Gabapentin would be any different from a
     vast number of other drugs that have been
     looked at in elderly people.
     Q    And the other drugs that you're
     thinking of are anti-epileptics?
     A    Well, no, just as a general principle
     of pharmacology.
     Q    So as you sit here today, you have no
     data to support your opinion that Neurontin
     takes longer -- would have a longer half life
     in the elderly, because it takes longer to
     eliminate?
     A    I do not, but my belief is that the
     answer to your question would be found in

     company documents.
     Q    Have you looked for those company
     documents?
     A    I haven't specifically looked for
     those company documents.
     Q    Where would you look?

     A    Well, it may well be that the company
     in the very early days when you have a new
     product, you look for biological variables in
     the human volunteer population.
     Q    The pharmacokinetic studies?
     A    Yes. And often these are not
     published and whatever, so but it may well be
     that the data is available.
     Q    Mr. Finkelstein didn't provide you
     with the pharmacokinetic studies --
     A    No.
     Q    -- related to Gabapentin?
     A    No. No.
     Q    I want to make sure I got this. I
     think when I asked you how many days it took to
     get to steady state, you said it would depend
     on the half life; right?
     A    The steady state is usually related

     to the half life.
     Q    Okay, so if it takes 48 hours in a
     regular person based on the half life of
     Neurontin to eliminate, are you suggesting it
     takes longer to get to a steady state in
     elderly people because it is slower at
     eliminating?
     A    Yes.
     Q    Okay, so what is the half life, in
     your opinion, in elderly individuals?
     A    I don't have those data at my
     fingertips. But it's easy to look up on the
     net.
     Q    Do you think it's something longer
     than six hours?
     A    It could be longer, yeah.
     Q    Well, do you think it's double?
     A    It could well be. But again --
     Q    Do you think it's triple?
     A    It depends on the individual, and how
     their general metabolism is, how they're
     functioning.
          So the elderly have other -- I don't want
     to go into this -- but elderly have other
     issues, like fat deposition which is different,

Page 258

you're missing.
THE WITNESS: It's a single dose?
This is a single-dose study?
BY MS. McGRODER:
Q Yes, let's talk single dose for now.
A Okay, because that's crucial, obviously, but I don't know, uhm -- I don't know if that's even been looked at. It probably has, but with the short half life, it probably would clear within 24 hours.
Q Is it not important to your opinion in the Smith case to know how long it takes for Neurontin to clear from the system following the last dose?
A That's a different question, though. The question as to what happens when you take a single dose is very different to somebody who takes multiple doses, because the body becomes saturated with the product. And if you stop taking the drug, you will still get the product emerging from fatty tissue, for example.
So the delay, when you've been taking the drug chronically, is very different.
Q Okay, let's say you have been taking Gabapentin for two months.

Page 259

A Okay.
Q And you take your last dose.
A Okay.
Q How long before there is no appreciable Gabapentin in your system?
A I would say several days, at least.
Q And on what do you base your opinion that it would be several days at least?
A On what I've just said, that the drug has to come out of the body tissue, body system. But that is a guess. As far as I know, it's not been looked at.
Q What is the point at which the drug would have no clinical effect following last ingestion?
A That is a different question again.
Q Yes, that's why I asked it.
A If you have a drug which acts on the brain and influences brain neurochemistry, you may well have an effect on the central nervous system which by far outlasts the effect of the amount of the blood, of what's in the blood.
So once you have got the blood into the brain, you're talking again about a different system to just looking at what comes out when

Page 260

you stop the drug from the blood stream.
Q All right, and so my question is related to clinical effects. So maybe you tried to answer my question and I just didn't understand your answer.
But my question is: How long after your last ingestion of Gabapentin would you expect there to be any clinical effect -- let's say, let's say you're taking Gabapentin for pain reduction -- how long after your last dose of Gabapentin would you have clinical, the clinical effect of pain reduction?
MR. FINKELSTEIN: Objection.
I don't know that there's any efficacy that it's ever been established that Gabapentin has any effect --
MS. McGRODER: Objection to form is fine.
MR. FINKELSTEIN: -- on pain reduction.
THE WITNESS: I do not know the literature on the use of Gabapentin in chronic pain.
BY MS. McGRODER:
Q All right, well, let's talk about an

