# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    IN RE:                        :  Videotape
      NEURONTIN MARKETING, SALES    :  Deposition of:
 4    PRACTICES AND PRODUCTS        :
      LIABILITY LITIGATION          :  MICHAEL TRIMBLE
 5                                  :
      ------------------------------
 6    THIS DOCUMENT RELATES TO:

 7    Smith, et al. v Pfizer, et al.

 8    Case No. 05-cv-11515-PBS

 9

10

11         TRANSCRIPT of testimony as taken by and

12    before PATRICIA A. SANDS, a Shorthand Reporter

13    and Notary Public of the States of New York and

14    New Jersey, at the offices of Lanier Law Firm,

15    126 East 56th Street, New York, New York, on

16    Tuesday, September 2, 2008, commencing at 9:15

17    in the forenoon.

18

19

20         REPORTING SERVICES ARRANGED THROUGH:
           VERITEXT/NEW JERSEY REPORTING COMPANY
21              25B Vreeland Road, Suite 301
              Florham Park, New Jersey 07932
22     Phone: (973) 410-4040    Fax: (973) 410-1313

23

24

25
```

Page 2

```
 1  APPEARANCES:
 2
 3  FINKELSTEIN & PARTNERS
    436 Robinson Avenue
 4  Newburgh, New York 12550
    BY: ANDREW G. FINKELSTEIN, ESQ.
 5  For the Plaintiff
    800 634-1212
 6
 7  THE LANIER LAW FIRM
    Tower 56
 8  126 East 56th Street, 6th Floor
    New York, New York 10022
 9  BY: KENNETH SOH, ESQ.
    For the Plaintiff
10  212 421-2800
11
    SHOOK, HARDY & BACON, LLP
12  2555 Grand Boulevard
    Kansas City, Missouri 64108-2613
13  BY: LORI CONNORS McGRODER, ESQ.
    For the Defendant
14  816 474-6550
15
16  ALSO PRESENT:
17    Adam DiCola, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                INDEX
 3
 4  WITNESS                       DIRECT
 5  PROFESSOR MICHAEL TRIMBLE
 6
 7    Ms. McGroder              6
 8
 9              EXHIBITS
10
11  NUMBER     DESCRIPTION              PAGE
12  TRIMBLE
13
14  Exhibit 1   Declaration              37
15  Exhibit 2   Aid memoir               37
16  Exhibit 3   Fromson letter           40
17  Exhibit 4   Table 15 & pg 37 of report  89
18  Exhibit 5   Table 7.20               95
19  Exhibit 6   Graphic                  97
20  Exhibit 7   Article                  112
21  Exhibit 8   Literature               113
22  Exhibit 9   Notes                    117
23
24
25
```

Page 4

```
 1          EXHIBITS, continued.
 2
 3  NUMBER     DESCRIPTION              PAGE
 4  TRIMBLE
 5
 6  Exhibit 10  Expert reports           128
 7  Exhibit 11  Gabapentin papers        129
 8  Exhibit 12  Questionaire             130
 9  Exhibit 13  Re GABA receptors        132
10  Exhibit 14  PubMed article           134
11  Exhibit 15  Questionaire             140
12  Exhibit 16  APA Guidelines           214
13  Exhibit 17  Cato's medical records   286
14  Exhibit 18  McComb's records         311
15
```

Page 5

