# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: NEURONTIN             MDL Docket No. 1629
MARKETING, SALES             Master File No.
PRACTICES and PRODUCTS                 04-10981
LIABILITY LITIGATION         Judge Patti B. Saris
                             Magistrate Judge
                             Leo T. Sorokin

RUTH SMITH,

    Plaintiff,          C. A. No.   05-11515
V.

PFIZER, INC., et al.,

    Defendants.

    Videotaped Deposition of:

    EDWARD MACKEY, M.D.

    Wednesday, May 23, 2007

Page 2

STIPULATIONS

It is stipulated and agreed, by and between the parties through their respective counsel, that the videotaped deposition of:

EDWARD MACKEY, M.D., may be taken before Fred W. Jeske, court reporter and Tennessee Notary Public, at the offices of Miller & Martin, 1200 US Bank Tower, 150 Fourth Avenue, North, Nashville, Tennessee, on Wednesday, May 23, 2007, commencing at approximately 8:40 a.m.

It is further stipulated and agreed that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

Page 3

It is further stipulated and agreed that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

Page 4

APPEARANCES:
For the Plaintiff:
  ANDREW G. FINKELSTEIN
  KEITH ALTMAN
  Finkelstein & Partners
  436 Robinson Avenue
  Newburgh, New York 12550
  (800) 634-1212
  afinkelstein@lawampm.com
-and-
  W. MARK LANIER
  ROBERT LEONE
  DARA HEGAR
  PATRICK O'HARA
  The Lanier Law Firm
  6810 FM 1960 West
  Houston, Texas 77069
  Post Office Box 691448
  Houston, Texas 77269-1448
  (713) 659-5200
  wml@lanierlawfirm.com

For the Defendant Pfizer:
  KENNETH J. FERGUSON
  CEDRIC E. EVANS
  Clark, Thomas & Winters
  300 West 6th Street, 15th Floor
  Austin, Texas 78701
  P.O. Box 1148
  Austin, Texas 78767
  (512) 472-8800
  cee@ctw.com

For the witness:
  NOEL F. STAHL
  Miller & Martin
  1200 one Nashville Place
  150 Fourth Avenue North
  Nashville, Tennessee 37219
  (615) 744-8503
  nstahl@millermartin.com

Also present:
  Jonathan Wilkerson, law clerk
  Sheldon Singh, videographer
  -oOo-

Page 5

TABLE OF CONTENTS

EDWARD MACKEY, M.D.                    Page

Direct By Mr. Lanier              7
Cross By Mr. Ferguson            44
Re-Direct By Mr. Lanier          93
Re-Cross By Mr. Ferguson        107

EXHIBITS
Exhibit    Description             Page
Exhibit 1  Curriculum vitae         8
Exhibit 2  Medical records          8
Exhibit 3  Pfizer records          15
Exhibit 4  Neurontin product label 18
Exhibit 5  Information             21
Exhibit 6  FDA Division of         35
           Neuropharmacological Drug
           Products Combined
           Medical-Statistical Review
           10/13/93
Exhibit 7  Affidavit of David Franklin, 38
           Ph.D.

REPORTER'S CERTIFICATE            112
           -oOo-

Page 6

1  VIDEOGRAPHER: My name is
2  Sheldon Singh of Nationwide Video
3  Productions, Inc., located in Roseland, New
4  Jersey.
5      Today's date is Wednesday, May
6  23rd, 2007, and the time on the monitor is
7  8:40 a.m. This deposition is being held in
8  the office of Miller and Martin, located at
9  150 Fourth Avenue, North, Nashville,
10 Tennessee, 37219.
11     The caption of this case is
12 Neurontin Marketing, Sales Practices and
13 Products Liability Litigation, Ruth Smith
14 v. Pfizer, Inc., et al.
15     The case number is 05-11515, in
16 the United States District Court, District
17 of Massachusetts.
18     The name of the witness is
19 Dr. Edward S. Mackey.
20     At this time the attorneys will
21 identify themselves and the parties they
22 represent after which our court reporter,
23 Mr. Fred Jeske, of Vowell & Jennings, will
24 swear in the witness so we can proceed.
25     MR. LANIER: My name is Mark

