# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

RUTH SMITH, Individually and as Widow   )
for the Use and Benefit of Herself and the   )
Next of Kin of RICHARD SMITH, Deceased,   )
                                )
       Plaintiff,                     )
                                )
v.                                  )     **Case No. 3:05-0444**
                                )     **Judge Trauger**
PFIZER INC., *et al.*,              )
                                )
       Defendants.                 )

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendants Pfizer Inc. and Warner-Lambert Company LLC (Docket No. 17), the plaintiff's response (Docket No. 51), and the defendants' reply (Docket No. 55). For the reasons discussed below, the defendants' motion will be denied.

## FACTS

On May 13, 2004, 79-year-old Richard Smith ("Smith") committed suicide.[1] Two months earlier, Smith had filled a prescription for the medication Neurontin, which is manufactured by defendants Pfizer Inc. and Warner-Lambert Company LLC (collectively,

---

[1] Unless otherwise noted, the facts are drawn from the defendants' Statement of Undisputed Material Facts (D. Mass., No. 04-10981 ("MDL") Docket No. 1643), the plaintiff's response (MDL Docket No. 1678), and related exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, the court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

"Pfizer" or "defendants").  Smith's widow, plaintiff Ruth Smith, alleges that Neurontin caused Smith's suicide.

In the years leading up to his death, Smith suffered from chronic joint and spine conditions that caused him severe pain and required numerous surgeries.  Smith underwent back surgery in April 2003.  A month later, he was diagnosed with depression and anxiety, and in the year following the surgery, he mentioned suicide at least twice.  Smith was prescribed Neurontin in May 2003, but he did not fill that prescription.  Another doctor suggested Neurontin in January 2004, but Smith did not follow up.

On March 9, 2004, Smith's orthopedic surgeon, Dr. Edward Mackey, prescribed 300 mg of Neurontin, twice daily, in an effort to treat Smith's chronic pain.  Smith filled a 30-day prescription later that day.  He also received several sample packages of Neurontin from a nurse in Dr. Mackey's office.

Although Neurontin has been approved by the FDA to treat epilepsy, doctors frequently prescribe it for the "off-label" usage of treating pain.[2]  During visits to Dr. Mackey's office, Pfizer sales representatives promoted Neurontin's ability to treat neuropathic pain, but they failed to disclose that the drug may cause depression and suicidality in patients.  There is evidence that the defendants were aware of these side effects.

In March and April of 2004, Smith continued to experience excruciating pain, which, according to the plaintiff, forced him to spend most of his time "[lying] around."  (D. Mass., No.

---

[2] In June 2004, Warner-Lambert Company LLC pleaded guilty to charges that it marketed the drug for off-label usage.

04-10981 ("MDL") Docket No. 1644, Ex. 4 at 166.)  On May 13, Smith committed suicide in his

bedroom by shooting himself in the head.  He left a note:

> Pain has taken over my mind and body!  I need back surgery, left
> and right rotator cuffs, right bicep torn, back surgery to correct
> pain in legs.  Forgive me; I cannot go on like this.  I cannot have
> my body, the temple of the Holy Spirit, cut on anymore.  I have
> talked to God all night and he understands.

(MDL Docket No. 1644, Ex. 2 at 497-98.)

The investigator who examined the scene of the suicide collected Smith's medications,

including the Neurontin.  He testified that there were pills remaining in the Neurontin bottle,

although he "probably" did not record the number of pills, because it did not appear at that time

that Smith's death was related to Neurontin.  (MDL Docket No. 1679, Ex. 24 at 49-50.)  For the

same reason, the medical examiner did not run a toxicology screen to test the level of Neurontin

in Smith's blood.  One of the plaintiff's expert witnesses, Dr. Ronald Maris, conceded at his

deposition that the investigator's report indicated that the bottle "looks like it's full of

Neurontin."  (MDL Docket No. 1644, Ex. 3 at 527-28.)  There were also unopened sample

packages of Neurontin in Smith's bedroom.

Ruth Smith testified that she cannot recall observing Smith take his Neurontin every time

the prescription called for it.  But she testified that Smith did take his prescriptions as prescribed

because "that was just the way he did things":

> Q. . . . [D]o you have personal knowledge as to whether your
> husband took this medication, the Neurontin prescription you
> picked up on March 9 or '04, in the way that the doctor had
> prescribed it?
>
> A.  I did know he did that.

> Q. How do you know that?
>
> A. That was just the way he did things, and that's one reason I picked up the prescription that day, make sure he could start it.
>
> Q. So you didn't observe him take it each time he took it; correct?
>
> A. At this time I can't recall whether I observed him every time, but he usually kept it on the dinette table, and that's where he would take it.
>
> Q. But your knowledge about how he normally conducted himself was that he would take it as the doctor prescribed?
>
> A. Absolutely.
>
> Q. So did he take his first dosage that very day [on March 9]?
>
> A. Yes.

(MDL Docket No. 1644, Ex. 4 at 143.)

On April 14, 2004, Smith filled out a list of current medications for his physical therapist. On that sheet, Smith wrote that he was taking "Neurontin 300" for "pain in lower back + legs to ankles." (MDL Docket No. 1679, Ex. 30.)

Lewis Carnahan, Smith's son-in-law, is a pharmacist at a VA medical center. Carnahan testified that Smith "occasionally would come to [him] about some medications." (Docket No. 1679, Ex. 26 at 20.) He said that Smith asked him about Neurontin's side effects five days before committing suicide:

> Q. And how did it come about on May 8th of 2004 that you learned that Richard was taking a medication called Neurontin?
>
> A. . . . We were at a gathering at Sherri's house. . . . He pulled me aside and asked me about – he didn't ask me about side effects.

He described side effects to me and asked if I thought it was the Neurontin.

Q. Tell me what side effects he described to you, please.

A. He told me that he was feeling loopy. He did not feel like himself since taking the Neurontin. . . .

Q. And did he either volunteer or did you ask him what he meant by feeling loopy? . . .

A. I don't recall anything offhand, anything additional that he said. He just kept saying that it made him loopy; he didn't feel like himself. And that was the main side effect that bothered him, so that's what he brought up with me in that conversation. . . .

Q. Okay. And what did you tell him?

A. I told him that it was a possibility.

Q. And how did you know or believe that was a possibility?

A. Because patients that I have seen [at the VA medical center] have also described similar [Neurontin] side effects to me.

(*Id.* at 20-23.)

