EXHIBIT A

*668 So. 2d 1016, \*; 1996 Fla. App. LEXIS 846, \*\*;*
*21 Fla. L. Weekly D 385*

JAMES A. NORMAN, JR. and TYLEIA NORMAN, Appellants, v. GLORIA FARMS, INC., Appellee.

CASE No. 93-2181.

COURT OF APPEAL OF FLORIDA, FOURTH DISTRICT

668 So. 2d 1016; 1996 Fla. App. LEXIS 846; 21 Fla. L. Weekly D 385

February 7, 1996, Filed

**SUBSEQUENT HISTORY:** [**1] Released for Publication February 23, 1996. Petition for Review Denied September 4, 1996, Reported at: 1996 Fla. LEXIS 1608.

**PRIOR HISTORY:** Appeal from the Circuit Court for Okeechobee County; William L. Hendry, Judge. L.T. CASE NO. 91-545 CA.

**LEXISNEXIS® HEADNOTES**                                                                 ⊞**Show**

**COUNSEL:** Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, and Orrin Beilly of The Law Offices of Orrin R. Beilly, West Palm Beach, for appellants.

Stephen G. Hayskar and Garrison M. Dundas of Brennan, Hayskar, Jefferson, Gorman, Walker & Schwerer, P.A., Fort Pierce, for appellee.

**JUDGES:** PARIENTE, J., GLICKSTEIN, J., and KROLL, KATHLEEN, Associate Judge, concur.

**OPINION BY:** PARIENTE

**OPINION**

[*1018] PARIENTE, J.

Plaintiffs, James and Tyleia Norman, appeal an adverse jury verdict in a personal injury lawsuit. We reverse because the combination of improper contact between the jury's foreman and his brother, an employee of defendant's liability carrier, and repeated improper remarks in closing argument lead us to conclude that plaintiffs did not receive a fair trial from an impartial jury.

Plaintiff, James Norman, received injuries while hog hunting on the premises of defendant, Gloria Farms, located in Okeechobee County, Florida. Plaintiff Norman, along with a group of five others, had [**2] been invited to go hunting for wild hogs by a ranch hand who had received permission from his father, the farm's foreman. Plaintiffs filed suit for damages, alleging that the accident was caused by the presence of a culvert covered with vegetation on the side of a road where plaintiff Norman had been riding in the morning hours of January 7, 1990. Liability was contested. A central issue regarding defendant's liability was whether it negligently maintained its premises in a dangerous condition and negligently failed to warn of the dangerous condition created by the camouflaged culvert. Following trial, the jury rendered a verdict in favor of defendant.

THE JUROR ISSUE

After the adverse jury verdict, plaintiffs learned that the foreman of the jury was the younger brother of an agent of Florida Farm Bureau, defendant's liability insurer. [1] The brother, in fact, had participated in the liability investigation of plaintiff Norman's accident. Defendant does not dispute this fact. The trial court granted a jury interview based on verified allegations of improprieties. **[*1019]** Instead of a jury interview before the court, the court authorized the taking of the deposition of the juror where **[**3]** both sides, but not the court, were present. The juror testified that while he knew his brother worked for the insurance company, he did not know that his brother's company insured defendant or that his brother had taken part in the investigation of the accident.

> **FOOTNOTES**
>
> [1] We agree with the trial court's conclusion that the juror's failure to disclose this familial relationship did not amount to improper concealment by the juror warranting reversal. Neither counsel asked any questions of the jury panel or this juror, individually, that should have alerted him to volunteer his familial relationship during voir dire. The insurance company was not named as a party, nor was the juror's brother named as a witness. Counsel did not ask the jurors whether they had any close friends or relatives employed by an insurance company. The fact that plaintiffs' counsel asked another juror about his relationship with Florida Farm Bureau was insufficient to have alerted the juror to disclose his relationship through his brother.

