# EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3

 4

 5   In re:  NEURONTIN MARKETING, )

 6   SALES PRACTICES AND PRODUCTS )

 7   LIABILITY LITIGATION         )

 8   --------------------------- ) MDL Docket No. 1629

 9   THIS DOCUMENT RELATES TO:    ) Master File No.

10                                ) 04-10981

11    BULGER v. PFIZER, et al.,   )

12    07-11426-PBS                ) Judge Patti B. Saris

13                                ) Magistrate Leo T.

14    SMITH v. PFIZER, et al,     ) Sorokin

15    05-CV-11515-PBS             )

16   ---------------------------

17

18          DEPOSITION OF ALEXANDER RUGGIERI, taken

19          at 999 Enchanted Way, Board Room 3,

20          Simi Valley, California, commencing at

21          9:10 A.M., Friday, December 5, 2008,

22          before Kathleen E. Barney, CSR #5698.

23

24      Job No. 183324

25   PAGES 1 - 330
```

 1   BY MR. ALTMAN:

 2      Q.  Was there some kind of a statement by the

 3   FDA in January of this year concerning antiepileptics

 4   and suicidality?

 5      A.  I was -- I came to be aware of that, yes.

 6      Q.  So there was a statement -- there was a

 7   communication --

 8      A.  I'd have to check the exact -- sorry.  I'd

 9   have to check the exact date to say I was aware on a

10   certain date.  I became aware of it.  I'm not sure if

11   it was on the exact date of the alert.

12      Q.  Okay.  And that document discussed

13   antiepileptic drugs, correct?

14      A.  The alert that I eventually found my way to

15   was the web link to that, and if that's what you mean

16   by a document, yes.

17      Q.  Okay.  And Neurontin is one of those drugs,

18   correct?

19      A.  Neurontin -- I'm not sure -- I can't recall.

20   I'd have to look at the specific alert.  I'm not sure

21   if the -- if Neurontin was enumerated.  I'd have to

22   check.  I believe my memory says it was included.

23      Q.  At the time that alert came out, do you

24   believe you possessed the requisite qualifications to

25   discuss that alert and how to interpret that alert?

```
 1            MR. BARNES:  Objection.  He had the
 2   requisite qualifications as a physician and drug
 3   safety expert to interpret the safety alert?
 4   BY MR. ALTMAN:
 5       Q.  Do you have the -- do you possess -- did you
 6   possess the requisite qualifications to interpret and
 7   comment upon the alert?
 8       A.  Yes.
 9       Q.  Okay.  So that's not some new skill you just
10   obtained between then -- you could have done it back
11   in January, correct?
12       A.  I don't understand the question.
13       Q.  Bad question.  Forget it.  Strike that.
14            MR. BARNES:  In January -- I think he
15   answered in January he was qualified to interpret the
16   safety alert.  He answered that already.  That was
17   your question.
18            MR. ALTMAN:  That's fine.
19            MR. BARNES:  Yeah.  He's answered that.
20            MR. ALTMAN:  Okay.
21   BY MR. ALTMAN:
22       Q.  Do you believe you possess the
23   qualifications to express opinions based upon the
24   statistical analysis done by the FDA in response to
25   that alert?
```

1    A.  Yes.

2    Q.  Okay.  What is the basis of that -- those
3  qualifications?

4    A.  I have a master's in public health with --
5  which includes epidemiological training.  I've worked
6  in pharmacovigilance, pharmacoepidemiology.  Versed
7  in the techniques that can be applied to study both
8  signal detection and analysis of data for drawing
9  safety inferences.  I'm a physician and I understand
10  the impact and the meaning of these types of alerts
11  and both the potential positive and negative impacts
12  they can have on patient care.  And in this
13  particular case I immersed myself in a lot of the
14  information specific to Neurontin that was included
15  in that alert.

16    Q.  Okay.  Do you believe that you possess the
17  requisite qualifications to review the advisory
18  committee transcripts -- strike that.

19    Are you aware that an advisory committee
20  meeting took place in July of 2008 with respect to
21  antiepileptic drugs and suicidality?

22    A.  Yes.

23    Q.  Were you aware that Neurontin was one of the
24  drugs discussed in that meeting?

25    A.  I believe it was the FDA meta-analysis that

1   was discussed in that meeting.  I did not recall
2   specific discussions about Neurontin in that meeting.
3       Q.  But Neurontin was one of the drugs that was
4   the subject of the meeting, correct?
5       A.  No.  The FDA meta-analysis and this abstract
6   aggregation that this meta-analysis constructed was
7   the object of that meeting.
8       Q.  Was there data from Neurontin included as
9   part of that meta-analysis?
10      A.  There was data about Neurontin that was
11  included in that meta-analysis.
12      Q.  Were you -- do you possess the
13  qualifications to discuss -- to render opinions based
14  upon what was discussed in that advisory committee
15  meeting?
16      A.  Yes.
17      Q.  And is the basis for that the same basis as
18  we talked about before in understanding FDA alerts?
19      A.  Everything I enumerated in my last
20  statement.
21      Q.  Okay.  Are you an epidemiologist?
22      A.  Yes.
23      Q.  Do you have a degree in epidemiology?
24      A.  I have a master's degree in public health
25  which requires epidemiology training.