EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   In re:  NEURONTIN MARKETING,

 5   SALES PRACTICES AND PRODUCTS

 6   LIABILITY LITIGATION

 7   _____/

 8   THIS DOCUMENT RELATES TO:    MDL Docket No. 1629

 9   Bulger v. Pfizer, et al.    Master File No. 04-10981

10   07-11426-PBS

11

12   Smith v. Pfizer, et al.

13   05-CV-11515-PBS

14   Crone v. California State Court

15   _____/

16

17              The videotaped deposition of SHEILA WEISS

18   SMITH, PH.D. was held on Monday, December 22, 2008,

19   commencing at 9:17 A.M., at the Law Offices of Goodell,

20   DeVries, Leech & Dann, LLP, 20th Floor Commerce Place,

21   One South Street, Baltimore, Maryland  21202,

22   before Ronda J. Thomas, a Notary Public.

23

24   Job No.: 183061

25   REPORTED BY:  Ronda J. Thomas, RPR, CLR
```

1

1       A       Not that I recall.

2       Q       Safe to say you didn't participate in the

3   development of any materials for such a meeting,

4   correct?

5       A       No.

6       Q       Okay.  Are you qualified to review the

7   FDA's statistical analysis in the advisory committee

8   transcript?

9       A       Excuse me?

10      Q       Do you believe that you are qualified to

11  have reviewed the FDA statistical review in the

12  advisory committee and render opinions?

13      A       Absolutely.  That's what I do for the FDA.

14  I often sit on these type of advisory committees.  I

15  couldn't sit on this one because I had already been

16  retained on this case.

17      Q       Do you believe that you were qualified to

18  do so in January when we took your deposition last?

19      A       Excuse me?

20      Q       Your qualifications to review this

21  information, is that a new found qualification or is

22  that something that you possessed back in January when

23  we took your deposition last time?

24      A       I believe I was qualified in January to sit

25  on the advisory committee and review the materials.

1      Yes.  I think I've been qualified for years to do so.

2          Q      Were you asked by Pfizer to review those

3      materials within January -- in the January timeframe

4      right after it came out?

5          A      I was provided by --

6                 MR. BARNES:  Answer the question.

7          A      By Pfizer?  Pfizer didn't -- I didn't

8      directly talk to anyone at Pfizer about this case.

9      Period.

10         Q      Were you asked by counsel to review that

11     FDA and render an opinion?

12         A      They provided me with the alert and the

13     information.

14         Q      Did they ask you to do anything with it?

15         A      Just to reread it.

16         Q      When the statistical review -- when did you

17     first see the FDA statistical review?

18         A      When did I see it?  When it was -- after it

19     was made available to the public on their web site.

20         Q      So you didn't see it before then?

21         A      No, I only saw it when it was made

22     available.

23         Q      Do you know if Pfizer had that document

24     before it was made publicly available?

25         A      I'm not aware.

1      Q      Were you asked to ever review it at that

2  time?

3              MR. BARNES:  What time?

4      Q      At the time it became publicly available.

5  When we're talking about the FDA statistical review?

6      A      Was I asked to look at it?  I think I had

7  already looked at it as soon as it became available

8  because I wanted to put the alert in January in

9  context.  So I was very interested in what they said.

10     Q      When was the first time you were asked to

11  put down on a piece of paper an opinion based upon the

12  FDA alert?

13             MR. BARNES:  Objection.  We have a

14  stipulation in this case where drafting of expert

15  reports is not the subject of examination.  So I'll

16  instruct her not to answer that question.

17             MR. ALTMAN:  I'm not asking about the

18  drafting.  I'm asking when she was asked to do it.

19  That's not the drafting.

20             MR. BARNES:  That's a different question.

21             MR. ALTMAN:  I asked when was the first

22  time you were asked to opine upon the FDA alert.

23             MR. BARNES:  That's a different question.

24  You may answer that one.

25     A      I believe it was in early fall.

1      Q      Okay.  When was the first time you were
2   asked to render any opinions on the advisory committee
3   meeting and the transcript and the discussions that
4   took place?
5      A      I believe it was around the same time.
6      Q      Have you ever had any direct discussions
7   with Dr. Robert Gibbons?
8      A      No.
9      Q      Do you believe that you are -- you're aware
10  that Dr. Gibbons did a pharmacoepidemiologic study of
11  the pharmametrics data, correct?
12     A      Yes, I'm aware of it.
13     Q      If you had been given that raw data as he
14  was, do you believe you could have done a similar
15  study?
16     A      Yes.
17     Q      So you pretty much see yourself as kind of
18  colleagues, same general qualifications?
19     A      I consider us colleagues.  He's a
20  biostatistician and I'm an epidemiologist.  We
21  typically work together on teams.
22     Q      We talked before about the AIRS G database
23  in this case.  Have you ever received similar data from
24  a company in the past?  What I mean by that a CD, et
25  cetera, that has their adverse event database or an