EXHIBIT C

```
 1           UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3   -----------------------------x
 4   In re: NEURONTIN MARKETING,SALES
 5   PRACTICES AND PRODUCTS LIABILITY
 6   LITIGATION              MDL Docket No. 1629
 7   -----------------------------x    No. 04-10981
 8   THIS DOCUMENT RELATES TO:
 9   PRODUCTS LIABILITY LITIGATION
10   -------------------------------x
11       SUPREME COURT OF THE STATE OF NEW YORK
12                COUNTY OF NEW YORK
13   -------------------------------x
14   IN RE: NEW YORK NEURONTIN
15   PRODUCTS LIABILITY LITIGATION
16   -------------------------------x
17   THIS DOCUMENT APPLIES TO:
18         ALL CASES
19   -------------------------------x    CONTAINS CONFIDENTAIL INFORMATION
20           The Videotaped deposition of SHEILA WEISS
21   SMITH, PhD., was held on Wednesday, January 9, 2008,
22   commencing at 9:12 a.m., at the Law Offices of Goodell,
23   DeVries, Leech & Dann, LLP, One South Street, Baltimore,
24   Maryland, before Ronald E. Bennett, Notary Public.
25   Reported By: Ronald E. Bennett
```

```
 1   APPEARANCES:
 2
 3        ON BEHALF OF PLAINTIFF CLASS:
 4          KENNETH B. FROMSON, ESQUIRE
 5          MARSHALL P. RICHER, ESQUIRE
 6            Finkelstein & Partners
 7            785 Broadway, 3rd Floor
 8            Kingston, New York 12401
 9            Tel:  1-800-LAW-AMPM
10            Fax: (845) 339-5825
11
12        ON BEHALF OF PFIZER:
13          RICHARD M. BARNES, ESQUIRE
14          MICHAEL J. WASICKO, ESQUIRE
15            Goodell, DeVries, Leech & Dann, LLP
16            One South Street, 20th Floor
17            Baltimore, Maryland  21202
18            Tel: (410)783-4004
19            Fax: (410)783-4040
20
21   ALSO PRESENT:  HANS JORGENSEN, Videographer
22                  KEITH ALTMAN, Complex Litigation
23                  VIJAY V. BONDADA, Counsel, Litigation
24                  ELANA GOLD, ESQUIRE (Telephonically)
25
```

```
 1                       INDEX
 2          Deposition of SHEILA WEISS SMITH, Ph.D.
 3                    January 9, 2008
 4   Examination by:                              Page
 5   Mr. Fromson                                    4
 6   Mr. Barnes                                   259
 7
 8                      EXHIBITS
 9   No.        Description                      Marked
10   1-5    Documents                              4
11   6      Vilhjalmsson article                  43
12   7      Dermatology                           52
13   8      Disc                                  79
14   9      FDA Alert                            117
15   10     Avandia Report                       176
16   11     MedWatch Form                        191
17   12     Data                                 198
18   13     Correspondence                       249
19   14     Letter                               255
20   15     Index                                259
21   16     Disc                                 259
22   17     Disc                                 259
23
24
25
```

```
 1                    - - - - - - -
 2            (Deposition Exhibits Number 1-5 marked for
 3   purposes of identification.)
 4   Whereupon,
 5            SHEILA WEISS SMITH, Ph.D.,
 6   called as a witness, having been first duly sworn to
 7   tell the truth, the whole truth, and nothing but the
 8   truth, was examined and testified as follows:
 9            EXAMINATION BY COUNSEL FOR PLAINTIFF
10            BY MR. FROMSON:
11        Q.  Is it Dr. Weiss?  Dr. Weiss-Smith or Dr.
12   Smith?  How would you like to be addressed this
13   morning?
14        A.  It's Dr. Weiss-Smith.
15        Q.  Thank you.  Dr. Weiss-Smith, good-morning.
16        A.  Good morning.
17        Q.  My name is Ken Fromson.  I'm going to ask
18   you a series of questions involving the report that
19   you have provided on behalf of defendants in this
20   case, the drug companies, Park-Davis, Warner-Lambert
21   and Pfizer.  Do you understand that?
22        A.  Yes, I do.
23        Q.  And I would ask, if you could, this
24   morning to keep your voice up so that we can make
25   sure that the court reporter can understand what you
```

## Page 41

1  Q. Are you aware that the language you quote
2  is not found at page 526 of that edition?
3  A. I do not quote any --
4  Q. I'm sorry. Let me rephrase the question.
5  Are you aware that the language you quote and
6  reference -- are you aware that the language you
7  referenced being at page 528 and 529 is not at 528
8  and 529?
9  MR. BARNES: Please look for the text of
10 this and find the citations.
11 MR. FROMSON: I withdraw the question.
12 Withdrawn. I'll ask it the way I want to ask it,
13 Rick.
14 MR. BARNES: That's fine.
15 BY MR. FROMSON:
16 Q. Let's get to the point of the matter.
17 Your references are wrong at certain parts of your
18 report. The quotes in fact may be in the electronic
19 version. Is that basically your position?
20 A. One, there are a few quotes. And yes, I
21 would stand by what I wrote. Now if I reference
22 something, it doesn't mean that I'm quoting it.
23 Q. When you reference something and you
24 reference it to a page number, you expect the reader
25 to be able to go to that page number and find the

