EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------x

In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

---------------------------------x

THIS DOCUMENT RELATES TO: MDL Docket No. 1629

PRODUCTS LIABILITY LITIGATION NO. 04-10981

---------------------------------x

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------x

IN RE: NEW YORK NEURONTIN PRODUCTS LIABILITY LITIGATION

---------------------------------x

THIS DOCUMENT APPLIES TO:
ALL CASES

---------------------------------x

The Videotaped deposition of CYNTHIA MCCORMICK, M.D., was held on Thursday, February 14, 2008, commencing at 9:04 a.m., at the law offices of Shook, Hardy & Bacon, 600 Fourteenth Street, Northwest, Washington, D.C., before Karen Geddes, CSR, and notary public.

REPORTED BY: Karen Geddes, CSR

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
W. MARK LANIER, ESQUIRE
ROBERT LEONE, ESQUIRE
KENNETH SOH, ESQUIRE
The Lanier Law Firm, P.C.
6810 FM 1960 West
Houston, Texas 77069
(713)659-5200 Phone
(713)659-2204 Fax

ON BEHALF OF THE PRODUCT LIABILITY PLAINTIFFS:
ANDREW G. FINKELSTEIN, ESQUIRE
Finkelstein & Partners
436 Robinson Avenue
Newburgh, NY 12550
(800)634-1212 ext. 9451
(845)562-3492 Fax

(APPEARANCES continued on next page.)

(APPEARANCES continued.)

ON BEHALF OF THE DEFENDANTS, PFIZER:
SCOTT W. SAYLER, ESQUIRE
VINCENT E. GUNTER, ESQUIRE
Shook, Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, Missouri 64108
(816)474-6550 Phone
(816)421-5547 Fax

ALSO PRESENT:

Mr. Keith Altman
Mr. Vijay V. Bondada
Mr. Ari Kresch
Mr. Hans Jorgensen, The Videographer

P R O C E E D I N G S

THE VIDEOGRAPHER: On the record at 9:04 a.m., Thursday, February 14, 2008. This is the videotaped deposition of Dr. Cynthia McCormick taken by Mark Lanier, Esquire, with offices at 6810 Farm Market 1960 West, in Houston, Texas.

The caption in the case is in re: Neurontin Marketing Sales Practices and Products Liability Litigation MDL, Docket Number 1629 in the United States District Court, District of Massachusetts.

The deposition is being conducted in the offices of Shook Hardy & Bacon located at 600 Fourteenth Street, N.W., Washington, D.C.

I'm Hans Jorgensen, videographer for Veritext. The court reporter is Karen Geddes also with Veritext.

Would Counsel please introduce themselves.

MR. SAYLER: Scott Sayler, Shook Hardy & Bacon, representing the Pfizer Defendants.

MR. GUNTER: Vince Gunter, Shook Hardy & Bacon, for the Pfizer Defendants.

MR. BONDADA: Vijay Bondada, Pfizer Legal.

MR. FINKELSTEIN: Andrew Finkelstein, Finkelstein & Partners, product liability

THE WITNESS: I didn't hire anyone.
MR. SAYLER: Objection, form.
THE WITNESS: They hired --
MR. SAYLER: Misstates the facts.
THE WITNESS: Thank you.
BY MR. LANIER:
Q Well, "hired out" may be a Texas phrase, so that may not be a good one.
A That's probably true.
Q They hired you.
A That's true.
Q The drug company hired you to help them in this Neurontin lawsuit?
A Right.
Q That's since you left the FDA in '02?
A That's correct.
(McCormick Deposition Exhibit Numbers 2 through 5 were marked for identification.)
BY MR. LANIER:
Q I'm going to hand you a document marked Exhibit 2. Did you sign that affidavit that I've handed you?
A Yes.
Q You signed it in September of '07; is that right?

A Let me see the date.
Yes, I did.
Q If you will, look at page 6, second line from the bottom.
A First I have to get there. Okay. What page?
Q Six, second line from the bottom.
Do you see where it says, "In presenting the data"?
A Uh-huh. Yes.
Q All right. Let's put this into a time frame because we've digressed with some other challenging questions.
You wrote the first document where you said -- Exhibit 1, where you said that "-- depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide --."
You labeled that one of the "less common but more serious events that may limit the drug's widespread usefulness," right?
A Uh-huh.
Q Is that a yes answer?
A That's true, yes.

