EXHIBIT A

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN MARKETING, SALES )CASE NO.

PRACTICES AND PRODUCTS LIABILITY )04-10981

LITIGATION )

)

)

THIS DOCUMENT RELATES TO: )

)

RUTH SMITH, Individually and as )05-CV-11515

Widow for the use and benefit of )

herself and the next of kin of )

Richard Smith, deceased. )

_____)

VIDEOTAPED DEPOSITION OF:

GARY WAYNE BIGGS, SR.

Taken on behalf of the Defendant

February 8, 2008

_____

---

**Page 2**

1  APPEARANCES:
2
   For the Plaintiff:
3
   KENNETH S. SOH, ESQUIRE
4  Lanier Law Firm
   6810 F.M. 1960 West
5  Houston, Texas 77069
   (713) 659-5200
6  713) 659-2204
   kss@lanierlawfirm.com
7
8  For the Defendant:
9  CEDRIC E. EVANS
   Clark, Thomas & Winters
10 P.O. Box 1148
   300 West 6th Street, 15th Floor
11 Austin, Texas 78701
   (512) 472-8800
12 (512) 474-1129
   cce@ctw.com
13
14 Also Present: Amanda Martin, Videographer
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1           I N D E X
2  WITNESS: GARY WAYNE BIGGS, SR.
3           INDEX OF EXAMINATIONS
4
                         Page/Line
5
   Examination by Mr. Evans        06  04
6  Examination by Mr. Soh          59  11
   Examination by Mr. Evans        73  05
7  Certificate                     75  01
   Errata Sheet                    76  01
8
9           INDEX OF EXHIBITS
10
   No. 1                           15  17
11 No. 2                           17  06
   No. 3                           29  07
12 No. 4                           46  17
   No. 5                           46  17
13 No. 6                           51  08
   No. 7                           64  05
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1      The videotaped deposition of GARY WAYNE
2  BIGGS, SR., taken on behalf of the Defendant,
3  on the 8th day of February, 2008, in the
4  offices of Medical Forensics, 850 R.S. Gass
5  Boulevard, Nashville, Tennessee, 37216, for all
6  purposes under the Federal Rules of Civil
7  Procedure.
8      The formalities as to notice, caption,
9  certificate, et cetera, are waived. All
10 objections, except as to the form of the
11 questions, are reserved to the hearing.
12     It is agreed that Deborah J. Harris, being
13 a Notary Public and Court Reporter for the
14 State of Tennessee, may swear the witness, and
15 that the reading and signing of the completed
16 deposition by the witness are reserved.
17
18
19
20           * * *
21
22
23
24
25

**9**

1  question -- let you get an answer out before we
2  start asking you a new question.
3      Also, sometimes questions aren't as clear
4  when they come out of at least my mouth as I
5  think it's going to be or as I think it is.
6      If you could just let me know if a
7  question isn't clear and I'll do my best to
8  restate it in a way that's more understandable.
9      Oh, at some -- there may be times when
10  either -- while I'm asking you questions
11  Mr. Soh may do this or when he's asking you
12  questions I may do this, but one of us will
13  make an objection.
14      Most likely it'll be something like
15  objection to form.  That is an objection that
16  we've making for the record.  You can let the
17  objection get out.  And unless one of us says
18  don't answer the question for some reason, you
19  can go ahead and answer the question.  All
20  right?
21      A    Yes, sir.
22      Q    Okay.  Good deal.
23      A    Oh, and I think it was a deposition.
24  The best I remember.  It was a long time ago.
25      Q    Okay.  Mr. Biggs, what is your

**10**

1  current occupation?
2      A    I'm an investigator for the Medical
3  Examiner's Office, Forensic Medical.
4      Q    And you say you're an investigator.
5  What is your exact job title?
6      A    We take the initial reports of death,
7  decide whether to --
8      Q    Oh, no.  Actually, I didn't mean to
9  cut you off.  But what is your job title, and
10  then we'll get into your job description?
11      A    Oh, my job title?
12      Q    Yes.
13      A    I'm sorry.
14      Q    That's okay.
15      A    Medical/legal death investigator.
16      Q    Okay.  And you indicated that you
17  work for Forensic Medical?
18      A    Yes, sir.
19      Q    Okay.  Now, can you -- and is
20  Forensic Medical -- is that a -- is it a
21  private company?
22      A    Yes, sir.
23      Q    Okay.  Can you explain the
24  relationship between -- and maybe, obviously,
25  this is something I think we touched on briefly

**11**

1  right before the deposition, but the
2  relationship between Forensic Medical and the
3  Medical Examiner's Office for this county or
4  for the state.
5      A    All right.  In 1997 they privatized
6  the operation of the Medical Examiner's Office.
7  Forensic Medical was the company that was given
8  the contract in '97 to function as the medical
9  examiner.
10      Dr. Bruce Levy was appointed chief medical
11  examiner of Davidson County and then later
12  appointed the state medical examiner also.
13      Q    Okay.  Sir, now, are you guys then
14  responsible for death investigation just in the
15  county or for the entire state?
16      A    As of this date, we do in-county
17  deaths.  We respond to the scenes if necessary.
18  Out of county, we'll take the death calls over
19  the phone but we do not normally respond to
20  those scenes.  We'll just take that on the
21  phone and bring them here.  We do more of an
22  autopsy service for those counties.
23      Q    How long have you been with Forensic
24  Medical?
25      A    Since inception, ten years ago.

