# EXHIBIT C

```
 1            UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    MDL Docket No. 1629
 3                                  Master File No. 04-10981
 4     * * * * * * * * * * * * * * * * * * *
                                           *
 5     IN RE: NEURONTIN MARKETING           *
            SALES PRACTICES AND             *
 6          PRODUCTS LIABILITY LITIGATION   *
       ------------------------------------ *
 7                                          *
       THIS DOCUMENT RELATES TO:            *
 8                                          *
       Shearer v. Pfizer Inc, 1:07-cv-11428-WGY *
 9                                          *
       * * * * * * * * * * * * * * * * * * *
10
11              DAILY TRANSCRIPT OF PRELIMINARY
                JURY INSTRUCTIONS, OPENING
12              STATEMENTS and THE EVIDENCE
                         (Volume 2)
13
             BEFORE:  The Honorable William G. Young,
14                         District Judge, and a Jury
15
       APPEARANCES:
16
              FINKELSTEIN & PARTNERS, LLP (By Ronald
17     Rosenkranz, Esq., Kenneth B. Fromson, and Keith L.
       Altman, Esq.), 1279 Route 300, P.O. Box 1111,
18     Newburgh, New York 12551
                 - and -
19            JACK W. LONDON and ASSOCIATES, P.C. (By
       Jack W. London, Esq.), 3701 Bee Cave Road, Suite
20     200, Austin, Texas 78746
                 - and -
21            THE LANIER LAW FIRM PLLC (By Kenneth S.
       Soh, Esq.), 6810 FM1960 West, Houston, Texas
22     77069, on behalf of the Plaintiffs
23
24                                  1 Courthouse Way
                                    Boston, Massachusetts
25
                                    March 31, 2010
```

## Page 2

```
 1    A P P E A R A N C E S (Cont'd)
 2
 3    BOIES, SCHILLER & FLEXNER LLP (By William
      S. Ohlemeyer, Esq.), 333 Main Street, Armonk, New
 4    York 10504
         - and -
 5    GOODELL, DeVRIES, LEECH & DANN, LLP (By
      Bonnie J. Beavan, Esq.), One South Street, 20th
 6    Floor, Baltimore, Maryland 21202
         - and -
 7    `SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
      (By Catherine B. Stevens, Esq. and Mark S. Cheffo,
 8    Esq.), Four Times Square, New York, New York
      10036, on behalf of the Defendant
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2
    WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS
 3
 4  DAVID FRANKLIN
 5    By Mr. London    46              150
 6    By Mr. Ohlemeyer         120
 7
                        FOR    IN
 8  EXHIBITS:           I.D.   EVID.
 9
10  2020    Neurontin Deciles.......... 67
11  2020-1  Neurontin Indications........ 83
12  6000    Dr. McCormick Regarding Neurontin . 100
13  5655    Voice Mail Tape........... 107
14  4062    Memorandum............ 113
15  5150    Neurontin Marketing Assessment .. 117
```

## Page 4

```
 1       THE CLERK: All rise. Court is in session, please
 2  be seated.
 3       Calling Civil Action 07-11428, Shearer v. Pfizer.
 4       Oh, sorry, Judge.
 5       MR. ROSENKRANZ: Good morning, your Honor.
 6       THE COURT: Good morning, counsel. Would you come
 7  over here to the side bar, this doesn't have to be on the
 8  record.
 9       (Side bar conference off the record.)
10       THE COURT: We'll stand in recess until we have the
11  jurors. If they're back there we'll start right at nine
12  o'clock. We'll recess.
13       THE CLERK: 11 rise. Court is in recess.
14       (Recess.)
15       THE CLERK: 11 rise for the jury.
16       (Whereupon the jury entered the courtroom.)
17       THE CLERK: Court is in session, please be seated.
18       THE COURT: Good morning, folks.
19       THE CLERK: If you would move down one. Thank you.
20  In the second row. Right. Okay, great.
21       THE COURT: My name is Bill Young. I'm the judge
22  who is assigned to preside in this session of the Court.
23  You've already met my colleague, Magistrate Judge Bowler,
24  who was gracious enough to conduct the impanelment of the
25  jury, but you're stuck with me for the actual trial of the
```

## Page 5

```
 1  case. That's my responsibility.
 2       You were sworn as jurors. Mr. Newman, the Court
 3  appoints you foreman of this jury.
 4       Let me take a few minutes to explain in detail
 5  exactly what's going to happen in this case and to tell you
 6  a little bit about what your function is in this case
 7  because you are the most important people in the courtroom.
 8       At this time, in this courtroom, there are thirteen
 9  judges. You twelve men and women are the judges of the
10  facts. You are the only judges of the facts. I'm the judge
11  of the law.
12       Now, let's consider a moment what that means to be
13  judges of the facts. This is informal, but I want to ask
14  you this: Do any of come from towns where they have direct
15  town meeting, everyone can get, go to town meeting and vote?
16  Does anyone? Thank you. Thank you.
17       When I'm picking a jury that's the first thing I
18  ask of the whole group. And you see you people who come
19  from towns where they have direct town meeting, you have the
20  experience of direct democracy, the people themselves ruling
21  directly. I don't come from such a town. But in those
22  towns everybody can go to town meeting. Everybody, if
23  you're 18 years of age or older, you can go to town meeting
24  and you 11 can vote. You vote whether to buy another fire
25  engine, raise the teachers' salaries, close the town dump.
```

