# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                      MDL Docket No. 1629
 3                                    Master File No. 04-10981
 4      * * * * * * * * * * * * * * * * * * *
                                            *
 5    IN RE: NEURONTIN MARKETING              *
             SALES PRACTICES AND              *
 6        PRODUCTS LIABILITY LITIGATION       *
      ---------------------------------------*
 7                                            *
      THIS DOCUMENT RELATES TO:               *
 8                                            *
      Shearer v. Pfizer Inc, 1:07-cv-11428-WGY *
 9                                            *
      * * * * * * * * * * * * * * * * * * *
10
11                 TRANSCRIPT OF THE EVIDENCE
                           (Volume 3)
12
              BEFORE:  The Honorable William G. Young,
13                             District Judge, and a Jury
14
      APPEARANCES:
15
              FINKELSTEIN & PARTNERS, LLP (By Ronald
16    Rosenkranz, Esq., Kenneth B. Fromson, and Keith L.
      Altman, Esq.), 1279 Route 300, P.O. Box 1111,
17    Newburgh, New York 12551
                 - and -
18            JACK W. LONDON and ASSOCIATES, P.C. (By
      Jack W. London, Esq.), 3701 Bee Cave Road, Suite
19    200, Austin, Texas 78746
                 - and -
20            THE LANIER LAW FIRM PLLC (By Kenneth S.
      Soh, Esq.), 6810 FM1960 West, Houston, Texas
21    77069, on behalf of the Plaintiffs
22
23
                                       1 Courthouse Way
24                                     Boston, Massachusetts
25                                     April 1, 2010
```

## Page 2

APPEARANCES (Cont'd)

BOIES, SCHILLER & FLEXNER LLP (By William S. Ohlemeyer, Esq.), 333 Main Street, Armonk, New York 10504
- and -
GOODELL, DeVRIES, LEECH & DANN, LLP (By Bonnie J. Beavan, Esq.), One South Street, 20th Floor, Baltimore, Maryland 21202
- and -
`SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP (By Catherine B. Stevens, Esq. and Mark S. Cheffo, Esq.), Four Times Square, New York, New York 10036, on behalf of the Defendant

## Page 3

INDEX

WITNESS:        DIRECT   CROSS   REDIRECT   RECROSS

Martin Teicher, By Deposition
    19
Charles King, III
  By Mr. London      41         146,
                                151
  By Mr. Ohlemeyer   114        150,
                                154

Robert Glanzman, By Deposition
    155

                        FOR    IN
EXHIBITS:               I.D.   EVID.
  2000 Guilty Plea .............. 5
  4289 Settlement Agreement ......... 6
  4290 Information ............. 6
  4292 E-Mail ................. 14
  4295 Memorandum ............... 16
  5669 Plea Agreement ............. 39
  5672 Judgment ................ 40
  4533 Neurontin Northeast CBU 1997 ...... 74
  4864 E-Mail ................ 85
  4875 E-Mail ................ 85
  4876 E-Mail ................ 85
  5768 Memorandum ............... 104
  2003 Neuropharmacological Review ..... 155
  3410 Roles and Responsibilities ...... 155

## Page 4

THE CLERK: All rise. Court is in session, please be seated.

THE COURT: Good morning, counsel.

COUNSEL: Good morning, your Honor.

THE COURT: We're down a juror. The juror's called. She's on her way. We're calling back to find out how close she is. And in the interim Ms. Smith tells me that you folks have an issue, so I came out to see if I could help.

MR. FROMSON: Your Honor, Kenneth Fromson, good morning. There are some documents that we would like to move into evidence before the deposition of Marty Teicher, as well as some documents that reflect the judgment and the plea which we think set the foundation for today's testimony, and that's what we have for you to discuss, which we would have asked for a side bar while the jury was here. So we appreciate your coming out this morning.

THE COURT: Fine. All right. Well, let's -- and they're in this folder?

MR. FROMSON: Your Honor, they're in a binder that was provided to the Court.

THE COURT: Right.

MR. FROMSON: And then I have the additional three documents that are not in the binder because they were not part of the deposition testimony.

## Page 5

THE COURT: Let's, well, let's just see here. AJ -- what I can do swiftly. AJS is admitted.

MS. STEVENS: Your Honor, we have some foundation objections to --

THE COURT: Well, you may. Do you expect to have an oral hearing on this document by document? I can take judicial notice of this. This is -- these are records of this particular Court, and the plea in this case I've already ruled is relevant. So once I've done that, what remains?

MS. STEVENS: There are several other documents that --

THE COURT: Well, I only said AJS.

MS. STEVENS: Thank you, your Honor.

THE COURT: Let's go step by step. AJS is in. What number?

THE CLERK: Hold on. I'll tell you.

THE COURT: Okay.

MR. ALTMAN: That should be 2000, your Honor.

THE COURT: 2000?

MR. FROMSON: 2000.

THE COURT: 2000.

(Exhibit marked in evidence.)

THE COURT: ASV I'll skip for a moment. ASW the same.

Page 126

