# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                          )
NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION    ) Pages 107 - 360

DAUBERT HEARING - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE
and
JUSTICE MARCY S. FRIEDMAN
NEW YORK SUPREME COURT

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
June 20, 2008, 9:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFFS:
 3      ANDREW G. FINKELSTEIN, ESQ. and KENNETH B. FROMSON, ESQ.,
        Finkelstein & Partners, LLP, 436 Robinson Avenue, Newburgh,
 4      New York, 12550.
 5      JACK W. LONDON, ESQ., Jack W. London & Associates, P.C.,
        3701 Bee Cave Road, Suite 200, Austin, Texas, 78746.
 6
    FOR THE DEFENDANTS:
 7
        DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
 8      160 Federal Street, 23rd Floor, Boston, Massachusetts,
        02110-1701.
 9
        JAMES P. ROUHANDEH, ESQ., Davis, Polk & Wardwell,
10  450 Lexington Avenue, New York, New York, 10017.
11      JAMES E. HOOPER, ESQ. and DIANE HELLWIG, ESQ.,
        Wheeler Trigg Kennedy, LLP, 1801 California Street,
12      Suite 3600, Denver, Colorado, 80202-2617.
13      SCOTT W. SAYLER, ESQ., LORI CONNORS McGRODER, ESQ.,
        and JENNIFER M. STEVENSON, ESQ., Shook, Hardy & Bacon, LLP,
14  2555 Grand Boulevard, Kansas City, Missouri, 64108-2613.
15      RICHARD M. BARNES, ESQ. and MICHAEL J. WASICKO, ESQ.,
        Goodell, DeVries, Leech & Dann, LLP, One South Street,
16  20th Floor, Baltimore, Maryland, 21202.
17      BETH L. KAUFMAN, ESQ., Shoeman Updike & Kaufman, LLP,
        60 East 42nd Street, New York, New York, 10165-0006.
```

```
              INDEX
 WITNESS          DIRECT   CROSS   REDIRECT
 Cheryl Blume       113     140      197
 Stefan P. Kruszewski 203   235      287
 Robert Gibbons     296     334
 Charles P. Taylor  339

 EXHIBITS    DESCRIPTION                              PAGE
 Plaintiff
  3    FDA manual - Guidance for Industry             117
  4    IV(a) Psychobiological Adverse
       Events in Pre-Approval Stage
 Defendant
  2    "Seizure frequency and CSF parameters,"
       Ben-Menachem, E., et al
  3    Exchange of correspondence between             162
       Dr. Hauben and Dr. Strom
  4    U.S. Department of Health and
       Human Services - Statistical Review
       and Evaluation
  5    Affidavit of Cynthia McCormick
```

PROCEEDINGS

THE CLERK: In Re: Neurontin Marketing Sales Practices and Product Liability Litigation, Civil Action No. 04-10981, will now be heard before this Court.

MR. FINKELSTEIN: Your Honor, before we get started, two very fast issues. One, I'd like to hand up -- I've already provided it to Mr. Rouhandeh -- the declaration from Dr. Trimble related to simply the peer-review articles that he had referenced.

Secondly, we did offer an element where we think we can satisfy the time constraints we have. We agreed and suggested to defense counsel we limit 20 minutes to direct, 40 minutes to cross, and we could get everything in today, and we're open to doing that.

MR. ROUHANDEH: Your Honor, before that's handed up, the defendants believe it's entirely inappropriate for the witness to leave the stand, and then, before he gets on a flight to go back to London, signs a declaration to hand up to the Court when we don't have any opportunity to cross-examine him.

JUDGE SARIS: Overruled. If they're just the documents he referred to yesterday, I'm going to allow it.

MR. FINKELSTEIN: That's all it is.

JUDGE SARIS: It's very helpful. Let me just say this: We're having problems here. We both realized we read

something yesterday involving Dr. Taylor. And I read this single-spaced opaque report, and she got some really great little summary in an affidavit. So we're trying to figure out whether we're, A, getting the same documents, and, B, what we should be using to prepare for this hearing.

Did I get the affidavit? Does anyone know?

MS. McGRODER: Your Honor, Lori McGroder for the Pfizer defendants. The reason why you got affidavits in the New York court proceeding was because of the local rule about supporting our evidence with an evidentiary basis. So the experts provided affidavits setting forth what was in their reports. The substance is the same as in their actual reports which you received, your Honor.

JUDGE SARIS: But which is, like, ten times longer.

MS. McGRODER: Well, we'd be happy to give you the declarations also.

JUDGE SARIS: And the same comes up with Dr. Blume. It was 193 pages single-spaced. I didn't get through it, confession. I mean, you couldn't read it all, and it didn't really have a decent executive summary. So at some point, our time is a little limited here, and we're trying to move quickly to do catchup. So I don't know that I want 20 minutes. I don't know what she said. I mean, I didn't -- with some of them, you can read it through from beginning to end and just figure it out. I mean, if they're

**Page 160**

1  (Discussion off the record.)
