IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RUTH SMITH, Individually and as Widow for the Use and Benefit of Herself and the Next Kin of Richard Smith, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>PFIZER, INC., *et al.*,<br><br>Defendants. | Civil No. 3:05-0444<br>Judge Aleta A. Trauger<br>(Dist. Of MA No.<br>1:05-cv-11515PBS) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF CHARLES KING

Defendants, Pfizer Inc and Warner-Lambert Company LLC (collectively "Defendants" or "Pfizer"), respectfully submit this memorandum in support of their motion to exclude the testimony of Professor Charles King, III, pursuant to Federal Rules of Evidence 401, 402, 403, 702, and 703.

### PRELIMINARY STATEMENT

Pfizer anticipates that Plaintiff may bring Professor King, an economist, as a witness at trial for the ostensible purpose of attempting to show a connection between Pfizer's marketing activity and an increase in sales. (Ex. A, King Report at ¶¶ 4, 6.)[1] Initially, because this is a personal injury case dealing with allegations about the failure to provide a warning on a product's label, testimony about off-label marketing is irrelevant to such claims.[2] In this case, Professor King's testimony is particularly irrelevant because he will not and cannot opine that Mr. Smith's Neurontin prescription was the result of off-label marketing – nor does he have any knowledge about the facts of Mr. Smith's individual case. (Ex. B, Deposition of Charles King,

---

[1] All exhibits are attached to the accompany declaration of Mark S. Cheffo.

[2] Defendants have separately moved *in limine* to exclude evidence of Defendants' marketing and promotional activities. Defendants incorporate that motion herein by reference.

III, ("King Dep.") at 84:3-14; 126:7-9; 126:17-23; 137:22-138:12.) At most, he will conclusorily state that some unknown quantity of unidentified physicians may have been influenced by marketing activities. (King Report at ¶ 5.d.) This is wholly irrelevant to the circumstances surrounding Mr. Smith's suicide, and such testimony would cause substantial prejudice, confuse the jury, unnecessarily broaden the scope of trial, and distract from the issues actually in dispute with regard to Plaintiff's failure to warn claim.

Even assuming that his purported conclusions are relevant, Professor King failed to apply any methodology in reaching them. For the sole purpose of rendering an opinion in this litigation, Professor King reviewed documents selectively provided to him by Plaintiff's counsel without performing any independent research or analysis of his own. (King Dep. at 81:10-21.) He then supplied the *ipse dixit* conclusion that, because the percentage of off-label sales of Neurontin increased around the time Plaintiff alleges off-label promotion began, these sales must have been caused by improper off-label marketing. He does not, however, make any effort to test his hypothesis, differentiate between the effects of legitimate and illegal or allegedly fraudulent marketing, account for other possible causes of the increase in off-label use, attempt to determine what portion of the increased sales are supposedly attributed to off-label promotion, or apply any recognizable methodology. As such, he fails to satisfy the threshold requirements of Rules 702 and 703.

Finally, Professor King seeks to give the jury his "interpretation" of certain documents selected by Plaintiff's attorneys. As demonstrated by his testimony in the *Shearer* trial, this basically consists of reading selected documents to the jury and then making conclusory, unfounded accusations about Defendants' intent and motives.[3] (*See, e.g.*, Ex. C, *Shearer v. Pfizer* 4/1/10 Trial Tran. ("*Shearer Tran.*") at 68:5-17; 77:21-25; 101:18-20.) His opinions about corporate intent lay far beyond his area of expertise, and this testimony would confuse the jury

---

[3] Professor King's report also contains a lengthy narrative of purported facts of which he has no first-hand knowledge, along with his conclusions regarding what these documents supposedly mean and how they supposedly buttress Plaintiff's claims. (King Report at ¶¶ 37, 66.)

