# EXHIBIT B

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3              MDL Docket No. 1629

4              Master File No. 04-10981

5    **********************************

6    IN RE:  NEURONTIN MARKETING, SALES

7            PRACTICES AND PRODUCTS

8            LIABILITY LITIGATION

9    **********************************

10   THIS DOCUMENT RELATES TO:
     Bulger v. Pfizer, Inc., Et Al
11   Case No. 07-11426-PBS
          and
12   Smith, Et Al v Pfizer, Et Al
     Case No. 05-CV-11515-PBS
13
     **********************************
14

15      VIDEOTAPED DEPOSITION OF CHARLES KING, III

16

17                   Held At:
             Greylock McKinnon Associates
                 One Memorial Drive
18             Cambridge, Massachusetts

19

20               October 28th, 2008
                    9:05 A.M.
21

22   Reported By:  Maureen O'Connor Pollard, RPR, CLR

23

     Videographer:  William Slater
24

1  FOR THE PLAINTIFF:
2      BY: RON ROSENKRANZ, ESQ.
3          KEITH ALTMAN, ESQ.
4          FINKELSTEIN & PARTNERS
5          1279 Route 300
6          Newburgh, New York 12551
7          800-634-1212
8          rrosenkranz@lawampm.com
9
10 FOR THE DEFENDANTS:
11     BY: PAUL S. MISHKIN, ESQ.
12         DAVID POLK & WARDWELL
13         450 Lexington Avenue
14         New York, New York 10017
15         212-450-4000
16         paul.mishkin@dpw.com
17         and
18     BY: NICHOLAS P. MIZELL, ESQ.
19         JAMES P. MUEHLBERGER, ESQ.
20         SHOOK, HARDY & BACON
21         2555 Grand Avenue
22         Kansas City, Missouri 64105
23         816-559-2991
24         nmizell@shb.com

1              INDEX
2  EXAMINATION                    PAGE
3  CHARLES KING, III
4  BY MR. MISHKIN                 5
5
6              EXHIBITS
7  NO.      DESCRIPTION           PAGE
8  Exhibit 1   Expert report of Charles
9              King, III...................   4
10 Exhibit 2   One page billing document.....  43
11 Exhibit 3   9/16/02 working paper by
12             Charles King, III............  58
13 Exhibit 4   Copy of article by Mizik and
14             Jacobson....................  150
15 Exhibit 5   4/4/06 retention letter.......  233
16 Exhibit 6   Group of e-mails.............  233
17
18
19
20
21
22
23
24

1              P R O C E E D I N G S
2
3          (Whereupon, King Exhibit Number 1 was
4      marked for identification.)
5
6          THE VIDEOGRAPHER:  This is Bill Slater
7  of Veritext.  Today's date is October 28th,
8  2008.  The time is 9:05 a.m..
9          We are here at the offices of Greylock
10 McKinnon Associates located at 1 Memorial Drive,
11 Cambridge, Massachusetts to take the videotaped
12 deposition of Charles King, III in the matter of
13 In Re:  Neurontin Marketing, Sales Practices and
14 Products Liability Litigation in the United
15 States District Court, District of
16 Massachusetts, MDL Docket Number 1629, Master
17 File Number 04-10981, relating to Bulger versus
18 Pfizer, Incorporated, Et Al, Case Number
19 07-11426-PBS, and Smith, Et Al, versus Pfizer,
20 Et Al, Case Number 05-CV-11515-PBS.
21         Counsel will now voice introduce
22 themselves for the record and state whom they
23 represent, and then the court reporter
24 will swear in the witness.

1          MR. MISHKIN:  Paul Mishkin from Davis,
2  Polk & Wardwell for the Defendants.
3          MR. MUEHLBERGER:  Jim Muehlberger,
4  Shook Hardy & Bacon.
5          MR. MIZELL:  Nicholas Mizell, Shook
6  Hardy & Bacon for the Defendant.
7          MR. ROSENKRANZ:  Ron Rosenkranz,
8  Finkelstein & Partners, for the product
9  liability Plaintiffs.
10         MR. ALTMAN:  Keith Altman, Finkelstein
11 & Partners, for product liability Plaintiffs.
12
13         CHARLES KING, III,
14 having been satisfactorily identified, being
15 first duly sworn, was examined and testified as
16 follows:
17         DIRECT EXAMINATION
18     BY MR. MISHKIN:
19 Q.   Good morning.
20 A.   Good morning.
21 Q.   Could you state your full name,
22 please?
23 A.   Charles King, III.
24 Q.   Do you prefer Dr. King?

2 (Pages 2 to 5)

1    Q.   Did you receive assistance on the
2  report from support staff?
3    A.   Yes, I did.
4    Q.   Can you tell me, who were those people
5  who helped you on the report?
6    A.   Well, Keith Altman was one, and then
7  there were a number of research associates in
8  our firm that I took advantage of.
9    Q.   Can you name those research associates
10  for me as best as you're able to?
11    A.   I may not get them all right.  Josh
12  Petite, Lisa Selker, S-E-L-K-E-R, Kate Young may
13  have worked on it but I'm not sure.
14    Q.   Can you give me that name again?
15    A.   Oh. Kate.
16    Q.   Kate.
17    A.   Katherine Young, Y-O-U-N-G.
18    Q.   Okay.
19    A.   Andrew Bechtel, B-E-C-H-T-E-L, who is
20  no longer with the firm.  I may have had a
21  summer associate or two involved, but I don't
22  specifically recall. Jayeeta Kundu,
23  J-A-Y-E-E-T-A, K-U-N-D-U.
24       That's the best I can recall at the

1  moment.
2    Q.   Okay. Can you tell me; in what way
3  did Mr. Altman contribute to the report?
4    A.   Basically Mr. Altman contributed some
5  data analyses that I requested that I wanted to
6  have prepared from materials that the Defendants
7  had turned over to us.
8    Q.   Did he suggest to you any data
9  analyses, or were you always the one telling
10  him, directing him what to do?
11    A.   You know, we discussed what data
12  analyses might be appropriate, what I was
13  interested in, and ultimately I made the
14  decision about what should be included and what
15  not.
16    Q.   Approximately how many discussions did
17  you have with Mr. Altman?
18    A.   Again, I don't specifically recall,
19  but, you know, we had a fair number.
20    Q.   When did you begin to have those
21  discussions with him?
22    A.   Again I don't specifically recall.  I
23  would have talked to him early on about what
24  data were available and what we might be able to

1  do with it.  But again, the heavy lifting on
2  this didn't really start until I started writing
3  it in the summer and fall of 2007.
4    Q.   Was there any data analysis that you
5  wanted to do that Mr. Altman suggested that you
6  not do?
7    A.   No.
8    Q.   Do you remember anything more about
9  the substance of the conversations you had with
10  Mr. Altman?
11    A.   Well, I mean they were about, you
12  know, the content of the analysis that we wanted
13  to include.  One of the issues that was involved
14  was we were interested in off-label uses of
15  Neurontin, so there was a question about how
16  best to classify those.  There was discussions
17  about what sort of data were available.  You
18  know, the standard sorts of things you would do
19  in the ordinary course of business, just as I
20  would do with one of our more junior people to
21  put together the graphs that are in the report.
22    Q.   Let's put aside your research
23  associates for just a moment.
24       Did you have discussions with others

1  regarding your report besides Mr. Altman?
2    A.   Oh, aside from that?
3    Q.   Aside from your research associates.
4    A.   No.
5    Q.   Did you have further discussions with
6  Mr. Finkelstein, for example?
7    A.   Oh, yes.
8    Q.   Regarding your report?
9    A.   Sorry.
10    Q.   Let's include lawyers.
11    A.   If you clarify the question a little
12  bit.
13    Q.   Sure.
14       I'm just trying to figure out the
15  different groups of people with whom you would
16  have been speaking regarding your report.
17    A.   Right.
18    Q.   And I think you've mentioned
19  Mr. Altman with whom you had discussions
20  regarding data analysis, is that right?
21    A.   Right.
22    Q.   You had your research associates who
23  were helping you.  Let's talk now about anyone
24  else with whom you were having discussions

18 (Pages 66 to 69)

1 Franklin case pertaining to Neurontin and
2 Neurontin marketing issues, and my understanding
3 is that he and Dr. Landefeld and presumably
4 others made those documents publicly available
5 over the Internet.
6     Q.   And when you talked about the chart
7 that you were requesting, was it from an article
8 that discussed those Franklin documents?
9     A.   Yes.
10     Q.   And can you tell me what that chart
11 consisted of, what it looked like?
12     A.   Sure. It's a chart basically that
13 shows over time, you know, by various categories
14 where -- what percentage of sales, or I can't
15 remember, it's probably not sales, it's probably
16 prescriptions, went into on-label versus
17 off-label uses. So it has a graph of the number
18 of prescriptions, as I remember, the number of
19 prescriptions for epilepsy versus the number of
20 prescriptions for neuropathic pain, bipolar.
21 I'm not sure of the specific categories that he
22 used, but he tried to identify off-label uses of
23 Neurontin.
24     Q.   Okay. Is there anything else about

1 the substance of your communications with Mike
2 Steinman that you can tell me?
3     A.   I think I've covered everything.
4     Q.   Okay. You mentioned Seth Landefeld.
5 When did you contact him?
6     A.   It would be about the same time,
7 because he's also a co-author on that paper, I
8 believe.
9     Q.   And how many contacts did you have
10 with Seth Landefeld?
11     A.   One or two, maybe three.
12     Q.   What was the substance of those
13 contacts?
14     A.   Well, Seth Landefeld is my old college
15 roommate, so we talked about that. And then,
16 you know, I asked him about what was publicly
17 available in terms of his analysis of on-label
18 versus off-label uses, and he told me about the
19 San Francisco database, and then he also told
20 me -- suggested that I might contact Mike
21 Steinman about, you know, getting the data
22 behind the graph.
23     Q.   You had contacted Seth Landefeld
24 before contacting Mike Steinman?

