# EXHIBIT A

1                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

2

3

4    IN RE:                              )

                                         ) CA No. 04-10981-PBS

5    NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 107

     AND PRODUCTS LIABILITY LITIGATION    )

6

7

8

9              FINAL PRETRIAL CONFERENCE - DAY ONE

10             BEFORE THE HONORABLE PATTI B. SARIS

                  UNITED STATES DISTRICT JUDGE

11

12

13

14

                              United States District Court

15                            1 Courthouse Way, Courtroom 19

                              Boston, Massachusetts

16                            July 20, 2009, 9:15 a.m.

17

18

19

20

21

22

                        LEE A. MARZILLI

23                   OFFICIAL COURT REPORTER

                   United States District Court

24               1 Courthouse Way, Room 7200

                      Boston, MA   02210

25                      (617)345-6787

1 APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
   ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
   KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
6  The Lanier Law Firm, 126 East 56th Street, 6th Floor,
   New York, New York, 10022.
7
8  FOR THE DEFENDANTS:
9     DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
10
   KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11 Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
12
   WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
13 575 Lexington Avenue, 7th Floor, New York, New York, 10022.
14
15
16
17
18
19
20
21
22
23
24
25

1            PROCEEDINGS
2        THE CLERK: In Re: Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court. Will
5  counsel please identify themselves for the record.
6        MR. FINKELSTEIN: Good morning, your Honor.
7  Andrew Finkelstein, Finkelstein & Partners, on behalf of
8  Dr. Egilman.
9        MR. FROMSON: Good morning, your Honor. Kenneth
10 Fromson, Finkelstein & Partners.
11        MR. ALTMAN: Good morning, your Honor. Keith
12 Altman, Finkelstein & Partners.
13        MS. ARMSTRONG: Good morning, your Honor.
14 Katherine Armstrong from Skadden Arps.
15        MR. CHEFFO: Good morning, your Honor. Mark
16 Cheffo from Skadden Arps.
17        MR. OHLEMEYER: Good morning, Judge. Bill
18 Ohlemeyer, Boise Schiller.
19        MR. GOODELL: Good morning, your Honor. Charlie
20 Goodell, Goodell DeVries.
21        THE COURT: You're representing?
22        MR. GOODELL: Pfizer.
23        MR. CHEFFO: Good morning, your Honor. Rick
24 Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25        MR. CHAFFIN: Good morning, your Honor. David

1  Chaffin.
2        MR. SOH: Ken Soh for the plaintiffs, your Honor.
3        MS. HEGAR: Dara Hegar, Lanier Law Firm.
4        THE COURT: Are you all going to be here next
5  week? That's huge. All right.
6        So we start with basics. Next Monday we will be
7  impaneling a jury. The one thing I probably didn't tell you
8  is, to make matters more complicated, I am sitting with the
9  First Circuit by designation for four cases in the morning.
10 And so I'm not sure a hundred percent when that's going to
11 finish, and what I'm thinking of doing is asking the jury
12 clerk to bring in a group of people for a 2:00 o'clock
13 impanelment. That might be just as easy for you all, it's a
14 Monday morning, rather than just having all the jurors
15 sitting downstairs stewing and annoyed until I'm done with
16 the First Circuit. So they will have eaten lunch. We will
17 impanel. I do not expect that it should take longer than
18 three hours, but what it essentially does mean is that you
19 need to block off your afternoon. So that's for starters.
20        The second thing is, I was thinking -- I saw
21 somewhere on the list -- you were possibly on the same page
22 with me -- of ten jurors. Given the fact that we were going
23 into three weeks, I could possibly lose some. So if that's
24 so, it's essentially five peremptories a side. The way I do
25 things is, there are no back challenges. So I'll first ask

1  plaintiffs to exercise their challenges, then defendants.
2  We'll strike people. We'll put people in the box for those
3  empty seats. The next time around defendants go first. The
4  defendants will challenge, then plaintiffs will challenge,
5  and so on until you use up your peremptories. But I don't
6  let you go back. In other words, if you've already passed
7  on a juror, you're stuck with the juror.
8        Because it's vacation time, I wanted to play out a
9  procedure for you. One of the things that annoys me no end,
10 but there seems to be no clear solution, is when I get my
11 pool of 50 jurors and half of them say, "I don't want to
12 serve because I'm going on vacation." I was thinking of
13 giving the jury clerk essentially a questionnaire to be
14 filled in under oath so that we don't bring up jurors who
15 have already prepaid vacation plans. I'm thinking about
16 that. The problem is, it's too easy an out for people.
17 It's a three-week trial which would be hard for people
18 anyway. So another way to do it is to simply ask for more
19 people, and then just have everybody who's got a vacation
20 plan come up and swear to me, and then just let them go.
21 Judge Gertner tried a technique which I really liked a lot,
22 which she had them fill it in under oath, a questionnaire
23 downstairs, and basically gave the -- I think brought up the
24 questionnaires, I okayed them so it was a judge's blessing,
25 and then we either sent them to another court or we

