# EXHIBIT A

1                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF MASSACHUSETTS

2

3

4    IN RE:                              )

                                         ) CA No. 04-10981-PBS

5    NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 107

     AND PRODUCTS LIABILITY LITIGATION    )

6

7

8

9               FINAL PRETRIAL CONFERENCE - DAY ONE

10              BEFORE THE HONORABLE PATTI B. SARIS

                   UNITED STATES DISTRICT JUDGE

11

12

13

14

                                 United States District Court

15                               1 Courthouse Way, Courtroom 19

                                 Boston, Massachusetts

16                               July 20, 2009, 9:15 a.m.

17

18

19

20

21

22

                          LEE A. MARZILLI

23                     OFFICIAL COURT REPORTER

                    United States District Court

24                  1 Courthouse Way, Room 7200

                         Boston, MA  02210

25                        (617)345-6787

1  A P P E A R A N C E S:
2
     FOR THE PLAINTIFFS:
3
     ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4    and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
     1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
     KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
6    The Lanier Law Firm, 126 East 56th Street, 6th Floor,
     New York, New York, 10022.
7
8    FOR THE DEFENDANTS:
9    DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
     100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
10
     KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11   Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
     Square, New York, New York, 10036.
12
     WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
13   575 Lexington Avenue, 7th Floor, New York, New York, 10022.
14
15
16
17
18
19
20
21
22
23
24
25

1              P R O C E E D I N G S
2        THE CLERK:  In Re:  Neurontin Marketing, Sales
3    Practices, and Products Liability Litigation, Civil Action
4    No. 04-10981, will now be heard before this Court.  Will
5    counsel please identify themselves for the record.
6        MR. FINKELSTEIN:  Good morning, your Honor.
7    Andrew Finkelstein, Finkelstein & Partners, on behalf of
8    Dr. Egilman.
9        MR. FROMSON:  Good morning, your Honor.  Kenneth
10   Fromson, Finkelstein & Partners.
11       MR. ALTMAN:  Good morning, your Honor.  Keith
12   Altman, Finkelstein & Partners.
13       MS. ARMSTRONG:  Good morning, your Honor.
14   Katherine Armstrong from Skadden Arps.
15       MR. CHEFFO:  Good morning, your Honor.  Mark
16   Cheffo from Skadden Arps.
17       MR. OHLEMEYER:  Good morning, Judge.  Bill
18   Ohlemeyer, Boise Schiller.
19       MR. GOODELL:  Good morning, your Honor.  Charlie
20   Goodell, Goodell DeVries.
21       THE COURT:  You're representing?
22       MR. GOODELL:  Pfizer.
23       MR. CHEFFO:  Good morning, your Honor.  Rick
24   Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25       MR. CHAFFIN:  Good morning, your Honor.  David

1    Chaffin.
2        MR. SOH:  Ken Soh for the plaintiffs, your Honor.
3        MS. HEGAR:  Dara Hegar, Lanier Law Firm.
4        THE COURT:  Are you all going to be here next
5    week?  That's huge.  All right.
6        So we start with basics.  Next Monday we will be
7    impaneling a jury.  The one thing I probably didn't tell you
8    is, to make matters more complicated, I am sitting with the
9    First Circuit by designation for four cases in the morning.
10   And so I'm not sure a hundred percent when that's going to
11   finish, and what I'm thinking of doing is asking the jury
12   clerk to bring in a group of people for a 2:00 o'clock
13   impanelment.  That might be just as easy for you all, it's a
14   Monday morning, rather than just having all the jurors
15   sitting downstairs stewing and annoyed until I'm done with
16   the First Circuit.  So they will have eaten lunch.  We will
17   impanel.  I do not expect that it should take longer than
18   three hours, but what it essentially does mean is that you
19   need to block off your afternoon.  So that's for starters.
20       The second thing is, I was thinking -- I saw
21   somewhere on the list -- you were possibly on the same page
22   with me -- of ten jurors.  Given the fact that we were going
23   into three weeks, I could possibly lose some.  So if that's
24   so, it's essentially five peremptories a side.  The way I do
25   things is, there are no back challenges.  So I'll first ask

1    plaintiffs to exercise their challenges, then defendants.
2    We'll strike people.  We'll put people in the box for those
3    empty seats.  The next time around defendants go first.  The
4    defendants will challenge, then plaintiffs will challenge,
5    and so on until you use up your peremptories.  But I don't
6    let you go back.  In other words, if you've already passed
7    on a juror, you're stuck with the juror.
8        Because it's vacation time, I wanted to play out a
9    procedure for you.  One of the things that annoys me no end,
10   but there seems to be no clear solution, is when I get my
11   pool of 50 jurors and half of them say, "I don't want to
12   serve because I'm going on vacation."  I was thinking of
13   giving the jury clerk essentially a questionnaire to be
14   filled in under oath so that we don't bring up jurors who
15   have already prepaid vacation plans.  I'm thinking about
16   that.  The problem is, it's too easy an out for people.
17   It's a three-week trial which would be hard for people
18   anyway.  So another way to do it is to simply ask for more
19   people, and then just have everybody who's got a vacation
20   plan come up and swear to me, and then just let them go.
21   Judge Gertner tried a technique which I really liked a lot,
22   which she had them fill it in under oath, a questionnaire
23   downstairs, and basically gave the -- I then brought up the
24   questionnaires, I okayed them so it was a judge's blessing,
25   and then we either sent them to another court or we

