# EXHIBIT C

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3
 4    In re:  NEURONTIN MARKETING,
 5    SALES PRACTICES AND PRODUCTS
 6    LIABILITY LITIGATION
 7    _____/
 8    THIS DOCUMENT RELATES TO:   MDL Docket No. 1629
 9    Bulger v. Pfizer, et al.   Master File No. 04-10981
10    07-11426-PBS
11
12    Smith v. Pfizer, et al.
13    05-CV-11515-PBS
14    Crone v. California State Court
15    _____/
16
17            The videotaped deposition of SHEILA WEISS
18    SMITH, PH.D. was held on Monday, December 22, 2008,
19    commencing at 9:17 A.M., at the Law Offices of Goodell,
20    DeVries, Leech & Dann, LLP, 20th Floor Commerce Place,
21    One South Street, Baltimore, Maryland  21202,
22    before Ronda J. Thomas, a Notary Public.
23
24    Job No.: 183061
25    REPORTED BY:  Ronda J. Thomas, RPR, CLR
```

```
 1  APPEARANCES:
 2
 3   ON BEHALF OF THE PLAINTIFFS, PRODUCTS LIABILITY
 4   STEERING COMMITTE AND CRONE:
 5      KEITH ALTMAN, ESQUIRE
 6      Finkelstein & Partners
 7      436 Robinson Avenue
 8      Newburgh, New York 12550
 9      Telephone:  845.562.0203
10      Facsimile:  845.562.3492
11      Email:  Kaltman@lawampmmt.com
12
13   ON BEHALF OF PFIZER AND MDL:
14      RICHARD M. BARNES, ESQUIRE
15      MICHAEL J. WASICKO, ESQUIRE
16      Goodell, DeVries, Leech & Dann, LLP
17      One South Street, 20th Floor
18      Baltimore, Maryland  21202
19      Telephone:  410.783.4000
20      Facsimile:  410.783.4040
21      Email:  Rmb@gdldlaw.com, mjw@gdldlaw.com
22
23
24
25  (APPEARANCES continued on next page.)
```

```
 1  (APPEARANCES continued.)
 2
 3   ON BEHALF OF RAYMOND JENNINGS, M.D.:
 4      ELANA GOLD, ESQUIRE (via teleconference)
 5      Law Offices of Steven D. Hillyard, APC
 6      345 California Street, Suite 1770
 7      San Francisco, California 94104
 8      Telephone:  415.334.6880
 9      Facsimile:  415.334.6967
10      Email:  Egold@hdmlaw.com
11
12  ALSO PRESENT:  Robert Kowalchik, Videographer
```

```
 1                      INDEX
 2          Deposition of SHEILA WEISS SMITH, Ph.D.
 3                   December 22, 2008
 4
 5  EXAMINATION BY:                               PAGE
 6  Mr. Altman                                      6
 7  Mr. Barnes                                    329
 8  Mr. Altman                                    331
 9
10  EXHIBIT NUMBER:                             MARKED
11  18    Supplemental Report                       5
12  19    Materials considered                      5
13  20    Current CV                                5
14  21    Materials relied on by Dr. Weiss Smith    5
15  22    Gabapentin Related Clinical Study Cases 155
16  23    Statement by Janet Woodcock, M.D.       195
17  24    3 page document Pfizer_MHauben_0000123-125 210
18  25    Cumulative Percentage Reports of
19        Suicidal and Self-Injurious Behavior    228
20  26    FDA letter                              265
21  27    Chart - Percentage of Serious Reports   280
22  28    Invoices                                328
23  29-32 CD's (retained)                         332
```