Page 261

epileptic, then. Do you know the literature on epilepsy and Gabapentin?
A I do.
Q Okay, so let's assume that somebody's on Gabapentin for epilepsy, and they take their last dose.
A Okay.
Q They just decide I'm not taking this drug anymore.
A Yup.
Q They've taken their last dose.
How long after the last dose will the person no longer have seizure control, or have the clinical benefit of the drug?
A As far as I'm aware, if you stop Gabapentin, you do not get a rebound of seizures, withdrawal seizures.
What you do get with some other anti-epileptic drugs -- the point of that is to say that the lingering anti-epileptic effect must go on several days.
Q And is there any literature that supports your opinion that there is lingering effect that goes on for several days?
A Well, I have not read a literature

VERITEXT CORPORATE SERVICES (800) 567-8658

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                        Continued
     IN RE:                               Videotape
 4   NEURONTIN MARKETING, SALES   :       Deposition of:
     PRACTICES AND PRODUCTS       :
 5   LIABILITY LITIGATION         :       MICHAEL TRIMBLE
                                  :
 6   ------------------------------

 7   THIS DOCUMENT RELATES TO:

 8   Smith, et al. v Pfizer, et al.

 9   Case No. 05-cv-11515-PBS

10

11

12

13         TRANSCRIPT of testimony as taken by and

14   before PATRICIA A. SANDS, a Shorthand Reporter

15   and Notary Public of the States of New York and

16   New Jersey, at the offices of Lanier Law Firm,

17   126 East 56th Street, New York, New York, on

18   Wednesday, September 3, 2008, commencing at

19   9:16 in the forenoon.

20

21

22         REPORTING SERVICES ARRANGED THROUGH:
           VERITEXT/NEW JERSEY REPORTING COMPANY
23              25B Vreeland Road, Suite 301
              Florham Park, New Jersey 07932
24    Phone: (973) 410-4040     Fax: (973) 410-1313