```
 1  PROF. MICHAEL TRIMBLE,
 2    Institute of Neurology
      Queen Square
 3    London WCIN3CB,
      having been sworn, was examined
 4    and testified as follows:
 5
 6
 7        THE VIDEO OPERATOR: Please standby.
 8    We are on the record. My name is
 9    Adam DiCola of Veritext Services. The
10    date today is September 2, 2008, and the
11    time is approximately 9:15 a.m.
12        This deposition is being held in the
13    office of Lanier Law Firm, located at 126
14    East 56th Street, New York, New York.
15        The caption of this case is Smith et
16    al., versus Pfizer, et al., in the United
17    States District Court, District of
18    Massachusetts. Case number
19    05-cv-11515-PBS.
20        The name of the witness is Michael
21    Trimble.
22        At this time the attorneys will
23    identify themselves and the parties they
24    represent, after which our court reporter,
25    Patricia Sands, will swear in the witness
```

Page 250

1  with the Gabapentin. And probably 24, 48
2  hours, two days.
3  BY MS. McGRODER:
4  Q  What is the half life of Neurontin?
5  A  Six hours. Depending on age, of
6  course.
7  Q  What's the half life in elderly
8  individuals?
9  A  The half life is much extended in
10 elderly individuals.
11 Q  And what's your basis for saying
12 that?
13 A  The half life of all drugs is
14 extended in elderly individuals, because they
15 have less efficient mechanisms to clear the
16 drug from the system.
17 Q  You are aware, Dr. Trimble, that
18 Neurontin is not metabolized by the liver;
19 correct?
20     MR. FINKELSTEIN: Objection.
21     THE WITNESS: No, it's the kidney
22     that is, begins to fail as you get older.
23 BY MS. McGRODER:
24 Q  So short of kidney failure --
25 A  Well, it's not failure, it's just

Page 251

1  that older kidneys don't get rid of the drugs
2  so efficiently.
3  Q  So are there data that support your
4  opinion, other than this principle, this, I
5  guess you would call it pharmacologic
6  principles you're relying on, are there data
7  that support that it takes longer for elderly
8  to eliminate Gabapentin than other age groups?
9  A  I'm not certain if there are specific
10 studies on the elimination rate of Gabapentin
11 specifically in the elderly, but I don't see
12 why Gabapentin would be any different from a
13 vast number of other drugs that have been
14 looked at in elderly people.
15 Q  And the other drugs that you're
16 thinking of are anti-epileptics?
17 A  Well, no, just as a general principle
18 of pharmacology.
19 Q  So as you sit here today, you have no
20 data to support your opinion that Neurontin
21 takes longer -- would have a longer half life
22 in the elderly, because it takes longer to
23 eliminate?
24 A  I do not, but my belief is that the
25 answer to your question would be found in

Page 252

1  company documents.
2  Q  Have you looked for those company
3  documents?
4  A  I haven't specifically looked for
5  those company documents.
6  Q  Where would you look?
7
8  A  Well, it may well be that the company
9  in the very early days when you have a new
10 product, you look for biological variables in
11 the human volunteer population.
12 Q  The pharmacokinetic studies?
13 A  Yes. And often these are not
14 published and whatever, so but it may well be
15 that the data is available.
16 Q  Mr. Finkelstein didn't provide you
17 with the pharmacokinetic studies --
18 A  No.
19 Q  -- related to Gabapentin?
20 A  No. No.
21 Q  I want to make sure I got this. I
22 think when I asked you how many days it took to
23 get to steady state, you said it would depend
24 on the half life; right?
25 A  The steady state is usually related

Page 253

1  to the half life.
2  Q  Okay, so if it takes 48 hours in a
3  regular person based on the half life of
4  Neurontin to eliminate, are you suggesting it
5  takes longer to get to a steady state in
6  elderly people because it is slower at
7  eliminating?
8  A  Yes.
9  Q  Okay, so what is the half life, in
10 your opinion, in elderly individuals?
11 A  I don't have those data at my
12 fingertips. But it's easy to look up on the
13 net.
14 Q  Do you think it's something longer
15 than six hours?
16 A  It could be longer, yeah.
17 Q  Well, do you think it's double?
18 A  It could well be. But again --
19 Q  Do you think it's triple?
20 A  It depends on the individual, and how
21 their general metabolism is, how they're
22 functioning.
23     So the elderly have other -- I don't want
24 to go into this -- but elderly have other
25 issues, like fat deposition which is different,

you're missing.
THE WITNESS: It's a single dose?
This is a single-dose study?
BY MS. McGRODER:
Q Yes, let's talk single dose for now.
A Okay, because that's crucial, obviously, but I don't know, uhm -- I don't know if that's even been looked at. It probably has, but with the short half life, it probably would clear within 24 hours.
Q Is it not important to your opinion in the Smith case to know how long it takes for Neurontin to clear from the system following the last dose?
A That's a different question, though. The question as to what happens when you take a single dose is very different to somebody who takes multiple doses, because the body becomes saturated with the product. And if you stop taking the drug, you will still get the product emerging from fatty tissue, for example.
So the delay, when you've been taking the drug chronically, is very different.
Q Okay, let's say you have been taking Gabapentin for two months.

A Okay.
Q And you take your last dose.
A Okay.
Q How long before there is no appreciable Gabapentin in your system?
A I would say several days, at least.
Q And on what do you base your opinion that it would be several days at least?
A On what I've just said, that the drug has to come out of the body tissue, body system. But that is a guess. As far as I know, it's not been looked at.
Q What is the point at which the drug would have no clinical effect following last ingestion?
A That is a different question again.
Q Yes, that's why I asked it.
A If you have a drug which acts on the brain and influences brain neurochemistry, you may well have an effect on the central nervous system which by far outlasts the effect of the amount of the blood, of what's in the blood.
So once you have got the blood into the brain, you're talking again about a different system to just looking at what comes out when

you stop the drug from the blood stream.
Q All right, and so my question is related to clinical effects. So maybe you tried to answer my question and I just didn't understand your answer.
But my question is: How long after your last ingestion of Gabapentin would you expect there to be any clinical effect -- let's say, let's say you're taking Gabapentin for pain reduction -- how long after your last dose of Gabapentin would you have clinical, the clinical effect of pain reduction?
MR. FINKELSTEIN: Objection.
I don't know that there's any efficacy that it's ever been established that Gabapentin has any effect --
MS. McGRODER: Objection to form is fine.
MR. FINKELSTEIN: -- on pain reduction.
THE WITNESS: I do not know the literature on the use of Gabapentin in chronic pain.
BY MS. McGRODER:
Q All right, well, let's talk about an

epileptic, then. Do you know the literature on epilepsy and Gabapentin?
A I do.
Q Okay, so let's assume that somebody's on Gabapentin for epilepsy, and they take their last dose.
A Okay.
Q They just decide I'm not taking this drug anymore.
A Yup.
Q They've taken their last dose.
How long after the last dose will the person no longer have seizure control, or have the clinical benefit of the drug?
A As far as I'm aware, if you stop Gabapentin, you do not get a rebound of seizures, withdrawal seizures.
What you do get with some other anti-epileptic drugs -- the point of that is to say that the lingering anti-epileptic effect must go on several days.
Q And is there any literature that supports your opinion that there is lingering effect that goes on for several days?
A Well, I have not read a literature

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                      Continued
    IN RE:                              Videotape
 4  NEURONTIN MARKETING, SALES  :       Deposition of:
    PRACTICES AND PRODUCTS      :
 5  LIABILITY LITIGATION        :       MICHAEL TRIMBLE
                                :
 6  ------------------------------

 7  THIS DOCUMENT RELATES TO:

 8  Smith, et al. v Pfizer, et al.

 9  Case No. 05-cv-11515-PBS

10

11

12

13          TRANSCRIPT of testimony as taken by and

14  before PATRICIA A. SANDS, a Shorthand Reporter

15  and Notary Public of the States of New York and

16  New Jersey, at the offices of Lanier Law Firm,

17  126 East 56th Street, New York, New York, on

18  Wednesday, September 3, 2008, commencing at

19  9:16 in the forenoon.

20

21

22       REPORTING SERVICES ARRANGED THROUGH:
         VERITEXT/NEW JERSEY REPORTING COMPANY
23            25B Vreeland Road, Suite 301
            Florham Park, New Jersey 07932
24   Phone: (973) 410-4040     Fax: (973) 410-1313

25
```