Page 7

1  Lanier. I'm here with a number of folks
2  representing the Smith family. I've got
3  from my office Bob Leone, Andrew
4  Finkelstein from his office is here, along
5  with Keith.
6      We've got Dara Hegar. We've got
7  Patrick O'Hara, and we've got -- and we
8  have got Jonathan Wilkerson here from our
9  office.
10     MR. FERGUSON: Ken Ferguson,
11 Clark, Thomas and Winters, in Austin, Texas
12 for Pfizer, Parke-Davis and Warner-Lambert
13 along with Cedric Evans from the same firm.
14     MR. STAHL: I'm Noel Stahl. I'm
15 here with Dr. Ed Mackey.
16     EDWARD MACKEY, M.D.,
17 having been duly sworn, testified as follows:
18     DIRECT EXAMINATION
19 BY MR. LANIER:
20 Q.  Dr. Mackey, thank you for taking time
21 to be with us today. We appreciate it.
22     We have an opportunity to take
23 your deposition by videotape so that a jury's
24 able to listen and watch your testimony, and
25 you don't have to stop your practice in the

Page 8

1  middle of the day to come down to the
2  courthouse to testify. But we do recognize you
3  taking time today, and we appreciate it.
4      I have a copy of what's your
5  curriculum vitae, kind of a resume type thing.
6  I'm marking it as Exhibit 1.
7  (Exhibit 1 marked.)
8  Q.  Would you confirm for the jury that
9  that's who you are.
10 A.  Yes.
11 Q.  Thank you. And then we have brought --
12 you have brought today a copy of your medical
13 records on Mr. Smith. We're going to mark that
14 as Exhibit 2 and we'll attach that as well.
15 (Exhibit 2 marked.)
16 Q.  Is that a full and complete copy of
17 those records, sir, to the best of your
18 knowledge?
19 A.  I, I believe so.
20 Q.  Okay. I assume you didn't make the
21 copies yourself personally but you asked for a
22 copy to be made?
23 A.  That is correct.
24 Q.  All right. Thank you. Please feel
25 free to refer to that as you need to throughout

Page 9

1  the deposition, and we'll try not to take too
2  much of your time today.
3      First a little bit about you.
4  What kind of doctor are you?
5  A.  I'm an orthopedic surgeon.
6  Q.  In everyday language what's an
7  orthopedic surgeon?
8  A.  It's a doctor specializing in the care
9  of bones and muscles of the body.
10 Q.  If I have got a problem with my back,
11 are you the kind of doctor I'd go see?
12 A.  Yes.
13 Q.  Okay. Did you have a chance to look at
14 and take care of some Richard Smith?
15 A.  Yes.
16 Q.  And that's the gentleman whose chart
17 you have in front of you; right?
18 A.  Yes.
19 Q.  What, if you could tell the jury, is
20 the time period when you gave your care for
21 Mr. Smith?
22 A.  I first saw Mr. Smith February 12th,
23 2004.
24 Q.  And so that we get the other bookend in
25 place, when was your last time to see

1  A. Yes, I do.
2  Q. Sir, Neurontin is the drug that we're
3  discussing; right?
4  A. Yes.
5  Q. Now you're not a pharmacist yourself?
6  A. No.
7  Q. And I assume that you've got a full
8  slate of patients, so you spend most of your
9  time trying to treat people and help them get
10 well and doing surgery?
11 A. Yes.
12 Q. You're not a drug researcher who is out
13 there doing independent research to figure out
14 what drugs do and how they do it, are you?
15 A. No.
16       MR. FERGUSON: Object to form.
17 A. No.
18 Q. (By Mr. Lanier) Have you ever had a
19 chance to look at the actual label for
20 Neurontin, yourself? And let me, let me
21 preface that by giving you a copy. So -- I'm
22 sure you've glanced at it or something, but I
23 want to ask you some questions about it. So
24 we'll mark it as Exhibit 4.
25 A. Okay.

1  (Exhibit 4 marked.)
2  Q. And I will represent to you this is a
3  copy of the label at the time that you had
4  prescribed it for Mr. Smith. And ask you to
5  take a moment and just sort of look at it. I'm
6  going to specifically direct your attention to
7  the indications, on page 10 of this copy.
8  A. Yes.
9  Q. Do you have that in front of you?
10 A. I do.
11 Q. Now there are two indications that
12 Pfizer has given for their drug, one is for
13 postherpetic neuralgia, which I understand
14 means the management of shingles pain; is that
15 right?
16 A. Yes.
17 Q. Obviously you weren't prescribing this
18 for shingles, were you?
19 A. No.
20 Q. The second is for epilepsy, partial
21 seizures. Do you see that as well?
22 A. I do.
23 Q. And I assume you were not prescribing
24 this for epileptic reasons either.
25 A. No.