Dr. Mackey, who prescribed Smith's Neurontin, testified that knowledge about the drug's suicide-related risks would have been relevant to his decision to treat Smith with the drug:

Q. On page 117 it talks about [Neurontin's] problems with suicide. . . . Is that the kind of thing that would be important to know before you start prescribing a drug? . . .

A. Yes.

Q. All right. Because if you're going – if you have got a drug that, that may cause suicide, clinically significant depression, you probably had other optional drugs you could have given Mr. Smith that, that don't seem to have that side effect; true? . . .

A.  Potentially, yes.

(MDL Docket No. 1679, Ex. 12 at 35-36.)

Dr. Mackey further testified that, had he known about an increased suicide risk, he would

have warned Smith to be aware of such risk while taking Neurontin:

> Q.  Now if you had been told either in the labeling information or
> through sales reps or, Dr. Mackey, through your partners, if you
> had been told that Neurontin was a drug with some of the problems
> we've talked about so far today, would it have changed the way
> you treated Mr. Smith? . . .
>
> A.  Possibly.  Probably.
>
> Q.  Probably.  And by probably, would it have meant you would
> have either tried another drug first, or would you have at least put
> out some warnings and some safeties and precautions and told
> them what to be observant about? . . .
>
> A.  Certainly I would have done the latter. . . .  And I don't know
> about the former. . . .
>
> Q.  Okay.  Mr. Smith, when he presented to you, I've read through
> your chart, there's nothing about him that made you think he was a
> suicide risk when he presented, was there?
>
> A.  No.

(*Id.* at 42-43.)

Even though Dr. Mackey now knows about Neurontin's possible side effects, he still

"selectively" prescribes the drug.  (MDL Docket No. 1644, Ex. 7 at 92.)  But had Smith come to

him today, he would have prescribed a different, newer drug:

> Q.  And my understanding from your testimony . . . is, based on
> what you know today, you don't know one way or the other
> whether you would still prescribe for Mr. Smith, is that accurate?

A.  If Mr. Smith came into my office today, I would not prescribe him Neurontin as – he would have gotten Lyrica.

Q.  Okay.  Lyrica wasn't available in 2004, was it?

A.  No.  Not that I'm aware of.  Not that I recall.

(*Id.* at 92-93.)

The plaintiff originally filed suit in Tennessee state court.  Pfizer removed to this court in June 2005, and in July 2005, the case was transferred to the District of Massachusetts (the "MDL court"), pursuant to an order from the Judicial Panel on Multidistrict Litigation.  There, the case underwent consolidated pre-trial proceedings with similar cases in MDL No. 1629, *In re Neurontin Marketing, Sales Practices and Products Liability Litigation*.  The case was remanded to this court on November 9, 2009.  (Docket No. 10.)  The MDL court previously denied the defendants' motion to strike the plaintiff's expert testimony regarding general and specific causation, *In re Neurontin Mktg.*, No. 04-cv-10981, 2009 U.S. Dist. LEXIS 118006, at *54, 88 (D. Mass. Aug. 14, 2009), and dismissed the plaintiff's claims for fraud via affirmative statements, breach of express warranty, and violation of Tennessee consumer protection statutes.  *In re Neurontin Mktg.*, 618 F. Supp. 2d 96, 114 (D. Mass. 2009); (D. Mass, No. 05-11515, Docket No. 10 at 2).

## ANALYSIS

The plaintiff's remaining claims are for negligence, products liability, breach of implied warranties, and fraudulent concealment.  The defendants have filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, arguing that the plaintiff cannot show that Neurontin was the actual or proximate cause of Smith's death and that the warranty and

fraudulent concealment claims must be dismissed.

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]."  *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249, 252.  An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    Whether Smith Ingested Neurontin

The defendants first argue that there is insufficient evidence to show that Smith took

Neurontin in the time period relevant to his suicide.

Unless Neurontin is the cause in fact of Smith's suicide, the plaintiff cannot prevail on any of her claims.[3] *See In re Neurontin*, 2009 U.S. Dist. LEXIS 118006 at *53 (noting that, in a pharmaceutical personal injury case, a plaintiff must establish both general and specific causation). "Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss." *Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 n.6 (Tenn. 1997). The plaintiff must show that the injury "would not have occurred but for [the defendant's] conduct." *Id.* "Cause in fact and proximate cause are ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005) (quotation marks omitted).

Here, the plaintiff must prove that Smith actually ingested Neurontin. In their brief, the defendants vigorously argue that Smith did not consume the drug in the days leading up to his death:

> Mr. Smith did not take his Neurontin as prescribed. Mr. Smith failed to fill an earlier prescription for Neurontin and failed to take even one pill from a blister pack given to him by his physician's nurse.[4] Had Mr. Smith been following directions, the one and only

_____

[3] As mentioned above, the MDL court has already rejected Pfizer's *Daubert* motions, which sought to exclude the testimony of the plaintiffs' experts regarding general causation (i.e., that exposure to Neurontin can, generally speaking, cause suicide-related injuries) and specific causation (i.e., that Neurontin caused Smith's suicide). *In re Neurontin*, 2009 U.S. Dist. LEXIS 118006 at *53-54. The experts' opinions, of course, are premised on the assumption that Smith actually ingested Neurontin.

[4] In response, the plaintiff points out the possibility that Smith finished one or more whole sample packs.

9

> Neurontin prescription that he filled should have been empty by April 8, 2004, more than one month before his May 13, 2004 death. Yet a bottle of Neurontin – which Dr. Maris described as "full" – was found on Mr. Smith's dresser after his death. On this basis, even Dr. Maris conceded that Mr. Smith had to have "skipped a few doses."

(Docket No. 18 at 10 (citations omitted).)