Plaintiffs **[**4]** further learned in post-trial deposition that the juror had two conversations with his brother during this three-day trial regarding the case. Although the juror testified in deposition that no substantive matters concerning the case were discussed during either conversation with his brother, he did admit that he told his brother, in response to his brother's inquiry as to how the case was going, that "Mr. Hayskar [defense counsel] was eating [plaintiffs' trial counsel's] lunch." [2]

> **FOOTNOTES**
>
> [2] He further testified that he told his brother he had received a subpoena to appear for the juror interview, to which his brother responded that "I knew you were probably going to get one." His brother told him the reason he was being subpoenaed was "because him and I were brothers and he had worked for Farm Bureau." Whether or not the juror knew of Florida Farm Bureau 's relationship to the case before the return of the jury verdict, by the time the juror was asked to testify post-trial he most certainly was aware of this relationship.

**[**5]** At the outset of trial, the judge expressly and repeatedly instructed the jury that they were prohibited from discussing the case with third parties in order to prevent outside influence, and further instructed them not to prematurely form an opinion as to the merits of the case or receive any evidence outside of the courtroom. Despite the judge's explicit instruction, the offending juror admittedly engaged in two separate conversations with his brother regarding the case during the three-day trial. His brother was not just a relative, but an employee of the defendant's liability carrier who participated in the investigation of this particular accident.

The very fact that questions were asked of a juror by a representative of defendant's liability

carrier during the pendency of the trial and the fact that the juror discussed the case in any manner with an outside party is troubling. It is axiomatic that one side ought not to have an unfair advantage by learning from a juror prior to the jury verdict how the case was going. Such information has the potential of influencing any settlement discussions during trial and trial strategy.

The fact that a juror is approached by a party, **[**6]** his agent or attorneys, or even the trial judge is considered an objective act extrinsic to the verdict which potentially compromises the integrity of the fact-finding process. See Maler v. Baptist Hosp. of Miami, Inc., 559 So. 2d 1157 (Fla. 3d DCA 1990), order approved, 579 So. 2d 97 (Fla. 1991); Fitzell v. Rama Indus., 416 So. 2d 1246, 1247 (Fla. 4th DCA 1982). As stated by the third district in Maler:

> In order to constitute juror misconduct and, therefore, a matter extrinsic to the verdict sufficient to set aside the verdict or for a post-trial jury inquiry, Florida and other courts have consistently held that some objective act must have been committed by or in the presence of the jury or a juror which compromised the integrity of the fact-finding process, as where . . . a juror was approached by a party, his agent or attorneys . . . .

559 So. 2d at 1162.

We find that the agent's improper contact with a juror and their subsequent conversation regarding the juror's perceptions of the case constitute objective acts within the contemplation of Maler that compromise the integrity of the fact-finding process. The question of "how the case **[**7]** was going" was initiated by a representative of defendant. This represents an instance of improper contact which will not be tolerated as a matter of public policy. Additionally, the response made by the juror was in contravention of an express instruction by the trial court not to discuss the case with anyone. That his response plainly indicated the juror's perceptions regarding the merits of the case further exacerbated the negative impact of the juror's misconduct.

In Amazon v. State, 487 So. 2d 8, 11 (Fla.), cert. denied, 479 U.S. 914, 107 S. Ct. 314, 93 L. Ed. 2d 288 (1986), the supreme **[*1020]** court enunciated the general rule that "potentially harmful misconduct is presumptively prejudicial." Contact with a juror during trial about the pending matter falls within this category. Id. Once that threshold has been met, the burden then shifts to the party seeking to preserve the jury's verdict to demonstrate that the contact was harmless. Id. In Maler, 579 So. 2d at 100 n.1, and State v. Hamilton, 574 So. 2d 124, 129 (Fla. 1991), the supreme court made this standard even more explicit. Once improper contact or juror misconduct is established by juror interview, the **[**8]** moving party is entitled to a new trial unless the opposing party can demonstrate that there is no reasonable possibility that the juror misconduct affected the verdict. See also Amazon, 487 So. 2d at 11.

We believe the record demonstrates that a potentially prejudicial communication occurred and defendant did not dispel the presumption of prejudice. The communication in this case at the very least supplied an employee of defendant's liability carrier with information that could improperly give defendant an unfair advantage. This cannot be countenanced as a matter of policy.

Albeit in a different context, that of an *ex parte* communication between a trial judge and a deliberating jury, specific prejudice will also be presumed even if the communication is innocent and purportedly unrelated to the issues in the case. See, e.g., Hernandez v. Charles E. Virgin, M.D., P.A., 505 So. 2d 1369 (Fla. 3d DCA 1987). In those cases it has been held

that:

> Reversal is required where . . . owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless.