## Page 42

1  reference. Would you agree with that?
2  A. Absolutely.
3  Q. And in this case you would agree in fact
4  that the reference to page 528 and 529 of the second
5  edition, the paper edition, that reference is not at
6  page 528 and 529?
7  A. I apologize for the error. I wish I had
8  someone editing it with that accuracy so I would
9  have found that beforehand. I apologize.
10 Q. Thank you. At page 26 of your paper,
11 Doctor, you cite to Vilhjalmsson, doctors associated
12 with suicide ideation in adults with a reference
13 date of 1998. Do you see that citation?
14 A. Yes, I do.
15 Q. Would you be surprised to know that the
16 language you quoted is not found in that article?
17 A. I don't quote anything there.
18 Q. Do you not in fact have this language in
19 quotations at page 26, immediately preceding the
20 Vilhjalmsson cite. You state, "Reports that
21 document positive rechallence do not prove a causal
22 relationship for events such as depression that have
23 a high background rate and a chronic remitting
24 natural history."
25        Did I read that sentence correctly

## Page 43

1  from your report?
2  A. No. It talks about the FDA scientist
3  O'Connell, Witkin and Pitts.
4  Q. So in fact, you want me to read the whole
5  sentence. Doctor, tell me if I'm reading this
6  correctly from your report. Particular to
7  depression, FDA scientists Drs. O'Connell, Wilkin
8  and Pitts write that "Reports that document positive
9  rechallence do not prove a causal relationship for
10 events such as depression that have a high
11 background rate and a chronic limiting natural
12 history."
13        Doctor, did I read that correctly?
14 A. That is what I wrote.
15 Q. You cite to Vilhjalmsson in an article
16 from 1998 immediately after the quote. Am I
17 correct?
18 A. Yes, there is that citation afterwards.
19 Q. That citation is incorrect, isn't that
20 true?
21 A. I don't know. I would have to look at it.
22 MR. FROMSON: I'll mark for Exhibit 6 a
23 copy.
24        (Deposition Exhibit Number 6 marked for
25 purposes of identification.)

## Page 44

1  BY MR. FROMSON:
2  Q. You now have Exhibit 6 in front of you,
3  Doctor?
4  A. Yes, I have Exhibit 6.
5  Q. Is that in fact the Vilhjalmsson article
6  from 1998?
7  A. Yes, that is.
8  Q. The language that you quote that
9  immediately preceded the cite, is that language that
10 you quote in the Vilhjalmsson article, now that the
11 article is in front of you?
12 A. The quotation for Vilhjalmsson goes toward
13 the high rate of suicide and chronic remitting
14 natural history. So the issue, why I'm quoting
15 Vilhjalmsson or not quoting but citing him is the
16 last part of the sentence. He's writing about
17 factors associated with suicide ideation in adults.
18 Q. Let me see if I understand you here.
19 You're saying, as an experienced author of peer
20 reviewed journal articles, that when you include a
21 sentence with a quote, that immediately following
22 the quote you can cite to a different reference for
23 the quote itself?
24 A. Each journal cites differently. Now if I
25 was citing for a journal where I would have a

| | |
|---|---|
| 1  little, what you call it, one of those little | 1  MR. BARNES: You want to review and see if |
| 2  superscripts, I would have put the superscript right | 2  it's cited earlier in the report? That would be |
| 3  after natural history. | 3  just -- just saying to respond to your question. |
| 4        Now you guys seem to do it | 4  MR. FROMSON: I appreciate the coaching, |
| 5  differently. But the issue is, Vilhjalmsson talks | 5  Counsel. |
| 6  about factors associated with suicide ideation. I'm | 6  MR. BARNES: You asked her -- |
| 7  trying to reference the fact that it has, depression | 7  MR. FROMSON: I asked her if her cite is |
| 8  has a high background rate in remitting chronic | 8  there. It's not there. Let me move on. |
| 9  history. | 9  A. It's not at this paragraph -- |
| 10       So the issue is, that you can't | 10  BY MR. FROMSON: |
| 11  separate the reason people are getting the drug from | 11  Q. Could be somewhere else in the report. |
| 12  the outcome that we are talking about here. I'm | 12      On page 27, Doctor, you use the term |
| 13  just saying that's why he's cited for that part, as | 13  in the end of the first full paragraph |
| 14  backup for what they say in their quote. | 14  uninterruptible. Can you tell me what that means? |
| 15  Q. Your position is, the citation is | 15  A. That is Bill Gates working. |
| 16  accurate? | 16  Uninterpretable. |
| 17  A. Yes. | 17  Q. So you did a spell check and when it did |
| 18  Q. And Wilkin and Pitts are nowhere in the | 18  it, it changed to uninterpretable to |
| 19  Vilhjalmsson article. You cite them that they were | 19  uninterruptible? |
| 20  in some other source. | 20  A. Unfortunately it just changes it |
| 21  A. I cite them before. Exactly. I cite them | 21  automatically, yes. Uninterpretable. |
| 22  earlier. | 22  Q. At page 5 of your report again you cite to |
| 23  Q. You don't cite where they write it. | 23  the Reference Manual on Science Evidence at page 90 |
| 24  Presumably they write it somewhere and the quote is | 24  and 91. Specifically you say that, case reports |
| 25  accurate as to Wilkin and Pitts and O'Connell, | 25  cannot be used to establish an association, because |