Q All right. Then you leave the FDA in '02, right?
A Uh-huh.
Q Then you get hired by the drug company on Neurontin to help them in the lawsuit, right?
A Uh-huh.
Q Is that a yes?
A Yes.
Q Then after you're hired by the drug company, you come back and say: I never suggested that Neurontin causes or increases the risk of depression or suicide behavior, right?
A That's true. Uh-huh.
(McCormick's Deposition Exhibit Nos. 3 and 3-A were marked for identification.)
Q And then four months after you did that affidavit, the FDA comes out -- I'll give you Exhibit No. 3-A -- FDA comes out and says that patients receiving gabapentin or Neurontin and other antiepileptic drugs had approximately twice the risk of suicide behavior or ideation compared to patients receiving placebo --
THE WITNESS: Uh-huh.
Q -- didn't they?
MR. SAYLER: Objection, misstates the

facts.
THE WITNESS: I think that's not what it -- thank you. That's really not what it says here.
MR. LANIER: Ma'am, I read it word for word.
MR. SAYLER: Let her finish, please.
THE WITNESS: No, you did not read it word for word, because there's no reference specifically to Neurontin in here and I think it's -- if I can read it for a second, if you give me a second to -- to reread this, I don't believe that any drug is particularly -- is specifically implicated.
BY MR. LANIER:
Q Well, ma'am, I'd suggest if you're going to take a second to read it, you go to page 4 of 4 first.
A Well, I'll start from the beginning, if you don't mind.
Q Okay. Ma'am, have you not seen this document before?
A Yes, I've seen it before, but I'd like to reread it.
Q Because I'm under a time deadline, I'd like to give you some direction on what specifically you need to be looking for, because I think I can

BY MR. LANIER:

Q Ma'am, you accused me of oversimplifying it. I'm not trying to oversimplify anything. I think all I'm doing is reading. Would you tell me if I'm reading correctly, please?

Let me read it to you: In the FDA's analysis, patients receiving antiepileptic drugs -- have I read correctly so far?

A (Nodding head.)

Q Is that a yes answer?

A Yes.

Q And you --

A It's not -- I'm sorry. Excuse me for just a second. It's not how you're reading this. It's what you're -- there's more below the surface than what you're stating, that's the problem. You know, we can all read this. We can all sit down and have a dramatic reading of this, but it's the content that's important.

MR. LANIER: Objection, nonresponsive.

BY MR. LANIER:

Q Ma'am, the way the mechanics of this works, if this frees you up some to answer my questions, is I have four and a half hours to question you. This gentleman that represents the

drug company has two and a half hours. He's going to get to ask you all the things you want to put forward, the position you're paid to put forward here today.

MR. SAYLER: Objection, argumentative.

MR. LANIER: I'm just asking you -- I'm just asking you my questions.

This whole thing is just a statement, it can't be played to the jury. You don't have to object. I'm just trying to help you understand, you don't need to add these little things. He's going to get to ask you all of that. Okay?

THE WITNESS: For the record, I'm being paid to give my opinion, not someone else's.

MR. LANIER: Yeah. I strongly suspect if your opinion today is what your opinion had been when you originally wrote your report in '92, you wouldn't be here.

MR. SAYLER: Argumentative.

THE WITNESS: Well, quite frankly, there's no difference.

BY MR. LANIER:

Q Oh, good. So you agree today with what you said in 1992; is that correct?

A Yes.

Q Okay. So you would agree today that a less common but more serious event that may limit Neurontin's widespread usefulness is depression which may become worse and require intervention or lead to suicide? You agree with that today; is that right?

MR. SAYLER: You're asking if she agrees that she said that back in 1992?

MR. LANIER: No. That's still her position today, isn't it?

MR. SAYLER: Explain your position.

MR. LANIER: No.

BY MR. LANIER:

Q Answer my question: Is it still your position today, ma'am, that a less common but more serious event that may limit Neurontin's widespread usefulness is depression which may become worse and require intervention or lead to suicide? Do you still agree with that today? Yes or no.

A Perhaps not the way it was stated, because what -- what isn't stated here is -- this was a period of time before the drug was marketed, and -- and we didn't know how -- whether or not some of these events that were seen in the clinical trial database would play out. And I think that, you

know, with due diligence in reviewing this material, there were certain events that were of concern: Cancer was one of them, status epilepticus was another, depression was a third, and these were concerns that were present at the time. And when the drug was approved, just as when any drug is approved, when events are identified, they continue to be followed in the post-marketing period, and they were.

So does that mean that we forget that something occurred in the original database when we first approved it? No. So I think that my feelings at the time, perhaps I -- my predictions were wrong, but I think this was a valid concern at the time.

MR. LANIER: Objection, nonresponsive.

Can we scroll back and let me find what she said before this?

Keep going. Keep going. Okay. No. Right there. I'm going to go down now. Can I do this just by page down? Sorry.