**12**

1      Q    So since 1997, is that --
2      A    Yes.
3      Q    Okay.  And has your -- your job title
4  always been the same?
5      A    When I was hired in '94, it was still
6  medical/legal death investigator, yeah.
7      Q    Now, you started to answer this for
8  me earlier.
9      But what is your job description as a
10  medical/legal death investigator?
11      A    We take the initial death call.  We
12  determine if it falls under the jurisdiction of
13  the Medical Examiner's Office.  If the death
14  occurs outside of a hospital, except on
15  infants -- on infants, if they die in the ER,
16  we will respond to the ER.  But any other ones
17  we won't respond to hospital.
18      If they die at a residence or wherever,
19  outside the hospital settings, we will respond
20  if it call -- if the need arises that we do
21  need to respond.  And we will do a death
22  investigation at the scene.  Transport the
23  decedent here to the office and the medical
24  examiner will determine whether to do an
25  autopsy or not.

Page 17

1    MR. EVANS: Wait a minute. Let's do
2    this. You're actually looking now -- let
3    me go ahead and let me do this right here.
4    Let me mark a copy of these notes as
5    deposition Exhibit No. 2.
6       (EXHIBIT NO. 2 WAS MARKED FOR
7       IDENTIFICATION.)
8    BY MR. EVANS:
9    Q   Okay. Can you -- let's do this then.
10   Can you walk us through kind of what we're
11   looking at when we look at the notes from the
12   top going down?
13   A   Sure. At the very top -- I guess it
14   would be the corner.
15   Q   The top right corner?
16   A   Yeah, there you go.
17   Q   Okay.
18   A   It says 8628510, dash 8510. That's
19   dispatch's number. And they could page me at
20   5:53 that morning. Over here it says 04-1575.
21   I assigned it a case number.
22   Q   Okay. So you assign the case number?
23   Yes?
24   A   Yes.
25   Q   Okay.

Page 18

1    A   Sorry.
2    Q   That's all right.
3    A   Of course the decedent's name, his
4    age.
5    Q   Okay.
6    A   I didn't write his race and sex. I
7    normally write that down. I didn't write that
8    down.
9    Q   Tell me something. Just the --
10   the -- the name and the age -- and is that the
11   date of birth, that 1/4?
12   A   Yes.
13   Q   Was it 1/4/20 --
14   A   25.
15   Q   25. Is that information that you got
16   before you arrived at the scene or is that
17   information you got at the scene?
18   A   Since ya'll have copies, you can't
19   see the difference in color. When I took the
20   initial call, it was in red. And then I had a
21   black pen. So that's when I got out to the
22   scene I had a different pen.
23   Q   Okay.
24   A   So you can see my initial notes.
25   Q   Well, let's just for the record, so

Page 19

1    it's clear that in terms of the things that are
2    in red, it's the dispatch phone number and
3    time. You also have --
4    A   Location.
5    Q   -- the 1443 Janie Avenue also in red?
6    A   And the officer at the scene.
7    Q   Okay. And that is --
8    A   Well, no. It's off of Murray and
9    McGavock Pike.
10   Q   Okay. So those are the cross streets
11   for the address?
12   A   Yes, sir.
13   Q   Okay. And everything else -- so
14   those are notes that you made when you got the
15   call. Everything else that is in black are
16   notes that you would have made at the scene?
17   A   At the scene.
18   Q   Okay.
19   A   Or when I got back.
20   Q   Or when you got back. Are you able
21   to distinguish between the notes that you made
22   at the scene and the notes you made when you
23   got back?
24   A   Pretty much I can tell by my writing
25   most of my notes were done at the scene. The

Page 20

1    case number, since it's in blue, it was
2    probably when I got back.
3    Q   Okay. You can keep working.
4    A   All right. So we've got the
5    decedent's name, Richard H. Smith. He was at
6    1443 Janie Avenue in Inglewood, 37216 Zip code.
7    The Complaint No. 04-240830, that's the Metro
8    Police complaint number. And if you look about
9    midway down the page on the left-hand side.
10   Q   Right.
11   A   It says, 0545 --
12   Q   Yes.
13   A   -- MPD. That's what time they got
14   the call.
15   Q   And is that information -- who do you
16   get that information from?
17   A   Either dispatch or the detective on
18   the scene.
19   Q   Okay.
20   A   And back to the top of the page on
21   the left-hand side, you see 738, 1098 below it?
22   That's the code for leaving the scene. So
23   that's the time I left that scene, 738.
24   Q   Okay.
25   A   Below that says 640, 1097. That's