Page 126

1  A  No. No.
2  Q  Okay.
3  A  I didn't meet with them before the deposition either.
4  Q  But you met with them yesterday?
5  A  They asked for time.
6  Q  Now, Dr. Franklin, Mr. Franklin, the doctors you met
7  with in the four months you were at Parke-Davis seemed to
8  you to be typically hard working, critical thinking doctors,
9  didn't they?
10 A  Yes.
11 Q  They were a cross-section of the kind of doctors that
12 you would find in an area like this, right?
13 A  Yes.
14 Q  Trying their best to help their patients?
15 A  Yes.
16 Q  Right.
17    And at the time that you joined Parke-Davis you
18 knew, didn't you, that Pfizer didn't invent Neurontin,
19 right?
20 A  I think it came from a Japanese company or -- I don't --
21 I don't recall specifically the origins of Neurontin.
22 Q  You learned, though, that it was approved by the FDA for
23 the adjunctive treatment of epileptic seizures in about
24 1993; isn't that right?
25 A  That's when it was approved, yes.

Page 127

1  Q  And you later learned that it was approved by the FDA in
2  2002 to treat pain associated with post-herpetic neurology,
3  right?
4  A  Yeah, that was long after I left the company.
5  Q  And referring to Exhibit 6000, do you know --
6  A  What page number is 6000.
7  Q  No, it's the time line I showed you.
8  A  All right.
9  Q  Do you know what the medical officer's role is at the
10 FDA in reviewing a New Drug Application?
11 A  I think they're the people that, the medical officer at
12 the FDA I believe is the individual who then reviews 11 of
13 the data analysis, gets their expert, sometimes they'll have
14 committees, expert committees, and that sort of stuff, and
15 they review all the data, and that's the person who makes
16 the final set of decisions or group of people that make the
17 final set of decisions.
18 Q  Do you know who the medical officer was at the FDA who
19 reviewed the Neurontin application prior to its approval in
20 1993?
21 A  I believe that we saw it earlier, it was something
22 McCormick.
23 Q  McCormick, right.
24    And am I correct, let me ask you to read a portion
25 of Exhibit 6000 for us. The February 14th entry on that.

Page 128

1  Can you read that for us.
2  A  Yes. Out loud?
3  Q  Yes, please.
4  A  In the documents that I reviewed, both in my
5  responsibility as a medical officer in epilepsy and also in
6  my review of the Neurontin application for post-herpetic
7  neuralgia, I did not see any -- and this is boldfaced -- I
8  did not see anything that would suggest an increased risk of
9  suicidality.
10 Q  And who is that statement attributed to?
11 A  It's February 14th, 2008, the McCormick deposition.
12 Q  And she to your knowledge was the medical officer who
13 reviewed the Neurontin applications?
14 A  Yes.
15 Q  Thank you.
16 A  Yes.
17 Q  Now, to get a drug approved you have to submit
18 controlled studies, don't you?
19 A  Yes.
20 Q  One of the slides Mr. London showed you had a
21 bullet point about anecdotal studies?
22 A  Yes.
23 Q  Is there a difference between a controlled study and an
24 anecdotal study?
25 A  Yes, absolutely.

Page 129

1  Q  It's a big difference, isn't it?
2  A  Giant difference. 11 the difference.
3  Q  Because a controlled study takes two groups of people
4  that seem, that are identical and tries to compare what
5  happens to them when one takes a drug and one takes a
6  placebo or sugar pill, right?
7  A  Not in 11 circumstances is there a placebo. But in
8  principle, yes.
9  Q  An anecdotal report is an observation of something that
10 occurs in somebody at a particular point in time?
11 A  That's right.
12 Q  And if you're trying to prove something the more
13 reliable evidence is the controlled study, not the anecdotal
14 report?
15 A  I would argue that the anecdotal report is not evidence.
16 Q  Now, I don't want to belabor this --
17 A  It's the lowest form of evidence.
18 Q  The anecdotal report?
19 A  Yes.
20 Q  And that's because there might be other explanations for
21 what you are observing?
22 A  Exactly.
23 Q  Now, Mr. London spent some time with this, I don't want
24 to belabor it, but there's a difference between an off-label
25 prescription and off-label promotion, right?