```
 1  antiepileptic drugs, they're different kinds of drugs,
 2  right?
 3  A  Yes.
 4  Q  And they're different chemical compounds sometimes,
 5  right?
 6  A  Yes.
 7  Q  And they have different mechanisms of action, don't
 8  they?
 9  A  Yes, they do.
10  Q  That means they behave differently when they take them,
11  right?
12  A  Correct.
13  Q  And what you're saying, I think, is just because one of
14  those drugs in the class has a certain effect on somebody
15  who takes it doesn't mean another drug will have the same
16  effect, right?
17  A  Correct.
18  Q  So, for example, if I were a doctor and I were going to
19  look at a drug in that class like Lamotrigine or Topiramate,
20  I would have to ask myself whether those drugs were going to
21  behave like Neurontin based on what I knew about their
22  chemical composition and the way they behave in the body?
23  A  I don't have specific knowledge about those particular
24  drugs but --
25  Q  Well, let me rephrase the question. I think what you
```

Page 127

```
 1  are telling me is you shouldn't predict how one drug in a
 2  class is going to behave based on clinical data or
 3  information about another drug in that class?
 4  A  I guess what I would say is that it depends. It depends
 5  upon how significant the differences are and what the
 6  differences are you want to use it for. It's a factor you
 7  want to take into consideration.
 8  Q  And if I wanted to figure out what those differences are
 9  what kind of data would I look for?
10      MR. LONDON: Objection. That's not an economic --
11      THE COURT: Yes, sustained, on what I understand
12  he's qualified to testify about.
13  Q  In your profession, Doctor, if you want to determine
14  significant differences between two different groups of
15  things or groups of people or the behavior of two different
16  groups of people, what kind of data do you use or what kind
17  of experiments do you conduct?
18  A  Well, I guess this is a question about what we call
19  experimental economics. So, you would get together groups
20  people and you would look at how they behaved under
21  different circumstances.
22  Q  Would you want to control that experiment?
23  A  Yes, you would.
24  Q  What does that mean?
25  A  A controlled experiment involves, it involves a couple
```

Page 128

```
 1  of concepts. So, one thing you want to do in controlling
 2  your experiment is you want to make sure that you do a
 3  scientific experiment that let me say is just clean. So you
 4  want to make sure that whatever it is the effect you're
 5  interested in looking at or understanding that you've
 6  removed everything else from consideration and you're just
 7  looking at the influence of that one particular thing.
 8       The other aspect of a controlled study that's
 9  important in the medical context is that you want to, you
10  want to use a randomized clinical trial that's blinded.
11       Now, those are a lot of technical terms. But
12  basically what the idea is that you want to get a group of
13  people together and randomly separate them into two
14  different groups and then to one group you would apply
15  treatment, you would give them Neurontin, and to the other
16  group you would give a placebo, a sugar pill, something that
17  didn't have an effect, but you wouldn't let either the
18  doctors or the people in those groups know whether they were
19  actually receiving the treatment or the placebo. And you do
20  that to eliminate bias and then you look at the results of
21  the outcome and you say, okay, the people who basically had
22  the placebo and didn't receive any effective therapy, did
23  they respond to treatment or not compared to the ones who
24  actually actively received the drug of Neurontin. And
25  that's how you would construct, that's generally speaking
```

Page 129

```
 1  how you would construct a clinical trial.
 2  Q  Thank you, Doctor.
 3      Now, another kind of medicine that is prescribed
 4  off-label for pain, or was prescribed off-label for pain
 5  during the period in which you were doing your study were
 6  tricyclic antidepressants, right?
 7      MR. LONDON: I'm going to object. That's outside
 8  the scope of his expertise and outside the scope of --
 9      THE COURT: Well, please don't argue. But I'll
10  sustain it on that ground.
11  Q  Do you know, Doctor, whether there were any other
12  medicines being used off-label for pain during the period of
13  time you studied?
14  A  I presume there were.
15  Q  All right. And do you know whether they were used
16  notwithstanding the absence of any improper off-label
17  promotion?
18  A  You know, I assume based on the academic studies and
19  elsewhere that there were drugs that were being used for
20  pain and other indications that were legitimate off-label
21  uses.
22  Q  And would you agree with me that the best evidence of
23  why a particular doctor chose to prescribe a particular
24  medicine to a particular patient would be testimony from
25  that doctor?
```