2  JUDGE SARIS: So do you have any idea what happened
3  in 1999 that made that shoot up so dramatically off of a
4  zero, almost of a zero base? Is that when it started getting
5  marketed in a different way?
6  MR. BARNES: Let me direct some examination. I
7  think I can teach you through this. Let me make a proffer.
8  This is not even -- this is an incident. This is a
9  percentage. It's not a proportion. What this represents is
10 a percentage of this higher-level term as the percentage of
11 the entire adverse event database. And so it's graphed over
12 time, and it's based upon spontaneous adverse event reports,
13 and it's used to generate to see if there is a signal, and
14 there are lots of -- I want to talk about the method and its
15 criticisms.
16 JUDGE SARIS: Yes, but I'm just asking. I mean,
17 it's dramatic, actually. I just focused on it. Why does it
18 suddenly shoot up for Neurontin? Do you know? I mean, if
19 you don't know, you don't know. I'm not asking you. I'm
20 just asking Dr. Blume. Do you know?
21 THE WITNESS: Oh, I'm sorry. I thought you were
22 talking to him. Several things happened. There was new
23 terminology put into the database, and also there was a
24 publication.
25 JUDGE SARIS: A new terminology, all right, so they

**Page 161**

1  were capturing more data?
2  THE WITNESS: Right, they were capturing more, and
3  there was a publication regarding Neurontin-related
4  intentional overdoses.
5  MR. BARNES: There was a Poison Center Control
6  Report that at this time basically dumped in about 22
7  reports. It's a literature report, and it just came in at
8  one time.
9  JUDGE SARIS: All right, okay, so that explains
10 that, and then it sort of slowly creeps up and then jumps
11 again. What happened there at around — now that I'm seeing
12 the dating that you used, in around March 31, 2002, maybe a
13 little later, it jumps, starts going a steep incline again.
14 Do you know why?
15 THE WITNESS: I'm turning to that section right
16 now.
17 MR. BARNES: Your Honor, what statement are you
18 concerned with?
19 JUDGE SARIS: You can see it right there. It looks
20 like Mount Everest at the tail end there.
21 MR. BARNES: Right here?
22 JUDGE SARIS: Yes.
23 MR. BARNES: There's a dispute about publicity bias
24 and when it was created. There was widespread advertising
25 that began in 2003 and publicity.

**Page 162**

1  JUDGE SARIS: So that's your view. Anyway, let me
2  just say, Dr. Blume, I don't want to take his time. Do you
3  have a ready explanation for that?
4  THE WITNESS: I'm looking to see it now, and I
5  don't think the publicity was until the second half of 2003.
6  I think those are the dates in which there was actually an
7  impact of publicity. Just one second. I'm looking right now
8  to see if I have specifically cited. . .
9  JUDGE SARIS: Anyway, if you see it later on, let
10 us know. Maybe you can find it for redirect. I don't want
11 to take his time to do it.
12 MR. BARNES: Thank you, your Honor. I've just
13 offered another exhibit into evidence. I guess it's Defense
14 Exhibit No. 3.
15 (Defendant Exhibit 3 received in evidence.)
16 MR. BARNES: Now, your Honors, I want to direct
17 your attention to the first paragraph. This is an exchange
18 of correspondence between Dr. Hauben of Pfizer and Dr. Brian
19 Strom.
20 Q. I think we can agree, Dr. Blume, that Dr. Brian Strom is
21 a recognized authority in pharmacovigilance in the United
22 States, correct?
23 A. I do cite his book.
24 Q. So you would agree, and --
25 A. I don't know if he's ever been designated as an

**Page 163**

1  authority in court, but I do cite his book.
2  Q. Okay. And in fact the plaintiffs at Page 35 of their
3  briefing agree that Dr. Strom's textbook is authoritative.
4  Let me show you what Dr. Strom says to Dr. Hauben about the
5  use of proportional reporting ratios and measures of
6  disproportionality such as the one that the Court was
7  inquiring about. Here's what Dr. Strom says: "I strongly
8  agree with Drs. Hauben and Dr. van Puijenbroek –"
9  JUDGE SARIS: Could you just fix that a little bit
10 on the screen there.
11 MR. BARNES: Is that better?
12 JUDGE SARIS: And the "In reply" is --
13 MR. BARNES: It is a reply to Dr. Hauben, who's
14 actually of Pfizer.
15 Q. And basically what Dr. Strom, an authority on
16 pharmacovigilance who you cite says, "I strongly agree with
17 Dr. Hauben and Dr. Puijenbroek that true signals should
18 emerge from clinical judgment, and that statistical
19 algorithms such as PRRs should be used as supplements to
20 clinical and epidemiological judgment, not replacements. I
21 also agree that the value of statistical algorithms, even in
22 that role, remains unproven. Unfortunately, however,
23 statistical algorithms are too often used alone, in
24 publications and in the courtroom, as if they represent
25 analyses useful for hypothesis testing, which is

Page 164

1  inappropriate."