2

and usurp their fact-finding responsibility to interpret documents. Essentially, Professor King proposes to interpret the evidence and, thereby, act as an advocate presented to the jury under the guise of an expert witness. Considering that he incorporated data analyses conducted by Plaintiff's attorneys into his report, the development of Professor King's report and proposed testimony also confirms that he is doing nothing more than "putting his imprimatur on the [Plaintiff's] case." *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 212 (D. Mass. 2009). Professor King's opinions clearly invade the province of the jury by instructing jurors as to what the documentary evidence means and speculating about the motives of parties and the thought-processes of non-party prescribing physicians. For all the reasons discussed below, the Federal Rules do not permit such testimony and it should be excluded.

## ARGUMENT

### I. PROFESSOR KING'S PROPOSED TESTIMONY IS IRRELEVANT AND UNDULY PREJUDICIAL

Plaintiff intends to proffer Professor King to testify regarding the impact of alleged off-label promotion of Neurontin on its sales. (*See Shearer* Tran. at 41:11-13, 44:12-45:1; King Report at ¶ 4.) Professor King cannot, and will not, testify as to whether any off-label promotion influenced Mr. Smith's prescribing healthcare providers – aside from a broad, conclusory statement that off-label promotion must have influenced "all physicians." (King Report at ¶ 5.d.) More specifically, he has not reviewed the deposition testimony of any of Mr. Smith's physicians, (King Dep. at 82:15-83:8), has no knowledge of the particular facts in this case, and does not know what Mr. Smith's healthcare providers considered when prescribing Neurontin. (*Id.* at 84:3-5.) In fact, Professor King explicitly stated in his deposition that he is "not offering an opinion . . . concerning a specific personal injury case" and he has not "considered any individual doctor and the source of the influence." (*Id.* at 84:6-14; 126:7-9; *see also id.* at 126:17-23; 137:22-138:12; *Shearer* Tran. 4/1/10 at 134:20-25.) Rather, his "opinion" is essentially that some number of unspecified and unidentified physicians somehow, somewhere may have been influenced by Defendants' marketing activities. (King Report at ¶ 5.)

Considering that he does not even attempt to relate his vague conclusions to the facts at issue in this case, his testimony will not assist the trier of fact and must be excluded.

As a threshold matter, the Court must find that expert testimony "'both rests on a reliable foundation and is relevant to the task at hand.'" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The "scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). Thus, in addition to the reliability requirement, the Sixth Circuit's "fit" requirement places a burden on the party proffering expert testimony to establish by a "preponderance of proof" that the expert "will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Id.* "The fit requirement directs the Court to look beyond the qualifications of a witness in the abstract, and focus on whether those qualifications provide a foundation for a witness to answer a specific question." *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 859 (M.D. Tenn. 2005).

Plaintiff will be unable show that Professor King's opinions "fit" the facts of this case because she has not demonstrated <u>any</u> nexus between his generalized accusations about Pfizer's marketing conduct and Mr. Smith's suicide. Professor King's testimony does not "fit" the facts of this case and is therefore irrelevant under Federal Rules of Evidence ("Rule") 402 and 702. (King Dep. at 84:6-14; 126:7-9; *Shearer* Tran. 4/1/10 at 134:20-25.)

Additionally, Professor King's opinions are inadmissible under Rule 403 because any minimal probative value would be substantially outweighed by the danger of undue prejudice and juror confusion. As the *Daubert* Court observed, "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" 509 U.S. at 595 (citation omitted).

Likewise, the Sixth Circuit has recognized that the danger of unfair prejudice is elevated in the context of expert testimony given that it can fallaciously create "an 'aura of reliability' tending to mislead the jury." *Moisenko v. Volkswagenwerk Aktiengesellschaft*, No. 98-2202, 1999 U.S. App. LEXIS 29998, at *14 (6th Cir. Nov. 12, 1999). Professor King's testimony regarding generalized marketing activity – the vast majority of which occurred outside of Tennessee – allows jurors to infer erroneously that Pfizer should be held liable merely for participating in the described marketing activity, regardless of whether it is in any way connected to Mr. Smith's suicide.[4] Admitting his expert testimony distracts from the chief issues in dispute by drawing a significant amount of the jury's attention toward marketing, a tangential issue to the principal failure to warn claim. As such, his testimony should be alternatively excluded pursuant to Rule 403.