1     A.   I think so. I'm not sure. I think
2 so.
3     Q.   Was it Seth Landefeld's idea to
4 contact Mike Steinman?
5     A.   No, it was my idea. Part of the
6 reason I don't remember exactly is I asked one
7 of my research associates to send Dr. Steinman
8 an e-mail.
9     Q.   All right. Did you have any other
10 discussions with Seth Landefeld about your work
11 in this case and opinions you express in your
12 report?
13     A.   No.
14     Q.   Let me ask you to take a look at your
15 report again, and to turn to attachment B, if
16 you would.
17     Now, is this a list of documents that
18 you relied upon in connection with the opinions
19 that you express in your report?
20     A.   Yes.
21     Q.   You mentioned I think at the outset
22 that there were other documents that you had
23 considered in connection with your work on this
24 case that are not reflected here in attachment

1 B?
2     A.   Yes.
3     Q.   Let's put aside anything that you
4 might have received after putting in the report.
5 I want to focus with you on the documents that
6 you reviewed before you put in your report.
7     What other documents besides those
8 listed on attachment B did you review in
9 connection with your work in this case?
10     A.   Well, the attorneys provided me with a
11 hard drive with a daunting number of documents,
12 so there's all sorts of internal company
13 memoranda or e-mail communications or marketing
14 plans or business plans or publication plans,
15 sales analyses, you know, transcripts of
16 conversation, contacts with outside medical
17 education companies. There is a large body of
18 evidence, and I reviewed an awful lot of
19 documents. And out of those, I selected these
20 as examples or as representatives for the points
21 I was trying to make.
22     Q.   And how did you make that selection?
23     A.   I tried to find things that I thought
24 were the -- made the point most clearly, most

1 succinctly, and were representative of what I
2 had discovered in reading various documents.
3    Q.   All right.  Let's talk about the
4 heading under "Legal Documents."  Well, let me
5 take a step back first.
6         Are there other documents that you are
7 relying upon for purposes of your opinion that
8 you chose not to include in this list of
9 documents relied upon?
10    A.   You know, there are other documents
11 available that support my opinions, but these
12 are the ones that, you know, I specifically
13 chose to rely upon for the opinions in the
14 report.
15    Q.   Okay.  Did you specifically choose to
16 rely upon any deposition testimony other than
17 the deposition testimony listed here under
18 "Legal Documents"?
19    A.   Well, the answer should be no.
20    Q.   Okay.  And if you look at -- well, you
21 said "the answer should be no."  Do you have any
22 reason to think the answer is something other
23 than no?
24    A.   No, I don't.

1    Q.   All right.  And let's look at --
2    A.   Other than clerical error.
3    Q.   Okay.  Are there other legal documents
4 outside of the -- outside of deposition
5 transcripts that you specifically relied upon
6 for purposes of your opinion in this case that
7 are not reflected in this list?
8    A.   No.
9    Q.   And then there's another heading here
10 "Bates Documents."  Are there any Bates
11 documents that you specifically relied upon for
12 purposes of your opinions expressed in this
13 report that are not listed here on attachment B
14 under the heading "Bates Documents"?
15    A.   No.
16    Q.   Have you reviewed the Bulger or Smith
17 amended complaints?
18    A.   No.
19    Q.   Do you plan to review them?
20    A.   I wasn't asked to.
21    Q.   Do you have any plans to review them
22 in the future?
23    A.   No.
24    Q.   Have you reviewed the complaints in

1 any of the personal injury cases?
2    A.   No.
3    Q.   Are you familiar with the facts in any
4 of the individual personal injury cases?
5    A.   No.
6    Q.   So I take it you're not offering any
7 opinions that are specific to any of the
8 particular personal injury cases, is that right?
9    A.   That's correct, except that the
10 opinions that I offer here apply to all doctors,
11 so they would apply to the individual doctors in
12 the personal injury cases.  But I'm not offering
13 an opinion to a -- concerning a specific
14 personal injury case.
15    Q.   Have you ever spoken to any of the
16 Plaintiffs in the personal injury cases?
17    A.   No.
18    Q.   Have you read any of the deposition
19 transcripts in the personal injury cases?
20    A.   No.
21    Q.   Do you plan to read any of those?
22    A.   Not unless I'm asked to.
23    Q.   Do you know who the treating
24 physicians were in any of the personal injury

1 cases?
2    A.   No.
3    Q.   Do you know who Ron Bulger is?
4    A.   No.
5    Q.   Do you know in what state Mr. Bulger
6 resides?
7    A.   No.
8    Q.   Do you know for what condition Susan
9 Bulger was prescribed Neurontin?
10    A.   No.
11    Q.   Do you know the names of Mrs. Bulger's
12 prescribing doctors?
13    A.   No.
14    Q.   Do you know who a Dr. Goldman is in
15 the context of this case?
16    A.   No.
17    Q.   Have you reviewed any testimony by
18 Dr. Goldman?
19    A.   No.
20    Q.   Do you know anything about what
21 Dr. Goldman has testified regarding why he
22 prescribes Neurontin?
23    A.   No.
24    Q.   And maybe just to cut through this, I

22 (Pages 82 to 85)

1　do with meetings and that sort of thing we just
2　don't keep.
3　　Q.　Are there other types of e-mails
4　besides those having to do with meetings that
5　relate to your work in this case that you would
6　have discarded?
7　　A.　I'm sure there were, but not things
8　that would be relevant to the report or
9　substantive or material from my perspective.
10　　Q.　So things that in your judgment were
11　not relevant to the report but that did relate
12　somewhat to the case you discarded?
13　　A.　Well, you know, I got an e-mail from,
14　thinking back to last summer, you know, e-mail
15　from Ken Fromson relating to our vacations, it's
16　not relevant, so I threw it out.
17　　Q.　Understood.
18　　A.　I was in Canada, he was in Buffalo, we
19　almost crossed paths, but we didn't, so --
20　　Q.　I understand. I'm just trying to
21　understand, you were making those judgments,
22　though, on your own --
23　　A.　Yes.
24　　Q.　-- as to what e-mails to --

1　　A.　In accordance with, you know, our
2　document retention policy.
3　　Q.　Okay. And let's talk about
4　correspondence other than e-mails. Would you
5　have any hard copy correspondence related to
6　this case sent to you or sent from you?
7　　A.　Not that I'm aware of. We may have
8　some transmittal letters, but we couldn't find
9　anything.
10　　Q.　You looked for that?
11　　A.　Yeah.
12　　Q.　Okay. Do you think you might have --
13　used to have any hard copy correspondence, or I
14　should say correspondence other than e-mails?
15　　A.　I doubt it. Almost all our
16　correspondence are through e-mails.
17　　Q.　Do you have any notes of conversations
18　that you've had with people in connection with
19　this case?
20　　A.　No, we don't keep those. I don't keep
21　those.
22　　Q.　When you say you don't keep them, do
23　you mean that you had them at one point and
24　discarded them?