1 girl because of her mother may be relevant.
2     THE COURT: Sure, sure.
3     MR. OHLEMEYER: Thank you.
4     THE COURT: So I think I've gone through all the
5 motions in limine except Gibbons, which is the hard one out
6 there.
7     MR. FINKELSTEIN: Your Honor, there's a motion,
8 plaintiffs' motion, miscellaneous subjects.
9     THE COURT: Oh, what is it?
10     MR. FINKELSTEIN: I just don't know off the top of
11 my head.
12     THE COURT: I can't remember either, so, I mean --
13     MR. ALTMAN: Your Honor, there's also the
14 Weiss-Smith motion as well, which has been sitting out for a
15 while which you deferred until this point in time.
16     THE COURT: I have not reread the Weiss motion. I
17 haven't seen -- what I said was, don't ask me to micromanage
18 each area. It's clear that she's qualified to talk about
19 certain things and not other things, and you wanted me to go
20 line by line through her report, which I'm not going to do.
21 And at some point I should reread her -- thank you for the
22 reminder -- I will reread the Weiss report, which I haven't
23 done in a very long time. So I need to read the Weiss
24 report again and the -- it's clear she can say some things
25 and not other things. This is a partial, and I'm not going

1 to go line by line.
2     MR. ALTMAN: Okay, we just don't have any
3 guidance.
4     THE COURT: Yes, you do. I'm not going to do
5 that. You'll object, like in any expert, and if I think
6 it's beyond her report or expertise, I'll worry about it.
7     When is Maris and Kruszewski going to update their
8 reports, or aren't they? Do you know yet?
9     MR. FROMSON: Your Honor, I believe we sought
10 leave to amend Dr. Roh's report regarding toxicology issues.
11 I don't know if that was one of the motions you denied
12 saying, "Stop filing motions." I just don't recall.
13     THE COURT: No, I think that's fine. I allowed
14 you to do that.
15     MR. FROMSON: Okay. And as far as Dr. Kruszewski
16 and Dr. Maris, I simply don't know if they've had an
17 opportunity to complete their review of depositions, those
18 witnesses. And I've apprised them of the 48 hours before
19 they hit the stand, if they have anything extra on those
20 issues, which shouldn't be much.
21     THE COURT: But before we go through this
22 exercise, are the two women going to testify? At some point
23 you need to put your stake in the ground because I don't
24 want to make them go through --
25     MR. OHLEMEYER: I think it's our intention -- it's

1 our intention that one of them would, at least one.
2     THE COURT: And the general drift of it being?
3     MR. OHLEMEYER: The discussion of --
4     THE COURT: The one I heard about?
5     MR. OHLEMEYER: Correct.
6     MR. FROMSON: Your Honor, I believe there's only
7 an issue of one being a witness. You said we could depose
8 the other witness if they were going to call her, so I
9 presume they're not calling --
10     THE COURT: Are you calling Samantha?
11     MR. OHLEMEYER: No.
12     THE COURT: All right. So I think you probably --
13 well, do you want to supplement?
14     MR. FROMSON: Your Honor, I believe at the
15 previous conference, I did not attend, but my understanding
16 from reviewing the conference transcript was that you had
17 said we could have them supplement within 48 hours of
18 hitting the stand, so I would simply rely upon that guidance
19 from the Court.
20     MR. FINKELSTEIN: And they're actively working on
21 it.
22     THE COURT: I just don't want to play games, cat
23 and mouse. They are going to change --
24     MR. FINKELSTEIN: They're actively working on it.
25 They're going to supplement. It's going to be very brief.

1 It's not a long --
2     THE COURT: So what are the various miscellaneous
3 subjects?
4     MR. OHLEMEYER: Are we at the loose ends section,
5 your Honor? I've got a couple of housekeeping. Do you
6 exclude witnesses, fact and expert?
7     THE COURT: Can we just -- no, I think they --
8 just like you had your golden rule objections, I think --
9     MR. FROMSON: Ours are similar in nature, your
10 Honor.
11     THE COURT: Yes, they're similar. Yes, you
12 shouldn't argue that plaintiff adversely impacts -- no one
13 should talk about the pharmaceutical industry in general.
14     MS. ARMSTRONG: Your Honor, our only issue on some
15 of these were, some of them would go to proportionality of
16 punitive damages. Punitive damages, to the extent awarded,
17 have to be limited, have to be an amount reasonably
18 necessary to accomplish the deterrent effect, should not be
19 overdeterrent; and the fact that a punitive damage award
20 would reduce innovation, would reduce the availability of
21 medicines, that's relevant to how much of a punitive damage
22 award would be sufficiently deterrent or overdeterrent.
23     THE COURT: I think that's fair, I mean, in the
24 context of punitive damages only.
25     MR. FROMSON: If they meet that burden, your

Case 3:05-cv-00444   Document 131-1   Filed 04/27/10   Page 4 of 5 PageID #: 2158