1  2005, if the company received a report of completed suicide,
2  they sent it to the FDA saying that "This is an unlabeled
3  event, it's not in our label." But yet all of their experts
4  want to get up in front of the jury and say, "But it really
5  was in the label." The company --
6  　　　　THE COURT: It does say that, "suicidal." It says
7  "suicidal."
8  　　　　MR. ALTMAN: But from a regulatory perspective,
9  the company considered a completed suicide report to be
10  unlabeled. Their own records, there's a statement by the
11  company that suicide is an unlabeled event.
12  　　　　THE COURT: Can I say something? This is one of
13  these things where maybe you all put a lot of -- but when I
14  hear "suicidal" and when a jury hears it, they're going to
15  think that it means anything -- actually, I would have
16  thought it meant trying to commit suicide or committing it.
17  Now, if it doesn't, you've got to be careful how you word
18  this, but they're allowed to put in the package insert.
19  　　　　MR. ALTMAN: But if that were true, your Honor,
20  then why did they tell the FDA it's not in the label?
21  　　　　THE COURT: I don't know. Ask them that question.
22  　　　　MR. FROMSON: Your Honor, we're not saying they
23  can't utilize the package insert. They just can't say "We
24  warn for suicide" as the term is used in the industry. That
25  would be untrue.

1  　　　　THE COURT: Just say "suicidal."
2  　　　　MS. ARMSTRONG: Your Honor, just to be clear, we
3  are not going to argue that the label in 2005 or in 2004
4  contained a warning for suicide. They are confusing
5  different components of the label to the warning section and
6  an adverse events section. Our experts are going to talk
7  about what was contained in the adverse events section,
8  which does include references to suicidal and suicidal
9  gesture; and they're going to explain why that was
10  appropriate in light of what was known at the time, what it
11  would mean to a reasonable physician. That's going to be
12  the type of testimony we present.
13  　　　　THE COURT: All right, fine.
14  　　　　Motion in limine to preclude any testimony or
15  discussion by defendants that they could not have amended
16  the Neurontin label or issued strengthened warnings without
17  prior FDA approval. That's just a legal argument.
18  　　　　MR. FROMSON: I don't really think there's a
19  disagreement. After having read their papers, they didn't
20  deny that there were federal regulations --
21  　　　　THE COURT: So allowed.
22  　　　　MR. FROMSON: Thank you, Judge.
23  　　　　THE COURT: Allowed.
24  　　　　MR. BARNES: Your Honor, if I may?
25  　　　　THE COURT: Yes, yes.

1  　　　　MR. BARNES: We're not going to argue that we were
2  legally prohibited from putting in a CBE. We do want to
3  talk about, and it goes with what Katherine was saying, we
4  do want to talk about the whole context of what we did and
5  why we did it and why we did not feel it was appropriate.
6  We're not making a legal argument we couldn't have, but we
7  want to explain the context.
8  　　　　THE COURT: All right, that's got to be part of
9  your -- just as they're putting in all this marketing stuff,
10  you've got to be able to put in what the corporation was
11  thinking about.
12  　　　　MR. BARNES: Absolutely. Okay, thank you.
13  　　　　THE COURT: Fair enough.
14  　　　　Plaintiffs' motion in limine to preclude the
15  testimony of all the defendants' expert witnesses other than
16  Dr. Gibbons concerning the FDA alert and related FDA
17  subjects. I don't know --
18  　　　　MR. CHEFFO: I mean, I'm not sure I really
19  understand. I mean, I think that they say that because he
20  was somehow qualified, that no one else can refer to it? I
21  mean --
22  　　　　THE COURT: Well, let me put it this way: This is
23  denied, but to the extent it starts getting cumulative, you
24  don't have that much time. I mean, time is a fabulous
25  discipline.

1  　　　　MR. CHEFFO: We don't disagree with that at all,
2  your Honor.
3  　　　　MR. FROMSON: Judge, very briefly -- and I
4  understand your order clearly -- they went out and got
5  Gibbons for the FDA alert because he was the only one in the
6  world uniquely qualified to do it.
7  　　　　THE COURT: You know, come on, that's just all
8  litigation posturing.
9  　　　　MR. FROMSON: Well, that's the way to posture to
10  the Court in order to get the Court to allow him to do the
11  rebuttal.
12  　　　　THE COURT: He's a statistician, just like
13  Greenland is. It's very hard stuff. So, I mean, he's the
14  only guy who's qualified, as far as I know, on statistics,
15  but there may be other aspects about the regulatory system
16  that other people can comment on.
17  　　　　MR. FROMSON: So then I think we're in agreement
18  that all the other experts couldn't come in and give
19  statistical opinion.
20  　　　　THE COURT: They can't give a statistical analysis
21  unless they're qualified.
22  　　　　MR. FROMSON: Thank you, Judge.
23  　　　　THE COURT: I mean, I don't think any --
24  　　　　MR. CHEFFO: But that's how this motion was. I
25  don't think we're going to have nonstatisticians talking,