```
 1            P R O C E E D I N G S
 2         (Whereupon, documents were premarked as
 3  Deposition Exhibit Number 18, 19, 20 and 21.)
 4         THE VIDEOGRAPHER:  We are on the record.
 5  The time is 9:17 a.m.  My name is Robert Kowalchik of
 6  Nationwide Video Production.  The date today is
 7  December 22, 2008.  This deposition is being held in
 8  the office of Goodell DeVries located at One South
 9  Street, Baltimore, Maryland.
10         The caption of the case is in Re: Neurontin
11  Marketing Sales Practices and Products Liability
12  Litigation in the United States District Court,
13  District of Massachusetts.  MDL Docket No. 1629 Master
14  File No. 04-10981.
15         This document relates to Bulger v. Pfizer,
16  et al. 07-11426-PBS and Smith v. Pfizer, et al.
17  05-CV-11515-PBS and cross noticed in the case of Crone
18  v. Pfizer.
19         The name of the witness is Sheila Weiss
20  Smith.  At this time the attorneys will identify
21  themselves and the parties they represent, after which
22  our court reporter, Ronda Thomas of Doerner and
23  Goldberg, will swear in the witness and we can proceed.
24         MR. ALTMAN:  Keith Altman on behalf of
25  Finkelstein & Partners for the Plaintiffs Products
```

1  Q   Were you asked to ever review it at that
2  time?
3      MR. BARNES:  What time?
4  Q   At the time it became publicly available.
5  When we're talking about the FDA statistical review?
6  A   Was I asked to look at it?  I think I had
7  already looked at it as soon as it became available
8  because I wanted to put the alert in January in
9  context.  So I was very interested in what they said.
10 Q   When was the first time you were asked to
11 put down on a piece of paper an opinion based upon the
12 FDA alert?
13     MR. BARNES:  Objection.  We have a
14 stipulation in this case where drafting of expert
15 reports is not the subject of examination.  So I'll
16 instruct her not to answer that question.
17     MR. ALTMAN:  I'm not asking about the
18 drafting.  I'm asking when she was asked to do it.
19 That's not the drafting.
20     MR. BARNES:  That's a different question.
21     MR. ALTMAN:  I asked when was the first
22 time you were asked to opine upon the FDA alert.
23     MR. BARNES:  That's a different question.
24 You may answer that one.
25 A   I believe it was in early fall.

1  Q   Okay.  When was the first time you were
2  asked to render any opinions on the advisory committee
3  meeting and the transcript and the discussions that
4  took place?
5  A   I believe it was around the same time.
6  Q   Have you ever had any direct discussions
7  with Dr. Robert Gibbons?
8  A   No.
9  Q   Do you believe that you are -- you're aware
10 that Dr. Gibbons did a pharmacoepidemiologic study of
11 the pharmametrics data, correct?
12 A   Yes, I'm aware of it.
13 Q   If you had been given that raw data as he
14 was, do you believe you could have done a similar
15 study?
16 A   Yes.
17 Q   So you pretty much see yourself as kind of
18 colleagues, same general qualifications?
19 A   I consider us colleagues.  He's a
20 biostatistician and I'm an epidemiologist.  We
21 typically work together on teams.
22 Q   We talked before about the AIRS G database
23 in this case.  Have you ever received similar data from
24 a company in the past?  What I mean by that a CD, et
25 cetera, that has their adverse event database or an

1  extract for a particular drug?
2  A   Yes.
3  Q   Did you use that, make use of that data,
4  did you load it into a database?  Did you use it in any
5  way yourself or did you do just a quick cursory review
6  of it and put it aside?
7  A   That's a general question for many
8  different situations.  So I can't answer just one
9  thing.
10 Q   Have you ever done more with a company's
11 internal adverse event database than you did in this
12 particular case?
13 A   Yes, I have.
14 Q   Did you do that work yourself and did you
15 have people working with you to do that?
16 A   Depends on the situation.
17 Q   Have you ever done it all by yourself?
18 A   Yes.
19 Q   What tools would you typically use to do
20 that?
21 A   Again, it depends on the situation.
22 Q   What tools have you used in the past to do
23 that?
24 A   You mean what software?
25 Q   What software?

1  A   I've used D Base, starting with 2, 3, 4.
2  Okay.  I've used Excel.  I've used sets, Epicure,
3  Epi-Info.  I've used SPSS.  Statistical packages,
4  database packages, access.  Sometimes I've already been
5  set up in a database.  It really depends on what time,
6  the decade, and what I'm doing and how big the database
7  is and where it's located.
8  Q   Is there any technical impediment that
9  would have kept you from doing work with the AIRS G
10 database produced in this particular litigation loaded
11 up into one of those packages and doing computations or
12 analysis or time trending of that data?
13 A   No, it's just a question of time and
14 necessity.
15 Q   Are all reports, strike that.
16     Does the company have to submit every
17 single adverse event reported received to the FDA?
18 A   It's my understanding that they do not
19 submit every report.  There's no need.
20 Q   So there could be and likely would be
21 adverse event data in a company's database that
22 wouldn't be in the FDA's database, correct?
23 A   That is correct.  They follow the federal
24 regulations.
25 Q   Do you know what junk science is when I use