25
```

# Page 341

APPEARANCES:

FINKELSTEIN & PARTNERS
436 Robinson Avenue
Newburgh, New York 12550
BY: ANDREW G. FINKELSTEIN, ESQ.
For the Plaintiff
800 634-1212

THE LANIER LAW FIRM
Tower 56
126 East 56th Street, 6th Floor
New York, New York 10022
BY: KENNETH SOH, ESQ.
For the Plaintiff
212 421-2800

SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
BY: LORI CONNORS McGRODER, ESQ.
For the Defendant
816 474-6550

ALSO PRESENT:
 Adam DiCola, Videographer

# Page 342

I N D E X

WITNESS                    DIRECT
PROFESSOR MICHAEL TRIMBLE

 Ms. McGroder                344

E X H I B I T S

NUMBER    DESCRIPTION              PAGE
TRIMBLE

EXHIBIT 19   Shell report              352
EXHIBIT 20   Neurogurgical records     399
EXHIBIT 21   UMC notes                 404
EXHIBIT 22   Juurlink article          455
EXHIBIT 23   Police report             482
EXHIBIT 24   Medical examiner's report 489
EXHIBIT 25   Suicide note              497
EXHIBIT 26   Photo                     508
EXHIBIT 27   Wood letter               539

# Page 343

PROF. MICHAEL TRIMBLE,
Institute of Neurology
Queen Square
London WCIN3CB,
having been previously sworn, was
examined and testified as follows:

        THE VIDEO OPERATOR: Please standby.
        We are on the record. My name is
Adam DiCola of Veritext Corporate
Services. The date today is September 3,
2008, and the time is approximately
9:16 a.m. This deposition is being held
in the office of Lanier Law Firm, located
at 126 East 56th Street, New York, New
York.
        The caption of this case is Smith, et
al., versus Pfizer, et al., in the United
States District Court, District of
Massachusetts, Case Number
05-CV-11515-PBS.
        The name of the witness is Professor
Michael Trimble.
        At this time the attorneys will
identify themselves and the parties they
represent, after which our court reporter,
Patricia Sands, will swear in the witness

# Page 344

and we can proceed.
        MR. FINKELSTEIN: Andrew Finkelstein,
on behalf of the Smith family.
        MR. SOH: Ken Soh, on behalf of the
Smith family as well.
        MS. McGRODER: Lori McGroder, of
Shook, Hardy & Bacon, on behalf of Pfizer.
        MS. STEVENSON: Jennifer Stevenson,
of Shook, Hardy & Bacon, also on behalf of
Pfizer.
        THE WITNESS: We did this yesterday.

CONTINUED DIRECT EXAMINATION
BY MS. McGRODER:
    Q  Professor Trimble, you know you're
still under oath; correct?
    A  Correct.
    Q  Did you do anything last night to
prepare for the continuation of your deposition
this morning?
    A  Last night and this morning I read
through my bundle of Mr. Smith's notes.
    Q  And those would be the medical
records marked as Exhibit --
    A  The ones that you had yesterday.

Page 501

BY MS. McGRODER:
Q  Does the literature report as a definition for impulsivity that the idea for the act of suicide occurs within 5 minutes of the suicide?
A  No.
Q  Did you look at the literature on that?
A  No, but I'm quite familiar with impulsive behaviors. We have done research in that area.
Q  Did you look at the literature on impulsive suicide behaviors?
A  Not especially.
Q  The behaviors you're referring to are aggression?
A  Aggressive behaviors, impulsive motor behaviors, obsessive compulsive behaviors. These kind of thing.
Q  Is obsessive compulsive behavior impulsive?
A  In certainly can be.
Q  And then the other one, apart from aggression, I think you said was impulsive motor disorders?

Page 502

A  In this country it's called Tourette syndrome, T-O-U-R-E-T-T-E syndrome, that people have compulsive and impulsive behaviors.
Q  And with Tourette syndrome, in your clinical practice is that considered part of your movement disorder practice?
A  Oh, yes.
Q  Okay. And so apart from impulsivity associated with those behaviors, movement disorder or obsessive compulsive or aggression, have you, in fact, studied the literature on impulsive suicide behavior?
A  Not specifically on impulsive suicide behavior.
Q  And you are not an expert in suicide behavior?
A  I am not a suicidologist, that is correct.
Q  And so you are not an expert in impulsive suicide behavior?
A  By definition.
Q  So you're not aware that the literature on impulsive suicide provides a definition of 5 minutes between the initiation of the thought of suicide and the actual

Page 503

suicide?
A  I am not.
Q  Reading this suicide note, is it now clear to you why Mrs. Smith said to the medical examiner that she did not want an autopsy, because Mr. Smith did not want to be cut on any more?
A  I'm just not certain of the link between her statement in the autopsy report and the suicide note. In other words, I'm not quite sure of the link between the two. I mean, he may have expressed an opinion before this suicide note about not having further operations.
Q  And so do you think it's coincidence that Mrs. Smith says "Richard's final wishes were not to be 'cut' on any more"?