## Page 341

APPEARANCES:

FINKELSTEIN & PARTNERS
436 Robinson Avenue
Newburgh, New York 12550
BY: ANDREW G. FINKELSTEIN, ESQ.
For the Plaintiff
800 634-1212

THE LANIER LAW FIRM
Tower 56
126 East 56th Street, 6th Floor
New York, New York 10022
BY: KENNETH SOH, ESQ.
For the Plaintiff
212 421-2800

SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
BY: LORI CONNORS McGRODER, ESQ.
For the Defendant
816 474-6550

ALSO PRESENT:
Adam DiCola, Videographer

## Page 342

### INDEX

| WITNESS | DIRECT |
|---|---|
| PROFESSOR MICHAEL TRIMBLE | |
| Ms. McGroder | 344 |

### EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| TRIMBLE | | |
| EXHIBIT 19 | Shell report | 352 |
| EXHIBIT 20 | Neurogurgical records | 399 |
| EXHIBIT 21 | UMC notes | 404 |
| EXHIBIT 22 | Juurlink article | 455 |
| EXHIBIT 23 | Police report | 482 |
| EXHIBIT 24 | Medical examiner's report | 489 |
| EXHIBIT 25 | Suicide note | 497 |
| EXHIBIT 26 | Photo | 508 |
| EXHIBIT 27 | Wood letter | 539 |

## Page 343

PROF. MICHAEL TRIMBLE,
Institute of Neurology
Queen Square
London WCIN3CB,
having been previously sworn, was
examined and testified as follows:

THE VIDEO OPERATOR: Please standby. We are on the record. My name is Adam DiCola of Veritext Corporate Services. The date today is September 3, 2008, and the time is approximately 9:16 a.m. This deposition is being held in the office of Lanier Law Firm, located at 126 East 56th Street, New York, New York.