1  Q. Sir, those are the only two indications
2  that the FDA allowed Pfizer to put into their
3  label. Do you see that?
4  A. Yes.
5  Q. I want to ask you some questions about
6  what your knowledge was about what Pfizer was
7  doing off label as far as their drug, so I'm
8  going to ask you a series of questions here,
9  and I will try and provide you the information.
10 I want to see if this is information that you
11 had even found out yourself, okay?
12       MR. FERGUSON: Object to form.
13 Q. (By Mr. Lanier) Did you know that
14 over 90, 90 percent of Pfizer's sales for
15 Neurontin were for off-label uses?
16       MR. FERGUSON: Object to form.
17 A. I knew it at some point. I don't know
18 when I knew that.
19 Q. (By Mr. Lanier) And by off-label uses,
20 you understand we're talking about
21 prescriptions being written to use the drug for
22 reasons that the FDA never approved in the
23 label; right?
24 A. Yes.
25 Q. Did you know that on the very day of

1  Mr. Smith's death that Pfizer filed with a
2  court a plea agreement basically setting
3  forward the fact that they had not been
4  following the law on the way they were
5  marketing their drug?
6        MR. FERGUSON: Object to form.
7  Q. (By Mr. Lanier) Did you know about
8  that?
9  A. Um, yes. That was widely reported in
10 the news.
11 Q. Okay. Didn't know about it beforehand,
12 that it had been going on, but once it happened
13 you found out about it, is that fair to say?
14       MR. FERGUSON: Object to form.
15 A. I don't recall exactly what I knew at
16 what point, but I certainly knew after the
17 lawsuit was discussed or settled.
18 Q. Okay.
19 A. The issues.
20 (Exhibit 5 marked.)
21 Q. (By Mr. Lanier) If you'll look at
22 Exhibit 5. It's a legal pleading, we call it
23 an information, but it basically sets up the
24 ultimate plea agreement with the court. And
25 you can go to the very last page of it, page

Page 42

1  abstracts and case reports in promoting
2  Parke-Davis's prescription drugs, including
3  Neurontin, for a variety of medically
4  unacceptable uses. Do you see that as well?
5  A.   Yes.
6  Q.   Sir, as a doctor, is it important to
7  you that drug companies put patient safety
8  first?
9  A.   Yes.
10 Q.   Is it important to you that drug
11 companies follow FDA instructions and rules and
12 guidelines --
13      MR. FERGUSON: Object to form.
14 Q.   -- about what they're telling you and
15 what they're not?
16 A.   Yes.
17 Q.   (By Mr. Lanier) Now if you had been
18 told either in the labeling information or
19 through sales reps or, Dr. Mackey, through your
20 partners, if you had been told that Neurontin
21 was a drug with some of the problems we've
22 talked about so far today, would it have
23 changed the way you treated Mr. Smith?
24      MR. FERGUSON: Object to form.
25 A.   Possibly. Probably.

Page 43

1  Q.   (By Mr. Lanier) Probably. And by
2  probably, would it have meant you would have
3  either tried another drug first, or would you
4  have at least put out some warnings and some
5  safeties and precautions and told them what to
6  be observant about?
7       MR. FERGUSON: Object to form.
8  A.   Certainly I would have done the
9  latter.
10 Q.   Okay.
11 A.   And I don't know about the former.
12 Q.   (By Mr. Lanier) All right. Now if
13 someone's at risk of -- I don't know that you
14 see often someone that you consider a suicide
15 risk in your practice, but if you see someone
16 that presents that you think is a serious
17 candidate for suicide, I would assume you would
18 do something about that. There is some
19 protocol.
20 A.   Yes.
21 Q.   Okay. Mr. Smith, when he presented to
22 you, I've read through your chart, there's
23 nothing about him that made you think he was a
24 suicide risk when he presented, was there?
25 A.   No.