But the plaintiff presents evidence that, five days before committing suicide, Smith told Carnahan that he "was feeling loopy" and that he "did not feel like himself since taking the Neurontin." (Docket No. 1679, Ex. 26 at 21.) The plaintiff herself testified that it was Smith's habit to take his medication as prescribed, and she observed him taking the pills on at least one occasion. Also, one month before his suicide – and therefore one month after filling his Neurontin prescription – Smith informed his physical therapist that he was taking Neurontin. This evidence all tends to support the plaintiff's contention that Smith took Neurontin up to the time of his death.[5]

The defendants characterize the above evidence as mere "speculation," and they claim

---

[5] The plaintiff has also submitted a letter from Smith's dentist, Christopher Wood, dated May 19, 2004. (MDL Docket No. 1679, Ex. 1.) Dr. Wood, who was a friend of Smith's, wrote about Smith's May 10 dentist appointment, which was only three days before the suicide: "Smith said well I am on a lot of drugs. You know anything about Neurontin? I shook my head . . . . He then said he had gone online and looked it up saying it was extremely powerful, with numerous side effects. Plus it makes me feel weird and isn't helping me." (*Id.*)

Although this supports the contention that Smith was taking Neurontin, it is inadmissible as double hearsay, because the unsworn statements in the letter are being offered for their truth. Smith's comments probably fall under the medical-diagnosis hearsay exception, Fed. R. of Evid. 803(4), but the letter itself is also hearsay. The plaintiff's memorandum suggests that Dr. Wood can testify at trial as to the contents of the letter and be "subject to cross-examination" (Docket No. 51 at 6), but the court cannot consider the unsworn letter, standing alone, at the summary judgment stage. *Alexander v. CareSource*, 576 F.3d 551, 559 (6th Cir. 2009).

that there is an "utter lack" of evidence that Smith "ingested Neurontin at any time temporally related to his suicide." (Docket No. 18 at 9 n.4; Docket No. 55 at 1-2.) Certainly, the plaintiff's case is weakened by the fact that some number of Neurontin pills remained in the bottle two months after Smith filled his 30-day prescription. The defendants have raised a question of fact regarding Smith's Neurontin intake, and it is possible that their arguments will persuade a jury at trial. But drawing all inferences in favor of the plaintiff, the court finds that a reasonable jury could still conclude that Smith took Neurontin in the days leading up to his death.[6] The testimony – particularly Carnahan's testimony – and document described above provide more than a "scintilla" of evidence supporting the plaintiff's case. *See Moldowan*, 578 F.3d at 374. There is no dispute that Smith possessed Neurontin, both in a prescription bottle and in sample packages, and there is admissible evidence that, as recently as five days before his death, he complained about Neurontin's side effects and implied that he was still taking the drug. Thus, the plaintiff has "produce[d] sufficient evidence beyond the bare allegations of the complaint." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003).

Under the defendants' standard, a wrongful-death plaintiff in a pharmaceutical case could not prevail unless (1) someone directly observed the deceased taking the drug immediately before death, or (2) a toxicology report indicated that the drug was in the deceased's system. These strict requirements are not supported by case law.

---

[6] Thus, the court need not rule at this time on the admissibility of Dr. Maris' and Dr. Trimble's statements that Neurontin can have prolonged effects on a patient's brain chemistry, even after the drug has left the bloodstream. (*See* Docket No. 18 at 10 n.5; Docket No. 55 at 8-10.) The defendants contend that Neurontin has a half-life of five to seven hours and that the drug is largely eliminated from a patient's bloodstream within 24 hours of ingestion.

None of the cases cited by the defendants are on point.  For example, in *Best v. Lowe's Home Centers, Inc.*, No. 3:04-CV-294, 2008 U.S. Dist. LEXIS 45175 (E.D. Tenn. June 5, 2008), *rev'd* 563 F.3d 171 (6th Cir. 2009), the plaintiff was splashed in the face by pool chemicals, which allegedly caused a permanent loss of smell.  *Id.* at *2.  The district court excluded the testimony of the plaintiff's expert witness, who opined that the inhalation of the chemicals caused the injury.  The expert based this opinion on the fact that the injury happened following exposure.  *Id.* at *9-10.  He did not, however, know the amount of chemicals to which the plaintiff was exposed, the amount of chemicals necessary to cause a loss of smell, or even if any medical literature linked such exposure to a loss of smell.  *Id.* at *11-12.  Unlike in *Best*, the issue here is not the sufficiency of the expert testimony, but rather the sufficiency of the evidence underlying a key factual assumption.  Regardless, the Sixth Circuit reversed the district court's decision in *Best*, finding that the expert had sufficiently ruled out other causes of the plaintiff's injury.  563 F.3d at 180-82.

The defendants also cite *In re Propulsid Products Liability Litigation*, 261 F. Supp. 2d 603 (E.D. La. 2003).  There, the court rejected expert testimony regarding causation because the plaintiff's experts "fail[ed] to identify the exact mechanism by which" the relevant harm could occur "well after [a] person has ceased taking" the relevant drug.  *Id.* at 617.  Again, here, the testimony by the plaintiff's experts sufficiently explains the mechanisms by which Neurontin affects patients.  The defendants' other cases are similarly inapposite.  *E.g.*, *Porter v. Whitehall Lab., Inc.*, 791 F. Supp. 1335 (S.D. Ind. 1992) (dismissing the plaintiff's claims on summary judgment because the plaintiff's experts failed to show that the drug at issue could have caused

the plaintiff's renal failure), *aff'd* 9 F.3d 607; *Barnes v. Kerr Corp.*, 418 F.3d 583, 590 (6th Cir. 2005) (dismissing the plaintiff dentist's claims because he could not prove what percentage of his mercury exposure came from fillings manufactured by the defendant, as opposed to other manufacturers).

The defendants also argue that the plaintiff's evidence is inadmissible. Specifically, they claim that Carnahan's testimony is hearsay. But Federal Rule of Evidence 803(4) allows a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof." Smith's questions to Carnahan, who is a pharmacist, fall under this exception. Smith told Carnahan that he felt "loopy" and asked him whether he thought that this feeling could be caused by Neurontin; in other words, Smith sought a medical professional's help in diagnosing the cause of distressing psychological symptoms.

The defendants argue that Carnahan is merely *a* pharmacist, not *Mr. Smith's* pharmacist, and that, in any event, Rule 803(4) does not apply to pharmacists. (Docket No. 55 at 6-7 n.8.) Nothing in the text of the rule supports such limits. The Advisory Committee note to 803(4) explains that the exception is rooted in a "patient's strong motivation to be truthful" when seeking medical advice, which provides a "guarantee of trustworthiness." Carnahan became "Smith's pharmacist" when Smith began asking him medical questions, and Smith had every motive to truthfully explain his condition. That Carnahan was Smith's son-in-law, or that Smith spoke to Carnahan in an informal setting, does not diminish this motivation. Indeed, the

committee note explains that "[s]tatements to hospital attendants, ambulance drivers, or even *members of the family* might be included" in the scope of the exception. Fed. R. Evid. 803(4) advisory committee's note (emphasis added). And even though pharmacists are not medical doctors, they are trained professionals who are capable of advising patients about pharmaceuticals. *See United States v. Kappell*, 418 F.3d 550, 556 (6th Cir. 2005) (noting that "[s]everal other circuits have recognized that the [Rule 803(4)] covers statements made to non-physicians" and holding that the rule"covers statements made to a psychotherapist for purposes of medical diagnosis or treatment, even though the therapist is not a physician or nurse"). The court finds that Carnahan's testimony is admissible.