Hatin v. Mitjans, 578 So. 2d 289, [**9] 290 (Fla. 3d DCA), review denied, 591 So. 2d 181 (Fla. 1991). ³

---

**FOOTNOTES**

³ We also note that in this case, the trial court based its conclusion that the juror's conduct did not necessitate a new trial solely upon a transcript of the juror's deposition which had been filed prior to the hearing on the motion for a new trial. We believe that the inquiry by deposition alone was insufficient. Rather, in such a situation, a juror interview conducted by the trial judge would have been the proper procedure to follow. See Sconyers v. State, 513 So. 2d 1113, 1117 (Fla. 2d DCA 1987). Although no rule of procedure requires that the inquiry be conducted in the presence of the court, the strong public policy against allowing litigants to harass jurors and the limited scope of any inquiry concerning jury deliberations compels us to conclude that this public policy is best served by a court-supervised interview. In this case, such a procedure would have assisted the trial court in accurately learning what had transpired between the juror and his brother directly from the juror, thus placing the trial court in a better position to determine whether further inquiry of the juror's brother or other agents of Florida Farm Bureau was warranted.

---

[**10]

A new trial based on complained-of conduct or improper contact may be required under "some circumstances as a matter of public policy for the purpose of maintaining confidence in the integrity of jury trials." Policari v. Cerbasi, 625 So. 2d 998, 998 (Fla. 5th DCA 1993) (citing Snelling v. Florida E. Coast Ry., 236 So. 2d 465, 466 (Fla. 1st DCA 1970)). While a party is not necessarily entitled to a perfect trial, a party is entitled to a fair one. Id. The combination of the juror's relationship to and conversations with his brother together with improper and inflammatory remarks made by defense counsel during closing argument substantially undermined plaintiffs' right to a fair trial, compromised the integrity of this jury trial, and thwarted substantial justice. Doyle v. State, 460 So. 2d 353, 356-57 (Fla. 1984); Policari; see generally Ford v. Robinson, 403 So. 2d 1379 (Fla. 4th DCA 1981). We therefore address the improper comments of defense counsel in closing argument.

IMPROPER CLOSING ARGUMENT REMARKS

Okeechobee is a rural community with many ranches and farms. Hunting (including wild hog hunting) is a popular sport as evidenced by the fact that [**11] among the six jurors and one alternate seated, only two had never hunted. Among the other five, four hunted, including hunting for hogs, and the fifth juror's husband hunted often.

During closing, defense counsel made the following arguments, all of which we find to be an improper appeal to the [*1021] passions and prejudices of this jury on the critical issues of liability and financial responsibility. Near the beginning of his closing argument, defense counsel stated:

> **A verdict in this case for the Normans, a verdict in this case against Gloria Farms is going to bring an immediate halt to hog hunting in Okeechobee.**
>
> **Can you imagine any rancher, anybody that owns property in this town or community ever allowing anybody to come out and hog hunt again? Not if the news of this were to get out?**

Midway through his argument, defense counsel returned to this line of improper argument:

> **This is just a decision you need to make based on being an Okeechobee resident and knowing there is lots of ranch property around and hog hunting is something special in Okeechobee**, it is not done everywhere, and trying to decide in your own mind what **[**12]** should be reasonably expected of a ranch owner who is willing to allow a group of people to come out and hunt hogs on his property. What should be expected in those circumstances and those conditions.

Finally, the closing argument concluded with the following exhortation:

> Take your time; there is no rush. Talk it out among yourselves. Do what is right. Do what justice requires. **And your message will be heard by every landowner in Okeechobee County.**

The message that defendant was communicating to the jury of Okeechobee residents was clear -- to render any verdict in this case for plaintiffs would endanger the recreational usage of all land in Okeechobee County for hunting. Although no punitive damages were being claimed, defense counsel impermissibly claimed that the verdict would have a punitive effect on landowners in general. He directly implored the jury to protect their neighbors, as well as their own interests as hunters and community residents, by returning a verdict for defendant, warning that a verdict in favor of plaintiffs would bring "an immediate halt to hog hunting in Okeechobee." This statement is not only totally unsupported by the **[**13]** evidence; it is blatantly untrue.