| | |
|---|---|
| 1  right? | 1  they lack a control or comparison group; they are |
| 2  A. Yes. | 2  merely reports occurrences of an outcome. Am I |
| 3  Q. You believe that the readers of this | 3  correct? |
| 4  report should have understood the manner that you | 4  A. Which paragraph are you on? |
| 5  put forth this cite? | 5  Q. It's the first full paragraph. It's |
| 6  A. I would hope so. Yes. | 6  actually the second paragraph beginning with the |
| 7  Q. And you felt it was important and | 7  words case reports. |
| 8  meaningful to include the citation from Vilhjalmsson | 8  A. Yes. |
| 9  related to his reference to suicidal ideation, | 9  Q. When you reference case reports in this |
| 10  right? | 10  context, are you referring to spontaneously reported |
| 11  A. Yes. In that it talks about depression. | 11  post marketing adverse event case reports or are you |
| 12  Q. You felt that because it talked about | 12  referring to case reports from clinical trials, both |
| 13  depression it was meaningful for your report? | 13  or something else? |
| 14  A. For this issue, yes. | 14  A. Case reports. Clinical trials are not |
| 15  Q. You don't list for the reader the actual | 15  considered case reports. So case reports could be |
| 16  source for the writing of Wilkin, Pitts and | 16  from public literature or could be given to the FDA |
| 17  O'Connell though in the text? | 17  through spontaneous reporting. I'm not |
| 18  A. I apologize. I probably should. | 18  differentiating the source of the report. Just a |
| 19  Q. That's a mistake. That was a mistake? | 19  report of a event. |
| 20  A. An oversight. | 20  Q. If a case report in this context or in any |
| 21  Q. It was an oversight. Is it an oversight | 21  context the reference to case report in your mind is |
| 22  you just learned from me, despite the fact that you | 22  not referring to clinical trial. How do you label |
| 23  reviewed this? | 23  an individual case in the clinical trial? What |
| 24  A. Yes, I didn't realize I didn't put that | 24  should we call it for purposes of today's |
| 25  citation in. Might be in earlier. | 25  deposition? |

*Page 49*

1    A.   People use the same technology. Just
2  having a case in isolation, even if it's in the
3  clinical trial, is itself not a statistical
4  association. Unless you have a comparator group.
5  So yes, you can have a case, an event from a
6  clinical trial. In fact, that's what you have from
7  the average report. They are individual cases.
8    Q.   I think we are on the same page. So then,
9  when you reference case reports in this text that,
10 the proposition that they cannot be used to
11 establish an association for the reasons listed,
12 would be the same whether it's in a clinical trial
13 or a spontaneously reported post marketing
14 adverse --
15        MR. BARNES: Objection.
16   Q.   Would that be true or not?
17   A.   In the clinical trial it's a different
18 issue. Because you have a randomized control group.
19 So this is a very odd question. It makes no sense.
20   Q.   I appreciate that. I really do. I want
21 to make sure I try to make sense here.
22        Would a case from a clinical trial
23 where you may have a control group, would that be a
24 situation where you could establish an association
25 then?

*Page 50*

1    A.   I can't answer it in that context. It
2  just doesn't make sense what you are asking.
3    Q.   What if I were to replace the words case
4  reports in your report, which basically refers to,
5  you're referring to postmarking adverse events
6  there, if I were to replace it with case reports
7  from clinical trials, would that make the question
8  make sense or no?
9         MR. BARNES: Objection. You may answer.
10        THE WITNESS: What do you mean when you
11 are asking me a case report from a clinical trial?
12   Q.   Okay. A report of an adverse event or
13 untoward event that was observed by an investigator
14 during a clinical trial of a participant or patient
15 which was observed during the ingestion period of
16 drug in question?
17   A.   A single event that occurs in isolation is
18 uninterpretable in isolation in this context.
19 However, that's not how clinical trial is designed
20 to work. So it's a little different.
21   Q.   Can a single case in a clinical trial ever
22 establish an association?
23   A.   Hypothetically, in some very unique
24 circumstances potentially. Like I said, extremely
25 rare hypothetical. I think Dr. Hauben wrote an

*Page 51*

1  article, it was published in British Medical Journal
2  that talks about these very unique adverse events.
3  But in general that wouldn't be an issue.
4         MR. BARNES: Is it time for a break?
5         THE WITNESS: I think that would be a
6  great idea. Thank you.
7         (Brief Recess.)
8  BY MR. FROMSON:
9    Q.   Doctor, would you turn to page 26 of your
10 report. Referencing your attention to our earlier
11 discussion regarding FDA scientists Dr. O'Connell,
12 Wilkin and Pitts and what they write as you
13 reference in your report. Could you please identify
14 for me in your materials list, which are Exhibits 3
15 and 4, where you reference the source for Drs.
16 O'Connell, Wilkin and Pitts?
17   A.   I believe it is the meeting at the FDA.
18 So it's somewhere in these --
19        MR. BARNES: One of these internet sites.
20   Q.   Which internet site is it, Doctor, so that
21 the layperson who is reading your report would know
22 which source it was?
23        MR. BARNES: Can she check the internet
24 just to verify.
25   A.   I would want to verify that I can --