BY MR. LANIER:

Q Ma'am, I was asking you about your opinion and you said there is no difference -- that's a quote of you -- no difference between your opinion in 1992 when you wrote Exhibit 1, and today,

A Yes.
Q You weren't part of the post-marketing division, were you?
A No.
Q The post-marketing division is the division in the FDA that monitors drugs after they've been approved, right?
A Correct.
Q You were in the part that just -- that worked up the approval of the drug?
A Uh-huh.
Q Is that a yes?
A Yes, it is.
Q You're not a neuropsychiatrist, true?
A That's true.
Q You're not an epidemiologist?
A That's true.
Q Epidemiologists are those numbers doctors who figure out percentages and associations based on -- on whether a study shows adequate power and things like that, right?
A Well, I don't think I would characterize it quite like that, but if that's how you understand it, that's fine.
Q Well, that's probably the way it's been

presented to the jury. The jury will hear from epidemiologists and the jury is going to hear them talking about the power of studies and associations and 95 percent degree of confidence intervals and a doubling of the risk and -- and rate ratios; those are epidemiology terms, by in large, fair?
A They are statistical terms, and yes, epidemiologists use those terms.
Q All right. You're not an epidemiologist?
A I am not an epidemiologist.
Q How much is Pfizer paying you to testify in this case?
MR. SAYLER: Objection.
MR. LANIER: Why?
MR. SAYLER: Paying her for her time.
MR. LANIER: Time testifying, right?
MR. SAYLER: Time doing whatever she's doing.
BY MR. LANIER:
Q They don't pay you to eat breakfast, do they?
A No, they don't.
Q Do they pay you to sleep?
A No, they don't.
Q Do they pay you to testify?

A I hope so.
Q Okay. So how much are they paying you to testify?
A Actually, we haven't discussed that.
Q You hadn't sent them a bill yet?
A Not for this, because we haven't finished.
Q All right. You tell them it was grueling, okay, and make them pay you.
How much are they paying you in general to work on this case?
A My usual consulting fee.
Q And what is that?
A $500 an hour.
Q And do you have a clue how much time you've spent so far?
A I have -- you've actually brought the records that you have subpoenaed, so you have those at your access. I don't -- I can't tell you right now how many hours I've spent in the past few days. It's been a few hours yesterday, six hours yesterday, roughly, and whatever time we spend today.
MR. LANIER: All right. Why don't we take a break for a minute, and let me have the documents that we need, and I'll look at those and then we'll

start back up.
THE VIDEOGRAPHER: Off the record 9:40 a.m.
(Recess 9:40 a.m. to 9:51 a.m.)
THE VIDEOGRAPHER: On the record 9:51 a.m.
BY MR. LANIER:
Q Ma'am, I got a chance to look at your bills. Looks to me like as of September 14th of '07 or so, you billed somewhere around, oh, $17,000 or so, maybe a little more. Does that seem about right?
A I -- those are the documents, so -- I haven't added it up.
Q Well, why don't we mark them as Exhibit 10 and I'll ask you, is that an accurate reflection of all of the time spent and money you've made on this case, through the time period covered by that -- those invoices?
(McCormick Deposition Exhibit Number 10 was marked for identification.)
A Some of this was reimbursed travel expenses.
BY MR. LANIER:
Q Okay. But you've got your time and your money there, don't you?

Q And not only did time pass but --
A And exposure passed.
Q And your position, your -- your job position changed --
A Yes.
Q -- since then. For example, back when you wrote this in '92 for the FDA, you didn't have lawyers looking over your shoulder editing your drafts, did you?
A That's true.
Q You didn't meet with lawyers before you wrote this, did you?
A No.
Q You weren't paid by lawyers before you wrote this, were you?
A No.
Q Lawyers did not give you the documents to review before you wrote Exhibit 1, true?
A That's true. I think what you are also doing, though, is taking this document as a sole -- the sole document that I wrote and you aren't reflecting that time has passed, and I did write subsequent documents that -- you know, you're taking something out of context, so I just would like to say that, you know, you're trying to highlight

something that probably -- I understand why, because you have a law case -- a lawsuit to win, but I think that you really are taking it out of context.
MR. LANIER: Objection, nonresponsive.
BY MR. LANIER:
Q You haven't met or seen the video of the Widow Smith, have you --
A I don't know who that is.
Q -- or her three daughters?
A No. I don't know who that is.
Q You don't know the story behind her husband's suicide?
A No.
Q Okay. They are my clients and I do take that very seriously.
A I'm sure you do.
Q Before you gave your affidavit and started offering your opinions in this case, you moved from the FDA and started being paid $500 an hour by the drug company, right?
A I'm sorry. I -- would you please --
Q Before you started writing affidavits and testifying in this case, one of the changes that happened is lawyers stepped in and started paying you $500 an hour on behalf of the drug company,