**21**

1  the code that I arrived at the scene. That's
2  what time I got there.
3    Q   Okay. So you were at the scene for
4  about an hour?
5    A   Yes, sir. And then, like you already
6  distinguished, it was off Murray and McGavock
7  Pike.
8    Q   All right. And then we have after --
9  kind of underneath that, under the -- the --
10  the, um, -- kind of the cross streets. You've
11  got some notes here. One year ago hip/knee
12  replacement. Talked in March of suicide. Can
13  you -- and there's some other notes here. I'm
14  not trying to just focus on those. But reading
15  down, there's some other notes.
16    Can you tell me where -- from what source
17  you would have obtained this information?
18    A   Initially from I believe Danny
19  Satterfield was out there. The
20  officers/detectives on the scene.
21    And then I would have, more than likely --
22  which I did talk to the wife in the living room
23  with the daughter present. I would have
24  confirmed that they did talk.
25    I would have made it quick because that

**22**

1  scene was -- the family was having a hard time
2  with it.
3    Q   Okay. Now, you said you did talk to
4  the wife, Ruth Brown Smith?
5    A   Yes, sir.
6    Q   Okay. And you said the daughter was
7  present?
8    A   Yes, sir.
9    Q   And which daughter was that?
10    A   Cindy Smith.
11    Q   Okay. And just to I guess sort of
12  figure out whether or not because there is, you
13  know, probably, you know, ten or 11 items of
14  information that's here in kind of this middle
15  set of notes, just are you able to say, okay,
16  well, this item of information is information I
17  got directly from Ruth Brown Smith and Cindy
18  Smith and this other information is information
19  I got from talking to Detective Satterfield or
20  one of the other officers on the scene?
21    A   No.
22    Q   Okay. All right. And do you have
23  any specific recollection of the substance of
24  your conversation with Ruth Brown Smith and her
25  daughter Cindy Smith?

**23**

1    A   Yes.
2    Q   Okay.
3    A   I talked to her at 7:35 a.m. That's
4  on our order for autopsy. Should be in the
5  file. And I explained that we, you know -- we
6  have to do an autopsy since the type of death
7  he experienced.
8    And more than likely, because I know how I
9  operate, I would have asked about the suicide
10  talk in the past or the attempts in the past,
11  to confirm that. And, basically, confirm the
12  story or just maybe ask little, quick
13  questions, because she was devastated. And the
14  daughter was there more of a protective kind of
15  role, which that's understandable.
16    And I asked everybody else to stay in the
17  kitchen. And I pulled her off to the living
18  room.
19    Q   Okay. You pulled her and Cindy Smith
20  off to the living room --
21    A   Yeah.
22    Q   -- when you spoke to them?
23    A   Yes. You come in the front door.
24  And to the right was a living room area, and
25  then the kitchen was back that way. So

**24**

1  everybody -- I just asked to talk to them
2  alone.
3    Q   And so you would have -- you would
4  have -- that's part of your normal working
5  protocol; one of the things you would have
6  confirmed was the talk of -- previous talk of
7  suicide?
8    A   Yes, sir.
9    Q   Okay. And in terms of -- were you --
10  was there any information that you can recall
11  that came from Cindy Smith versus Ruth Smith?
12    A   No, sir.
13    Q   All right. And in terms of your
14  confirming the information contained in your
15  notes here, if you had gotten a response that
16  the information that you had -- that you had,
17  you know, regarding the previous talk of
18  suicide or some of the other information was
19  incorrect, is that something you would have
20  noted in your written --
21    A   Yeah. I would have changed my note.
22    Q   Okay. All right. And -- okay. And
23  you said it was at seven -- 7:35 when you spoke
24  to -- to Ruth Smith and her daughter?
25    A   Yes.

## Page 25

1  Q   Okay.  One of the things you talked
2  to them about was the -- was the autopsy one of
3  the things you talked to them about, as well?
4  A   Yes.
5  Q   What were their thoughts about an
6  autopsy?
7  A   They were strongly opposed.
8  Q   Okay.
9  A   And I documented that in my senior
10 investigator report.
11 Q   And we're going to -- we'll go
12 through those in a second.  Um --
13 A   And it's on the side of my notes.
14 Q   Right.  Yeah.  I think you noted here
15 on the left-hand margin, opposed to autopsy.
16 In terms of the normal protocol for a --
17 the investigation of a death like Mr. Smith's
18 death, a gunshot wound to the head, is it a
19 normal part of the protocol to request an
20 autopsy?
21 A   Repeat your question.
22 Q   I'm sorry.  Yeah.  I'm just trying to
23 figure out, is it standard protocol for the
24 Medical Examiner's Office to do an autopsy in a
25 case like this?