2      Do you agree with Dr. Strom, Dr. Blume?
3  A. Well, let me answer that step by step. I don't know to
4  whom he's writing or the essence of this, but I will note
5  that FDA in its Guidance instructs us to do PRRs -- just a
6  second -- so we are instructed to do that. FDA says that you
7  may examine PRRs for evidence of causation and in signal
8  detection. And I agree that clinical and epidemiologic
9  judgments would be wonderful to have, but in this case we
10 can't have randomized clinical trials. And prior to the
11 FDA's meta-analysis, I could find no epidemiology data
12 associated -- found anywhere in your databases, so all we had
13 were these type of data. But now we have the FDA
14 epidemiologic review, and it confirms the PRR issues.
15     JUDGE SARIS: Well, do you agree that standing
16 alone, these PRRs cannot establish general causation?
17     THE WITNESS: I agree that the PRRs are a tool in
18 examining products across a series. That's the way I use
19 them, or looking at differences within particular vulnerable
20 subgroups.
21     JUDGE SARIS: Well, sure, but just as we just were
22 doing going through that graph, it could be a difference in
23 publicity, it could be a difference in reporting techniques.
24     THE WITNESS: Exactly, I agree.
25     JUDGE SARIS: I mean, the jumps look horrific when

Page 165

1  you first look at them, but then there are explanations,
2  right?
3      THE WITNESS: Right, I agree that they are a tool,
4  but I would also agree that, your Honor, if you recall
5  several years ago -- in fact they mentioned it -- the Bacol
6  removal from the United States marketplace was predicated
7  upon FDA's use of PRR ratios comparing Bacol and Lipitor. So
8  that formed the basis of the product's removal.
9      JUDGE SARIS: It's a red flag.
10     THE WITNESS: It is a flag, yes, it's a flag.
11     JUDGE SARIS: And we all agree it's a useful red
12 flag, but standing alone, you can't use it.
13     THE WITNESS: I would agree that we can't use it
14 for statistical; but in a case such as when the end point is
15 death and we can't have a randomized clinical trial, it's an
16 end point that we have to look at.
17     JUDGE SARIS: Fair enough.
18 Q. Is it your testimony that -- what Judge Saris asked you
19 was dead on. All these techniques do, if you accept them, is
20 to say -- and there is some controversy as to whether or not
21 they're even legitimate, as Dr. Strom points out -- you would
22 agree that FDA does not believe and has never recommended in
23 its Guidance document that these can be used as evidence of
24 general causation?
25 A. Yes, I would agree with that, but I would also agree --

Page 166

1      MR. FINKELSTEIN: Can she answer the question?
2  A. I mean, I would agree with that, but I would also point
3  out in Dr. Strom's textbook, if you wanted to be complete,
4  that Dr. Strom's textbook in fact is saying that even one --
5  he supports in his FDA chapter the use of such data and the
6  use of post-marketing data when there's biologic plausibility
7  to support causation. So he doesn't out of hand reject
8  this. In fact he gives examples where post-marketing data,
9  even limited post-marketing data, can be evidence of
10 causation.
11 Q. Let's take it step by step. Dr. Strom is saying that
12 the use of your technique for any purpose such as general
13 causation is completely inappropriate. He even says it
14 shouldn't even be used in a courtroom, correct? That's what
15 he says?
16 A. You have read it correctly.
17 Q. Thank you.
18 A. I do not know the basis of this, but I know the extent
19 of what he addresses in his book.
20     JUDGE SARIS: Now, who's this guy Strom again?
21     MR. BARNES: Dr. Strom is a --
22     JUDGE SARIS: You know, actually -- so who's
23 Strom?
24     THE WITNESS: Dr. Strom is a well-recognized
25 epidemiologist, and he publishes a textbook or a reference

Page 167

1  book related to pharmacovigilance.
2      JUDGE SARIS: He's the guru in epidemiology?
3      THE WITNESS: He is, and what he does in his book
4  is, he has FDA chapters, World Health Organization chapters,
5  and he gets regulators as well as leaders in the field to
6  talk on various topics. In the last two books, he has
7  discussed the issue of causation, PRRs,
8  dechallenge/rechallenge data. And I would submit that he
9  finds great use for post-marketing data when we don't have
10 anything else, especially when it's been confirmed by
11 rechallenge data.
12 Q. Let me just finish one more question on this, just what
13 Dr. Strom says. I want to finish reading what he says about
14 your method, proportional reporting. Page 2, the same
15 letter. This is Dr. Strom writing: "My central points
16 remain. Case reports are primarily useful for hypothesis
17 generation."
18     Now, Dr. Blume, that whole database that you were
19 looking at was made up of MedWatch reports, which are
20 essentially reports from doctors or patients about an
21 experience with a drug, correct?
22 A. Well, they can be submitted by several people, but, yes.
23 Q. Yes, as an example. And here's what Dr. Strom says:
24 "And I still concur with the observation of Hennessey that
25 anecdotal case reports and disproportionality measures of

16 (Pages 164 to 167)

Case 3:05-cv-00444   Document 111-5   Filed 04/16/10   Page 5 of 5 PageID #: 1773