## II. PROFESSOR KING'S METHODOLOGY FAILS THE *DAUBERT* TEST BECAUSE HIS OPINIONS ARE BASED SOLELY ON SPECULATION AND *IPSE DIXIT*

Professor King's conclusions relate to the general assertion that Defendants' marketing conduct led to an increase in Neurontin sales. (King Report at ¶ 5.) He does not, however, explain how this occurred, differentiate between legal and illegal marketing activity, address other potential causes, or even estimate what portion of off-label sales can be attributed to marketing. Rather, he simply declares that, because an increase in the percentage of off-label Neurontin usage occurred at about the same time as the alleged marketing activities, the increase must have been caused by Defendants' off-label marketing. Yet, his purported analysis does not contain any methodology to account for or rule out other factors that might have contributed to the increase. Additionally, he does not analyze the data or test his hypothesis; he simply observes that the percentage of off-label use of Neurontin increased over time and then speculates that this statistical phenomenon must have been caused by off-label marketing. This

---

[4] Furthermore, Professor King's assertions as to Defendants' intent and motives also must be excluded under Rule 403. *See infra* at IV.

is a mere *ipse dixit* conclusion that is not the product of any identifiable scientific methodology – much less a reliable one.

It is axiomatic that "[b]efore a court can evaluate the reliability of an expert's methodology, the expert must employ one."[5] *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 535 (D.N.J. 2001). "A district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (citation omitted); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). After ignoring all of the expert's conclusory assertions, "'[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson*, 243 F.3d at 254 (citation omitted).

Professor King's expert opinion is derived from no identifiable analysis. He merely states that off-label sales must have been caused by marketing because the percentage of off-label sales increased after 1994, when off-label marketing of Neurontin allegedly began. This conclusion is underscored by the fact that he does not consider any other factor that might have contributed to the increase in off-label sales, including legal and legitimate marketing activity, physicians' clinical experience, or new empirical information about off-label efficacy.

Professor King admits that he indiscriminately attributed Neurontin's sales increase to all marketing – regardless of whether it was off-label, improper, or fraudulent – and did not separately consider the effect of proper marketing. (King Dep. at 109:2-16; 112:18-21.) Even

---

[5] Because Professor King applies no ascertainable methodology aside from conclusions, application of the four tradition *Daubert* factors is difficult. *See* 509 U.S. at 592-594. To the extent they are applicable, however, they clearly weigh against admissibility. First, he failed to test his theory in any meaningful way. (*See, e.g.*, King Dep. at 123:14-124:4; 124:20-125:16; 126:7-9; 133:15-20; 137:17-138-9.) Second, there is no indication his methodology has been subjected to peer review. Third, there is obviously no way to calculate a rate of error considering that Dr. King will not even say what percentage of off-label sales was supposedly caused by improper marketing. (King Dep. at 119:7-12; 119:19-23; 121:9-13; *Shearer* Tran. 4/1/10 at 130:23-131:1.) Fourth, there has been no showing that he used techniques that have gained a general acceptance within the relevant community.

though he concedes that "legitimate promotion of Neurontin may have generated some off-label uses of it," his flawed analysis basically assumes that *all* influence resulted from only illegitimate marketing, despite his stated belief to the contrary. (King Dep. at 113:23-114:1; *see also id.* 114:7-24.) Although Professor King references an increase in uses for off-label indications, he can state no opinion as to what portion of such increases were caused by allegedly improper marketing. (*Id.* at 121:9-13; *see also id.* at 119:7-12; 119:19-23; *Shearer* Tran. 4/1/10 at 130:23-131:1.) Furthermore, he has not done any economic or statistical analysis as to what the off-label sales of Neurontin would have been in the absence of improper promotion.[6] (King Dep. at 133:15-20; *Shearer* Tran. 4/1/10 at 133:3-8.)