1　　A.　I may have had them to remind me to do
2　something, but we don't retain notes on cases.
3　　Q.　What types of notes did you take on
4　relating to this case that you no longer have
5　because you've discarded them?
6　　A.　You know, I don't -- the only thing I
7　can think of was, you know, notes that were --
8　early on I remember I took some notes in terms
9　of thinking about, you know, where do I want to
10　go, how do I want to develop the draft, they
11　were incorporated in the draft and I destroyed
12　the notes.
13　　Q.　Did you have notes of any
14　conversations with other people regarding the
15　case?
16　　A.　No.
17　　Q.　Okay. Let's look at your report
18　again.
19　　A.　Okay.
20　　Q.　If you'd take a look at Page 4,
21　Paragraph 4. Is it correct as stated here that
22　counsel retained you to provide an expert
23　opinion with respect to the four main questions
24　listed at the bottom of Page 4 of your report

1　and continuing on to the top of Page 5?
2　　A.　Yes.
3　　Q.　As part of the expert opinions you're
4　offering, were you asked to address any other
5　questions besides those listed here at the
6　bottom of Page 4 and continuing on to Page 5?
7　　A.　No.
8　　Q.　Let me take a step back.
9　　I take it from your report you'd agree
10　that physician prescribing decisions are
11　impacted by a variety of factors, is that a fair
12　statement?
13　　A.　Yes.
14　　Q.　So in other words, there are many
15　different factors that could lead physicians to
16　prescribe a particular medication for a
17　particular use, is that right?
18　　A.　I think you want to be a little
19　careful. Some factors are more important than
20　others, but there are --
21　　Q.　Fine. But there are a variety of
22　factors?
23　　A.　Yes.
24　　Q.　Why don't we go through some of the

VERITEXT CORPORATE SERVICES (800) 567-8658

1    Q.    Now, I think your report also
2  mentioned some factors relating to insurance
3  coverage that can impact physicians prescribing
4  decisions, is that correct?
5    A.    Yes.
6    Q.    Let me give you again some specific
7  examples, and I'll ask you whether those
8  examples could impact prescribing of Neurontin.
9          The first would be the formulary
10 status of Neurontin.  Is that something that
11 could impact Neurontin off-label prescribing?
12   A.    Yes.
13   Q.    In fact, the formulary status of a
14 competitor drug?
15   A.    Yes.
16   Q.    How about the existence of prior
17 authorization programs relating to other drugs
18 besides Neurontin that might be used to treat
19 the same conditions?
20   A.    Yes.
21   Q.    How about approvals for new
22 indications, either of the drug in question or
23 of other drugs that might compete with the drug
24 in question, could those types of -- could those

1  new approvals impact physician prescribing
2  decisions?
3    A.    Sorry, which is the drug in question?
4    Q.    Let me try to make it a little bit
5  more specific.
6          So, for example, Neurontin's approval
7  for post-herpetic neuralgia, could have that
8  impacted physicians' decisions to prescribe
9  Neurontin for post-herpetic neuralgia?
10   A.    Yes.
11   Q.    Could it have impacted physician
12 prescribing decisions with respect to other
13 types of neuropathic pain?
14   A.    Yes.
15   Q.    How about FDA approval of a drug in
16 the same therapeutic category as Neurontin,
17 could that have an impact on off-label
18 prescribing of Neurontin?
19   A.    Yes.
20   Q.    How about FDA approval -- or strike
21 that.
22          How about an approval of Neurontin for
23 the applicable use but in a different country,
24 could that impact off-label prescribing of

1  Neurontin for that use in the United States?
2    A.    Yes, possibly.
3    Q.    And how about approval of a drug in
4  the same therapeutic class as Neurontin in a
5  different country, could that potentially impact
6  prescribing of Neurontin off-label in the United
7  States?
8    A.    Yes, potentially.
9    Q.    Let's take a look at Page 5 of your
10 report.  Are you with me there already?
11   A.    Yes.
12   Q.    Okay.  And more specifically
13 Paragraph 5.
14          Now, I think you list here the
15 principal conclusions of your report, is that
16 correct?
17   A.    Correct.
18   Q.    I'd like to start with what you've
19 written here in 5A.  You've concluded that "the
20 marketing and promotional efforts of
21 Warner-Lambert and Pfizer were significant
22 contributing factors to the off-label sales of
23 Neurontin."
24          Did I read that right?

1    A.    Yes.
2    Q.    When you refer here to Defendant's
3  marketing and promotional efforts, are you
4  talking about all Neurontin marketing and
5  promotional efforts, or just those alleged to
6  have been improper in this case?
7    A.    I guess I would say I'm talking about
8  all promotional marketing efforts.
9    Q.    Okay.  So when you make that
10 statement, you're not distinguishing between
11 improper and proper marketing, you're stating
12 that their combined effect on Neurontin
13 off-label sales was significant?
14   A.    You know, much of the marketing that
15 was done -- in fact I'm not sure I understand
16 your question.  Marketing for -- let me ask you
17 a question.
18   Q.    Sure.
19   A.    Would you consider marketing for
20 off-label use, is that a permissible or not
21 permissible?
22   Q.    I actually wanted to ask you that.
23          In your approaching of the report, are
24 you -- what do you understand to be improper

VERITEXT CORPORATE SERVICES (800) 567-8658

1 marketing in this context?
2    A.   So in this context I understand it to
3 be improper for Pfizer, Warner-Lambert to
4 promote off-label sales of a drug which doesn't
5 have an indication.
6    Q.   Do you understand that off-label
7 promotion, even truthful off-label promotion,
8 would give rise to liability in this case?
9    A.   You know, I'm not here to offer a
10 legal opinion, I'm just here to offer marketing
11 opinion.
12    So it's certainly true that
13 inappropriate marketing or marketing for
14 off-label uses would increase the sales for
15 off-label uses.
16    Q.   Well, let me just ask you just for
17 terminology sake going forward, if I refer to
18 improper marketing, you're going to understand
19 that to be off-label marketing of any kind,
20 including truthful off-label marketing?
21    A.   Well --
22    MR. ROSENKRANZ: I'm objecting to the
23 form.
24    A.   I'm not sure I fully understand it.

1 What do you mean by "truthful off-label
2 marketing"?
3    BY MR. MISHKIN:
4    Q.   Well, you know, let me just take a
5 step back.
6    You're saying that you haven't been
7 given an understanding one way or the other as
8 to whether all off-label marketing would give
9 rise to liability in this case, did I understand
10 that right?
11    A.   It's not an issue on which I've been
12 asked to offer an opinion.
13    Q.   Okay.
14    A.   It seems to me it calls for a legal
15 conclusion, and I'm not here to testify as a
16 legal expert.
17    Q.   Okay. Fair enough.
18    In reaching your conclusion that you
19 stated in 5A here, what are you assuming about
20 the portion of Neurontin promotion that was
21 improper as compared to proper?
22    A.   I don't know that I've made any
23 assumptions about that.
24    Q.   Well --

1    A.   I rely on the documents and the
2 evidence in the case.
3    Q.   I guess what I'm asking, though, is
4 doesn't the extent to which alleged improper
5 marketing had an effect depend on how much
6 marketing was, in fact, improper?
7    A.   Yes, to a certain extent certainly.
8 If there is no improper marketing and there is
9 no marketing for off-label uses of Neurontin,
10 one wouldn't expect to see large sales of
11 Neurontin for off-label.
12    Q.   So I guess what I'm saying is when
13 you're offering this opinion that marketing and
14 promotional efforts of Warner-Lambert and Pfizer
15 were significant contributing factors -- well,
16 withdrawn. I don't want to make it more
17 confusing.
18    Have you reached any conclusion about
19 the percentage of Neurontin's marketing that was
20 improper as compared to proper?
21    A.   No.
22    Q.   If it turned out that the allegations
23 regarding improper marketing could only be
24 proved with respect to a small portion of

1 Defendant's overall marketing of Neurontin,
2 would you still conclude that Defendant's
3 alleged improper marketing contributed
4 significantly to off-label sales?
5    MR. ROSENKRANZ: Objection to form.
6    A.   Well, I don't know whether or not
7 that's actually true.
8    But what I do know is that there were
9 promotional efforts for off-label uses, and that
10 the off-label sales of Neurontin increased from
11 about fifteen percent in 1994 to about
12 90 percent in 2003 or so. So the off-label
13 promotion, whatever percentage it actually was,
14 seems to have been quite effective.
15    BY MR. MISHKIN:
16    Q.   So you're assuming in that statement
17 that on-label promotion wouldn't have led to
18 off-label sales?
19    MR. ROSENKRANZ: Objection to form.
20 Mischaracterization.
21    You can answer.
22    A.   I don't think that's what I just said.
23 But, you know, it's possible that legitimate
24 promotion of Neurontin may have generated some

29 (Pages 110 to 113)

1  off-label uses of it as, you know, it's common
2  for other drugs, and it may be for some of the
3  reasons that you mentioned; if it's good in the
4  category -- if other drugs are good in the
5  category, this is good in the category, maybe
6  this one will work as well.
7      Q.   Have you done a specific analysis of
8  the impact that permissible on-label marketing
9  would have had on off-label sales of Neurontin?
10     A.   No, I haven't.
11          I guess I would add on the permissible
12  versus impermissible marketing, it's very
13  difficult to find out because I don't have full
14  and complete information on how much was
15  actually spent by the company on these various
16  efforts.  I tried to piece some of that
17  together, but I wasn't able to with the
18  documents that you provided.
19     Q.   And so you haven't reached any
20  conclusions, for example, on how much was spent
21  on permissible marketing initiatives as compared
22  to allegedly impermissible marketing
23  initiatives?
24     A.   No.  And I don't -- no.