1  Honor, then I can understand that. I don't think they will,
2  but certainly the deterrent should be passed on to the
3  consumer. They shouldn't be allowed to come in to the jury
4  say, "We did something wrong, we're going to get punished,
5  and guess what, we're going to pass it on to you." Then
6  there would be no deterrent.
7  THE COURT: No, no, no. It's got to be the
8  punitive piece of it. It's only about make it proportionate
9  so that if it's too great. I think that's fair, to the
10  extent you're sending messages to the industry or to --
11  which is part of what punitive is about, right? So fair
12  enough. Not on the stock price of Pfizer.
13  MS. ARMSTRONG: No, your Honor.
14  THE COURT: Okay, or not on insurance.
15  MS. ARMSTRONG: No, your Honor.
16  THE COURT: I think cost of purchasing
17  medications, cost of innovation, that is --
18  MS. ARMSTRONG: The same rationale on over-
19  deterrence.
20  THE COURT: There is an interesting legal argument
21  here which I won't get to, which is we will send -- let me
22  ask you this: The Massachusetts statute penalizes with
23  punitive damages gross negligence. They've made a
24  constitutional argument. I don't want to rule on that
25  before trial because I think that's an interesting and

1  innovative question. So either you can drop the gross
2  negligence, and we just leave it with recklessness and
3  intentional, or I would just ask them to check off what the
4  grounds were for doing it, and we could deal with the
5  constitutional issue later.
6  MR. FROMSON: Your Honor, can I consider that
7  because I can't give you an answer right now?
8  THE COURT: If you try and explain to someone the
9  difference between gross negligence and recklessness, they
10  look at you as if you're speaking another language. So my
11  personal preference is to leave it where it's very safely
12  placed in intent and recklessness, but I think the Supreme
13  Court is giving strong signals in this area.
14  MS. ARMSTRONG: Your Honor, they did not actually
15  request a gross negligence instruction in their jury
16  instructions. We did a simultaneous exchange. But we agree
17  that it's the difficulty in explaining the concept of gross
18  negligence that is the basis for our constitutional
19  challenge.
20  THE COURT: So maybe you weren't planning on it
21  anyway. I missed that, I missed that.
22  MR. FROMSON: I believe she's accurate, which is
23  why this threw me for a loop because I'm focusing on the
24  reckless and conscious disregard. And I believe she's
25  accurate. I don't think there is an issue. That's why I

1  couldn't say one way or the other because I --
2  THE COURT: I'm just going to assume it's a
3  nonissue until you tell me otherwise. We have so much to
4  deal with that I'm just going to put that one to bed unless
5  you resurrect it at some point, all right?
6  And, yes, nothing about the litigation crisis or
7  about lawyers or about the FDA rules. That will just all be
8  done as a matter of law. Okay, I think we've dealt with
9  miscellaneous.
10  MS. ARMSTRONG: Your Honor, could I just raise a
11  couple of issues on the miscellaneous? Part of their motion
12  went to lawyer advertising. We do have an issue in this
13  case that certain adverse event reports were generated as a
14  result of lawyer advertising. And, also, if they're going
15  to offer --
16  THE COURT: Well, how many -- I'm glad you
17  mentioned it. I forgot that issue. How many came in after
18  the advertisements?
19  MS. ARMSTRONG: There's hundreds.
20  MR. CHEFFO: Yes, I think they filed over 200, 250
21  or so that were essentially, I think, fairly correlated with
22  the advertising, and in fact may have been filed by counsel
23  themselves.
24  THE COURT: So that might -- if you're planning to
25  put in the volume of AEDs, which are appropriate -- AERs?

1  MR. ALTMAN: Your Honor, we have no intention of
2  introducing a number of adverse events after the second half
3  of 2003. Lawyer advertising didn't begin until later that
4  part of the year --
5  THE COURT: Well, I'll wait and hear your thing,
6  and then just don't mention it in the opening. I'll wait
7  and hear. I'll wait.
8  So, all right, trial procedures, do we want to
9  sequester witnesses?
10  MR. OHLEMEYER: Do you draw a distinction, your
11  Honor, between fact witnesses and expert witnesses?
12  THE COURT: I'm looking to all of you. Sometimes
13  lawyers care; sometimes they don't. For sure fact
14  witnesses, fact witnesses except parties, so one corporate
15  representative is allowed to be here, and Dr. Egilman is
16  allowed to be here.
17  MR. FROMSON: An expert shouldn't have to be
18  sequestered, your Honor.
19  THE COURT: Experts in general I don't sequester
20  unless anybody sees a strong reason for it.
21  MR. OHLEMEYER: Not here, your Honor.
22  THE COURT: So "yes" to fact witnesses, "no" to
23  experts. Are either of the treating physicians coming in?
24  MR. FROMSON: Your Honor, one treating physician
25  is dead.

Case 3:05-cv-00444   Document 131-1   Filed 04/27/10   Page 5 of 5 PageID #: 2159