A  Well, if she's referring to this document, then I accept that. But we have to just recall that he had expressed concern about having further surgery before, that was all.
Q  And so when Mr. Smith says "I don't want to be cut on any more", is that a reference, in your opinion, to future surgeries?

Page 504

A  That is certainly a possibility.
Q  It is it more likely than not that that's what he's referring to?
A  It is likely that that is what he is referring to.
    MS. McGRODER: Let's take a 3 minute break.
    THE VIDEO OPERATOR: Please standby. We are going off the record, the time is 1:23 p.m.
    (Recess.)
    THE VIDEO OPERATOR: Please standby. We are back on the record, the time is 1:31 p.m.
BY MS. McGRODER:
Q  Are you aware, Professor Trimble, that Mr. Smith laid a plastic sheet out on the bed to prevent the soiling of the bed with biohazard material before his suicide?
    MR. FINKELSTEIN: Objection.
    THE WITNESS: No, I'm not. I was not aware.
    THE VIDEO OPERATOR: Professor, your mic.
    THE WITNESS: No, I was not aware.

Page 549

1  he says it makes him loopy. But he, himself,
2  refers to the fact that he is on Neurontin.
3  And then the family depositions also consider
4  him to have been reliable on taking
5  medications. So I no reason to doubt the fact
6  he was taking Neurontin.
7      Q   Have you looked to see how many pills
8  were in the prescription vile of Neurontin that
9  Mr. Smith left on his dresser at the time of
10 his suicide?
11     A   I have not.
12     Q   So, again, you have no idea whether
13 he completed taking the pills that were
14 prescribed for him? The Neurontin pills that
15 were prescribed for him?
16     A   My understanding is that he had more
17 Neurontin given to him beyond those that were
18 prescribed in a script.
19     Q   Okay.
20     A   That's my understanding.
21     Q   Samples?
22     A   Well, in a sashay, as I believe.
23     Q   Well, we'll get there.
24     A   Okay.
25     Q   Right now the question is you don't

Page 550

1  know one way or the other whether he completed
2  taking the pills that were in the vile that he
3  filled at the pharmacy on March 9, 2004?
4      A   That is correct.
5      Q   And there could be a full vile of
6  pills left over, and that is something you
7  didn't consider?
8      A   That is correct.
9      Q   Do you know the exact number of
10 samples that were in Mr. Smith's possession?
11     A   I do not.
12     Q   Is there any evidence in the record
13 of the exact number of samples that Mr. Smith
14 took?
15     A   Not that I have seen.
16     Q   Do you consider anywhere in your
17 report Donna Smith's illness, her cancer as a
18 factor related to Mr. Smith's suicide?
19     A   I do not consider it a factor
20 relating to his suicide.
21     Q   It's not in your report?
22     A   It is not, and I do not consider it a
23 factor.
24     Q   Is it your opinion in this case that
25 Neurontin caused Mr. Smith's suicide because

Page 551

1  more likely than not his suicide was impulsive?
2      A   It has not so much to do with
3  impulsivity, it has to do with the alteration
4  of his mental state that occurs following the
5  ingestion of Gabapentin or Neurontin.
6      Q   Tell me specifically what evidence
7  you rely on, the factual evidence in the
8  record, that Mr. Smith's suicide was impulsive?
9          MR. FINKELSTEIN: Objection as to
10     form.
11         THE WITNESS: Well, I think I have a
12     difficulty with the term "impulsive". I'm
13     not certain --
14 BY MS. McGRODER:
15     Q   It's in your report?
16     A   Yes, but this was not a carefully
17 planned, documented suicide where everything
18 was put in context, everything was sorted out,
19 saying good-bye to people. This happened
20 suddenly.
21     Now the term "impulsive" is used in a
22 number of ways. I am using it to say that this
23 was not a carefully planned, or even
24 predictable suicide event. It came out of the
25 blue.

Page 552

1      Q   You testified yesterday that it is
2  most likely that at some point before March, or
3  in March, because of his "fiscal" problems he
4  was working part-time.
5      What fiscal problems were you referring
6  to?
7      A   Physical problems? I just didn't get
8  the question.
9      Q   Fiscal problem.
10     A   I wasn't sure whether you said
11 "fiscal" or "physical."
12     Q   Well, the transcript --
13         MR. FINKELSTEIN: They think you
14     said --
15     Q   Of course it's a draft, says
16 "fiscal".
17     A   No, physical.
18     Q   So the word you were using is
19 "physical"?
20     A   Physical, yes.
21     Q   All right. Are you aware of any
22 financial problems that the Smith family had at
23 any time in 2004?
24     A   No.
25     Q   How about 2003?

54 (Pages 549 to 552)