The caption of this case is Smith, et al., versus Pfizer, et al., in the United States District Court, District of Massachusetts, Case Number 05-CV-11515-PBS.

The name of the witness is Professor Michael Trimble.

At this time the attorneys will identify themselves and the parties they represent, after which our court reporter, Patricia Sands, will swear in the witness

## Page 344

and we can proceed.

MR. FINKELSTEIN: Andrew Finkelstein, on behalf of the Smith family.

MR. SOH: Ken Soh, on behalf of the Smith family as well.

MS. McGRODER: Lori McGroder, of Shook, Hardy & Bacon, on behalf of Pfizer.

MS. STEVENSON: Jennifer Stevenson, of Shook, Hardy & Bacon, also on behalf of Pfizer.

THE WITNESS: We did this yesterday.

CONTINUED DIRECT EXAMINATION
BY MS. McGRODER:
Q  Professor Trimble, you know you're still under oath; correct?
A  Correct.
Q  Did you do anything last night to prepare for the continuation of your deposition this morning?
A  Last night and this morning I read through my bundle of Mr. Smith's notes.
Q  And those would be the medical records marked as Exhibit --
A  The ones that you had yesterday.

Page 501

1  BY MS. McGRODER:
2    Q   Does the literature report as a
3  definition for impulsivity that the idea for
4  the act of suicide occurs within 5 minutes of
5  the suicide?
6    A   No.
7    Q   Did you look at the literature on
8  that?
9    A   No, but I'm quite familiar with
10 impulsive behaviors. We have done research in
11 that area.
12   Q   Did you look at the literature on
13 impulsive suicide behaviors?
14   A   Not especially.
15   Q   The behaviors you're referring to are
16 aggression?
17   A   Aggressive behaviors, impulsive motor
18 behaviors, obsessive compulsive behaviors.
19 These kind of thing.
20   Q   Is obsessive compulsive behavior
21 impulsive?
22   A   In certainly can be.
23   Q   And then the other one, apart from
24 aggression, I think you said was impulsive
25 motor disorders?

Page 502

1    A   In this country it's called Tourette
2  syndrome, T-O-U-R-E-T-T-E syndrome, that people
3  have compulsive and impulsive behaviors.
4    Q   And with Tourette syndrome, in your
5  clinical practice is that considered part of
6  your movement disorder practice?
7    A   Oh, yes.
8    Q   Okay. And so apart from impulsivity
9  associated with those behaviors, movement
10 disorder or obsessive compulsive or aggression,
11 have you, in fact, studied the literature on
12 impulsive suicide behavior?
13   A   Not specifically on impulsive suicide
14 behavior.
15   Q   And you are not an expert in suicide
16 behavior?
17   A   I am not a suicidologist, that is
18 correct.
19   Q   And so you are not an expert in
20 impulsive suicide behavior?
21   A   By definition.
22   Q   So you're not aware that the
23 literature on impulsive suicide provides a
24 definition of 5 minutes between the initiation
25 of the thought of suicide and the actual

Page 503

1  suicide?
2    A   I am not.
3    Q   Reading this suicide note, is it now
4  clear to you why Mrs. Smith said to the medical
5  examiner that she did not want an autopsy,
6  because Mr. Smith did not want to be cut on any
7  more?
8    A   I'm just not certain of the link
9  between her statement in the autopsy report and
10 the suicide note. In other words, I'm not
11 quite sure of the link between the two. I
12 mean, he may have expressed an opinion before
13 this suicide note about not having further
14 operations.
15   Q   And so do you think it's coincidence
16 that Mrs. Smith says "Richard's final wishes
17 were not to be 'cut' on any more"?
18   A   Well, if she's referring to this
19 document, then I accept that. But we have to
20 just recall that he had expressed concern about
21 having further surgery before, that was all.
22   Q   And so when Mr. Smith says "I don't
23 want to be cut on any more", is that a
24 reference, in your opinion, to future
25 surgeries?