Page 44

1  Q.   All right. How did you find out about
2  his death?
3  A.   His wife called our office and spoke
4  with our telephone answering operator and then
5  spoke with my nurse.
6  Q.   Okay. Did you by any chance file a
7  MedWatch report with the FDA after this, do you
8  know?
9  A.   I don't know. I don't think I've
10 ever -- I don't know to do that or --
11 Q.   Yeah. I didn't think so, but I didn't
12 see one, and I just wasn't sure.
13      MR. LANIER: I'm going to, I've
14 used 45 of my minutes. I'm going to save
15 my other 45. I'm going to pass the witness
16 and see if he can really do it in 44.
17      MR. FERGUSON: Doctor, are you
18 doing okay? Do you need a break or
19 anything?
20      THE WITNESS: I'm okay.
21      CROSS-EXAMINATION
22 BY MR. FERGUSON:
23 Q.   Dr. Mackey, we met briefly before the
24 deposition. My name is Ken Ferguson. I
25 represent Pfizer in this matter. Do you

Page 45

1  understand that?
2  A.   Yes.
3  Q.   Doctor, you graduated from Dartmouth
4  undergrad; correct?
5  A.   Yes.
6  Q.   And you went to Vanderbilt University
7  Medical School right here?
8  A.   Yes.
9  Q.   You're board certified in orthopedic
10 surgery?
11 A.   I am.
12 Q.   You're board certified in spine surgery
13 also; correct?
14 A.   Yes.
15 Q.   Generally, do you make your own
16 decisions about how you treat your patients?
17 A.   Yes.
18 Q.   Nobody's going to tell you how to treat
19 your patients, are they?
20 A.   No.
21 Q.   I want to follow up a bit on some of
22 the care and treatment you actually performed
23 on Mr. Smith, if I could, okay?
24      Mr. Lanier spoke about that
25 briefly. Let me ask you some questions.

1 you that I recall for sure, --
2 Q. Um-hum.
3 A. -- that I had samples in my closet for
4 distribution to patients.
5 Q. Okay. And did you distribute those
6 samples?
7 A. I did.
8 Q. And those samples are always
9 accompanied by their product labeling, aren't
10 they?
11 A. I believe so. I think each box comes
12 with one.
13 Q. We talked about the fact that Lortab or
14 narcotic pain relievers have potential for
15 addictive behavior. To your knowledge, does
16 Neurontin have potential for addictive
17 behavior?
18 A. I'm not aware of it.
19 Q. Do some medications have the potential
20 to damage the liver, because they're
21 metabolized through the liver?
22 A. Yes.
23 Q. Do you know if Neurontin fits that
24 category or not?
25 A. I believe it goes through the kidney.

Page 79

1 Q. And you noted that you had had success
2 with Neurontin with other patients prior to
3 Mr. Smith?
4 A. Yes.
5 Q. And you have had success with Neurontin
6 since prescribing for Mr. Smith.
7 A. Yes.
8 Q. Was the fact that you had had success
9 in treating other patients with Neurontin a
10 factor in making the decision to prescribe for
11 Mr. Smith?
12 A. Among others, yes.
13 Q. Other than the discussions that you
14 think may have taken place, probably took place
15 with sales representatives, did you receive any
16 other information from any source of Pfizer,
17 Warner-Lambert, Parke-Davis regarding the use
18 of Neurontin, that you recall?
19 A. Not that I recall.
20 Q. And I think Mr. Lanier asked you this,
21 but I can't recall exactly what your answer
22 was. With regard to the PDR information, the
23 labeling information regarding Neurontin, had
24 you reviewed that at some point prior to
25 prescribing for Mr. Smith?

Page 80

1 A. A long time ago, probably.
2 Q. There was a lot of discussion on the
3 prior examination regarding off-label use
4 versus on-label use. Do you understand that
5 distinction?
6 A. Quite well.
7 Q. And really off-label use can, can
8 include indications that aren't labeled;
9 correct?
10 A. Right.
11 Q. Off-label use can also include for --
12 in dosages not labeled; correct?
13 A. I didn't realize that as well, but yes,
14 that makes sense.
15 Q. Okay. Is it uncommon or common for
16 doctors to prescribe medications for unlabeled
17 indications?
18 A. I, I imagine it's relatively common. I
19 don't know to what extent it is.
20 Q. Okay. Is Neurontin the only medication
21 you have ever prescribed off-label?
22 A. I don't know.
23 Q. Do you know whether or not the FDA
24 recognizes and even approves the prescription
25 of drugs off-label?