The defendants also argue that Ruth Smith's testimony regarding her husband's tendency to take medicine as prescribed is not admissible evidence of habit. Rule 406 states that "[e]vidence of the habit of a person . . ., whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit." First, the defendants note that Ruth Smith's testimony conflicts with the fact that Smith's bottle of Neurontin was not empty at the time of his death. But additional evidence that a person acted contrary to his general habit does not render habit testimony inadmissible. Second, citing *Bell v. Consolidated Rail Corp.*, 299 F. Supp. 2d 795 (N.D. Ohio 2004), they argue that Ruth Smith's testimony consists solely of "subjective and conclusory statements." (Docket No. 55 at 5 n.5.) In *Bell*, the court rejected testimony from trainmen that it was "not uncommon [or] unusual" for the defendant's trains to have non-functioning window defrosters. *Id.* at 801. The court noted that, "'before a court may

admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature.'" *Id.* at 800 (quoting *Bowman v. Corrections Corp. of America*, 350 F.3d 537, 549 (6th Cir. 2003)). The court believes that Ruth Smith will be able to show that she frequently observed her husband taking prescription medicine as directed.[7] Smith suffered from chronic pain for years, and he undoubtedly took various medications for much, if not all, of that time. This gave Ruth Smith ample opportunity to observe his medication-taking habits, and implicit in her testimony is the assertion that she made such observations. For the purposes of summary judgment, the court will consider her testimony.

In sum, the court finds that the plaintiff has offered enough admissible evidence to create a question of fact as to whether Smith took Neurontin in the days before his death.

## III.     The Learned Intermediary Doctrine

Next, the defendants argue that the plaintiff has failed to show causation because additional warnings would not have affected Dr. Mackey's decision to prescribe Neurontin.

Tennessee law recognizes the learned intermediary doctrine. Under this doctrine, "makers of unavoidably unsafe products who have a duty to give warnings may reasonably rely on intermediaries to transmit their warnings and instructions." *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn. 1994). Thus, if a drug company sufficiently warns doctors of a given

---

[7] The plaintiff does not specifically address Rule 406 in her response memorandum, and the defendants raised the argument for the first time in their reply.

side effect, the company cannot be held liable by patients for that side effect. "Warnings concerning prescription drugs generally are adequate when they contain a full and complete disclosure of the potential adverse reactions to the drug." *Id.*

Of course, "the learned intermediary doctrine does not shield a drug manufacturer from liability for inadequate warnings to the physician," *id.*, and here, the plaintiff has alleged that Pfizer did not adequately warn Dr. Mackey of Neurontin's side effects. Nevertheless, a pharmaceutical company can escape liability if it can show that additional warnings would not have changed the prescribing doctor's actions. In other words, the plaintiff must show that "the failure to warn the physician was . . . a cause in fact . . . of the plaintiff's injury." *Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 451 (Tenn. Ct. App. 1998) (citing 63A Am. Jur. 2d *Products Liability* § 1200 (1984)). The key inquiry is whether, "had additional warnings been given, the plaintiffs would not have sustained their injuries." *King v. Danek Med.*, 37 S.W.3d 429, 453 (Tenn. Ct. App. 2000).

There is no evidence that additional warnings from Pfizer would have caused Dr. Mackey to avoid prescribing the drug for Smith. Dr. Mackey did testify, however, that, had he known about Neurontin's psychological side effects, he "certainly" would have warned Smith about them and told Smith to look for signs of depression and suicidal ideation. (MDL Docket No. 1679, Ex. 12 at 42-43.) Similarly, the nurse who gave Smith the sample packages of Neurontin testified that she would have warned patients if she had known about Neurontin's side effects. (*Id.*, Ex. 25 at 15-16.)

The defendants argue that the plaintiff must present evidence that these hypothetical

warnings would have caused Smith to stop taking Neurontin. They cite *Vanderwerf v. SmithKlineBeecham Corp.*, 529 F. Supp. 2d 1294 (D. Kan. 2008), in which the plaintiffs' decedent committed suicide after taking Paxil, an antidepressant. The court found that the plaintiff did not sufficiently show that additional warnings from the doctor would have prevented the suicide: "A reasonable jury might infer, as a matter of common sense, that [the deceased] would have paid some attention to additional warning information. It would be entirely speculative, however, to conclude that he would use this information to prevent his own suicide. . . . [Plaintiffs] have not presented evidence as to [the deceased's] psychological state which would suggest that additional warning information would have changed his course of conduct." *Id.* at 1314 n.23.

In the instant case, though, it is not "entirely speculative" that Smith would have heeded warnings from Dr. Mackey. Even without the benefit of a doctor's warnings, Smith sought advice from his pharmacist son-in-law as to whether Neurontin could cause him to feel "loopy." This shows that Smith was concerned with the drug's side effects and that he was willing to follow up on those concerns. From this evidence, the jury could reasonably conclude that Smith would have stopped taking Neurontin if Dr. Mackey had told him in March 2004 that he should be alert to the possibility of increased depression or suicidality. *See Forst v. Smithkline Beecham Corp.*, 602 F. Supp. 2d 960, 970 (E.D. Wis. 2009) (in similar circumstances, denying summary judgment and finding that "[t]he record suggests that [the deceased] may not have continued taking Paxil if warned about an increased risk for suicidality"); *In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-md-1760, 2009 U.S. Dist. LEXIS 72098, at *6-7 (M.D. Tenn. Aug. 13,

2009) (denying summary judgment because the plaintiff's doctor "would still prescribe [the drug], but with a change in how he prepares the patient for the drug," and "Plaintiff himself . . . might have behaved differently").

Thus, the jury need not rely solely on its common sense to conclude that warnings from Dr. Mackey might have prevented Smith's suicide. The court finds that the learned intermediary doctrine does not require dismissal of the plaintiff's claims.