Defense counsel's remarks during his closing impermissibly went far beyond traditionally impermissible golden rule arguments with a totally improper appeal to the jurors' self-interest as hunters, fellow Okeechobee residents and "the conscience of the community." Whereas a golden rule argument may ask the juror to put himself or herself in the shoes of the litigant, here defense counsel told the jurors that they would in fact be personally affected by the outcome of this case. With his persuasive plea to the jurors as residents of the Okeechobee community, defense counsel launched a "conscience of the community" attack by asking the jurors to consider the effect of a plaintiffs' verdict on their lives in Okeechobee. Similar appeals to the prejudices of the jury have been condemned. S.H. Inv. & Dev. Corp. v. Kincaid, 495 So. 2d 768 (Fla. 5th DCA 1986), review denied, 504 So. 2d 767 (Fla. 1987). As the fifth district stated in Kincaid:

> This us-against-them plea can have no appeal other than to prejudice . . . . Such argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according **[**14]** to the facts and evidence presented at trial . . . . Our condemnation of a "community conscience" argument is not limited to the use of those specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community law through common duty and expectation.

Id. at 771 (quoting Westbrook v. General Tire & Rubber Co., 754 F.2d 1233, 1238-39 (5th Cir. 1985)). See generally Borden, Inc. v. Young, 479 So. 2d 850 (Fla. 3d DCA 1985), review denied, 488 So. 2d 832 (Fla. 1986).

By telling the jurors that their verdict would put an end to recreational hog hunting, and by asking the jurors to decide this case as Okeechobee residents knowing that hog hunting is "something special in Okeechobee," defense counsel attempted to dissuade the jurors from deciding the case in a fair and impartial manner based on the evidence and issues in this case. Instead, the jurors were told that the outcome of this case would affect them personally and their way of life in  [*1022]  Okeechobee. The comments thus constituted a threat on two levels: that a verdict would destroy the jurors' lifestyle and that a verdict would subject the jurors to community condemnation.

 [**15]  Besides invoking fears personal to the jurors as Okeechobee residents, defense counsel also played on general fears and prejudices of the jury by evoking images of runaway verdicts and frivolous lawsuits and their effect on the American system of justice [4] and by attacking plaintiffs' lawyers with impermissible comments regarding their trial strategy in personal injury cases. [5] All of these arguments have been uniformly condemned. Plaintiffs describe defense counsel's closing argument as a veritable catalogue of improper closing arguments and we agree.

---

**FOOTNOTES**

[4] If you are nice enough to let a group of people come out and pursue an activity they want to pursue, what do you get for it in return, you get a lawsuit. You get somebody coming in and asking for $ 400,000.

What is happening to our American system of justice if that is what is supposed to be justice?

Courts have held such comments on the perceived impact of personal injury cases on the court system to be improper attempts to appeal to the "conscience of the community and matters far afield from the evidence admitted." Bellsouth Human Resources Admin., Inc. v. Colatarci, 641 So. 2d 427, 429 (Fla. 4th DCA 1994) (quoting Stokes v. Wet ' N Wild, Inc., 523 So. 2d 181, 182 (Fla. 5th DCA 1988)); see also Bosch v. Hajjar, 639 So. 2d 1096 (Fla. 4th DCA 1994), and cases cited therein. [**16]

[5] Plaintiffs' lawyers love to get up here and fill out all these blanks here; seventy here, seventy-five thousand here; twenty-five thousand here. You know, the secret to that is to get up here and grab this stand just as hard and tight as you can and ask for just as much money as you can ask for and hope you don't turn people off.

As then-Judge Anstead, writing for this court, noted in Hartford Accident & Indemnity Co. v. Ocha, 472 So. 2d 1338, 1343 (Fla. 4th DCA), petition for review dismissed, 478 So. 2d 54 (Fla. 1985):

Suggesting that all claimants' lawyers always ask for more than they expect to receive or that defense lawyers always say their clients are innocent or that the damages are minor, adds nothing to the orderly resolution of the factual disputes before the jury, and does considerable harm to the already impaired reputation of the legal profession. . . . The trial court should not hesitate . . . to keep tight reins on a lawyer who seeks to win his case by castigating an entire segment of the legal profession.