*Page 52*

1    Q.   At the time you request the next break we
2  can maybe check that.
3         So you believe it was written or now
4  do you believe it was stated, because if it was at a
5  meeting, it would have been stated.
6    A.   It would have been part of the briefing
7  materials. It might be this one. We'll have to
8  check, from the FDA advisory committee.
9    Q.   That would have been involving
10 isotretinoin or Accutane?
11   A.   I don't know -- I know what was -- Cheryl
12 Blume had quoted that. I don't know if it was that
13 one or the other. So I'll have to double-check it.
14 But it was definitely one of the internet sites.
15 I'll have to find out exactly which one.
16   Q.   I'll see if I can assist and expedite the
17 matter, notwithstanding the fact that you may have
18 seen it with internet site, I'll submit to you that
19 the quotation is in the Journal of American Academy
20 of Dermatology, February 2003. We can have that
21 marked as Exhibit 6.
22        MR. BARNES: Exhibit 7.
23        (Deposition Exhibit Number 7 marked for
24 purposes of identification.)
25 BY MR. FROMSON:

### Page 53

1  Q. Do you have what's been marked as Exhibit
2  7. Do you have the exhibit?
3  A. Yes, I have the exhibit. Thank you.
4  Q. Can you turn to page 2 of the exhibit, the
5  third full paragraph beginning with the word
6  reports. Do you see the word reports?
7  A. Yes, I do.
8  Q. Would that quote be consistent with the
9  quote that you have in your actual report?
10 A. It's not identical.
11 Q. It's not identical?
12 A. No.
13 Q. Okay.
14 A. I don't believe I quoted this article.
15 Q. Let's see if we can read it together.
16 Your report says at page 26 --
17 A. I see. I was looking at the second one.
18     MR. BARNES: Let her catch up to you.
19     MR. FROMSON: Sure.
20 Q. It's not a trick question, Doctor. The
21 quote from the Dermatology Journal starting with the
22 word reports.
23 A. I apologize. I was looking at the next
24 sentence, which was not verbatim. This is. I
25 reviewed it now.

### Page 55

1  evaluating for depression and suicidality, correct?
2  A. I have heard that they were doing that,
3  yes.
4  Q. You are actually on a science advisory
5  board --
6  A. -- advisory board.
7  Q. For Accutane, correct?
8  A. For the pregnancy registry, yes.
9  Q. Your experience with the science board has
10 nothing to do with the suicidality assessment for
11 Accutane. Would that be fair?
12 A. That is correct.
13 Q. Now, would you agree with the general
14 premise, as stated by these scientists O'Connell
15 Wilkin and Pitts, and as quoted in the journal
16 article, that positive rechallenges are very
17 important evidence in overall causality assessment
18 and psychiatric adverse events?
19 A. I agree with the first sentence of that
20 paragraph. However, the scientifically, I would
21 disagree that they provide good evidence. So, in
22 other words, the science I agree with in the first
23 sentence.
24     The second sentence they are stating
25 what they used. And I have -- I don't necessarily

### Page 54

1  Q. Can we agree that the quote in the journal
2  article, which is marked as Exhibit 7, is quoted in
3  your report at page 26?
4  A. Yes, that's the same words.
5  Q. The words are, reports that document
6  positive rechallenge do not prove a causal
7  relationship for events such as depression that have
8  a high background rate and a chronic remitting
9  natural history, correct?
10 A. Yes.
11 Q. You did not include in your expert report
12 the very next sentence, which in fact states,
13 nonetheless, positive rechallenges are very
14 important evidence in overall causality assessment
15 of isotretinoin and psychiatric adverse events.
16     You didn't include that specific
17 quote with that specific language, correct?
18 A. No, I did not.
19 Q. And you understand that these writers,
20 these scientists, O'Connell, Wilkin and Pitts, were
21 making these statements in the context of
22 isotretinoin, otherwise known as Accutane, correct?
23 The word isotretinoin is in the quote, Doctor?
24 A. I'm looking for the signatures. Yes.
25 Q. Isotretinoin was a drug which the FDA was

### Page 56

1  agree that that is a good use of such. And it
2  actually contradicts their earlier sentence.
3  Q. Let me see if I can be on the same page
4  with you. Is it that you don't believe positive
5  rechallenges are evidence of causality or that you
6  don't believe positive rechallenges are very
7  important evidence in overall causality assessment.
8  Or is it something else?
9  A. Well, you're taking this sentence out of
10 context. They are saying in a very specific
11 circumstance, of which I don't have the entire
12 dossier, that they were important in their overall
13 causality of this issue.
14     I would have to review that issue in
15 total. So I don't know the context of that. I
16 agree with the first sentence. This is a generally
17 accepted principle that the positive rechallenges
18 are not good evidence for events such as depression.
19 Q. So when you quoted this for the
20 proposition that was favorable essentially to the
21 defendant's case, you were aware that O'Connell,
22 Wilkin and Pitts were rendering their statement in
23 the context of Accutane, correct?
24     MR. BARNES: Objection. I'm not sure you
25 laid a foundation for, if she has seen this before.