right?
A This is the only affidavit that I'm aware of that I have ever written.
Q But you have drafts of it? You didn't write it first draft, did you?
A No.
Q Did you even write the first draft, or did you consult with lawyers and have them prepare it?
A We talked at length and they wrote -- they took notes and they prepared the first draft.
Q So you didn't even prepare the first draft of the affidavit as far as dictating it or sitting down and typing it, you just had a conversation and the lawyers prepared it; is that fair to say?
A That is correct.
Q If I wanted to see the computer that had the first draft on it, I would have to go to the law firm; I wouldn't go to your office, right?
A That's correct.
Q And it's the lawyers that's -- in essence, gave you the documents they wanted you to review before you had those meetings, didn't they?
A Well, I have to say that I started the process.
Q That's fair. That's fair. But when you

started the process --
A They reviewed what was in the record.
Q Yeah. They -- they came to you probably not because you are a neuropsychologist.
A I'm not a neuropsychologist.
Q Right. They came to you because you had written some things, quite frankly, that hurt them in this case; did you know that?
MR. SAYLER: Objection, misstates the facts.
THE WITNESS: No, I don't think so.
MR. LANIER: All right.
THE WITNESS: I don't think so, and I don't know what somebody else's motives are, so --
MR. LANIER: Did they --
THE WITNESS: -- I don't want to speculate.
BY MR. LANIER:
Q All right. Did you go out and aggressively get all of your own documents, or did the documents that I'm going to have in the box marked as the exhibit in this case all come from the lawyers?
A Some of them, actually, I downloaded off the FDA's web site and printed myself.

see in the first paragraph under the heading "Considerations for Physicians and other Healthcare Professionals," data from 199 placebo-controlled clinical studies covering 11 different antiepileptic drugs were reviewed and analyzed for reports of suicidal behavior -- paren -- completed suicides, suicide attempts, and preparatory acts and suicidal ideation.

Did I read that correctly?

A Yes.

Q Now, looking at the categories of information in the June 2006 submission, first, completed suicide, what code or category would that be?

A Code one.

Q And how many completed suicides were there in the gabapentin patient population?

A In the controlled database, zero.

Q And how many were there in the placebo population?

A Zero.

Q Next is suicide attempts; which code would that be?

A Code two.

Q And how many gabapentin cases were there?

A Zero.

Q Next is preparatory acts; which code would that be?

A Code three.

Q How many preparatory acts toward imminent suicide behavior were there in the gabapentin population?

A Zero.

Q And then finally is suicidal ideation; which code would that be?

A Code five.

Q And how many cases of suicidal ideation were there in the gabapentin population?

A There were two.

Q And how many -- and what percentage did that add up to?

A .039 percent.

Q .039 percent?

A Uh-huh.

Q And how many cases of suicidal ideation were there in the placebo population?

A There was one.

Q And what percentage did that add up to?

A .037.

Q Now, the FDA Alert states that when this

data is pooled for all 11 antiepileptic drugs, we have a -- a incidence of 0.43 percent in the pooled drug population versus an incidence of 0.22 percent in the placebo population.

Do you see that --

A Yes, I do.

Q -- in the FDA's alert?

A Yes, I do.

Q Whereas, if we look at the data in the gabapentin-only population and we add up the percentages in codes one, two, three and five, what are the percentages in gabapentin versus placebo?

A Sorry. So one, two, three, four and five?

Q One, two, three and five.

A One, two, three and five. Well, it's still two -- .037 -- .039 percent, because there's a zero in the other categories.

MR. FINKELSTEIN: I just want to object to this whole line of questioning and set forth that at no point in time has Dr. McCormick ever been put forth as an expert and it seems that you are seeking to elicit expert testimony. You can go forward with your line of questioning. I'm just reserving my right to make the appropriate application related to it.

BY MR. SAYLER:

Q You testified earlier that the FDA Alert does not change as you sit here today the fact that you have never concluded that Neurontin increases the risk of or causes suicide-related behavior; is that your testimony?

MR. LANIER: Objection, form.

THE WITNESS: That's correct.

BY MR. SAYLER:

Q And can you --

A That's correct. I mean, these data are largely --

Q Let me ask a question.

A Okay.

Q Can you -- can you explain why your conclusion has not changed as you sit here today notwithstanding the FDA Alert?

MR. FINKELSTEIN: Objection.

THE WITNESS: Because the -- there was no signal in the controlled database in both NDAs. This is simply -- this is basically the same data.

BY MR. SAYLER:

Q And when you say "both NDAs," you are talking about --

A Both, the NDA and --