## Page 26

1  A   Yes, sir.
2  Q   Okay.  Why?
3  A   Because they have a projectile still
4  in their body.  So you have to remove the
5  projectile.  And that's -- basically, several
6  reasons.
7  But the main one is what about if it came
8  back later and it was a homicide?  So then you
9  would have to bury somebody and have to exhume
10 them to get the projectile out.
11 Q   Okay.
12 A   But Dr. Li can go into more about it.
13 Q   Yeah.  No.  We -- yeah.  We're going
14 to talk to him in a bit.  Let me ask you this:
15 Obviously, given what happened earlier, that,
16 you know, Mrs. Smith, Ruth Smith, was upset?
17 A   (Nods head.)
18 Q   Correct?
19 A   Yes, sir.
20 Q   Okay.  Was she able to talk to you
21 and give you the answers that you were trying
22 to -- the answers to the questions that you
23 were asking of her?
24 A   Yes.
25 Q   Okay.

## Page 27

1  A   But I was quick with it.
2  Q   Okay.
3  A   Normally, when they're upset, I just
4  get what I need to do really quickly and let
5  them ask me any questions before I leave and
6  then I leave.
7  Q   Do you recall any questions that Ruth
8  Smith asked of you?
9  A   No.
10 Q   Okay.  All right.  And you said that
11 Cindy Smith was there in more of in a
12 protective role?
13 A   Yeah.
14 Q   Okay.  Was she -- to the extent that
15 you directed questions toward her, was she able
16 to answer the questions that you were asking of
17 her?
18 MR. SOH:  Objection to form.
19 MR. EVANS:  You can answer.
20 MR. SOH:  Go ahead.  Vague.
21 MR. EVANS:  Yeah, you can answer.
22 THE WITNESS:  Now, what was your
23 question?
24 MR. EVANS:  Yeah.  No --
25 MR. SOH:  Yeah, that's what usually

## Page 28

1  happens.
2  BY MR. EVANS:
3  Q   It's just to the extent that you
4  asked questions of Cindy Smith -- and do you
5  recall asking any questions of Cindy Smith?
6  A   I don't recall asking Cindy Smith.
7  Q   Okay.  All right.
8  A   I directed my questions to the wife.
9  Q   Okay.  All right.
10 MR. SOH:  Over my objection.  Thank
11 you, sir.
12 THE WITNESS:  And the only -- and the
13 reason why is because I was trying to make
14 it quick.  And I said, she came in there
15 more of a protective role.  And that
16 happens.  There are some times when the --
17 the decedent's family members are
18 distraught and then other family members
19 will step up and that's fine.
20 I just wanted to make it quick and help
21 them get their grieving process started.
22 MR. EVANS:  Okay.  Okay.  So we're
23 going to put this -- right.  And then I --
24 oh, let me just while we're -- since I
25 have this, I'm going to go ahead and mark

**29**

1   this.
2        You brought your fee schedule with you,
3   the charge.  And it says, Gary W. Biggs, Sr.,
4   Medical Investigator, and a charge schedule for
5   a private consultation.  I'm going to mark this
6   as deposition Exhibit No. 3.
7        (EXHIBIT NO. 3 WAS MARKED FOR
8   IDENTIFICATION.)
9   BY MR. EVANS:
10      Q   And just to be clear, you are being
11  compensated today for your time in this
12  deposition, correct?
13      A   Yes, sir.
14      Q   Okay.  And the going rate for your
15  time giving a deposition is -- is $250 an hour,
16  plus any travel expenses if you have to travel
17  somewhere for the deposition, correct?
18      A   Yes, sir.
19      Q   And you set your minimum a two-hour
20  minimum?
21      A   Yes, sir.
22      Q   Okay.  So, essentially, if the --
23  even if the deposition went one hour, your fee
24  would be $500?
25      A   Yes, sir.

**30**

1       Q   Okay.  All right.  And you also -- on
2   this fee schedule there's some charges for
3   court testimony, as well.
4        And just to be clear, we have agreed --
5   Pfizer has agreed to compensate you for --
6   according to your fee schedule for your time
7   today, correct?
8       A   Yes, sir.
9            MR. SOH:  If they stiff you, sir,
10       we'll be glad to send you -- we'll be glad
11       to compensate you, as well.
12           MR. EVANS:  Thanks for that.  I have
13       the check with me.  But, nice, appreciate
14       that.
15           MR. SOH:  Do you want to hand it to
16       him on the video, Cedric?
17           MR. EVANS:  No, no, no.  No, no, no.
18       No, no, no.  Ever.
19           MR. SOH:  (inaudible.) -- am I
20       correct?  (Inaudible.)
21  BY MR. EVANS:
22      Q   Can you -- can you -- and you've
23  talked some about this, just in terms of your
24  role.
25       So you said you arrived at the Smith home

**31**

1   at 0640, so that's 6:00 -- I'm sorry.
2   6:40 a.m., correct?
3       A   Yes, sir.
4       Q   Okay.  What was your role in the
5   investigative process at the Smith home?
6       A   My role is twofold.  It is to look at
7   the victim.  I can say victim, right?
8       Q   Sure.
9       A   Because I got in trouble for it
10  before.  To look at the decedent and do a body
11  examination, document the scene with
12  photography, correlate the decedent to the
13  scene, and if anything appears different from
14  what we're looking at -- we start off as
15  everything is a homicide, and you go from
16  there.
17       This was very consistent with a suicide
18  and we -- do you want me to go on and tell what
19  I saw at the scene?
20      Q   No, no.  We'll talk about that in a
21  second.
22      A   Okay.  So, anyway, document the
23  scene.  Do a body exam.  Prepare the decedent
24  for transport.  Make sure transport arrives in
25  a timely manner and have him released from the