Also, Professor King does nothing to account for other factors that he admits could have impacted Neurontin sales. For instance, he did not investigate whether any portion of the increase in Neurontin sales could be contributed to physicians' familiarity with the off-label uses of other anti-epileptic drugs, within the same class as Neurontin. (King Dep. at 206:17-207:16.) Rather, he dismisses this source based only upon his "speculation" as a "lay person" with regard to how he assumes physicians would act. (*Id.*) He concedes that an increase in off-label prescriptions could be caused by physicians who prescribe Neurontin for on-label conditions and observe efficacy for comorbid off-label conditions, but his purported analysis does not account for whether some or all of the off-label prescriptions could have been the result of such cases and the medical information that subsequently flowed into the medical community. (*Id.* at 207:17-210:18.)

While Professor King agrees that a variety of factors affect individual physicians' prescribing decisions, he does not attempt to account for any other factor aside from the marketing of Neurontin.[7] (King Dep. at 97:9-23.) The Sixth Circuit has recognized that failure

---

[6] Given these considerations coupled with the fact that he has done no case-specific analysis, Professor King certainly cannot opine that, even assuming Mr. Smith's physicians were somehow influenced by marketing, such influence was not the result of *legitimate and legal* marketing. (King Dep. at 84:3-14; 126:17-23; 137:22-138:12.)

[7] Due to the multitude of factors that affect each prescription, it is infeasible that the decision-
*(cont'd)*

7

to rule out plausible alternative causes may render an expert's methodology unreliable. *See Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 814 (6th Cir. 1994) (excluding experts as unreliable where they were "unable to exclude other potential causes"). This failure to consider any alternative source of causation leaves a clear "analytical gap" in his testimony. *Nelson*, 243 F.3d at 254 (citation omitted). Furthermore, even assuming the correctness of Professor King's baseless assertion that *some* increase in off-label sales of Neurontin could be attributed alleged off-label marketing, this conclusion does not aid the jury's deliberation because he admits that he cannot calculate what portion – whether 1% or 99% – of the increase was supposedly caused by off-label marketing.[8] (King Dep. at 119:7-12; 119:19-23; 121:9-13; *Shearer* Tran. 4/1/10 at 130:23-131:1.)

In addition to his failure to rule out or account for the impact of alternative causes, he did nothing to test his hypothesis that the increase in off-label use was caused by marketing. As such, his opinions are also inadmissible because they are based on pure speculation. The Sixth Circuit has observed that "an expert's subjective belief or unsupported speculation will not" satisfy Rule 702. *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997); *see also Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."). Professor King speculated that the increase percentage of Neurontin sales after 1994 was caused off-label marketing, but he conducted no empirical study or any other test to support this hypothesis. (King Dep. at 123:14-124:4; 124:20-125:16.) For instance, he failed to interview any doctors that actually prescribed Neurontin to determine the bases for real-life prescribing conduct, did

---

*(cont'd from previous page)*
making processes of thousands of physicians could ever be reliably measured through aggregate methodology, including statistical analysis, without some way to determine what each physician considered when addressing each patient's unique set of symptoms and medical history. With regard to Professor King's opinions, however, this is a moot point because he applies no recognizable methodology whatsoever.

[8] For this same reason, his testimony should be excluded under Rule 403 because of the unfair prejudice created by the false impression – bolstered by Professor King's designation as an expert – that the entire increase in Neurontin sales was caused by off-label marketing.

8

not perform any economic or statistical analyses, did not explore whether any particular prescription was directly caused by Defendants' alleged conduct, and has not constructed an economic model that could project what Neurontin sales would have been in the absence of the alleged conduct.[9] (*Id.* at 126:7-9; 133:15-20; 137:17-138-9.) Quite simply, Professor King's failure to make any effort to test his hypothesis makes his opinions nothing more than rank speculation. *See, e.g., Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 977 (M.D. Tenn. 2002) (observing that "failure to test a hypothesis may disqualify a witness from testifying as an expert"), *aff'd*, 89 F. App'x 927 (6th Cir. 2003). Because Professor King's proposed opinions are based on untested speculation, they must be excluded under Rule 702 and *Daubert*.