1      Q.   Let me ask you to look at 5D here on
2  Page 5.  You've concluded that "Pfizer's
3  off-label marketing of Neurontin indirectly
4  influenced all, or substantially," all physicians
5  prescribing of Neurontin."
6          Did I read that right?
7      A.   Yes.
8      Q.   Can you be more specific regarding
9  what you mean by "indirectly influenced"?
10     A.   Sure.  And I can also speak to
11  directly influenced.
12          Let me just take a look at the section
13  where I discuss that in my report.
14     Q.   I realize I might have --
15          MR. MISHKIN:  Could you just read back
16  the question?  I just want to make sure I asked
17  the question I thought I asked.
18          (Whereupon, the reporter read back the
19  pending question.)
20     A.   So starting on Page 44, Section C, I
21  discuss indirect influences, and I basically
22  make the point that, you know, it would be
23  unlikely if doctors had never heard of Neurontin
24  but for some of the marketing efforts of

1  Warner-Lambert and Pfizer, and how did that
2  indirect influence occur.  Well, we talked about
3  this earlier in some of your other questions,
4  what Pfizer and Warner-Lambert did was analyze,
5  you know, where do doctors obtain their sources
6  of information in prescribing and making
7  prescribing decisions, and in their promotion of
8  off-label marketing of Neurontin through
9  subverting the scientific process and distorting
10  the publication process, they influenced what
11  was published about the drug through their
12  continuing medical education efforts, they also
13  influenced what doctors thought about the drug,
14  and those were problematic because they
15  typically didn't reveal some of the problems
16  with efficacy and safety.  This also applies to
17  sales calls when there are sales calls.
18          And then as we talked about, the
19  indirect influence can come because, you know,
20  as we talked about where do doctors get sources
21  of their information, and you identified
22  colleagues as an important source, so if I'm
23  thinking about prescribing Neurontin I might
24  well call up one of my colleagues who was

1  directly influenced by the company.  So it comes
2  from word of mouth, which we know is an
3  important part of -- and conversations with
4  colleagues in determining what drugs to provide.
5  And so there are a number of different avenues
6  in general by which this may happen.
7          I guess the other think I would say,
8  there's also a direct channel in that doctors
9  have an obligation to understand the drugs that
10  they provide and their benefits and potential
11  weaknesses, problems, liabilities, side effects,
12  whatever.  So as a practical matter, a
13  responsible physician in prescribing Neurontin
14  will take a look at the label for the drug which
15  should indicate what the contraindications for
16  the drug are.  In the case of bipolar, there's a
17  serious question about suicidality.
18          So those are the ways in which the
19  marketing efforts of Neurontin, just in brief
20  summary, could have affected physicians in their
21  prescription habits.
22     Q.   There's a lot in your answer and we're
23  going to come back to all that in more detail.
24     A.   Okay.

VERITEXT CORPORATE SERVICES (800) 567-8658

1    Q.   For right now I'm looking for
2  something -- I'm asking a more narrow question.
3        I'm wondering if you can be more
4  specific regarding the magnitude of the impact
5  of the indirect influence.  And maybe to make
6  that more specific; have you reached a
7  conclusion regarding the extent to which
8  physicians wrote more off-label Neurontin
9  prescriptions as a result of alleged improper
10  promotion?
11    A.   Well, we have, you know, data on that.
12  You know, we can look at some of the graphs in
13  the report and the statistics that I mentioned
14  before that the off-label uses of Neurontin went
15  from about fifteen percent in '94 to 90 percent
16  in 2003.
17        And as a point of comparison, you
18  could take a look at the Radley Finkelstein
19  article which surveyed off-label uses in drugs,
20  160 drugs, and one of the questions they asked
21  was "well, what's a typical level of off-label
22  use?"  And the answer was, I believe, was
23  something on the order of 20 percent.
24        So you have 20 percent off-label use

1  as a characteristic -- average number for most
2  drugs, and you have Neurontin at 90 percent, so
3  these efforts were quite -- seem to have been
4  quite successful.
5    Q.   Dr. King, I'm really asking a much
6  more specific question.
7        Are you offering an opinion regarding
8  the number of additional off-label Neurontin
9  prescriptions that were -- that resulted from
10  alleged improper promotion?  And if so, what
11  number are you saying that was?
12    A.   I'm not offering an opinion on that.
13  Dr. Rosenthal offers an opinion on that.  And if
14  you look at her expert report, she uses
15  statistical, statistical analysis to estimate
16  the level of -- or the amount of off-label uses
17  of Neurontin that are inappropriate.
18    Q.   Understood.
19        You haven't done any statistical
20  analysis that would allow you to estimate the
21  number of off-label prescriptions that resulted
22  from alleged improper promotion of Neurontin?
23    A.   No, I haven't.  But I have looked at
24  Dr. Rosenthal's report, and it supports my

1  conclusions.  And if you want a specific number,
2  she provides one.
3    Q.   But you're not offering one as far
4  as --
5    A.   No.
6    Q.   Can we look again actually at 5A?  And
7  you see where you use the phrase "significant
8  contributing factors"?
9    A.   Yes.
10    Q.   Similar question about whether you can
11  be more specific regarding the -- what you mean
12  by "significant contributing factors."
13        Do you have a particular magnitude in
14  mind when you use that expression, significant
15  contributing factors?
16    A.   I don't have a specific magnitude in
17  mind, but again I would point to the, you know,
18  the observed facts in the case that when it was
19  originally introduced Neurontin had an off-label
20  usage of about fifteen percent or so, which is
21  consistent with what the Radley Finkelstein
22  article says we should generally expect, and
23  that grew to 90 percent which then made it the
24  outlier, it's the highest off-label use of any

1  drug that was studied by Bradley and
2  Finkelstein.
3        MR. ROSENKRANZ:  Just for point of
4  reference, the Finkelstein article was not
5  written by anybody in my office named
6  Finkelstein, is that correct?
7        THE WITNESS:  Yes, that is correct.
8        BY MR. MISHKIN:
9    Q.   You've referenced these increases.
10  Are you offering any opinion as to what portion
11  quantitatively of those increases are
12  attributable to alleged improper marketing?
13    A.   No.
14    Q.   Could you walk through for me your --
15  well, let me put it like this.
16        What are the specific steps that
17  you've taken to support your conclusions that
18  we've been talking about here?  If you could
19  summarize the steps for me that you took.
20    A.   Briefly, you know, I did a couple of
21  things.
22        I looked at the company documents to
23  see what their own marketing people and
24  salespeople were saying about the success of

1  their promotional efforts in promoting off-label
2  sales. I looked at their strategic plans, and
3  when you do that you discover that the main
4  source of growth for Neurontin is not in its
5  approved indication for epilepsy or pediatric
6  epilepsy or post-herpetic neuralgia, it all
7  comes from the off-label uses, and that's where
8  they concentrated their marketing efforts. And
9  it's a very comprehensive scheme of things that
10  was done to promote the off-label uses, and
11  we've touched on some of the aspects of that.
12  So I looked at the company documents to see what
13  the company was doing and how they were thinking
14  about it.
15      And also I looked at their own
16  analyses of the market in terms of how
17  successful they were in meeting their corporate
18  objectives.
19      I also reviewed the academic
20  literature to see what's known about promotion
21  of pharmaceuticals and how it would relate to
22  this case.
23      You know, I drew upon my own
24  experience, too.

1      And then I did some additional
2  analyses of data that you provided to see if I
3  could corroborate the findings that I had from
4  the documents, from the academic studies, and
5  see if that's what I observed in this case.
6      And then finally, as we've discussed,
7  when subsequent expert reports came out, I read
8  the expert reports and analyzed them to see if
9  they were consistent with the analyses that I'd
10  done based on company documents, based on
11  independent market and economic analyses, and
12  based on my review of the academic literature,
13  and they were highly corroborative.
14    Q.   So let me just try to recap and make
15  sure I'm not missing anything.
16      You reviewed documents produced by
17  Defendants, you reviewed the literature,
18  academic literature on pharmaceutical promotion,
19  and you reviewed expert reports filed by other
20  Plaintiffs' experts?
21    A.   Well, subsequently to writing the
22  report. And I also did analyze the data,
23  available data to see what was happening in the
24  market.

1    Q.   Did you do anything else?
2    A.   I think that's most of it. I can't
3  think of anything at the moment. If I thought
4  about it.
5    Q.   Okay. Just to be clear, when you -- I
6  think you've already said this, but when you
7  refer to Plaintiffs' other expert reports, you
8  mentioned that those were received after you
9  submitted this report, right?
10    A.   Correct.
11    Q.   So they didn't form the basis for the
12  opinions as you've expressed them in the report?
13    A.   No, they don't, but they corroborate
14  my findings and opinions.
15    Q.   And the data analysis, is there any
16  data work that you've done that is not reflected
17  in the charts that appear in your report?
18    A.   Not that support the basis of my
19  opinion, no. It's all here in the report.
20    Q.   Okay. And this may be implicit in one
21  of your last answers, but I take it you haven't
22  sought to quantify in any specific way the
23  impact of any particular types of alleged
24  improper promotion on off-label sales of

1  Neurontin?
2    A.   I have not. And I would also add it's
3  not clear to me, or I wasn't able to on the
4  basis of the information and data that I had, I
5  didn't see a way that I could actually do that
6  with what had been provided.
7    Q.   So this is a kind of analysis that you
8  personally haven't done?
9    A.   No, I haven't done any such analysis.
10    Q.   And you haven't sought to determine
11  whether any particular Neurontin prescriptions
12  for any particular patients were the result of
13  alleged improper promotions, is that right?
14    A.   In an individual case?
15    Q.   Right.
16    A.   No.
17    Q.   Okay. So you're not offering an
18  opinion that any particular Plaintiff's
19  Neurontin prescriptions resulted from any
20  alleged improper conduct?
21      MR. ROSENKRANZ: Objection. Asked and
22  answered.
23      You can answer.
24    A.   I guess there I would say, you know,