Page 504

1    A   That is certainly a possibility.
2    Q   It is it more likely than not that
3  that's what he's referring to?
4    A   It is likely that that is what he is
5  referring to.
6        MS. McGRODER: Let's take a 3 minute
7    break.
8        THE VIDEO OPERATOR: Please standby.
9    We are going off the record, the time
10   is 1:23 p.m.
11       (Recess.)
12       THE VIDEO OPERATOR: Please standby.
13   We are back on the record, the time
14   is 1:31 p.m.
15 BY MS. McGRODER:
16   Q   Are you aware, Professor Trimble,
17 that Mr. Smith laid a plastic sheet out on the
18 bed to prevent the soiling of the bed with
19 biohazard material before his suicide?
20       MR. FINKELSTEIN: Objection.
21       THE WITNESS: No, I'm not. I was not
22   aware.
23       THE VIDEO OPERATOR: Professor, your
24   mic.
25       THE WITNESS: No, I was not aware.

## Page 549

1  he says it makes him loopy. But he, himself,
2  refers to the fact that he is on Neurontin.
3  And then the family depositions also consider
4  him to have been reliable on taking
5  medications. So I no reason to doubt the fact
6  he was taking Neurontin.
7      Q   Have you looked to see how many pills
8  were in the prescription vile of Neurontin that
9  Mr. Smith left on his dresser at the time of
10 his suicide?
11     A   I have not.
12     Q   So, again, you have no idea whether
13 he completed taking the pills that were
14 prescribed for him? The Neurontin pills that
15 were prescribed for him?
16     A   My understanding is that he had more
17 Neurontin given to him beyond those that were
18 prescribed in a script.
19     Q   Okay.
20     A   That's my understanding.
21     Q   Samples?
22     A   Well, in a sashay, as I believe.
23     Q   Well, we'll get there.
24     A   Okay.
25     Q   Right now the question is you don't

## Page 550

1  know one way or the other whether he completed
2  taking the pills that were in the vile that he
3  filled at the pharmacy on March 9, 2004?
4      A   That is correct.
5      Q   And there could be a full vile of
6  pills left over, and that is something you
7  didn't consider?
8      A   That is correct.
9      Q   Do you know the exact number of
10 samples that were in Mr. Smith's possession?
11     A   I do not.
12     Q   Is there any evidence in the record
13 of the exact number of samples that Mr. Smith
14 took?
15     A   Not that I have seen.
16     Q   Do you consider anywhere in your
17 report Donna Smith's illness, her cancer as a
18 factor related to Mr. Smith's suicide?
19     A   I do not consider it a factor
20 relating to his suicide.
21     Q   It's not in your report?
22     A   It is not, and I do not consider it a
23 factor.
24     Q   Is it your opinion in this case that
25 Neurontin caused Mr. Smith's suicide because

## Page 551

1  more likely than not his suicide was impulsive?
2      A   It has not so much to do with
3  impulsivity, it has to do with the alteration
4  of his mental state that occurs following the
5  ingestion of Gabapentin or Neurontin.
6      Q   Tell me specifically what evidence
7  you rely on, the factual evidence in the
8  record, that Mr. Smith's suicide was impulsive?
9          MR. FINKELSTEIN: Objection as to
10     form.
11         THE WITNESS: Well, I think I have a
12     difficulty with the term "impulsive". I'm
13     not certain --
14 BY MS. McGRODER:
15     Q   It's in your report?
16     A   Yes, but this was not a carefully
17 planned, documented suicide where everything
18 was put in context, everything was sorted out,
19 saying good-bye to people. This happened
20 suddenly.
21     Now the term "impulsive" is used in a
22 number of ways. I am using it to say that this
23 was not a carefully planned, or even
24 predictable suicide event. It came out of the
25 blue.

## Page 552

1      Q   You testified yesterday that it is
2  most likely that at some point before March, or
3  in March, because of his "fiscal" problems he
4  was working part-time.
5      What fiscal problems were you referring
6  to?
7      A   Physical problems? I just didn't get
8  the question.
9      Q   Fiscal problem.
10     A   I wasn't sure whether you said
11 "fiscal" or "physical."
12     Q   Well, the transcript --
13         MR. FINKELSTEIN: They think you
14     said --
15     Q   Of course it's a draft, says
16 "fiscal".
17     A   No, physical.
18     Q   So the word you were using is
19 "physical"?
20     A   Physical, yes.
21     Q   All right. Are you aware of any
22 financial problems that the Smith family had at
23 any time in 2004?
24     A   No.
25     Q   How about 2003?

54 (Pages 549 to 552)