Page 81

1 A. Um, again, I don't know.
2 Q. Okay. Does the FDA try to --
3    MR. STAHL: Four minutes.
4    MR. FERGUSON: Thank you.
5 Q. (By Mr. Ferguson) Does the FDA ever,
6 to your knowledge, try to tell doctors how to
7 practice medicine?
8 A. No.
9 Q. During the period of time that you --
10 you said you may have reviewed the Neurontin
11 label sometime prior to having prescribed for
12 Mr. Smith. Do you re-review labeling on an
13 annual basis or on any kind of a regular basis
14 or not, on medications that you prescribe
15 regularly?
16 A. Ah, not typically.
17    I guess, you know, those type of
18 updates or changes I sort of rely on
19 information coming to me.
20 Q. Do you know one way or the other
21 whether in the label in, say, 2003-2004 time
22 frame, there was any information in the label
23 regarding suicidal behavior or suicidal
24 gesture?
25 A. Do I -- did I know that in 2004?

Page 82

1  Q. Yes, sir.
2  A. No, I did not.
3  Q. As you sit here today, do you know
4  whether or not there was --
5  A. Yeah.
6  Q. -- such information in the label back
7  in 2003-2004?
8  A. Yes. Among many other issues.
9  Q. As -- and if I'm getting out your area
10 you just let me know. But as someone who
11 treats chronic pain patients, and I realize you
12 treat them for certain, in certain situations.
13 And you would have your colleagues in your
14 office treat other kinds of chronic pain. But
15 you do treat chronic pain patients; correct?
16 A. Um, if they're -- if I can manage them
17 surgically, I will.
18 Q. Um-hum.
19 A. If I cannot, I sent them out to someone
20 who does that.
21 Q. Do you know one way or the other
22 whether individuals who have long-term chronic
23 pain are more likely or less likely to commit
24 suicide than the normal population?
25 A. You're right, I think you're outside my

Page 83

1  area of expertise.
2  Q. Okay. Fair enough.
3       VIDEOGRAPHER: One minute
4     remaining.
5       MR. FERGUSON: Why don't we go
6     ahead and break real quick since we have
7     one minute left, and then I'll try to
8     finish up here quickly.
9       VIDEOGRAPHER: We're going off
10    the record. This marks the end of tape
11    number 1. The time on the monitor is
12    10:02. Tape number 1. Going off the
13    record.
14 (Recess from 10:02 to 10:17 a.m.)
15      VIDEOGRAPHER: Stand by.
16    We're coming back on the record.
17 This marks the beginning of tape number 2.
18 Time on the monitor is 10:17.
19      You may proceed, counselor.
20 Q. (By Mr. Ferguson) Okay, Doctor, we
21 have taken a break. Are you ready to
22 proceed?
23 A. I am.
24 Q. We were talking a little bit earlier
25 about the fact that you are aware now that back

Page 84

1  in the 2003-2004 time frame there was some
2  information about suicidal conduct, suicidal
3  gesture in the, the Neurontin labeling;
4  correct?
5  A. It's in the PDR, 2004.
6  Q. Right. When did you become aware of
7  that?
8  A. Preparing for this deposition.
9  Q. And the fact of that was in there,
10 that's not keeping you from prescribing
11 Neurontin to anybody, is it?
12 A. I wouldn't say to anybody, but it has
13 not -- I still will prescribe it.
14 Q. Okay. Are you aware of any, any
15 labeling changes that took place with regard to
16 Neurontin in the 2004-2005 time frame?
17 A. I'm not aware of any.
18 Q. Mr. Lanier talked to you about
19 Exhibit 6, which is, he represented, as an FDA
20 document. Do you recall that discussion?
21 A. Yes.
22 Q. And he showed you I think one page of
23 this. This is about a hundred and -- I don't
24 know how many page document. Hundred and
25 something page document; correct?