## IV.     Whether Suicide was an Intervening Cause

The defendants further argue that, under Tennessee law, Smith's suicide is an intervening cause that destroys proximate causation and relieves them of liability.[8]

The defendants correctly point out that Tennessee courts have long held that "the voluntary and free act of the deceased in taking [his] own life . . . [is] an abnormal thing, which supersedes defendant's liability." *Lancaster v. Montesi*, 390 S.W.2d 217, 222 (Tenn. 1965). Thus, suicide is usually an "independent intervening cause [that] breaks the chain of legal causation between the original negligent actor's conduct and the eventual injury." *Rains v. Bend of the River*, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003).

But the doctrine of independent intervening cause only applies when the intervening act (1) was not reasonably foreseeable to the negligent actor and (2) was not a normal response to the negligent actor's conduct. *Id.* Accordingly, Tennessee courts have recognized three exceptions to the general rule that suicide constitutes an intervening cause:

---

[8] The plaintiff points out that the defendants did not raise this argument in their earlier motion for summary judgment in the MDL court. Nevertheless, this court will consider the issue.

(1) [C]ircumstances in which the defendant's negligence causes delirium or insanity that results in self-destructive acts; (2) custodial settings in which the custodian knew or had reason to know that the inmate or patient might engage in self-destructive acts; and (3) special relationships, such as a physician-patient relationship, when the caregiver knows or has reason to know that the patient might engage in self-destructive acts.

*Id.* at 593-94 (citations omitted); *see also MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 736 (6th Cir. 2007).

The defendant argues that these are the only possible exceptions to the general rule regarding suicide and that none of them applies to this case. But this view is too narrow, and it disregards the relatively recent Tennessee Supreme Court case of *White v. Lawrence*, 975 S.W.2d 525 (Tenn. 1998). In *White*, the court offered a general explanation of proximate cause:

[P]roximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient."

*Id.* at 529 (citation omitted). The court then noted that "suicide *may* constitute an intervening cause if it is a willful, calculated, and deliberate act of one who has the power of choice." *Id.* at 530 (emphasis added).

But the *White* court explained that "[t]he fact that the deceased was not insane or bereft of reason does not necessarily lead to the conclusion that the suicide . . . is unforeseeable." *Id.* In examining proximate causation, "the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. If so,

19

the suicide is not an independent intervening cause breaking the chain of legal causation. Those decisions holding to the contrary are overruled." *Id.*; *see also Drake v. Williams*, No. M2007-00979-COA-R3-CV, 2008 Tenn. App. LEXIS 240, at *42 (Tenn. Ct. App. Apr. 25, 2008) ("The central issue then is whether reasonable minds could conclude that [the deceased's] suicide was a foreseeable result of [the defendant's] negligence . . . ."). Thus, the touchstone is foreseeability, not whether a given case fits into a previously carved-out exception.

This court has little trouble concluding that, if a drug company negligently or intentionally fails to warn doctors that a particular drug increases the risk of suicide, it is foreseeable that some patients who take the drug will commit suicide. Indeed, in that case, an increased rate of suicide is the "normal [result of] the negligent actor's conduct." *Rains*, 124 S.W.3d at 593. Thus, Smith's suicide does not act as an independent intervening cause, shielding Pfizer from liability.

The circumstances in *White* were analogous. There, the deceased suffered from alcoholism and severe depression. The defendant doctor instructed the deceased's wife to secretly place Antabuse, a drug that interacts with alcohol to create a highly unpleasant physical reaction, in the deceased's food. 975 S.W.2d at 527. Not knowing that he had been given the drug, the deceased drank alcohol, suffered the adverse reaction, and committed suicide by shooting himself. *Id.* at 527-28. The plaintiff offered expert testimony that it was foreseeable that this covert treatment might increase the risk of suicide. *Id.* at 528. The court found that proximate causation was a question for the jury and refused to grant summary judgment to the

defendant.[9]  *Id.* at 530.

Pfizer argues that, in *MacDermid*, the Sixth Circuit held that "Tennessee's framework for analyzing suicide as intervening cause is not based on fact issues regarding foreseeability." (Docket No. 55 at 15.)  Thus, according to the defendants, outside of the three narrow exceptions listed in *Rains*, suicide is *always* an intervening factor that destroys proximate causation.  (*Id.* at 15-16.)  But this is a misreading of *MacDermid*, which explicitly stated that "foreseeability is the touchstone of the independent intervening cause inquiry."  488 F.3d at 736.

Furthermore, *MacDermid* is factually distinguishable from the instant case.  There, the defendant credit card company was attempting to collect a debt from the plaintiff's wife.  When the defendant threatened the wife with criminal fraud prosecution, she committed suicide.  *Id.* at 725-27.  After analyzing Tennessee case law, the Sixth Circuit held that the wife's suicide resulted from a "moderately intelligent power of choice" and thus constituted an intervening cause.  *Id.* at 738.  The court relied heavily on *Lancaster*, a 1965 decision from the Tennessee Supreme Court.  *See id.* at 737 (citing *Lancaster*, 390 S.W.2d 217).  In *Lancaster*, the defendant physically abused a woman and "was clearly on notice of [her] intention to commit suicide if he persisted in treating her as he did."  *Id.*  When he continued to beat her, she committed suicide.

---

[9] *White* is the basis for the "doctor-patient" exception listed in *Rains*.  *See Rains*, 124 S.W.3d at 594.  It would be anomalous and unjust for the court to not extend this exception to pharmaceutical companies.  If the defendants' argument is correct, then a doctor can be liable for negligently prescribing a drug that causes a patient to commit suicide, but a drug company cannot be liable for causing the same injury by withholding information about the drug's side effects.  It makes no sense for the injury in the latter scenario to go unredressed, when it is just as foreseeable as the injury in the former.  This result would conflict with the "logic [and] common sense" that underlie Tennessee's concept of proximate cause.  *White,* 975 S.W.2d at 529 (citation omitted).

The *Lancaster* defendant was not liable, however, because the woman "'kn[ew] and underst[ood] the nature of her act'" and was in "'full command of [her] faculties.'" *Id.* (quoting *Lancaster*, 390 S.W.2d at 222) (last alteration in original).