See also Bellsouth; Stokes.

 [**17]  The frequency with which improper and inflammatory references to matters outside the record are made by trial lawyers during closing argument prompted Judge Alvarez to refer to the problem as a "malady" which has "with increasing and disturbing frequency, infected the courtrooms of this state." Bosch v. Hajjar, 639 So. 2d 1096, 1097 (Fla. 4th DCA 1994) (Alvarez, Assoc. J., concurring). Judge Klein expressed his exasperation that, no matter how often appellate opinions address the subject, "trial counsel and trial judges do not seem to get the message" that inflammatory arguments made by counsel for either plaintiff or defendant will not be tolerated. Bellsouth Human Resources Admin., Inc. v. Colatarci, 641 So. 2d 427, 430 (Fla. 4th DCA 1994).

Apparently, this problem is not simply a malady of the nineties. In 1978, Judge Letts expressed that "we are distressed at an increasing tendency, by the trial bar, to permit the noble art of trial practice to degenerate into a free-for-all." Nelson v. Reliance Ins. Co., 368 So. 2d 361, 361 (Fla. 4th DCA 1978). Too often we see examples of both sides engaging in improper argument in a kind of "tit for tat" approach to trial advocacy.  [**18]  [6] See, e.g., Bellsouth; Borden; Metropolitan Dade County v. Dillon, 305 So. 2d 36 (Fla. 3d DCA 1974), cert. denied, 317 So. 2d 442 (Fla. 1975).

> **FOOTNOTES**
>
> [6] While we recognize the need for zealous advocacy, we agree with the langugage in Murphy v. Murphy, 622 So. 2d 99, 102 (Fla. 2d DCA 1993): "We are cognizant of the glamorization of the 'cowboy' litigator. We believe, however, that a trial jury should not resemble a 'Shoot-out at the OK Corral'."

However, here plaintiffs' counsel did not engage in misconduct during closing argument and, in fact, did nothing to prompt the improper comments, so that defendant's arguments cannot, by any stretch of the imagination, be deemed a fair response to the opposing side's tactics. See Borden. The difficulty presented by this case is not plaintiffs'  [*1023]  similar misconduct; but rather, the failure of plaintiffs' counsel to object during the entire litany of improper closing argument remarks.

While not condoning improper closing arguments, our court has been **[**19]** unwilling to overturn a verdict in the absence of a contemporaneous objection unless the remarks are so outrageous that they rise to the level of fundamental error. [7] The remarks must be "of such character that neither rebuke nor retraction may entirely destroy their sinister influence." Baggett v. Davis, 124 Fla.  **[**20]**  701, 717, 169 So. 372, 379 (1932); Budget Rent A Car Sys. v. Jana, 600 So. 2d 466 (Fla. 4th DCA), review denied, 606 So. 2d 1165 (Fla. 1992); LeRetilley v. Harris, 354 So. 2d 1213, 1215 (Fla. 4th DCA), cert. denied, 359 So. 2d 1216 (Fla. 1978). See also Tyus v. Apalachicola N. R.R., 130 So. 2d 580, 587 (Fla. 1961); Seaboard Air Line R.R. v. Strickland, 88 So. 2d 519 (Fla. 1956). We find significant our supreme court's holding in Strickland which dealt with unobjected-to closing argument in a civil case:  **[**21]**

> While we are committed to the rule that in the ordinary case, unless timely objections to counsel's prejudicial remarks are made, this court will not reverse the judgment on appeal, however, this ruling does not mean that if prejudicial conduct of that character in its collective impact of numerous incidents, as in this case, is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury, this court will not afford redress. . . . Courts are conscious of the fact that without partisan zeal for the cause of his client, counsel in many instances could have little success in properly representing litigants in sharply contested cases,

but his conduct during the cause must always be so guarded that it will not impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury.