## Page 57

1  This is what she actually saw.
2  BY MR. FROMSON:
3  Q. Fair enough. When you saw or recognized
4  or observed their statements that you did believe
5  it, which you quoted in the report, you either got
6  it from a journal article or you got it from the
7  FDA's copy of the hearing transcript.
8  A. They actually had a little summary posted
9  on the website.
10  Q. The summary posted on the website would
11  have been for the Accutane meeting that took place
12  at the time?
13  A. Yes, it would have related to that.
14  Q. So again, I'm not trying to ask you a
15  difficult question. You would have known, when you
16  relied or considered that source, that the source
17  was being given in the context of Accutane?
18  A. The statement, the very first statement
19  that reports a document positive rechallenge do not
20  prove a causal relationship events such as
21  depression that have a high background rate in
22  chronic history is a generally accepted principle in
23  the field.
24    And I quote it because I want to make
25  sure that that is very clear, the scientific context

## Page 59

1  in submitting fair and accurate information?
2  A. Yes.
3  Q. You have no understanding as to why the
4  second sentence, the one that you don't agree with,
5  was important to the FDA scientists, Pitt, O'Connell
6  and Wilkin, right?
7  A. You're putting words in my mouth. I'm not
8  saying I agree or disagree. That second sentence is
9  a statement of fact that they took these into
10  account in their causal assessment. It's not a
11  scientific opinion.
12  Q. Maybe I wasn't clear. Do you have any
13  reason to disagree that positive rechallenges were
14  very important evidence in the overall causality
15  assessment of Accutane in psychiatric adverse
16  events?
17  A. I have no reason to state any opinion
18  because I did not read that full report on the
19  causality, in their causality assessment.
20  Q. Why didn't you read the full causality
21  assessment to see if there were any analogies that
22  can be made to the Neurontin litigation,
23  particularly since they were a lymphatic drug and an
24  association with suicidality. And you're looking at
25  a drug that had a potential for association with

## Page 58

1  that we are discussing in this case. How they use
2  them professionally in one case or another I may
3  have a difference of opinion with.
4  Q. So you are basically using the language
5  that was provided as a general statement but within
6  the context of an Accutane hearing and you are
7  applying it in the context of the Neurontin
8  litigation?
9    MR. BARNES: Objection. Go ahead. You
10  may answer.
11  A. I'm taking the principle, the scientific
12  principle, which they clearly state, and putting
13  that, because it is a similar issue, putting that in
14  context, yes.
15  Q. What, if anything, prevented you from
16  including the second sentence, the one you don't
17  agree with, and indicating to the layperson who is
18  reading the document that the second sentence was
19  also said in the context of Accutane and it's not
20  applicable here?
21  A. Because it has nothing to do with this
22  case. No sense to put it in.
23  Q. You believe that that opinion that you
24  just gave, that statement that you just gave, would
25  be consistent with scientifically sound methodology

## Page 60

1  suicidality?
2  A. Because I reviewed the literature for this
3  specific drug. If I looked at the literature for
4  every drug and every suicide, I would need probably
5  five years to do this case. And I didn't have that.
6  Q. Why not look at drugs that have a similar
7  pharmacologic action?
8  A. If there were any signal at all, I may
9  have expanded my search. But there was absolutely
10  nothing to reasonably rationally do that. There was
11  absolutely nothing in the evidence for this drug.
12  Q. With respect to the first sentence in the
13  O'Connell letter or as it was reflected in the
14  hearing or meeting transcript you read, in any way
15  shape or form the fact that you quote in your
16  report, does that statement mean to you that it was
17  generally accepted in the community?
18    In other words, does that statement
19  reports the document positive rechallenge not prove
20  a causal relationship for events such as depression
21  that have a high background rate and a chronic
22  remitting natural history. Is that generally
23  accepted?
24  A. I believe so. That it is a standard in
25  pharmacovigilance.

```
 1      A.   Again, the seriousness or non-seriousness
 2  is based on the patient outcome, not on event term.
 3      Q.   I understand that.  But basically did you
 4  look to see whether there were serious suicidal
 5  ideations in the system?
 6      A.   Again, that would have to be a clinical
 7  judgment, because there would probably be more terms
 8  in the report.  And for me to make a judgment of
 9  which term was related to the outcome would be
10  inappropriate.
11      Q.   Instead of asking them individually, I'll
12  run through them.  There is not that many.
13  Intentional self-injury, suicidal ideation,
14  self-injurious ideation, self-injurious behavior,
15  self-mutilation and suicidal behavior.
16           My first question as to those terms,
17  were you aware those are terms in the adverse event
18  database?
19      A.   I believe I've seen them in the MedDRA
20  dictionary.
21      Q.   Are you aware that those are in fact
22  adverse events that have been reported on a serious
23  basis in the adverse event database?
24      A.   On a serious basis?
25      Q.   They are marked as serious, they are
```