**32**

1   scene.  And --
2       Q   And when you say --
3       A   -- and --
4           COURT REPORTER:  I'm sorry.  Released
5       from the scene?
6           THE WITNESS:  Yes, ma'am.  And talk
7       to the families if they're on the scene
8       and explain our procedures, protocols,
9       that we have to do.
10      Q   And you said document the scene.
11  What does document the scene entail?
12      A   We take notes.  We take photographs.
13  And then we come back and we type up the scene
14  description and the report.
15      Q   Would your focus -- I mean, beyond
16  the conversation that you had with Ruth Smith
17  and Cindy Smith, have been on -- and we talked
18  about the scene.  Obviously, the entire home
19  was a scene.
20       But in particular in the Smith home that
21  day, was there a -- was there an area of the
22  home that was the focus of the investigation?
23      A   Yes, sir.
24      Q   And what area was that?
25      A   When you come in the door, the best I

### Page 49

1  other whether or not there was a collection
2  made of the medications, the cyclobenzaprine,
3  the Hydrocodone, and Neurontin at the Smith
4  home?
5    A  Did I collect them?
6    Q  Yes.
7    A  Yes.
8    Q  You did?  Okay.
9    A  As best I remember.
10   Q  Okay.  And why -- do you have a
11  specific recollection of collecting the pill
12  bottles?
13   A  As best I remember, I collected them.
14   Q  Okay.  All right.  And then what
15  happens to the pill bottles once they're
16  collected?
17   A  You transport them back here.  We
18  usually use two forms, a medication log, which
19  basically logs the medication that was there.
20  And we have a medication list, which we put the
21  type of drug, when it was prescribed, how many
22  were left, who prescribed it, such like that.
23   Q  Okay.
24   A  So I probably didn't do that.  And
25  the reason is because I couldn't find it,

### Page 50

1  because I noted it in my -- and I didn't think
2  since they looked in therapeutic range that it
3  was related to the death.
4    Q  Okay.  All right.  And you said that
5  you -- you said you didn't do it because you
6  noted it where?
7    A  In my senior investigation form.
8    Q  Okay.  And then what was the second
9  thing you said about there appeared to be
10  therapeutic range?
11   A  Yeah.  There was pills in there.  If
12  he had overdosed, he more than likely would
13  have took them all and not used what he did.
14   Q  Okay.  Because your concern with the
15  medication at that time would have been whether
16  or not they were medications that were used to
17  facilitate the suicide?
18   A  Yes.  And, plus, you don't leave the
19  narcotics on the scene.
20   Q  Okay.  You also, in addition to that
21  note, you note that there is a -- that there
22  was a suicide note.
23     You note that in your scene report,
24  correct?
25   A  Oh, yes, sir.

### Page 51

1     MR. EVANS:  I'm going to mark as
2  Exhibit No. 6 photograph 5.  It's the same
3  one.
4     THE WITNESS:  Here.  You can see it
5  better.
6     MR. SOH:  That's all right.  I have
7  seen it.
8     (EXHIBIT NO. 6 WAS MARKED FOR
9  IDENTIFICATION.)
10 BY MR. EVANS:
11   Q  Does what I have marked as deposition
12 Exhibit No. 5, which is scene photograph number
13 005, does that appear to be the suicide note
14 that you reference in your report?
15   A  Yes, sir.
16 BY MR. EVANS:
17   Q  And you note here in this, also after
18 kind of you -- you -- you recite what the note
19 says.  You said the victim reportedly had a
20 history of hip and knee replacement surgery.
21     The victim was reportedly in chronic pain
22 and the victim reportedly discussed thoughts of
23 suicide in March of 2004.
24     Are you able to tell me specifically where
25 that information came from?

### Page 52

1    A  More than likely -- well, definitely,
2  the officers and detectives on the scene.  Then
3  when I talked to the wife, I would have either
4  confirmed or denied it real quick.  Like I
5  said, she was really distraught.  So I might
6  have just rushed real --
7    Q  Okay.  Okay.  The last -- is there
8  something else I wanted to talk to you about?
9  Oh, yeah.  The statement of opposition to
10 autopsy.
11   A  Is there one in the file?
12   Q  There is one in the file.  Give me --
13 here it is.  It's page 18 of deposition Exhibit
14 No. 1.  And if you can't find it, I've got a
15 copy of it.  And, actually --
16   A  To save time, we'll look at this one.
17   Q  Who created this document; do you
18 know?
19   A  It's a blank document except for the
20 wording and that's from us.  And I believe
21 David Crowder had them put the opposition for
22 autopsy.
23   Q  Okay.  All right.
24   A  Because he signed it at the bottom.
25 And that's --