### III. PLAINTIFF'S ATTORNEYS' EXCEPTIONAL DEGREE OF INFLUENCE OVER PROFESSOR KING'S OPINIONS SUPPORTS EXCLUSION

In the Sixth Circuit, an "important factor" in any *Daubert* analysis "is whether the expert is testifying about matters arising naturally and independently of litigation or whether opinions are developed solely for the purpose of testifying." *Johnson*, 406 F. Supp. 2d at 865; *see also Nelson*, 243 F.3d at 252 (finding that the court did not abuse its discretion in considering that the expert opinion was rendered for the purposes of litigation). This is because the Sixth Circuit recognizes that "expert witnesses are not necessarily always unbiased scientists," *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992), and too much influence by a single party upon the expert's analysis may impugn its reliability. *Id.*

In this case, not only were Professor King's opinions rendered for the purposes of litigation,[10] Plaintiff's attorneys have been actively involved in his purported expert analysis. The charts and figures in Professor King's expert reports were, in fact, created by Plaintiff's own

---

[9] With regard to his specific opinion that "[t]he suppression of information about serious adverse events enabled growth in off-label sales" of Neurontin, (King Report at ¶ 5.c.) Professor King admitted that he did nothing to support this point besides review academic literature. (King Dep. at 136:12-24.) Yet, when he was asked whether any of this literature, which supposedly served as the sole basis for his opinion, related specifically to Neurontin, he claimed that he did not know. (*Id.* at 136:12-24; 144:23-145:10.)

[10] In fact, Plaintiff's attorneys' have, thus far, paid Professor King's litigation consulting firm more than $300,000 for his opinions. (*Shearer* Tran. 4/1/10 at 115:4-6.)

attorneys. (King Dep. at 216:6-7; 223:6-10; *Shearer* Tran. 4/1/10 at 136:20-24.) Professor King did not collect or classify the data, and he has only a "general understanding" of how the charts were put together. (King Dep. at 216:20-217:4; 218:10-219:1.) Instead, this data was collected and classified by an outside firm hired by the Plaintiff's attorneys. (*Id.* at 221:4-14.) At his deposition, Professor King was not even sure as to the source from which the data came. (*Id.* at 221:2-6.) Also, Plaintiff's attorney, Keith Altman, conducted the data analyses relied upon by Professor King. (*Id.* at 67:4-7; *Shearer* Tran. 4/1/10 at 136:25-137:9.) Finally, the documents Professor King examined when preparing his report were entirely selected and provided by Plaintiff's attorneys. (King Dep. at 81:10-21.)

While experts may rely upon data supplied by others in appropriate circumstances, they must undertake an independent investigation to verify the accuracy of such data. For example, in *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985), the court discredited testimony from an expert who based his opinion on facts from a layman while failing to independently "verify the 'facts' submitted to him."[11] This need for an independent investigation is especially pertinent where, as here, the information was supplied by an interested party. *See, e.g., Ellipsis, Inc. v. Color Works, Inc.*, 428 F. Supp. 2d 752, 761 (W.D. Tenn. 2006) (excluding testimony as unreliable where, among other flaws, the expert "relied exclusively on data provided by" plaintiff).

As such, that his opinions were rendered for the purposes of litigation, especially considering the exceptional degree his opinions were influenced by and depended upon data supplied by Plaintiff's attorneys, indicates unreliability. *Johnson*, 406 F. Supp. 2d at 865.