1 it's my opinion that all physicians were
2 directly or indirectly -- or all or
3 substantially all physicians were directly or
4 indirectly influenced by Pfizer and
5 Warner-Lambert's marketing efforts, so to that
6 extent I am offering an opinion about individual
7 doctors, though I haven't considered any
8 individual doctor and the source of the
9 influence.
10     BY MR. MISHKIN:
11     Q.   Understood.
12         But certainly some off-label
13 prescriptions of Neurontin would have been
14 written in the absence of any of the alleged
15 improper promotion, is that right?
16     A.   Yes.
17     Q.   Okay.  And you're not offering an
18 opinion specific to any Plaintiffs that their
19 particular prescriptions resulted from any
20 alleged improper promotion?
21     MR. ROSENKRANZ:  Objection.  Asked and
22 answered.
23     A.   Yes.
24     BY MR. MISHKIN:

1     Q.   I'm correct?
2     A.   Yes.
3     Q.   Okay.  Can you describe for me the
4 analysis that you did to support the conclusion
5 that you state here in Paragraph 5B?  I'll just
6 read it for the record, you've concluded
7 "off-label sales of Neurontin would have
8 continued had Pfizer ceased promotional
9 promotional activities for Neurontin."
10         What is the work that you did to
11 support that conclusion?
12     A.   So generally speaking there are two
13 things that I did.
14         The first thing I did was look at the
15 academic literature to see what we know about
16 pharmaceutical promotions and their long-term
17 effects.  And as you know from your own consumer
18 experiences, brand recognition has a lasting
19 value.  And there have been academic studies of
20 the pharmaceutical market and other drugs to
21 see, you know, how-long-lived were promotional
22 activities.  There are a number of reports --
23 sorry, academic articles published in peer
24 reviewed journals that I cite in here, Berndt is

1 one, Azoulay, Gonul, Machanda, my own work, and
2 in each of those papers they look at the issue
3 of how long-lasting are the marketing effects,
4 and what they find is that these -- the effects
5 of promotion, they look at various types of
6 promotion, they look at detailing, they look at
7 detailing plus samples, they look at journal
8 advertising, and the consensus of, you know,
9 this broad base of literature is that these
10 things do have long lives, and that they do
11 persist.
12         So based on academic studies of the
13 pharmaceutical market and other drugs in the
14 market, it seems clear that, you know, even if
15 sales of -- or promotion of Neurontin had ceased
16 that sales would continue.
17         And one of the things that's
18 interesting about that is that the rate,
19 so-called rate of depreciation, in other words
20 how long does it take for this effect to wear
21 out, is quite low.  So these are long-term
22 effects, and you can look at the specific papers
23 for estimates of it.
24         Now, I would add that the other

1 interesting thing about this is that, you know,
2 now we don't have to speculate about how
3 long-lived those effects might have been, we
4 actually have data on that, and that's provided
5 by Meredith Rosenthal's report.  And if I
6 remember correctly, her analysis of the
7 long-term effect of promotion is that it has a
8 depreciation rate of about three percent a
9 quarter, about twelve percent or so a year, so
10 this lasts for a long time.  So even though --
11 even if you'd ceased promotion, the sales would
12 continue for some time.
13         So the academic studies is one source,
14 the Meredith Rosenthal's report --
15 Dr. Rosenthal's report corroborates that
16 analysis, and then sort of more -- less formal
17 analysis we can look at something like one of
18 the charts I've provided in here, if I can find
19 it.
20     (Witness reviewing document.)
21     A.   Okay.  So, you know, using the data
22 that was provided by the company in figure nine
23 on Page 41, what I've done here basically is I
24 asked Keith Altman to prepare an analysis of

1  sales calls to psychiatrists, and psychiatrists
2  are not people one would normally expect to
3  prescribe Neurontin for its approved uses. And
4  what we have here is there are three lines on
5  the graph.
6       The lowest line tracks sales calls
7  mentioning Neurontins. In this case we were
8  actually able to match based on company records
9  individual psychiatrists who received a sales
10  call, and then the company tracked their
11  prescribing habits afterwards, so we can look at
12  roughly, I think it's 800 some odd -- 832
13  psychiatrists, we can see when they received
14  sales calls, and we can look at what happened
15  subsequently to both total prescriptions and new
16  prescriptions. Total prescriptions is the top
17  line, new prescription is the bottom line.
18       And again just as a casual
19  observation, what you see is as the sales calls
20  increased to this group, the off-label
21  prescriptions, both new and total, increase.
22  And then when promotions effectively cease in
23  December of 2000, as we were discussing you
24  would expect sales to persist, and they do, they

1  drop, but they continue, they don't drop to
2  zero.
3       And then at the very tail end of this
4  period we see a slight increase in sales calls,
5  and, you know, I wouldn't want to push the data
6  too hard, but it looks like the curve is sort of
7  leveling out.
8       This is sort of direct evidence with a
9  specific set of psychiatrists who are tracked by
10  the company where we can relate sales calls and
11  their association with prescribing. So what we
12  see is sales calls, sales calls, promotion
13  increase, prescribing goes up, when it falls,
14  the prescriptions don't immediately drop to
15  zero. So that's, you know, again another piece
16  of evidence that these sales will persist.
17    Q.    There was a lot in there, let me just
18  try to synthesize it.
19       I think what you've said is to support
20  your conclusion in 5B you've looked at the
21  pharmaceutical promotion literature and you've
22  looked at the trends in the data as you've
23  depicted it here in your report? I have those
24  right?

1    A.    Yes.
2    Q.    You mentioned Dr. Rosenthal's report,
3  but of course that's not something that would
4  have formed the basis for the conclusion that
5  you expressed in 5B originally?
6    A.    Right, that's correct. But it
7  certainly corroborates it.
8    Q.    All right. Is there anything else
9  that you've done to support the conclusion in 5B
10  that you haven't already mentioned?
11    A.    Well, let me check my report here and
12  see what else I mentioned.
13       Gimmick studies, sales calls.
14       No.
15    Q.    And just to be clear, you didn't seek
16  to quantify the extent to which off-label sales
17  of Neurontin would have continued if Pfizer had
18  ceased alleged improper promotion and all
19  activities of Neurontin?
20    A.    No, I did not. But I think it's clear
21  from the -- especially from -- I think it's
22  clear from two things. It's clear from the
23  academic studies, again because of the
24  persistence in the long-lived aspect of

1  promotional efforts that we're not going to see
2  a sudden drop in sales, and that's also
3  corroborated by figure nine. And then again, as
4  I've mentioned, in subsequent analysis
5  Dr. Rosenthal has attempted to address that
6  issue.
7    Q.    Right. But just to be very clear, I'm
8  looking for the support for this conclusion as
9  you wrote it, at the time that you wrote it.
10       You've referred to the literature on
11  depreciation rates. Did any of that literature
12  look at depreciation rates specifically related
13  to Neurontin?
14    A.    No.
15    Q.    But you haven't done any kind of
16  economic or statistical analysis of what
17  Neurontin off-label sales would have been in the
18  absence of alleged improper promotion as of a
19  certain date, for example?
20    A.    No, I haven't.
21    Q.    And let's take a look at 5D. You've
22  concluded here that "Pfizer's off-label
23  marketing of Neurontin indirectly influenced
24  all --" I'm sorry, I meant to refer to 5C, which

1 says that "the suppression of information about
2 serious adverse events enabled growth in
3 off-label sales."
4         Can you just take me through again the
5 categories of analysis that you did, the steps
6 that you took to support that conclusion?
7     A.   I suppose as a marketing expert and
8 economist I shouldn't say common sense, but
9 common sense is corroborated by, again, I looked
10 at academic studies.
11        There is a fair amount of literature
12 on what happens when things like black box
13 warnings or adverse events are revealed about a
14 drug.  And as you would expect from economic
15 theory, if other things being equal you suddenly
16 discover that your good or adverse -- if your
17 drug has an adverse interaction or a bad side
18 effect that that's going to decrease the utility
19 of the drug to the patients and doctors and
20 demand for the drug is likely to fall.  So I
21 looked at that.
22        And, you know, I've also -- if you
23 look at the articles by Dr. Berndt, Dr. Azoulay,
24 I'm not sure about Machanda and Gonul and the

1 others, but -- also my own work, when you
2 estimate demand for a drug, in other words what
3 the sales will be, one of the very important
4 factors is the number of adverse drug
5 interactions and side effects.  And we know,
6 again based on academic literature it's very
7 well established that as -- if and as bad side
8 effects about the drug are revealed, the sales
9 will decline.  Again, it's as we'd expect from
10 economic theory.  So there's very hard evidence
11 in the academic studies that this is what you
12 would expect.
13     Q.   Other than reviewing the literature,
14 did you do any other work or analysis to support
15 the conclusion that you've stated here in 5C?
16     A.   Let me see what else I did here.
17        (Witness reviewing document.)
18     A.   I think it's also consistent with --
19 here I'd have to go back and check the actual
20 timing of release of information on either
21 safety issues or lack of efficacy for Neurontin
22 for the off-label uses, so we do see some of
23 these off-label uses decline.  And as I
24 remember, that is also associated with some

1 information about lack of efficacy or adverse
2 side effects becoming public knowledge.
3         BY MR. MISHKIN:
4     Q.   Let's talk about that.
5     A.   I didn't do a specific analysis on
6 that.
7     Q.   Does your report anywhere mention
8 anything about a drop in sales being supposedly
9 associated with information about alleged side
10 effects of Neurontin?
11     A.   I don't believe so, no.
12     Q.   Other than reviewing the literature,
13 did you do anything else to support your
14 conclusion in 5C?
15     A.   Well, again I looked at the data on
16 Neurontin.  But no, I mean it's such a
17 well-established principle, it's so
18 well-established in the academic literature I
19 didn't really think it was necessary to belabor
20 the point.
21     Q.   Okay.  And did any of that literature
22 that you're talking about in this connection
23 relate specifically to Neurontin?
24     A.   I don't know.