Page 85

1  A. Yes.
2  Q. Okay. You haven't reviewed the whole
3  document?
4  A. No.
5  Q. Okay. And if as you -- 119 pages. If
6  as he represented to you this is an FDA
7  document, the FDA had whatever information was
8  in here when it approved the Neurontin
9  labeling; correct?
10 A. I would assume so.
11 Q. And I think he asked you if you would
12 like to have known the information that he
13 pointed out in there; correct? Do you recall
14 that?
15 A. Yeah, any, any relevant information I
16 would like --
17 Q. Sure.
18 A. -- to have available.
19 Q. And this referred, this document,
20 Exhibit 6, referred to a suicide attempt that
21 may have occurred, or suicide in connection
22 with someone who was on Neurontin; correct?
23      MR. LANIER: Page 117.
24 Q. (By Mr. Ferguson) Page 117.
25 A. Okay. I'm sorry, what was your

1 Q. Including potential suicides?
2 A. Statistically I'm sure, yes.
3 Q. Okay. And the population taking
4 Neurontin are people with pain?
5 A. Yes.
6 Q. To your knowledge, epilepsy; correct?
7 A. Yes.
8 Q. And do both of those conditions, if you
9 know, have increased possibility of suicide?
10 A. I do not know.
11 Q. Okay. If 12 million people took
12 Neurontin worldwide, would, would it give you
13 concern one way or the other if there were 35
14 suicides reported in connection with that?
15     MR. LANIER: What do you mean by
16 "report"?
17     MR. FERGUSON: Has adverse
18 events.
19     MR. LANIER: Are you talking
20 about like filing those MedWatch things?
21     MR. FERGUSON: I'm talking about
22 adverse events reported to the company.
23     Like to say anything else?
24     MR. LANIER: Well, he hadn't
25 even filed a MedWatch. These doctors don't

Page 91

1 do that. You can't even look at those.
2 But I'll -- I shouldn't be saying that.
3 I'm saving that for redirect. Go ahead.
4     MR. FERGUSON: Thank you.
5 Q. (By Mr. Ferguson) Doctor, if 12
6 million people took it, would it surprise you
7 if there were 35 suicides reported in
8 connection with those 12 million?
9 A. Probably not. But I would want to know
10 the details surrounding that.
11 Q. Sure. Sure. Fair enough. If 12
12 million people take something and a certain
13 number of things are going to occur by, by
14 chance alone; correct?
15 A. Right. And but you also have to weigh
16 the relative complications --
17 Q. Sure.
18 A. -- to the frequency.
19 Q. And I take it you're not an expert in
20 epidemiology, fair enough?
21 A. Fair enough.
22 Q. Okay. And with regard to the
23 epidemiology of suicide, you're specifically
24 not an expert; correct?
25 A. No.

Page 92

1 Q. With regard to this gentleman named
2 David Franklin, who Mr. Lanier talked to you
3 about, you never met Mr. Franklin, did you, or
4 Dr. Franklin?
5 A. No. Again, not that I'm aware of.
6 Q. And he read, read you some what
7 purported to be a quote from a guy named Phil
8 Magistro, a phone conversation or something.
9 You don't know Mr. Phil Magistro, do you?
10 A. No.
11 Q. Given the information you have today
12 going, going into today, as we discussed,
13 you're still prescribing Neurontin for some
14 patients?
15 A. Selectively, yes.
16 Q. And my understanding from your
17 testimony, Mr. Lanier is, based on what you
18 know today, you don't know one way or the other
19 whether you would still prescribe for
20 Mr. Smith, is that accurate?
21 A. If Mr. Smith came into my office today,
22 I would not prescribe him Neurontin as -- he
23 would have gotten Lyrica.
24 Q. Okay. Lyrica wasn't available in 2004,
25 was it?

Page 93

1 A. No. Not that I'm aware of. Not that I
2 recall.
3 Q. Okay.
4     MR. FERGUSON: I think that's
5 all I have for now, Doctor. Thank you very
6 much.
7     THE WITNESS: All right.
8     MR. LANIER: You know, he did
9 better on time than I thought he was going
10 to. I got to give it to you.
11     MR. FERGUSON: Appreciate it.
12     REDIRECT EXAMINATION
13 BY MR. LANIER:
14 Q. I want to go back through some
15 questions that were just asked of you and make
16 sure I understand some of the answers, okay?
17     You were first asked, is it true
18 that you decide how to treat patients and
19 nobody tells you how to do it. Do you remember
20 those questions?
21 A. Yes, I do remember that question.
22 Q. Let me understand how you do this,
23 please. You certainly are the doctor, and you
24 make your recommendations, is that fair to
25 say?

24 (Pages 90 to 93)