There is a clear difference between a defendant's harassing or abusive behavior, as in *Macdermid* and *Lancaster*, and a defendant's negligence that causes a patient to ingest a drug that increases suicidality. In the latter case, suicide is, in some sense, "a normal response" to the defendant's actions. *See Rains*, 124 S.W.3d at 593. In *MacDermid*, the court specifically noted that "there [was] absolutely no expert medical proof that decedent's suicide was a reasonably foreseeable result of any act or omission of Defendant." *Id.* at 736 (citation omitted). Here, in contrast, an increased risk of suicide is the very reason that the defendants' conduct was allegedly negligent. Even if medication that causes suicidality does not create "delirium" or "insanity," as defined in *Lancaster* and its progeny, it effectively removes a patient's "power of choice." *See Macdermid*, 488 F.3d at 738.

Because it is at least a question of fact whether Smith's suicide is an independent intervening cause, the court will not dismiss the plaintiff's claims for lack of proximate cause. *Accord Rimbert v. Eli Lilly & Co.*, 577 F. Supp. 2d 1174, 1231-34 (D.N.M. 2008); *Stupak v. Hoffman-LaRoche, Inc.*, 287 F. Supp. 2d 968, 974-75 (E.D. Wis. 2003).

## V.     Implied Warranty Claims

The defendants argue that the plaintiff cannot maintain her claims for breach of implied warranty because she failed to give Pfizer notice of her claims before filing suit. They also argue that the claim for breach of implied warranty of fitness fails because there is no evidence that

Smith or Dr. Mackey relied on the defendants' skill and judgment.

Under Tennessee law, a buyer claiming breach of warranty "must within a reasonable time after he discovers . . . any breach notify the seller of breach or be barred from any remedy." Tenn. Code Ann. § 47-2-607(3)(a).  The term "'within a reasonable time' should be determined on a case-by-case basis, and in light of the nature, purpose and circumstances of such action." *Carmichael & Carmichael, Inc. v. Nicholstone Cos.*, No. 01-A-01-9104-CV-00148, 1992 Tenn. App. LEXIS 633, at *13 (Tenn. Ct. App. July 24, 1992) (citations and quotation marks omitted). Here, the plaintiff filed her suit just under one year after Smith's death.  She did not give Pfizer any separate, pre-suit notice of her claims.

The defendants do not argue that one year was an unreasonably long delay in giving notice.[10]  Instead, they argue that the statute required the plaintiff to give a separate, pre-suit notification of Smith's death.  But section 47-2-607(a)(3) simply requires that a plaintiff "notify the seller of breach within a reasonable time."  Nothing in the plain text of the statute indicates that a lawsuit cannot serve as this notification.  *Cf. Ashley v. Goodyear Tire & Rubber Co.*, 635 F.2d 571, 573 (6th Cir. 1980) (holding that a personal injury complaint put the defendant tire manufacturer on notice of its own third-party warranty claim against steel supplier).

---

[10] In any event, the reasonableness of the delay is a question of fact for the jury.  *See, e.g.*, *Artistic Carton Co. v. thelamco, Inc.*, No. 1:06-CV-316-TS, 2009 U.S. Dist. LEXIS 86994, at *11-12 (N.D. Ind. Sept. 22, 2009) (construing identical Indiana statute); *cf. Tidy Didy Di-Deeland, Inc. v. Bristol Jeans, Inc.*, No. 03A01-9301-CV-00007, 1993 Tenn. App. LEXIS 417, at *13 (Tenn. Ct. App. June 15, 1993) ("Whether the notice of revocation of acceptance was made within a reasonable time is a question of fact for the trier of fact to determine."). Furthermore, the standard for what constitutes a "reasonable time" for a retail consumer is laxer than the standard that applies to a merchant.  U.C.C. § 2-607 cmt. 4.

The defendants claim that *Friedman v. Georgia Showcase Co.*, 183 S.W.2d 9 (Tenn. Ct. App. 1944), supports their position. In *Friedman*, the court dismissed a commercial action because the plaintiff "admit[ted] that he gave no notice of his intention to claim a breach . . . for at least two years . . . until the pleadings were filed in this case." *Id.* at 11-12. The defendants have misread the case – the court's focus was the two years of delay, not the fact that the plaintiff gave notice via the pleadings.

The defendants also provide some non-Tennessee authority that commercial plaintiffs must give a separate, pre-suit notification. *E.g.*, *Williams v. Mozark Fire Extinguisher Co.*, 888 S.W.2d 303, 306 (Ark. 1994) (holding, in the context of a commercial case, that "the notice must be more than a complaint"). But it is "widely accepted" that a personal injury plaintiff can fulfill the notice requirement simply by filing a lawsuit. *Matos v. Nextran, Inc.*, No. 2008-65, 2009 U.S. Dist. LEXIS 71041, at *14-15 n.6 (D.V.I. Aug. 10, 2009); *see also, e.g.*, *Horne v. Novartis Pharms. Corp.*, 541 F. Supp. 2d 768, 786 (W.D.N.C. 2008) (finding that the notice provision may be satisfied if the plaintiff is "'a lay consumer and notification is given to the defendant by the filing of an action'"); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (Ill. 1996) ("[A] consumer plaintiff who suffers a personal injury may satisfy the section 2-607 notice requirement by filing a complaint stating a breach of warranty action against the seller."); *Shooshanian v. Wagner*, 672 P.2d 455, 462 (Alaska 1983) ("[A] complaint filed by a retail consumer within a reasonable period after goods are accepted satisfies the statutory notice requirement."). *But see Geib v. Oshkosh Truck Corp.*, No. CV 940135932S, 1997 Conn. Super. LEXIS 2403, at *2-3 (Conn. Super. Ct. Aug. 26, 1997) (noting "a split of authority" in various

jurisdictions).

It does not appear that Tennessee courts have squarely addressed this issue. But in

*Moulton v. Ford Motor Co.*, 1973 Tenn. App. LEXIS 319 (Tenn. Ct. App. 1973), *aff'd in part*,

511 S.W.2d 690, which was a personal injury case, the Tennessee Court of Appeals

characterized section 47-2-607(3)(a) as "providing for the time within which a claim must be

asserted." *Id.* at *10, *quoted in Ford Motor Co. v. Moulton*, 511 S.W.2d 690, 694 (Tenn. 1974).

This certainly suggests that a personal injury plaintiff can give notice by filing suit.

This approach accords with the purpose of the statute. Generally, the notice provision is

intended to alert the seller "that the transaction is still troublesome and must be watched," as

well as to "open[] the way for normal settlement through negotiation."[11] U.C.C. § 2-607 cmt. 4.