88 So. 2d at 523. Our supreme court further elaborated on the appellate court's ability to reverse based on closing argument remarks in certain limited circumstances:

For lack **[\*\*22]** of objection and specific motion, it is argued that an appellate court may not interfere. As to the ordinary case, we agree, but we have never understood it to be the law that flagrantly abusive statements, unsupported by the evidence and introducing matters clearly irrelevant to the jury's deliberation of the issues on the law and the evidence, in the absence of an admonition to the jury, are immune from appellate redress simply because there was not an objection to each such statement.

Id. at 524 (quoting Robinson v. Pennsylvania R. Co., 214 F.2d 798, 802 (3d Cir. 1954)).

---

**FOOTNOTES**

**7** The third district, however, has granted a new trial where it finds that the unobjected-to comments of trial counsel constitute an ethical violation. See Martino v. Metropolitan Dade County, 655 So. 2d 151 (Fla. 3d DCA 1995); Kaas v. Atlas Chem. Co., 623 So. 2d 525 (Fla. 3d DCA 1993); Borden, Inc. v. Young, 479 So. 2d 850 (Fla. 3d DCA 1985), review denied, 488 So. 2d 832 (Fla. 1986); Schreier v. Parker, 415 So. 2d 794 (Fla. 3d DCA 1982). The first and fifth districts have likewise been willing to reverse for the cumulative effect of remarks during closing argument which constitute ethical violations. See Sacred Heart Hosp. of Pensacola v. Stone, 650 So. 2d 676 (Fla. 1st DCA 1995); Pippin v. Latosynski, 622 So. 2d 566 (Fla. 1st DCA 1993). See also Silva v. Nightingale, 619 So. 2d 4 (Fla. 5th DCA 1993); S.H. Inv. & Dev. Corp. v. Kincaid, 495 So. 2d 768 (Fla. 5th DCA 1987), review denied, 504 So. 2d 767 (Fla. 1987); Murphy v. Murphy, 622 So. 2d 99, 102 (Fla. 2d DCA 1993).

While in both Jeep Corp. v. Walker, 528 So. 2d 1203 (Fla. 4th DCA 1988), and Lemoine v. Cooney, 514 So. 2d 391 (Fla. 4th DCA 1987), review denied, 523 So. 2d 577 (Fla. 1988), we acknowledged the approach taken by the third district in Borden, in neither Walker nor Lemoine did we find that the misconduct sank to the depths of that encountered in Borden so as to deny the party a fair trial. The different approaches of the districts to unobjected-to improper remarks during closing arguments are set forth in a Florida Bar Journal article. See John W. Reis, Improper Jury Argument: Gilding the Lustre of the Golden Rule, Fla. B.J., Jan. 1995, at 60.

---

We continue to adhere to the proposition adopted by this court that we "perceive very few instances where remarks by an attorney are of such sinister influence as to constitute reversible error, absent objection." Nelson, 368 So. 2d at 361. See also LeRetilley. However, the remarks here went far beyond traditional golden rule arguments which we have found do not constitute **[\*1024]** fundamental error warranting reversal absent objection. See Jana; LeRetilley. Moreover, we find the nature of defense counsel's arguments to be far more egregious in their potential impact on the integrity of the **[\*\*23]** fact-finding process than other types of arguments which have been condemned based solely on constituting a violation of Florida Rule of Professional Conduct 4-3.4(e). **8** In this case, the impermissible statements were inflammatory, directly appealing to the juror's passions and prejudices and calculated to produce a verdict based on fear and self-interest. See Baggett, 124 Fla. at 717, 169 So. at 379. The statements were "flagrantly abusive" and "unsupported by the evidence." See Strickland, 88 So. 2d at 524. Accordingly, due to the nature of the remarks,

their collective import and their pervasiveness throughout closing argument, we find that the remarks constitute fundamental error. See Strickland.

> **FOOTNOTES**
>
> 8 For example, arguments expressing personal beliefs and opinions of the lawyers do not inherently appeal to the jury's passions or prejudice. But see Davies v. Owens-Illinois, Inc., 632 So. 2d 1065, 1067 (Fla. 3d DCA), review denied, 641 So. 2d 1346 (Fla. 1994); Kaas.

Based on the combination **[\*\*24]** of the juror issue and defense counsel's improper and inflammatory closing argument, we reverse and remand for a new trial.

GLICKSTEIN, J., and KROLL, KATHLEEN, Associate Judge, concur.