153

```
 1  reported as serious adverse events?
 2           MR. BARNES:   Objection.
 3      A.   That would be speculation for me to link
 4  the outcome with the event.
 5      Q.   Would you look at the report to see what
 6  that person thought it was?  The outcome of the
 7  patient you said is what determines whether it's a
 8  serious adverse event, right?
 9      A.   I did not do a clinical evaluation of
10  individual reports.
11      Q.   Did you inquire of the defendant as to
12  whether you should?
13      A.   I'm not a clinician.  I had no -- it's
14  beyond my purview.  I wouldn't presume to make a
15  clinical evaluation report.
16      Q.   I understand that you don't, you in your
17  field, don't make a determination of whether an
18  adverse event is serious or not serious.  Because
19  you are not a clinician, correct?
20      A.   That's correct.
21      Q.   But there are reports in the adverse event
22  database that are available to you which are not
23  suicide and suicide attempt, but are any of the
24  other ones I referenced to you, and which are in
25  fact serious, requiring no clinical judgment on your
```

154

```
 1  part, they are marked as serious or non-serious in
 2  the adverse event database.  Do you agree with that?
 3           MR. BARNES:   Objection.  Asked and
 4  answered.  You may answer again.
 5      A.   I did not go and investigate this issue.
 6  And, again, you are mixing up adverse event terms
 7  with patient outcomes.  And they are two different
 8  things.
 9      Q.   These terms are contained in the reports
10  where the overall report is marked as serious.
11  That's what I'm telling you.  You simply don't know
12  because you didn't look, right?
13      A.   There's two issues; one, I didn't go and
14  pull these terms.  And two, just because a term
15  exists on a report does not mean that that is the
16  reason for being marked serious or non-serious.
17  There may be other events mentioned also.
18      Q.   But you're not supposed to evaluate that.
19  You're not a clinician.  You are just supposed to,
20  as a mathematical expert in epidemiology, you are
21  supposed to go, let me look at serious adverse
22  events.  And I'm going to -- you're supposed to look
23  at the serious adverse event reports, cull them and
24  do an analysis of them.  You chose to limit it to
25  suicide and suicide attempt for the reasons we have
```

155

```
 1  already discussed today?
 2      A.   I limited it because these are reasonably
 3  defined outcomes and, for example, suicide in itself
 4  is always a serious event, whether or not the check
 5  box would be checked for that.
 6      Q.   You think self-mutilation is a serious
 7  event?
 8      A.   I have no opinion on that.
 9      Q.   And you are not aware whether it's in the
10  adverse event database as a serious event report,
11  because you didn't look?
12      A.   Absolutely.
13      Q.   Suicidal behavior.  You have no opinion,
14  you have no clinical opinion as to whether that's a
15  serious event, correct?
16      A.   I have no opinion about the clinical.
17      Q.   You are not aware of whether any suicidal
18  behavior adverse event reports were marked as
19  serious, because you didn't look for that, right?
20      A.   I don't want to blanket because some of
21  the events that you're saying, even a layperson
22  knows that they may be non-serious.
23      Q.   They will be marked as such, won't they?
24  If they are in the adverse event reporting system,
25  won't they be marked as serious or non-serious?
```

156

1  There were a number of suicides, very, very small.
2  I think by 1999 there were a handful.
3      Q.   I don't want to know about '99.  I want to
4  know between '93 and '97 you indicated that there
5  were zero completed suicides -- I'm sorry -- you
6  indicated the PRR was zero from '93 to '97 for
7  completed suicides.
8      A.   That is correct.
9      Q.   And that would have been utilizing the
10 Costart dictionary?
11          MR. BARNES:  Objection.
12     A.   That is incorrect.
13     Q.   What dictionary did Drug Logic use for
14 you?
15     A.   The reports in the SRS were coded using
16 Costart.  The reports in AERS were coded using
17 MedDRA.  There is a mapping that maps all the
18 reports the Costart terms to MedDRA terms.  So you
19 can go and look the all reports using one
20 dictionary.
21     Q.   Were you aware there was no term for
22 suicide in the Costart dictionary?
23     A.   Prior to?
24     Q.   From '93 to '97 are you aware there was no
25 Costart term for suicide?

1  report so I would have to go back on line.  I looked
2  at everything.  I don't necessarily print everything
3  out.  You just go through and look.
4      Q.   I think I understand.  You looked at it
5  online using Drug Logic's Q Scan?
6      A.   Using the MedDRA dictionary, which is
7  mapped to Costart.
8      Q.   So you are relying on MedDRA's mapping it
9  to Costart to determine if there was a completed
10 suicide, right?
11     A.   That's correct.
12     Q.   And so, if there was no completed suicide
13 code in Costart, then you wouldn't expect to find a
14 completed suicide being mapped to MedDRA?
15          MR. BARNES:  Objection.
16     A.   Theoretically, yes, that would be maybe an
17 issue.
18     Q.   Why would it be an issue?
19     A.   If what you are saying is correct, then
20 it's something that needs to be considered.
21     Q.   Why would it need to be considered?
22     A.   Why?
23     Q.   Why?  I want to know why it's important
24 for you to know how many -- why would it need to be
25 considered?