**57**

1  as opposed to a homicide or an accidental
2  death.
3  Q   Okay.  And in terms of your -- your
4  opinions on the why of Mr. Smith's suicide,
5  what does your -- what did your investigation
6  reveal to you in terms of why you believe he
7  committed suicide?
8  A   He just got tired.  He got tired of
9  hurting.
10  Q   Okay.  And what is it that tells you
11  that?
12  A   His note.  He has medication that
13  shows that he's being treated for pain.  And
14  just from the -- they said that he had it in
15  the past.  But from the scene, he's laid
16  everything out and -- let's see.  I think -- if
17  you'll give me a moment?
18  Q   Oh, sure thing.
19  A   A lot of times on suicides they'll
20  lay all their personal effects out and stuff,
21  on the dresser, as you see in the pictures.
22  Q   Let's figure out which photograph you
23  have there.  That's one we already marked.  I
24  think what you're showing here is Exhibit
25  No. 5.

**58**

1  A   And if you'll see in the background,
2  he's marked the circle around pain.
3  Q   Okay.  Can you -- what are you -- oh,
4  you're looking at -- okay.  I see.
5     Just for the record, you're referring
6  to -- there is a -- is that the pamphlet that's
7  toward the back?
8  A   The pamphlet next to the mirror --
9  Q   Okay.
10  A   -- says pain.  He circled it.  He has
11  a written note.  He talked to his wife.  He got
12  tired of hurting.  That's an opinion, though.
13  Q   Of course.  I understand that.  But
14  that's your opinion based upon your experience
15  as a -- as a forensic investigator?
16  A   That and the wound.
17  Q   And the what?
18  A   The wound.
19  Q   The wound?
20  A   Yes, sir.
21  Q   What about the wound tells you that?
22  A   He's got a contact GSW at the right
23  temple region.  That means he put the gun to
24  his head.  He would have fought -- anybody
25  would have fought.  If they didn't do it

**59**

1  themselves, they would have fought.  There
2  would have been signs of a struggle.
3  Q   Okay.  All right.  That's what tells
4  you it's suicide?
5  A   That and everything else at the
6  scene.
7     MR. EVANS:  All right.  Okay.  I
8  think that those are probably all the
9  questions I have for you for right now.
10  I'll pass the witness.
11        EXAMINATION
12  BY MR. SOH:
13  Q   Do I call you Investigator Biggs,
14  Detective; what should I call you?
15  A   Call me Gary.
16  Q   Mr. Biggs, let me just go through a
17  couple of issues with you here.  You expressed
18  your opinion that Mr. Smith committed suicide
19  because of the pain, correct?
20  A   Yes, sir.
21  Q   Okay.  But that's not a formal -- is
22  that a -- would you consider that a formal
23  opinion from the Medical Examiner's Office?
24  A   That would be up to the medical
25  examiner to say that.

**60**

1  Q   Okay.  But it's your personal --
2  A   It's my personal.
3  Q   That's your personal opinion.  All
4  right.  Let me ask you this:  And I know that
5  you probably -- your friends and family think
6  that what you do is a lot like CSI, but it
7  really isn't what it's like at CSI, correct?
8  A   No.  They have all the good stuff.
9  Q   I mean, but, for example, if there
10  was a drug that caused suicides, you would not
11  go back and review like medical literature
12  showing an increased risk of suicide and make a
13  determination if that drug caused a role in the
14  suicide, would you?
15  A   Not unless my medical examiner,
16  Dr. Bruce Levy, tells me to do so.
17  Q   Okay.  Have you ever done that in
18  your years as an investigator for the Medical
19  Examiner's Office?
20  A   No, sir.  We turn that over to
21  Consumer Affairs Product or whatever.
22  Q   Like you wouldn't review, let's say,
23  an FDA warning about -- that a drug would
24  double the risk of suicide; you wouldn't review
25  that as part of your investigation, would you?

**Page 61**

```
1       MR. EVANS: Object to the form.
2    A   We knew about it, like the Vioxx or
3  whatever, we could like of look forward to that
4  when that came out.
5  BY MR. SOH:
6    Q   Okay. Oh, okay. You mentioned
7  Vioxx. Let's give you an example.
8       So you're saying that if someone died of a
9  heart attack while taking Vioxx, you would
10 investigate whether or not Vioxx might have
11 caused that heart attack?
12   A   If we found Vioxx, we would bring it
13 back in and document it.
14   Q   Okay. But you didn't do that in this
15 case with the Smith Family and the Neurontin?
16   A   We did bring -- I did document the
17 drug.
18   Q   That he was on Neurontin. But you
19 didn't go and document any kind of scientific
20 literature or anything like that to maybe show
21 a link between Neurontin and suicide?
22   A   No, sir.
23   Q   Okay. Let me ask you. I got a
24 little confused about your answers, and I just
25 want to maybe try and make it clearer, okay?
```