## IV. PROFESSOR KING'S SUBJECTIVE INTERPRETATIONS OF DEFENDANTS' DOCUMENTS CANNOT BE ADMITTED UNDER THE GUISE OF EXPERT TESTIMONY

When Professor King testified at the *Shearer* trial, Plaintiff's attorney presented to him

---

[11] *See also SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) (stating that "an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession").

certain marketing documents that allowed him to deliver speculative testimony as to Defendants' intent and motives. Professor King is not qualified to speculate as to anyone's intent or motives, and Defendants will be prejudiced if he is allowed to construe documents, which speak for themselves, because his subjective interpretation would be given the "aura of reliability" that accompanies expert testimony to the jury. *Moisenko*, 1999 U.S. App. LEXIS 29998, at *14; *see also Smelser*, 105 F.3d at 303 (stating that Rule 702 does not permit testimony based upon "an expert's subjective belief").

### A. Professor King Cannot Testify As To Intent Or Motive

Professor King is unqualified to render opinions about intent or motive, particularly where it has not been disclosed in his expert report, and such testimony is clearly impermissible. Nevertheless, at a previous trial in this MDL, he repeatedly attempted to testify on this topic. For example, at the *Shearer* trial, Professor King claimed that he "looked at the company documents to try and understand how [Defendants] wanted to sell and promote Neurontin." (*Shearer* Tran. 4/1/10 at 68:5-7.) King then went on to make baseless accusations about intent, literally, by putting words into the Warner-Lambert's mouth. Professor King testified: "And what you find is that in 1994 when the drug is first introduced, the company looks at Neurontin and says, [']okay, how much money can we expect to make out of this over time[?'] . . . The next thing they did is they decided, [']okay, how could we make more money selling this drug[?']" (*Id.* at 68:7-17.) After apparently channeling Warner-Lambert's collective internal monologue from a decade earlier, Professor King then further speculated about Defendants' intent and motives by claiming "they made a deliberate analysis to look at where could they make the most profit and what should they do, and they decided that rather than seek FDA approval . . . they would try and sell the drug for unapproved uses."[12] (*Id.* at 68:21-69:4.)

---

[12] Professor King's *Shearer* testimony is riddled with examples of speculation and insinuations as to Warner-Lambert's intent and motives. (*See, e.g., Shearer* Tran. 4/1/10 at 69:24-70:2 ("Well, [Warner-Lambert] had a problem that, you know, as the judge has pointed out, it's illegal to market a drug for an off-label use. So how would you get around that if you wanted to[?]"); 77:7-9 ("And these are all the indications, I shouldn't say all, all of these indications that they later decide to pursue aggressively in their off-label marketing strategy."); 77:21-25 ("[T]hey're analyzing a strategy, they're trying to figure out
*(cont'd)*

As an economist, Professor King is clearly not qualified to testify as to anyone's (no less the employees of entire corporations') intent or motives, and such opinions were not disclosed in his expert report. But even if his opinions had been adequately disclosed, opinion testimony regarding the intent or purpose behind a party's conduct is inadmissible. It is well settled that "[t]he question of intent is a classic jury question and not one for experts." *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000). Opinion testimony regarding "the intent, motives or states of mind of corporations, regulatory agencies and others ha[s] no basis in any relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004).[13]

Just as he cannot testify to Defendants' intent, he cannot speculate as to the internal decision-making process of "all physicians prescribing" Neurontin. (King Report at ¶ 5.d.) As the *Rezulin* court held, an expert's "'surmising as to what physicians would do with different information is purely speculative and not based on scientific knowledge.'" *Rezulin*, 309 F. Supp. 2d at 557 (quoting *In re Diet Drugs*, 2001 WL 454586 at *18). As in *Rezulin*, Professor King's opinions regarding the decisions of prescribing doctors are speculative on their face. Professor King did no research to test any of his speculative assumptions by speaking with any doctors who prescribed Neurontin. In this case in particular, he did not attempt to find out what Mr. Smith's prescribing healthcare providers actually relied upon. (King Dep. at 84:3-5.) As such, he has no evidence regarding whether Mr. Smith's prescribing healthcare providers were

---

*(cont'd from previous page)*
what do we do to increase sales. What's the first thing they mention[?] Strategy #1[:] Execute publication/educational plan and clinical trials to support product expansion in emerging uses."); 78:2-3 ("[E]merging uses is a code word or another way of saying unapproved uses."); 101:18-20 ("So they had programs where they wanted to start early in the physician's career . . . ").)