1     Q.   Does any example come to mind?
2     A.   No, not as I sit here.
3     Q.   All right.  And the extent to which
4 your review of data was involved in reaching
5 this conclusion, that's not something that you
6 discussed in the report?
7     A.   No.
8     Q.   I'm correct in saying that?
9     A.   Yes, I did not discuss it in the
10 report.
11     Q.   And to be clear, you didn't seek to
12 quantify the extent to which alleged suppression
13 of information about adverse events increased
14 off-label Neurontin sales, is that correct?
15     A.   No, I didn't, and it's not clear to me
16 necessarily how you would do it.
17     Q.   Okay.  So you didn't attempt some sort
18 of economic projection of what Neurontin sales
19 would have been in the absence of an alleged
20 suppression, is that correct?
21     A.   No, I did not.
22     Q.   And I take it you haven't sought to
23 determine whether any particular Neurontin
24 prescription for any particular patients would

1  not have been written in the absence of the
2  alleged suppression, is that right?
3      A.  Yes, that's correct.
4      Q.  Okay.  So you're not offering an
5  opinion that any particular Plaintiff's
6  Neurontin prescription wouldn't have been
7  written in the absence of the alleged
8  suppression?
9      A.  No.
10     Q.  I'm correct?
11     A.  I'm sorry, yes, you are correct, I'm
12 not offering an opinion on that.
13     Q.  Okay.  Now, you've referenced the
14 pharmaceutical promotion literature.  Are you
15 aware of any literature that's concluded that
16 all or substantially all sales of a prescription
17 medication were due to promotion of some sort?
18     A.  I don't think that's how economists
19 and marketers would frame the question, so I'm
20 not quite sure how to answer that.
21     What I'm aware of is a substantial
22 body of literature that has analyzed the effect
23 of promotion on pharmaceutical sales, and that
24 unequivocally demonstrates that promotion is

1  effective generating pharmaceutical sales.
2      Q.  Okay.  You're not aware, though, of
3  any study that's ever concluded that all or
4  substantially all sales of a prescription
5  medication resulted from marketing, is that
6  right?
7      MR. ROSENKRANZ:  Resulted -- I didn't
8  hear.
9      MR. MISHKIN:  From marketing.
10     A.  You know, I think there's a sense in
11 which it's hard to imagine that they wouldn't,
12 because, you know, the function of marketing is
13 communication, and communication about a drug
14 and the product.  So if you're not marketing and
15 promoting the product, first of all you have to
16 define what you mean by that, but how would
17 anybody hear about it?  How would anybody know
18 to prescribe it?  And, you know, are there
19 accidental prescriptions for drugs you've never
20 heard of?  Possibly, but it's not going to be on
21 the formulary, there's not going to be a label
22 on it, how -- so as I said, it's a little bit --
23 I'm a little bit confused about what you're
24 asking here.

1      BY MR. MISHKIN:
2      Q.  I'm wondering if you could point me to
3  a cite, or if there's a particular article I
4  could go to that would have some finding in some
5  case that all or substantially all of the sales
6  of some drug were the result of promotion as
7  opposed to other factors?
8      A.  What do you have in mind by "other
9  factors"?
10     Q.  I mean anything outside of promotion.
11 The confusion is about what I mean by
12 "promotion"?
13     A.  Yes, promotion is an awfully broad
14 topic.  Exactly what constitutes promotion is
15 occasionally highly debated in the marketing
16 community, but --
17     Q.  Well, can you point me to any article
18 that would reach that conclusion under any
19 definition of marketing, and if so what article?
20     A.  As I sit here and think about it, I
21 can't think of one off the top of my head.  But
22 I would refer you to any number of general
23 marketing textbooks that address those and
24 related issues.  And maybe Doug, I can't

1  remember how to pronounce his name, Doug
2  Dogramatzis is one that discusses the role of
3  pharmaceutical market sales.
4      But as, again as I've said, as a
5  practical matter how is a doctor, physician or
6  consumer going to know about a product if there
7  hasn't been marketing communication and
8  promotion about it?  So that's why I'm a little
9  bit stymied.
10     Q.  Well, I guess what I'm trying to --
11 I'm looking at the whole, the total number of
12 sales over time, and I'm wondering if there's
13 any source, whether the one you just referred to
14 or any other one would take a step back and say
15 that all of the sales that occurred over time,
16 or substantially all of them would not have
17 occurred if it hadn't been for promotion.  And
18 I'm looking for a source that would make a
19 statement like that rather than something that
20 you might infer from one of the sources.
21     MR. ROSENKRANZ:  May I ask a
22 clarification?  Are you talking about all
23 promotion or off-label promotion?
24     MR. MISHKIN:  I'm talking about all

1    promotion.
2        MR. ROSENKRANZ: All promotion of a
3    drug?
4        MR. MISHKIN: Yes.
5    A.   I'd have to think about that. If I
6    come up with one, I will provide it to you.
7        BY MR. MISHKIN:
8    Q.   But sitting here right now, you can't
9    come up with one?
10   A.   Sitting here today, as I said, it's
11   kind of an unusual question.
12   Q.   I'm sorry, sitting here today you
13   can't think of one?
14   A.   Nothing occurs to me as I sit here.
15   Q.   Fair enough.
16       Did any of the literature that you've
17   looked at in connection with your work in this
18   case deal with the effects of alleged fraudulent
19   marketing?
20   A.   I'm sorry, could you repeat the
21   question?
22   Q.   Sure.
23       Did any of the literature that you
24   looked at in connection with your work on this

1    case deal with effects on sales of alleged
2    fraudulent marketing of a prescription drug?
3    A.   I don't believe so.
4    Q.   Now, I think you mentioned some
5    articles that were specific to Neurontin, and I
6    want to follow up on that more generally in
7    another context, I think you referred to some.
8        Are you relying on any literature
9    specific to Neurontin to support your
10   conclusions regarding the impact of alleged
11   improper promotion on off-label Neurontin
12   prescriptions?
13   A.   I guess what I would say is I'm
14   relying on academic and clinical studies about
15   the characteristics of Neurontin, specifically
16   its efficacy or lack of efficacy, and safety
17   issues that might arise. But I'm not aware of
18   any literature that looks specifically at, you
19   know, those issues and then ties it to the
20   effect on marketing.
21   Q.   And when you say "those issues,"
22   you're not aware --
23   A.   Can you ask the question again?
24   Q.   Sure. I think you may have answered

1    it.
2        But you're not aware of any literature
3    specific to Neurontin that has analyzed the
4    impact of any kind of Neurontin promotion on
5    Neurontin sales, is that right?
6        MR. ROSENKRANZ: Objection to form.
7    A.   No. I've certainly done a search for
8    it. I don't know that I've done one exhaustive
9    enough to answer your question yes or no.
10       BY MR. MISHKIN:
11   Q.   Sitting here today, you can't think of
12   an article that would fall into that category?
13   A.   Well, I mean it's a logical conclusion
14   that can be drawn from a lot of articles
15   pointing out lack of efficacy for certain
16   specific uses or bad side effects, but I'm not
17   aware of a study that -- a specific study that
18   looks at that and the effect on sales.
19       But as we've discussed, the effect on
20   sales follows naturally from what we know in
21   other drugs when there's information that's
22   released about adverse side effects.
23   Q.   Okay. I think I asked you, but to be
24   clear' you're not aware sitting here of any

1    published article that has examined the impact
2    of any kind of Neurontin promotion specifically
3    on Neurontin sales, is that right?
4    A.   Not as I sit here, but again it may be
5    there.
6    Q.   Okay. But you're not relying on any
7    such article for your --
8    A.   No.
9    Q.   -- conclusions that you've expressed?
10   A.   No.
11   Q.   Now, you referred to other
12   pharmaceutical promotion literature that
13   wouldn't be specific to Neurontin. Would you
14   agree with me that specific results vary across
15   drugs and studies regarding the impact of
16   pharmaceutical promotion on prescription drug
17   sales?
18   A.   Yes, I think that's generally true.
19   And that's one of the strengths of this
20   particular set of analyses, that in different
21   contexts under different situations in a variety
22   of -- with different drugs we find a very
23   consistent theme, and that is that marketing and
24   promotion are effective in increasing