"As envisioned by Tenn. Code Ann. § 47-2-607(3)(a), a seller of goods with timely notice that

they are nonconforming may inspect the goods . . . and then cure the defects or preserve

evidence that no breach occurred." *Duffy Tool & Stamping v. Bosch Auto. Motor Sys. Corp.*, No.

M1997-00144-COA-R3-CV, 2000 Tenn. App. LEXIS 63, at *8 (Tenn. Ct. App. Feb. 1, 2000).

But notice serves a different purpose in personal injury cases:

> The purpose of enabling the seller to cure the defect has
> significance in a commercial setting but has no significance in a
> personal injury case[,] because the defect has already caused the

---

[11] The defendants argue that the comment to U.C.C. § 2-607 states that the purpose of the notice requirement is to give the parties "the opportunity to settle the dispute *prior to litigation*." (Docket No. 55 at 17.) But the comment only refers to "normal settlement through negotiation." U.C.C. § 2-607 cmt. 4. It is not immediately obvious that "normal settlement" cannot occur after a lawsuit has been filed. Also, the comment states that "there [is no] reason *to require* the notification to be a claim for damages." *Id.* (emphasis added). The clear implication is that a claim for damages *can* serve as notification.

harm and the seller can do nothing to remedy the situation that has already occurred.  However, the notice still serves the purpose of alerting the seller to the need of gathering evidence in preparation for trial or negotiation, and in order to protect against stale claims.  It also serves the general social purpose of informing the manufacturers of the need for making improvements to avoid further injuries.

Lary Lawrence, 6 Lawrence's Anderson on the Uniform Commercial Code § 2-607:7 (3d. ed. 2009).

These latter purposes are served just as well by the filing of a lawsuit as by a separate, pre-suit notification.  *See Hobbs v. GMC*, 134 F. Supp. 2d 1277, 1284 (M.D. Ala. 2001) ("[T]hese policies [do] not require notice in a situation of personal injury where notice is inconsequential in preventing or mitigating the harm since the injury has already occurred."). The court finds that section 47-2-607(3)(a) did not require the plaintiff to serve the defendants with separate, pre-suit notice of her claims.

Next, the defendants argue that the plaintiff's implied warranty of fitness claim must be dismissed because the plaintiff has not shown that Smith or Dr. Mackey relied on Pfizer's skill and judgment to furnish suitable goods.  *See* Tenn. Code Ann. § 47-2-315 (requiring that the seller know that "the buyer is relying on the seller's skill or judgment to select or furnish suitable goods").

Dr. Mackey explicitly testified, however, that he relied on information from the defendants when assessing Neurontin's fitness as a pain medication:

Q. . . . [H]ad you been under the impression that Neurontin was effective for pain relief in a person like Mr. Smith?

A.  Yes.

26

> Q. When you make determinations like this . . . Do you go out
> there and do your own independent medical research on drugs
> before you prescribe them?
>
> A. No.
>
> Q. Do you rely upon the drug companies to be honest and
> forthright with you? . . .
>
> A. Yes.
>
> Q. . . . Do you rely on the drug companies to tell you both the, the
> good and the bad and the ugly about their drugs, be honest about
> it?
>
> A. Yes.

(MDL Docket No. 1679, Ex. 12 at 27-28.)

Smith, in turn, obviously relied on Dr. Mackey's determination that Neurontin was a

suitable drug. Because this fulfills the reliance requirement of section 47-2-315, the court will

not dismiss the plaintiff's claim for breach of implied warranty of fitness.

## VI.        Fraudulent Concealment Claim

Finally, the defendants argue that the plaintiff's fraudulent concealment claim fails

because they had no duty to disclose Neurontin's risks to Dr. Mackey.[12]

Under Tennessee law, "'the tort of fraudulent concealment is committed when a party

who has a duty to disclose a known fact or condition fails to do so, and another party reasonably

---

[12] The MDL court previously dismissed the plaintiff's fraud claim "alleging affirmative
misrepresentations or a suppression of information as part of a national marketing campaign." *In
re Neurontin*, 618 F. Supp. 2d at 112. The court refused to dismiss a fraudulent concealment
claim regarding product labeling and sales representatives' visits to Dr. Mackey's office. *Id.* at
112-14.

relies upon the resulting misrepresentation, thereby suffering injury.'" *Shah*, 338 F.3d at 571

(quoting *Chrisman v. Hill Home Dev., Inc.* 978 S.W.2d 535, 538-39 (Tenn. 1998)).  The Sixth

Circuit has stated:

> The duty to disclose arises in three distinct circumstances: (1) "where there is a previous definite fiduciary relation between the parties," (2) "where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other," and (3) "where the contract or transaction is intrinsically fiduciary and calls for perfect good faith."

*Id.* (quoting *Domestic Sewing Mach. Co. v. Jackson*, 83 Tenn. 418, 425 (1885)).  The defendants

claim that they had no duty to disclose Neurontin's suicide-related risks because none of these

categories apply to this case.

First, the MDL court already held, in deciding Pfizer's motion to dismiss, that "a

manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts

about the risks of the drug, particularly when it is engaged in off-label marketing for uses not

approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot

reasonably discover the undisclosed facts."  *In re Neurontin*, 618 F. Supp. 2d at 110.  It derived

this rule from the nationwide consensus that drug manufacturers must warn doctors and patients

of their products' risks.  *Id.* at 109-10.  The MDL court specifically noted that the defendants did

not "contend[] that there [were] material differences" between Tennessee law and the state law

applicable to the other MDL cases.  *Id.* at 108.

Under the law of the case doctrine, this determination by the MDL court is binding.

"[T]he law of the case doctrine provides that a prior order of the Court in an action controls

unless a showing of a manifest injustice arises."[13]  *John B. v. Goetz*, No. 3:98-0168, 2010 U.S.

Dist. LEXIS 8821, at *190 (M.D. Tenn. Jan. 28, 2010) (citing *Arizona v. California*, 460 U.S.

605, 618 (1983)).  The defendants have not argued that the MDL court's determination of this

issue creates a manifest injustice.