1          MR. BARNES:  Objection.
2      A.   I know there were some issues in the
3  readings about suicidal and terminology about, with
4  a label, but that I was not working on.  So mapping
5  them, I'm not going to put an opinion there.
6      Q.   You think it would be important to know,
7  in letting the readers see a PRR of zero, as to
8  whether there was in fact a term for completed
9  suicide in the Costart dictionary that could
10 actually even be mapped to MedDRA?
11     A.   If that's the case, and there are no terms
12 then, yes, that would be important.
13     Q.   Did you ever take any steps personally to
14 determine whether that was in fact the case?
15     A.   I have to go back to my, to look and see
16 what the number of events were.  I didn't
17 unfortunately put it in the report.
18     Q.   Where do you have that information, the
19 number of events?
20     A.   How many suicides in each year?
21     Q.   Yes.  Where are you keeping it?  As we sit
22 here today, where is it?  There is a deposition
23 notice that says bring everything you have.  So
24 where is it?
25     A.   I mean I looked at it on line from the

1      A.   Well, if there's no suicides, then there
2  would be no suicides.  There is both the observed
3  and expected would be zero.
4      Q.   Zero.  That would mean that you don't
5  have, and this is all into the hypothetical, of
6  course, that you would have to confirm there were in
7  fact no terms for completed suicide.  Now assuming
8  that is the case --
9           MR. BARNES:  Or no mapping.
10     Q.   Or no mapping of the terms to MedDRA.  If
11 that's in fact the case, then your PRR is wrong from
12 '93 through '97?
13     A.   It's not wrong.  There are none in either
14 source.
15     Q.   I hear you.  You're saying it's not on the
16 data, it's not in the data so you are not factually
17 wrong.  Because there are no completed suicide terms
18 that you were able to see --
19     A.   If that's the case, absolutely.
20     Q.   But it may have been because there simply
21 wasn't a definition term for it?
22          MR. BARNES:  Objection.
23     Q.   Right?  And just to be clear.  There would
24 have been no suicides in the background either,
25 correct, assuming that this hypothetical is true,

1 that there in fact was no Costart term for suicide
2 or there was no mapping of completed suicide to
3 MedDRA, your background would also be zero?
4     MR. BARNES: Objection.
5     A. If that's the case, there would be none in
6 either, if there was no term.
7     Q. So you basically say here zero over zero.
8 From a percentage, from a mathematical equation are
9 we looking at zero over zero?
10     MR. BARNES: Objection.
11     A. Yes, but mathematically it has to be one
12 over one.
13     Q. No. It's zero over zero it should be
14 undefined?
15     A. Undefined.
16     Q. If I am right, and there is no completed
17 suicide in Costart, and there is no mapping from
18 Costart to MedDRA for a completed suicide term, then
19 this should really be undefined not zero for that
20 time period we are discussing, right?
21     A. Well --
22     Q. You can't zero over zero. You have
23 undefined.
24     A. Undefined over, divided by undefined would
25 be one. They are identical. So theoretically --

169

1     Q. Undefined would be more accurate, isn't
2 that correct? For the layperson you would put
3 undefined?
4     A. Undefined or there's none. None. In your
5 hypothetical situation. Yes.
6     Q. Is that the same as saying zero for PRR?
7 To say none, is that the same as saying PRR zero.
8 Is undefined the same as zero?
9     A. Undefined, from a mathematical standpoint,
10 is not the same as zero.
11     Q. That's what I want to know. Okay. If you
12 accept my hypothetical, that there were no completed
13 suicide terms in Costart or there was no completed
14 suicide terms to map to MedDRA, would it now be
15 appropriate for you to start a PRR beginning after
16 November '97, when you know in fact that completed
17 suicides actually do get coded in MedDRA? Wouldn't
18 that be a reasonable place to start? This way you
19 can get rid of all the issue here of zero over zero.
20     A. The problem is, you don't know when this
21 stimulated reporting began and the issues about
22 suicidality in general in the AERS database where it
23 was stimulated reporting because of issues or SSRI's
24 and other drugs, even Accutane is the example you
25 brought up. So there's an issue.

170

1     Q. So you think --
2     A. In the entire database I think there's a
3 problem looking at suicides in AERS.
4     Q. Accutane, SSRI's, basically notariety
5 bias, those are your issues now in terms of whether
6 to start at that '97. Any other reason?
7     A. Whether to look at PRR at all even.
8 Whether it's even a valid assessment is a very
9 important scientific question to discuss.
10     Q. Now are you going to consider it? What
11 are you going to do now as the expert in this case?
12     A. I stand by my opinion that AERS analysis
13 provides no evidence of an association or a signal
14 or even a hint that Neurontin is associated or even
15 would generate the hypothesis that Neurontin may be
16 associated with suicide.
17     Q. Would it essentially be your position that
18 a PRR would not be of utility anymore, if in fact
19 this hypothetical was true regarding the lack of a
20 completed suicide term. Because you don't know how
21 to account for the SSRI issue or the Accutane issue
22 or the notariety bias. Would you basically now
23 throw out a PRR?
24     A. What I'm saying is, the AERS database
25 provides no signal of disproportional reporting at

171

1 all for suicide and suicide attempt with Gabapentin.
2     Q. How do you know that, if your analysis
3 would be wrong, because you included a huge
4 denominator in the background. In other words, you
5 included all the reports for all drugs going across
6 all of time, from '93 forward.
7     You haven't even begun, you haven't
8 done the analysis to take out the vast number of
9 reports in the background. And then reestablished
10 it from '98 forward to see if during this timeframe,
11 '98 through 2003, there would be any signal. How do
12 you know there would be nothing, no hint, if you
13 haven't done that yet?
14     A. What you are stating, if hypothetically
15 it's an issue, you're still talking about a
16 proportional reporting rate. So the difference is
17 going to be in the drug that you're looking at and
18 it's also going to be in the comparator.
19     And so, when you're talking about a
20 relative difference, that's one of the reasons we
21 look relative as opposed to absolute, it's moot.
22     Q. The comparator in your case so far has
23 been to use all drugs, right?
24     A. That's correct.
25     Q. You could avoid the SSRI, you could avoid

181

1  as to whether this group of drugs would have been an
2  appropriate group to utilize?
3       A.   Since she didn't do the analysis, I didn't
4  bother going to that step.
5       Q.   Did you think to do the analysis yourself
6  against those comparator drugs?
7       A.   No.  Why would I?  It would have made no
8  sense.
9       Q.   Did you know even the data that was
10 utilized to formulate this information in Dr.
11 Blume's report was even available to you in the
12 first place?
13      A.   I have to go back to the report to see
14 what the source was.
15      Q.   Your report or her report?
16      A.   For her report.  I know what I did.
17      Q.   Let me ask you this way.  After
18 November 12th or 13th of 2007, did defense counsel
19 provide you with any CD that was purportedly the
20 data that was utilized to render her opinions on
21 PRR?
22      A.   Actually I did see a CD.  I believe your
23 colleague put together quite a wealth of analysis
24 that was the basis for that table.
25      Q.   What did you do with that CD, hopefully

182

1  not just use it as a coaster?
2       A.   Actually --
3       Q.   What did you do with it?
4       A.   I looked at it and I put it aside.
5       Q.   When did you do that?
6       A.   Sometime in the course of my review of the
7  material -- October-November-December.
8       Q.   That CD is not on your materials relied
9  upon or considered yet you did --
10      A.   I didn't rely or consider it.  No.
11      Q.   What is the threshold for consider -- for
12 any of these documents.  What do you have to do to
13 make it reach the considered threshold?  You looked
14 at it.  You reviewed it in some fashion.  You put it
15 aside?
16      A.   I looked at it and said this isn't
17 something I'm going to evaluate.  It's not relevant
18 to what I'm doing, or it's nonsense, or it's, in
19 some cases they would send me reports that were too
20 clinically or -- and I just put them aside.  I
21 thought they came as mistake or just not relevant to
22 the work I was doing.
23      Q.   Well, in this particular case, and in the
24 context of this particular litigation do you have an
25 independent recollection, as you sit here today, as

183

1  to what you actually reviewed about the CD that was
2  provided to you by counsel, which had been provided
3  to the counsel by me or my colleague?  What did you
4  do?  You said you reviewed it.  Tell me exactly what
5  you did to determine that it was either --
6       A.   Put it in my computer.  Looked at the
7  names of the files.  I took it out of my computer
8  and I put it aside.
9       Q.   Did you do anything to determine whether
10 any of the plots or any of the data -- when I say
11 plots, any of the plots of the graphs that were on
12 the discs, did you do anything to determine whether
13 any of those plots were inaccurate?
14      A.   No, I didn't.  I relied on -- I looked
15 Cheryl Blume's report.  That's the basis.
16      Q.   Did you do anything to consider whether
17 any of the data was inaccurate or missing?
18      A.   No.  I didn't consider it.
19      Q.   Is there a difference in your mind, when
20 you are reaching this conclusion that there is not a
21 hint of evidence in this case, as you said today, is
22 your opinion that there is no evidence, no reliable
23 evidence or no clear evidence?  You used these terms
24 interchangeably throughout the report.  I just want
25 to know where you stand on that?

184

1       A.   All of the above.  There's nothing.
2       Q.   Let's go back to the Avandia document
3  which was marked as an exhibit.  Do you have that
4  exhibit in front of you?  What number is that
5  number?
6       A.   It's Exhibit 10.
7       Q.   It's your position this is not a PRR at
8  table 7.1, correct?
9       A.   That's correct.  There are no PRR's in
10 this table.
11      Q.   Now it indicates there's a proportion of
12 cardiac events over all events by serious outcome
13 year-end product, correct?
14      A.   That's correct.
15      Q.   Can a reader like yourself with your
16 expertise in epidemiology, can you calculate a PRR
17 using any of the numbers in the columns?
18      A.   No, because it's inappropriate, as I said,
19 to compare one drug to another.  That would not be a
20 PRR.
21      Q.   What do you believe the purpose is of this
22 chart in this Avandia briefing document?  What is a
23 reader supposed to do with the proportion that's
24 given for each drug?
25      A.   I don't know why they put this table in