**Page 62**

```
1  Do you believe that you or the Medical
2  Examiner's Office actually took possession of
3  the prescription medication at Richard Smith's
4  home on the day of his suicide?
5    A   The best I would remember, yes.
6    Q   Okay. But there is no documentation
7  in your file or anywhere else in the Medical
8  Examiner's Office that says there are three --
9  we took three bottles of Neurontin and there
10 were 18 pills left in there?
11   A   No. I'm just going on standard
12 protocol.
13   Q   Okay.
14   A   But there are occasions when we have
15 left them on the scene.
16   Q   Okay. But -- so you're saying that
17 standard protocol in the Medical Examiner's
18 Office would be that you would take possession
19 of all prescription medication at the scene?
20   A   Yes, sir.
21   Q   But there's no paper trail or any
22 other documents in your possession that showed
23 that you actually took possession or how many
24 pills were left in those prescription bottles?
25   A   No, sir.
```

**Page 63**

```
1    Q   All right. Do you have any personal
2  knowledge of taking possession of the
3  prescription medication that day?
4    A   The best I remember I took it.
5    Q   Okay. But there's no documentation
6  and there's no --
7    A   Four years ago.
8    Q   What would happen to that medication?
9  Would it be released back to the family or
10 would it be disposed of?
11   A   We dispose of it here.
12   Q   Okay. But best of your recollection,
13 you took it but there's no other documentation;
14 fair statement?
15   A   Fair statement.
16      MR. SOH: All right. I just wanted
17 to clear that up. You -- let me show you
18 the police report real quick. I'm going
19 to mark -- what's next? -- Exhibit 5 --
20      MR. EVANS: No. 7, I think.
21      MR. SOH: Mark the police report as
22 Exhibit 7 to your deposition. This is
23 Detective Satterfield's supplemental
24 report from the -- I'm sorry -- I'm just
25 noting that the --
```

**Page 64**

```
1       MR. EVANS: Are you just marking --
2  are you marking the whole thing or just
3  his report? Because now you put that --
4  yeah, okay.
5       (EXHIBIT NO. 7 WAS MARKED FOR
6       IDENTIFICATION.)
7  BY MR. SOH:
8    Q   All right. I'm going to be marking
9  Detective Satterfield's supplemental report
10 from the Metropolitan Nashville Police
11 Department on the Smith suicide. I want to
12 mark that exhibit.
13      I just want -- I'm highlighting a couple
14 sentences in there, okay. And just read that
15 highlighted section.
16   A   Ms. Smith states that about one year
17 ago the victim had hip and knee replacement
18 surgery and has been in constant pain since
19 that time. On 3/1/04 the victim mentioned to
20 his daughter Cindy Smith that he might take his
21 own life.
22   Q   That's virtually identical to your
23 narrative summary, isn't it?
24   A   Do you mean in the report?
25   Q   In the narrative summary from your
```

**Page 65**

1   report.
2       MR. EVANS:  From the report of
3   investigation?
4       THE WITNESS:  Yeah.
5   BY MR. SOH:
6       Q   From your report.  Okay.
7   Is it likely that you got that information
8   from Detective Satterfield?
9       A   Yes.  I said that.
10      Q   I'm just -- clean it up.
11      A   Sorry.
12      Q   I've just got to clear that up.  And
13  just -- put that away.  Yeah.  Back to -- if we
14  can, I'd like to construct a quick little
15  timeline from you.  Go to the -- this -- this,
16  ME report form.  It talks about the times of
17  all that situation in your file.
18      Fair to say that the police were called
19  about Richard Smith's suicide about 5:45 a.m.?
20      A   Yes, sir.
21      Q   Medical examiner was notified
22  5:53 a.m.?
23      A   Yes, sir.
24      Q   And that's also on your notes?
25      A   Yes, sir.

**Page 66**

1       Q   Okay.  You got to the scene, you
2   said, at -- you got to the scene at 6:40 a.m.?
3       A   Yes, sir.
4       Q   And then you spoke to Mrs. Smith at
5   7:35 a.m?
6       A   Yes, sir.
7       Q   And three minutes later you left the
8   scene at 7:38?
9       A   Yes, sir.
10      Q   All right.  Fair to say that I think
11  you had -- what was Mrs. Smith's emotional
12  state when you spoke to her two hours after her
13  husband's suicide?
14      A   She was more like in shock.
15      MR. EVANS:  I was going to say
16  objection to form.  You said two hours.  I
17  think it was one hour.
18  BY MR. SOH:
19      Q   No.  You spoke to Mrs. Smith at 7:35?
20      MR. EVANS:  Oh, you're right, I'm
21  sorry.  I apologize.
22      MR. SOH:  Let me rephrase and clear
23  that up.
24      MR. EVANS:  I apologize.
25  BY MR. SOH:

**Page 67**

1       Q   You spoke to Mrs. Smith approximately
2   two hours after the suicide was phoned in,
3   correct?
4       A   I spoke to her at around 7:35.
5       Q   And the suicide was phoned in to the
6   police at 5:45, so a little bit under two
7   hours?
8       A   Yes, sir.
9       Q   What was Mrs. Smith's state of mind
10  when you spoke to her about a little bit under
11  two hours after --
12      A   I'd say --
13      MR. EVANS:  Objection to form.
14      COURT REPORTER:  One moment.  When
15  you spoke to her --
16  BY MR. SOH:
17      Q   Let me rephrase the question.
18      What was Mrs. Smith's state of mind or
19  emotional state about an hour and 50 minutes
20  after the suicide was phoned in to the
21  Nashville Police?
22      MR. EVANS:  Objection to form.  Now
23  you can go ahead and answer.
24      A   I would say she was distraught, more
25  in shock.

**Page 68**

1   BY MR. SOH:
2       Q   Okay.
3       A   Best I remember.
4       Q   Okay.  Let me just go over this very
5   quickly.  Assume with me that Mrs. Smith got
6   this information wrong about her husband's hip
7   and knee replacement.
8       You don't have a copy of the medical
9   records, but assume with me that that
10  information is wrong, that he did not -- let me
11  start again and rephrase the question.
12      Assume with me that Mrs. Smith told either
13  you or Detective Satterfield that a year ago
14  her husband had hip and knee replacement.
15  Okay?
16      A   Okay.
17      Q   Assume with me that the actual hip
18  and knee replacement was -- occurred in 1993,
19  1996, and 1998.
20      A   Whatever you say.
21      Q   Assume with me.  Is that
22  understandable, given her emotional state?
23      A   Sure.
24      Q   That she made a mistake about the
25  knee and hip surgery?

**Page 69**

1  A  Yes, sir.
2  Q  Assume with me that Mr. Smith had
3  back surgery about a year before he committed
4  suicide. All right?
5  A  All right.
6  Q  Is that error understandable, given
7  her emotional state?
8  A  Yes, sir.
9  Q  Okay. It doesn't have any impact on
10  your investigation?
11  A  It can -- no, sir.
12  Q  Okay. Understandable given the fact
13  that she was distraught and in shock?
14  A  I understand.
15  Q  Okay. Would you be surprised if
16  there are any other mistakes that she gave you
17  about a factual recitation, given her emotional
18  state that day?
19      MR. EVANS: Objection to form.
20  BY MR. SOH:
21  Q  Go ahead and answer.
22  A  No, I would not be surprised.
23  Q  Very common in the case of suicides,
24  where simple ordinary facts get confused by the
25  widow of a suicide victim?

**Page 70**

1  A  Oh, yeah.
2  Q  Okay. Fair enough. Is there
3  anything unusual about a suicide victim's
4  family declining an autopsy?
5  A  No, sir.
6  Q  How often does that happen? About
7  half the time; a little bit over half the time?
8  A  No. About a third of the time.
9  Q  About a third of the time?
10  A  Even if that much. It's -- they're
11  such in shock, and we're giving it to them --
12  at the scenes, especially, they don't think
13  about that.
14  Q  Okay.
15  A  But sometimes if they're really
16  religious they'll bring that up, and this
17  family was.
18  Q  Okay. But you don't read the refusal
19  for an autopsy one way or the other with
20  regards to an investigation, do you?
21  A  I don't. I just document their
22  objection. On this case.
23  Q  In your three-minute conversation
24  with Mrs. Smith and her daughter --
25  A  I just documented the time that I --

**Page 71**

1  I walked out to the car and then documented my
2  time that I spoke to them.
3  Q  Okay.
4  A  It was a -- brief. I don't know if
5  it was three minutes. I don't know if it was
6  five minutes, but it was very brief.
7  Q  Okay. In your brief -- and I just
8  want to clear this up, partly because I want my
9  voice on the record instead of Cedric's voice
10  on the record, okay.
11      But in your brief conversation with
12  Mrs. Smith and her daughter. Okay?
13  A  Yes.
14  Q  Is it fair to say that you simply
15  confirmed that there was a reference that
16  Mr. Smith had threatened suicide at some point
17  in the past?
18  A  That's fair to say, yes, sir.
19  Q  And that you also talked to them
20  about whether or not they wanted an autopsy
21  performed?
22  A  That would be my primary focus.
23  Q  Is there anything else that you can
24  recall as we sit here today that you spoke to
25  the Smith family about in your brief

**Page 72**

1  conversation?
2  A  I don't remember. I know I told them
3  God bless you.
4  Q  Okay. That's the -- those are the --
5  the two things are the main things that you
6  remember?
7  A  Talked to them about the autopsy and
8  usually correlate the events and --
9  Q  Okay. Give me a minute or two to
10  clean up.
11  A  Take your time.
12      MR. SOH: I've got to go to the
13  restroom.
14      MR. EVANS: Okay.
15      MR. SOH: But give me a second to go
16  over my notes, and I think I'm done.
17      MR. EVANS: You don't want to pass
18  him to me?
19      MR. SOH: Let me hold onto him.
20  Let's go off the record.
21      THE VIDEOGRAPHER: Going off the
22  record at 10:17.
23      (BREAK WAS TAKEN AT 10:17 A.M.)
24      (BACK ON THE RECORD AT 10:23 A.M.)
25      THE VIDEOGRAPHER: Back on record.