[13] *See also, e.g., In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (precluding expert "from testifying as to the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials" because "[t]his is not a proper subject for expert or even lay testimony"); *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1067 (D. Minn. 2007) (expert's criticisms of drug manufacturer's conduct "d[id] not qualify as expert testimony under Rule 702" because, inter alia, "Bayer's motives as to how it proceeded with evaluating Baycol's toxicity, and its reactions to its toxicologist's warnings are issues that can be decided by the jury, without expert assistance").

influenced by any marketing activity and, as the MDL court recognized, doctors' prescribing decisions "rest[] primarily in the minds of the prescribing doctors." *In re Neurontin Mktg., Sales, Practices & Prod. Liab. Litig.*, 257 F.R.D. 315, 322 (D. Mass. 2009); *see also Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1322 (W.D. Okla. 2006) (granting summary judgment in failure-to-warn case where prescribing doctor testified that he would have prescribed the drug even if adequately warned of alleged risks). Thus, to the extent Professor King attempts to speculate as to Defendants' or prescribing healthcare providers' internal thought processes, such testimony must be excluded. *See Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) (indicating that an expert's testimony as to "state of mind" creates a "false impression").

### B. Professor King Cannot Usurp The Jury's Fact-Finding Role By Interpreting Documents That Speak For Themselves

Professor King has no expertise that would aid the jury in interpreting Defendants' internal documents, and his subjective interpretations of these documents, which mirror Plaintiff's allegations, would only mislead the jury. He neither articulates nor applies any methodology distinct from his own interpretation of the documents he reviewed; he simply offers his own conclusions regarding what those documents supposedly mean. As such, Plaintiff cannot present pure arguments through the mouth of an expert and with an accompanying "aura of reliability." *Moisenko*, 1999 U.S. App. LEXIS 29998, at *14. For instance, when presented with company documents at the *Shearer* trial, Professor King did nothing more than advocate that the documents, which were plain on their face, fit within the *Shearer* plaintiff's theory of the case. When the jury was shown a document from the Neurontin Northeast Consumer Business Unit, Professor King posited that the document "suggests that [Warner-Lambert was] looking about unapproved uses for Neurontin as a sources of sales [and] they're thinking of, well, they are here actually arguing that, you know, people should use higher doses because it doesn't work, even though that's unapproved."[14] (*Shearer* Tran. 4/1/10 at 76:1-22; *see also supra* at fn.

---

[14] In this instance, not only did Professor King subjectively interpret a document that speaks for itself, he touched upon matters that were beyond the scope of his expertise as an economist, including medical opinions about Neurontin's efficacy at certain doses and legal opinions about compliance with

*(cont'd)*

9.)

An expert's role is to "assist," not usurp, the role of the jury. *See* Fed. R. Evid. 702. Thus, an expert may not testify to matters within the realm of common knowledge and everyday experience. *See United States v. Smithers*, 212 F.3d 306, 319 (6th Cir. 2000) (noting that courts have found expert testimony regarding eye witness identification inadmissible because it is "unhelpful, the subject was within the jury's common knowledge, the subject was not a proper one for expert testimony under Evidence Rule 702 or some analogous test, or the prejudice substantially outweighed the probative value pursuant to Rule 403"); *see also United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979) (experts must present a "system of analysis . . . beyond the ken of lay jurors to satisfy Rule 702"). Professor King may not present his own summary and interpretation of documentary evidence under the guise of expert testimony. Testimony that "merely repeat[s] facts or opinions stated by other potential witnesses or in documents produced in discovery," *Rezulin*, 309 F. Supp. 2d at 546, "is improper . . . because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *Id.* (citation omitted). "Such material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence." *Id.* at 551.[15]

It is axiomatic that "expert testimony that is merely speculation or pure conjecture based on the expert's impressions of the . . . evidence must be excluded as not based on any reliable methodology or scientific principle." *In re Baycol*, 532 F. Supp. 2d at 1053. At no point did

---

*(cont'd from previous page)*
FDA regulations.

[15] *See also, e.g., id.* at 541 ("[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'" (citation omitted)); *Tuli*, 592 F. Supp. 2d at 211 (excluding experts whose reports "resonate as a lawyer's closing argument rather than an expert analysis" and would improperly present "a roadmap to a particular outcome"); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (summarizing the facts and opining on the purpose of the subject transactions "is what a lawyer does in his or her summation . . . [and] . . . is not the function of an expert witness"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

Professor King apply any methodology in reviewing the set of documents selected and provided by Plaintiff's counsel. Rather, he merely presents them in a way to fit with Plaintiff's theory of the case with regard to off-label promotion and support an argument that Pfizer acted improperly. This is not only unreliable, it exacerbates the unfair prejudice that would result from allowing Plaintiff to mislabel Professor King's advocacy as expert testimony. Courts have repeatedly held that expert testimony may not be used to simply parrot a plaintiff's allegations. An expert who simply accepts information provided to him by an interested party, and conducts no independent investigation, has not employed a reasonable methodology and his testimony cannot satisfy *Daubert*. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993); *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985); *Coral Way, L.L.C. v. Jones*, No. 05-21934-CIV, 2006 WL 5556004, at *1 (N.D. Fla. Oct. 17, 2006); *Total Containment, Inc. v. Dayco Prods., Inc.*, No. Civ. A. 1997-CV-6013, 2001 WL 1167506, at *6 (E.D. Pa. Sept. 6, 2001); *Otis v. Doctor's Assocs., Inc.*, No. 94 C 4227, 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998). So too, Professor King's opinions regarding the meaning of documents, narrative summaries of the evidence, and opinions about the internal thought process of parties or physicians lack a reliable foundation under Rule 702. This testimony alternatively should be excluded under Rule 403 because of the unfair prejudice that would result from allowing Plaintiff to present arguments with "the aura of reliability" that surrounds scientific evidence. *Moisenko*, 1999 U.S. App. LEXIS 29998, at *14.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their motion *in limine* to exclude Professor King from offering testimony at trial.

Dated: April 16, 2010

        Respectfully submitted,

        SKADDEN, ARPS, SLATE,
          MEAGHER & FLOM LLP

        By:   /s/ Mark S. Cheffo
                Mark S. Cheffo

        Four Times Square
        New York, NY 10036
        Tel: (212) 735-3000

            -and-

        NEAL & HARWELL, PLC

        By:   /s/ Gerald D. Neenan
                Aubrey B. Harwell, Jr., No. 002559
                W. David Bridgers, No. 016603
                Gerald D. Neenan, No. 006710

        2000 One Nashville Place
        150 Fourth Avenue, North
        Nashville, TN 37219
        (615) 244-1713
        (615) 726-0573 (fax)

        *Attorneys for Defendants Pfizer Inc and*
        *Warner-Lambert Company LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on this the 16th day of April 2010, I electronically filed the foregoing document with the Clerk of the Court, United States District Court for the Middle District of Tennessee, using the CM/ECF system. True and correct copies of the foregoing documents are being served via the Court's CM/ECF system on the following:

Andrew G. Finkelstein, Esq.
Kenneth B. Fromson, Esq.
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburg, NY 12550

Charles F. Barrett, Esq.
Barrett & Associates, P.A.
6718 Highway 100, Suite 210
Nashville, TN 37205

Dara G. Hegar, Esq.
Ken S. Soh, Esq.
Maura Kolb, Esq.
Robert Leone, Esq.
W. Mark Lanier, Esq.
Lanier Law Firm
6810 FM 1960 West
Houston, TX 77069

/s/ Gerald D. Neenan