1    Q.   In addition to the sources you've
2  listed here, could a doctor's decision to
3  prescribe Neurontin off-label for the first time
4  have been due to information learned through a
5  continuing medical education class?
6    A.   Yes.
7    Q.   How about through a medical conference
8  of some kind put on by a medical association, is
9  that possible?
10    A.   Yes.
11    Q.   Could a doctor's decision to prescribe
12  Neurontin for the first time for an off-label
13  use have been due to the physician's own past
14  experience using other drugs from the same
15  therapeutic category?
16    A.   I suppose it could, yes.
17    Q.   Let's talk the case of a physician who
18  already has experience prescribing Neurontin for
19  on-label uses in the past, could his or her
20  decision to start prescribing Neurontin for
21  off-label uses have been based on their past
22  experience having prescribed Neurontin for
23  on-label uses?
24    A.   You know, I'm not, I'm not a medical

1  expert, I'm not here to give expert medical
2  opinions.  So I -- but as a lay person looking
3  at it, if you're a neurologist and you're
4  prescribing this for epilepsy, I'm not sure how
5  you make the leap of faith to bipolar disorder,
6  for example.  Though it's true, as I understand
7  it, that other AED drugs, anti-epileptic drugs,
8  may be useful in some pain contexts, so maybe
9  that's how you do it.  But that's speculation on
10  my part.
11       It's certainly possible.  How frequent
12  it would be, I don't know, but I wouldn't think
13  that would be a terribly common occurrence.
14    Q.   Have you done any investigation of how
15  commonly that occurred?
16    A.   No.
17    Q.   Let me give you an example where a
18  doctor has past experience prescribing Neurontin
19  for on-label conditions and observed efficacy
20  and comorbid off-label conditions, could that be
21  a basis for beginning to prescribe Neurontin
22  off-label in the future?
23    A.   Which comorbid conditions?
24    Q.   I could be clear.  Comorbid conditions

1  such as pain or some condition that would not be
2  one of the labeled conditions for Neurontin?
3    A.   I think it's certainly possible.
4  Whether it would lead to the size of sales you
5  saw for Neurontin I think is another question,
6  but certainly it's possible.
7    Q.   Have you done any analysis of the
8  frequency with which what I just described in my
9  hypothetical could happen?
10    A.   Well, I guess the first thing that
11  would pop into my mind is you have to look at,
12  you know, of the total sales of Neurontin how
13  much are for on-label uses, and that's something
14  like ten or fifteen percent.  So I guess I find
15  it a bit of a stretch to think that neurologists
16  prescribing Neurontin for second line treatment
17  in refractory epilepsy are all of a sudden going
18  to discover, you know, what, a six or seven fold
19  increase in their population of patients that
20  have these comorbidities, so suddenly they're
21  prescribing Neurontin more for the comorbidities
22  than for the actual approved use and the actual
23  area of their specialization.
24    Q.   Well, other than what you are saying

1  you don't think is likely, have you done
2  yourself any specific analysis of what that
3  quantity might be of people who would fall into
4  the category of the hypothetical I gave?
5    A.   Well, I think I just gave you an
6  argument that's based on an analysis that says
7  how large that population would have to be.  But
8  have I done additional specific analyses on
9  that?  No.
10    Q.   How large that population would have
11  to be in order for my example to count for all
12  off-label prescriptions, is that what you mean?
13    A.   Well, you were offering the
14  hypothetical that said, as I understood it, it's
15  only marketed for its on-label uses, which means
16  it's going to go to neurologists or people who
17  treat epilepsy, maybe a small number of primary
18  care physicians, but that's typically referred
19  out, as I understand it.  So how big are those
20  people compared to the total universe of
21  Neurontin sales, well, they're only ten or
22  fifteen percent.
23       So you've got a population coming in
24  for epilepsy that's ten or fifteen percent of

1  the total consumption of Neurontin, so that
2  leaves 85 percent of the sales of Neurontin that
3  you've got to explain for in this
4  fifteen percent population. So I just said
5  okay, fifteen into 85 goes how many times,
6  because you're going to have to be prescribing
7  those additional prescriptions, the
8  comorbidities that you speculate on, to that
9  narrow population. So you're going to have to
10 be selling an awful lot of -- you're going to be
11 selling, you know, 85 percent of your
12 prescriptions to the neurologists are going for
13 the off-label uses, and that just doesn't seem
14 plausible.
15      Q.   Have you done anything other than what
16 you've just described to investigate this
17 question?
18      A.   No.
19      Q.   Let me ask you about the different
20 information sources from which you've said
21 doctors get their information about drugs.
22           Is it correct that physicians will
23 have different levels of exposure to those
24 information sources?

1      A.   Yes.
2      Q.   So if we took medical and scientific
3  literature as an example, is it fair to say that
4  some doctors are more exposed to medical and
5  scientific literature than others would be?
6      A.   I'm sure that's true. But the -- I
7  think as I mentioned here and as I provide
8  academic documentation for, doctors are very
9  busy, so they don't have huge amounts of time to
10 read the scientific literature in their spare
11 time. But I think to -- I just want to avoid
12 drawing an incorrect inference because the
13 scientific literature actually is the foundation
14 for all of the messages that are communicated in
15 the other channels that you mentioned from sales
16 representatives to continuing medical education
17 to advisory groups to colleagues, etcetera. So
18 it's just because few doctors directly refer to
19 the scientific and medical literature, and
20 doctors work on sort of a hierarchy of
21 information and status does not mean that that
22 literature and those publications are
23 unimportant.
24      Q.   You may be reading too much into my

1  question. I'm just asking whether it varies
2  from doctor to doctor, the level of exposure.
3      A.   It varies.
4      Q.   What might account for the level of
5  variation and exposure?
6      A.   You know, I guess all kinds of things.
7  The nature of the practice, are you a
8  specialist, are you a generalist, you know, your
9  level of experience, do you practice in a
10 hospital, do you practice in a group, do you
11 practice solo. You know, I can imagine lots of
12 things that would affect it. How much time you
13 have.
14           And also I guess the other thing
15 that's important here is your level of
16 sophistication and being able to read and
17 interpret academic research. Are you capable
18 of understanding what kind of studies are sort
19 of gold standard, and what kind of studies are
20 sort of secondary, and what sort of studies are
21 just case reports, and how you should
22 appropriately weight those things in making your
23 decision, which is why doctors typically rely on
24 trusted sources because those are complicated,

1  sophisticated questions that require a certain
2  sophistication and knowledge of statistics and
3  other matters.
4      Q.   So all of the factors that you've just
5  mentioned, you'd expect that those would vary
6  from doctor to doctor?
7      A.   Yes.
8      Q.   Okay. And that variance would lead to
9  different levels of exposure to scientific -- to
10 published literature?
11      A.   Yes.
12      Q.   Okay. Why don't we talk about
13 detailing, or just to be more general contacts
14 of any kind between pharmaceutical company and
15 physicians.
16           With respect to that category, would
17 there be variations from doctor to doctor in
18 terms of their exposure to communications from a
19 pharmaceutical company?
20      A.   In general, yes.
21      Q.   Okay. Are there some physicians who
22 would never come in contact with manufacturers
23 of particular drugs?
24      A.   I'm sure there are.

1    Q.    Okay. Some doctors or institutions,
2  they might even have a policy that would prevent
3  their physicians from meeting with sales
4  representatives, for example?
5    A.    Yes.
6    Q.    Okay. In addition to different levels
7  of exposure, which is what we've been focusing
8  on, would you also agree that there -- that
9  physicians would place different relative
10 importance on these different sources, just
11 depending on the physician?
12   A.    Yes.
13   Q.    Some doctors for whatever reason might
14 rely more heavily on input from colleagues than
15 on CME classes, for example?
16   A.    Yes, that's possible.
17   Q.    Okay. Some might rely more heavily
18 than their own clinical experience than the
19 other sources we've talked about?
20   A.    Yes, that's certainly possible.
21   Q.    Would you expect all doctors to
22 respond in the same way to the same type of
23 promotion from a pharmaceutical company?
24   A.    In general, no, I wouldn't.

1    Q.    So, for example, the level of
2  skepticism that a physician might have with
3  respect to different types of promotional
4  initiatives, that would differ from physician to
5  physician?
6    A.    It would, and that's an area where the
7  self-reporter physicians is particularly
8  interesting. The academic literature shows that
9  physicians generally believe that marketing
10 efforts by detailers or sales reps are
11 effective, and that gifts and other things are
12 also effective, but they all seem to think they
13 personally wouldn't be effected and these things
14 wouldn't influence their decisions because they
15 would exercise independent judgment. So those
16 are two inconsistent things.
17   Q.    I'm just asking you whether the
18 response in level of skepticism would differ
19 from doctor to doctor.
20   A.    I certainly would assume yes.
21       MR. ROSENKRANZ: Objection. Asked and
22 answered.
23       BY MR. MISHKIN:
24   Q.    Dr. King, let's take a look at the

1  charts that are in your report.
2    A.    Okay.
3    Q.    I think we can start with figure one
4  which appears on Page 13.
5    A.    Okay.
6    Q.    Who created this chart?
7    A.    Keith Altman.
8    Q.    And what role did you have in the
9  selection or creation and ultimate inclusion of
10 this chart in your report?
11   A.    It was a chart I asked for him to
12 create and, you know, I specified what it was I
13 wanted to see and how I wanted to present the
14 data.
15   Q.    Did you specifically ask for a chart
16 showing what's called anxiety prescriptions?
17   A.    Yes. I asked for charts showing all
18 of the off-label uses of Neurontin, and I
19 specified what they were.
20   Q.    And do you have an understanding of
21 sort of the mechanics of how the chart was put
22 together?
23   A.    Well, I assume you don't mean how do
24 we do it in Excel.

1    Q.    Well, I mean the underlying data, that
2  sort of thing.
3    A.    Yes, I think I do have a general
4  understanding of it. It's something -- you
5  know, it's Verispan is one of two primary
6  providers of data in this industry, they're
7  relied upon by all of the pharmaceutical
8  manufacturers, it's widely used in academic
9  studies, these are standard surveys that they
10 do. And then in terms of classification for
11 what constitutes anxiety, that was something
12 where we relied on the classification of
13 Dr. Cheryl Blume, I believe.
14   Q.    Tell me a little bit about that. Who
15 is Dr. Blume and where did that classification
16 come from?
17   A.    Dr. Blume, my understanding, is the
18 medical expert or medical expert in this case
19 who is qualified to distinguish the -- to decide
20 what categories of diagnosis go into which sort
21 of what -- we call them buckets, what would be
22 migraine, what would be anxiety, what would be
23 non-neuropathic pain, and so that's how, you
24 know, we used her categorization of things to

55 (Pages 214 to 217)

1 select out which prescriptions and uses should
2 fall into which of the off-label categories.
3     And then I also looked at, we've
4 talked about this previously, but I looked at
5 this, and I also looked at Dr. Michael
6 Steinman's classifications which I think may be
7 slightly different to see if we got the same
8 sort of general result, and these results were
9 consistent.
10     Q.    In terms of deciding what particular
11 prescriptions to put in the bucket called
12 anxiety, did you have any role in that?
13     A.    Well, other than to say, you know, I
14 want to understand what an anxiety diagnosis
15 should be, and then asking Keith to please, you
16 know, go through the data and sort those out,
17 that's all I did. I didn't actually select the
18 actual records, no.
19     Q.    Okay. And you didn't have any input
20 in terms of what types of prescriptions for what
21 types of conditions should be characterized as,
22 quote unquote, anxiety?
23     A.    No, I didn't. That's not a -- I'm not
24 a medical expert, so that's not something I'm

1 qualified to testify about.
2     Q.    Okay.
3     A.    I should also add that Verispan
4 categorizes these things to begin with, I
5 believe.
6     Q.    When you say they characterize them,
7 you're saying that the anxiety bucket came from
8 Verispan?
9     A.    Well, something like bipolar, I
10 believe they, you know --
11     Q.    Do you know if they provide the data
12 on the level of a particular code like an ICD-9
13 code or something like that that would tell you
14 what a particular prescription was for?
15     A.    They may use ICD-9 codes, they may
16 not, I don't know. But my understanding -- I
17 mean obviously the data are sufficient to break
18 them out in these buckets, otherwise we wouldn't
19 have used them.
20     But in terms of the particulars and
21 how it's coded and the fields and all that, I
22 didn't pay attention to that.
23     Q.    Fair enough.
24     Why don't you turn to Page 19.

1     MR. ROSENKRANZ: 19 did you say?
2     MR. MISHKIN: Yes, 19.
3     BY MR. MISHKIN:
4     Q.    Well, I guess I should back up.
5     You said that you had asked for charts
6 showing all of the different off-label uses.
7 Are you referring to, in addition to figure one
8 which we've already spoken about, are you also
9 referring to figures two, three, four, five and
10 six?
11     A.    Let's see, figure one, yes. Figure
12 two, yes. Figure three, yes. Four, yes. Five,
13 yes, and six.
14     Q.    And was your level of involvement and
15 level of familiarity with the charts the same
16 for two through five as they are for one?
17     A.    Yes, I believe they're all based on
18 the same data.
19     Q.    Okay. Let's look at figure seven
20 which appears on Page 19.
21     First, just as a matter of
22 clarification, I think the title should be Total
23 Quarterly Neurontin?
24     A.    Yes. There are some typos in my

1 report.
2     Q.    What's the data source for figure
3 seven?
4     A.    It's either Verispan or internal
5 company data, but Keith Altman would be able to
6 tell you exactly.
7     Q.    Did you have any role in selecting
8 which data source was going to be used for this
9 chart?
10     A.    I'm sure we discussed it, but I at the
11 moment don't remember which one we used. I
12 think it's Verispan, but I'm not absolutely
13 certain. You know, either one would be reliable
14 from my perspective.
15     Q.    Did you make a specific request of
16 Mr. Altman for a chart that looked like this?
17     A.    Yes, I did.
18     Q.    And did you have any discussions back
19 and forth with him that you remember any more
20 details of regarding how the chart would be
21 created?
22     A.    You know, I know we talked about it,
23 and basically I treated Keith the same way I'd
24 treat one of our research associates here, so we

1  sat down and discussed, you know, we've
2  discussed what is it we're looking for, what
3  would the chart look like, what data would be
4  used, what's the best source of available
5  evidence, then presented it.
6      Q.    Why don't we move to figure eight,
7  which I think the heading is on Page 27 and then
8  it spills over into 28.
9      A.    Okay.
10     Q.    Now, to be clear, figure 28 is a
11 recreation with no modifications of a document
12 that was produced by Defendants?
13     A.    Yes, that was certainly the intent.
14     Q.    And how did you -- anything particular
15 about this document that led you to select it?
16     A.    Well --
17     Q.    Or were you just looking for this
18 general type of information?
19     A.    Well, you know, as we've discussed,
20 the percentage of off-label uses and where they
21 fall was of interest, so I was looking for
22 anything that -- analyses that the company
23 itself had done on off-label uses of the drug
24 and how they broke down, and that's where I

1  found this chart. So, you know, we just
2  recreated what's in that report.
3      Q.    And no modifications to that that
4  you're aware of?
5      A.    Not that I intended.
6      Q.    Okay. Let's take a look at figure
7  nine, which is on Page 41.
8      A.    Okay.
9      Q.    Who created this figure?
10     A.    Keith Altman.
11     Q.    Can you tell me what the data sources
12 are if you know them that underlie each one of
13 the lines that we're seeing here?
14     A.    Yes. My understanding, my
15 recollection is that these are all -- this is
16 all company based data, and the sales calls are
17 based on a database that the company kept about
18 who specifically was visited and what they
19 discussed. And then the new prescriptions and
20 the total prescriptions come from tracking data
21 where the company actually tracked, you know, of
22 those physicians that we -- for whom we visited
23 on sales calls with detailers or sales reps, ***
24 what did their -- you know, how did -- what were

1  their new prescriptions what were their total
2  prescriptions over time. This is all based on
3  marketing data that Pfizer collected, or Pfizer
4  and Warner-Lambert.
5      Q.    And whose idea was it to do this
6  particular type of analysis of the kind you just
7  described?
8      A.    You know, it was my idea. We were
9  looking for, you know, something that would --
10 we were looking to see if, you know, we could
11 find something that made a direct connection
12 between sales calls and visits to doctors and
13 their prescription, prescribing habits, how did
14 it influence the prescription patterns of
15 doctors.
16     Q.    Why don't you take a look at the chart
17 and focus on the early part of the date range,
18 specifically the first year from about June,
19 1997 through June of 1998.
20         According to this chart, psychiatrists
21 were already writing Neurontin prescriptions
22 before any sales calls to psychiatrists started,
23 is that correct?
24     A.    No, that's not entirely correct,

1  because although it's too small to see there
2  is -- you can see, see the little triangles,
3  whatever they are, I guess diamonds, those
4  bounce up and down a little bit. So there is
5  some sales call activity here.
6      Q.    It's very low at that point?
7      A.    It is low. But again, remember this
8  is not the only source of information to
9  physicians, or in this case psychiatrists.
10     Q.    Right. There are other sources
11 besides sales calls that psychiatrists would
12 have been receiving about Neurontin?
13     A.    Right. And so what you see is little
14 sales calls little sales, big sales calls bigger
15 sales, the sales calls go away, total sales
16 decrease slowly.
17     Q.    Well, let's focus again on that first
18 year.
19         According to this chart, Neurontin
20 prescriptions by psychiatrists had started to
21 increase before any sort of significant increase
22 in sales calls, is that right?
23     A.    Yes, I think that's one way to look at
24 the data.

57 (Pages 222 to 225)