Second, the defendants ignore the line of Tennessee precedent that arises from *Simmons*

*v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947), which held that "each party to a contract is bound

to disclose to the other all he may know respecting the subject matter materially affecting a

correct view of it."  As recently as last year, the Tennessee Court of Appeals reaffirmed this

principle, stating that "contracting parties have a duty to disclose material facts affecting the

essence of a contract's subject matter."[14]  *Odom v. Oliver*, No. W2008-01145-COA-R3-CV,

2009 Tenn. App. LEXIS 103, at *11 (Tenn. Ct. App. Mar. 17, 2009); *see also Lonning v. Jim*

*Walter Homes, Inc.*, 725 S.W.2d 682, 685 (Tenn. Ct. App. 1986) (same); *Patel v. Bayliff*, 121

S.W.3d 347, 353 (Tenn. Ct. App. 2003) ("[A] seller has a duty to disclose 'a fact of controlling

importance in determining the desirability and value of that residence . . . .'"); *Garrett v. Mazda*

---

[13] The court realizes that a "holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery."  *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000).  But there has been no additional discovery in the past nine months relevant to the narrow legal issue of whether a drug company has a duty to disclose its products' risks.

[14] Although there was no contract directly between Smith and Pfizer, the principle expressed in *Simmons* applies equally to drug manufacturers that conceal information from doctors and patients.  For example, in *Collins v. Danek Medical, Inc.*, No. 95-2829, 1999 U.S. Dist. LEXIS 4489 (W.D. Tenn. Mar. 23, 1999), the court dismissed a fraudulent concealment claim against the defendant medical device manufacturer because the plaintiff could not show that his doctor relied on the defendant's representations or omissions.  *Id.* at *19-22.  The court did not question, however, that the defendant owed a duty to disclose information about the medical device at issue.

*Motors of America*, 844 S.W.2d 178, 181 (Tenn. Ct. App. 1992) ("[A] seller who induces a purchaser to buy an article of property by . . . concealing a material fact is liable for the damages that are the natural and proximate result of the fraud."). "This concept goes back almost 200 years" in Tennessee's jurisprudence. *Bradley v. All Am. Classics of Tenn., Inc.*, No. M2008-01738-COA-R3-CV, 2009 Tenn. App. LEXIS 138, at *10 (Tenn. Ct. App. Apr. 16, 2009) (citing *Perkins v. M'Gavock*, 3 Tenn. 415, 417 (1813)).

Furthermore, it is well settled that a drug manufacturer has "an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use."[15] *Laws v. Johnson*, 799 S.W.2d 249, 253 (Tenn. Ct. App. 1990); *see also Pittman*, 890 S.W.2d at 429 (noting that drug companies must give physicians "a full and complete disclosure of the potential adverse reactions to the drug"). The court concludes that, in the context of a patient's fraudulent concealment claim, a pharmaceutical company has a duty to disclose to the prescribing physician any material facts regarding the risks of its drugs. Here, it is almost certain that an increased risk of suicide is material to doctors' and patients' treatment decisions regarding Neurontin.

In *Shah*, the Sixth Circuit recognized the existence of *Simmons* and subsequent cases but noted that they were generally limited to real estate or automobile sales. 338 F.3d at 572 n.9 *But see Body Invest, LLC v. Cone Solvents, Inc.*, No. M2006-01723-COA-R3-CV, 2007 Tenn. App. LEXIS 480, at *16, 24 (Tenn. Ct. App. July 26, 2007) (allowing a fraudulent concealment claim

---

[15] The defendants argue that Pfizer's duty to warn of risks is completely unrelated to its duty to disclose those risks (Docket No. 18 at 20 n.12), but this is unpersuasive. Neither *Shah* nor *McConkey v. McGhan Medical Corp.*, 144 F. Supp. 2d 958 (E.D. Tenn. 2000), the cases cited by the defendants, addressed the interplay of the two duties.

to go forward when the defendant sold contaminated chemicals to the plaintiff, a tanning products manufacturer). The Sixth Circuit "decline[d] to anticipate that the Tennessee Supreme Court would extend [these cases] to the context of a franchise dispute." 338 F.3d at 572 n.9. But given the consensus that drug manufacturers have a duty to disclose their product's risks, *see In re Neurontin*, 618 F. Supp. 2d at 109-10, this court believes that the Tennessee Supreme Court *would* extend the rule to pharmaceutical cases, where patients' lives are at stake and where drug companies generally have "superior access to information about their drugs." *Wyeth v. Levine*, 129 S. Ct. 1187, 1202 (2009).

The defendants cite two Eastern District of Tennessee cases in support of their argument, but both are easily distinguishable from the instant case. In *McConkey v. McGhan Med. Corp.*, 144 F. Supp. 2d 958 (E.D. Tenn. 2000), the court dismissed a claim that 3M had concealed facts about the risks of silicone breast implants. *Id.* at 965-66. The plaintiff received breast implants in 1988, but these were manufactured by McGhan Medical Corp., not 3M. *Id.* at 961. 3M had divested its breast implant business to McGhan four years earlier. *Id.* Furthermore, "the medical community, the Food and Drug Administration, and much of the public already knew the risks associated with [breast implants] as early as the late 1970's. . . . 3M therefore had no duty to reveal information already in the public domain." *Id.* at 966. Here, in contrast, it was not publicly known that Neurontin increased the risk of suicide, and the defendants manufactured the Neurontin that Smith took.

In *Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704 (E.D. Tenn. 2001), the court found that the defendant beryllium manufacturer had no duty to disclose risks associated with

that substance, which is used in the production of nuclear weapons. *Id.* at 721-22. The plaintiffs were government employees who contracted chronic beryllium disease ("CBD") while working for government contractors. They alleged that the defendant concealed the fact that beryllium was not safe in airborne concentrations of less than 2.0 micrograms per cubic meter. *Id.* at 715. But the Atomic Energy Commission knew, from 1951 onward, "that CBD had been found in a small group of people who had been exposed to beryllium at levels far below the 2.0 standard." *Id.* at 712. It was common knowledge that beryllium was a toxic substance, whereas here, it was not common knowledge that Neurontin increased the risk of suicide.

Tennessee courts have deemed it important enough for a home seller to disclose that a house is constructed from logs, *Odom*, 2009 Tenn. App. LEXIS 103 at *18-19, or for a car seller to disclose that the dealer has replaced the engine, *Garrett*, 844 S.W.2d at 180, that they impose an affirmative duty to disclose these facts. Certainly, then, the law must impose a similar duty on a pharmaceutical company when that company knows that its drug might cause patients to commit suicide. The court will not dismiss the plaintiff's fraudulent concealment claims on the basis that the defendants had no duty to disclose.

## CONCLUSION

For all of the reasons discussed above, the court will deny the defendants' Motion for Summary Judgment.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge