# EXHIBIT A

```
 1         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2

 3  IN RE:  NEURONTIN MARKETING, SALES  ) CASE NO.
    PRACTICES AND PRODUCTS LIABILITY    ) 04-10981
 4  LITIGATION                          )
                                        )
 5                                      )
    THIS DOCUMENT RELATES TO:           )
 6                                      )
    RUTH SMITH, Individually and as     ) 05-CV-11515
 7  Widow for the use and benefit of    )
    herself and the next of kin of      )
 8  Richard Smith, deceased.            )
                                        )
 9  _____ )

10

11

12

13             VIDEOTAPED DEPOSITION OF:

14                GARY WAYNE BIGGS, SR.

15          Taken on behalf of the Defendant

16                  February 8, 2008

17

18  _____

19

20

21

22

23

24

25
```

*Condensed Copy* (watermark)

APPEARANCES:

For the Plaintiff:

KENNETH S. SOH, ESQUIRE
Lanier Law Firm
6810 F.M. 1960 West
Houston, Texas 77069
(713) 659-5200
713) 659-2204
kss@lanierlawfirm.com

For the Defendant:
CEDRIC E. EVANS
Clark, Thomas & Winters
P.O. Box 1148
300 West 6th Street, 15th Floor
Austin, Texas 78701
(512) 472-8800
(512) 474-1129
cce@ctw.com

Also Present: Amanda Martin, Videographer

---

INDEX
WITNESS: GARY WAYNE BIGGS, SR.
INDEX OF EXAMINATIONS

Page/Line

Examination by Mr. Evans        06  04
Examination by Mr. Soh          59  11
Examination by Mr. Evans        73  05
Certificate                     75  01
Errata Sheet                    76  01

INDEX OF EXHIBITS

No. 1    15  17
No. 2    17  06
No. 3    29  07
No. 4    46  17
No. 5    46  17
No. 6    51  08
No. 7    64  05

---

The videotaped deposition of GARY WAYNE BIGGS, SR., taken on behalf of the Defendant, on the 8th day of February, 2008, in the offices of Medical Forensics, 850 R.S. Gass Boulevard, Nashville, Tennessee, 37216, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Deborah J. Harris, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are reserved.

* * *

---

PROCEEDINGS

THE VIDEOGRAPHER: Here begins Volume 1, Videotape No. 1, in the deposition of Gary Biggs, in the manner of Neurontin Marketing and Sales Practices versus Pfizer Incorporated, in the United States District Court for the District of Massachusetts.

The Case No. is 04-10981. Today's date is the 8th of February, 2008. The time on the video monitor is 9:07. The video operator today is Amanda Martin of Vowell & Jennings, Nashville, Tennessee. This video deposition is taking place at 850 RS Gass Boulevard, Nashville, Tennessee.

Counsel, please identify yourselves and state whom you represent.

MR. EVANS: Cedric Evans representing Pfizer.

MR. SOH: Kenneth Soh for the Plaintiffs.

THE VIDEOGRAPHER: The court reporter today is Deborah Harris of Vowell & Jennings. Would the reporter please swear in the witness.

Page 10

1  current occupation?
2      A   I'm an investigator for the Medical
3  Examiner's Office, Forensic Medical.
4      Q   And you say you're an investigator.
5  What is your exact job title?
6      A   We take the initial reports of death,
7  decide whether to --
8      Q   Oh, no. Actually, I didn't mean to
9  cut you off. But what is your job title, and
10 then we'll get into your job description?
11     A   Oh, my job title?
12     Q   Yes.
13     A   I'm sorry.
14     Q   That's okay.
15     A   Medical/legal death investigator.
16     Q   Okay. And you indicated that you
17 work for Forensic Medical?
18     A   Yes, sir.
19     Q   Okay. Now, can you -- and is
20 Forensic Medical -- is that a -- is it a
21 private company?
22     A   Yes, sir.
23     Q   Okay. Can you explain the
24 relationship between -- and maybe, obviously,
25 this is something I think we touched on briefly

Page 11

1  right before the deposition, but the
2  relationship between Forensic Medical and the
3  Medical Examiner's Office for this county or
4  for the state.
5      A   All right. In 1997 they privatized
6  the operation of the Medical Examiner's Office.
7  Forensic Medical was the company that was given
8  the contract in '97 to function as the medical
9  examiner.
10     Dr. Bruce Levy was appointed chief medical
11 examiner of Davidson County and then later
12 appointed the state medical examiner also.
13     Q   Okay. Sir, now, are you guys then
14 responsible for death investigation just in the
15 county or for the entire state?
16     A   As of this date, we do in-county
17 deaths. We respond to the scenes if necessary.
18 Out of county, we'll take the death calls over
19 the phone but we do not normally respond to
20 those scenes. We'll just take that on the
21 phone and bring them here. We do more of an
22 autopsy service for those counties.
23     Q   How long have you been with Forensic
24 Medical?
25     A   Since inception, ten years ago.

Page 12

1      Q   So since 1997, is that --
2      A   Yes.
3      Q   Okay. And has your -- your job title
4  always been the same?
5      A   When I was hired in '94, it was still
6  medical/legal death investigator, yeah.
7      Q   Now, you started to answer this for
8  me earlier.
9      But what is your job description as a
10 medical/legal death investigator?
11     A   We take the initial death call. We
12 determine if it falls under the jurisdiction of
13 the Medical Examiner's Office. If the death
14 occurs outside of a hospital, except on
15 infants -- on infants, if they die in the ER,
16 we will respond to the ER. But any other ones
17 we won't respond to hospital.
18     If they die at a residence or wherever,
19 outside the hospital settings, we will respond
20 if it call -- if the need arises that we do
21 need to respond. And we will do a death
22 investigation at the scene. Transport the
23 decedent here to the office and the medical
24 examiner will determine whether to do an
25 autopsy or not.

Page 13

1      We collect the data. We talk to the
2  families. We take photographs at the scene.
3  We work hand-in-hand with the police department
4  on -- sometimes we're needed to collect
5  evidence. But we work hand-in-hand with the
6  police department in investigation of the
7  scene.
8      So, basically, we help the medical
9  examiner decide manner and cause of death. We
10 assist the medical examiner.
11     Q   Okay. And that was going to be my
12 next question to you. So in terms of the
13 overall function of the Medical Examiner's
14 Office, does that go to determine the manner
15 and cause of death?
16     A   Yes, sir. And to -- we have -- to
17 investigate the criteria under state law. But
18 ultimate goal is manner and cause of death.
19     Q   When you say investigate the criteria
20 under state law, what do you mean by that?
21     A   There's certain criteria. You'll see
22 on the report of investigation of County
23 Medical the types of death we do investigate.
24     Q   Okay.
25     A   And it's those deaths and

4 (Pages 10 to 13)

**Page 14**

1  cremations -- all cremations in the county of
2  death have to be approved by the medical
3  examiner in the county.
4     Q   And in terms of the types of deaths
5  that you investigate, are -- do suicide deaths
6  fall within the responsibility of the Medical
7  Examiner's Office?
8     A   Yes, sir.
9     Q   And in the course of your employment
10 with Forensic Medical, have you had occasion to
11 conduct investigations of suicide deaths?
12    A   Yes, sir.
13    Q   Do you have an approximation of the
14 number of suicide deaths that you've
15 investigated?
16    A   I don't have it in front of me, but
17 over 500.
18    Q   Okay. And what would be your --
19 again, I know this is an estimate because you
20 don't have the numbers in front of you -- the
21 overall number of death cases that you've
22 investigated during your time with Forensic
23 Medical?
24    A   It's around 3,400 right now. I said
25 over 500. I might have to retract that and say

**Page 15**

1  250 to 500.
2     Q   Okay.
3     A   I can't remember which figure -- I'm
4  trying to remember what my sheet looked like.
5     Q   Okay. You actually keep that
6  information?
7     A   I'm about a year behind. But, yeah,
8  I keep up to date.
9        MR. EVANS: Okay. What I want to do
10       now is -- let's see. Let's mark a couple
11       of things for the record. We're going to
12       mark a copy of the Forensic Medical file
13       as Deposition Exhibit No. 1.
14       And this is the copy of the record that is
15       -- I think it's 19 pages long. And it's -- it
16       has a certification date of 9/5/07.
17       (EXHIBIT NO. 1 WAS MARKED FOR
18       IDENTIFICATION.)
19 BY MR. EVANS:
20    Q   And I see that you have the original
21 file in front of you?
22    A   Oh, yes, sir.
23    Q   Okay. All right. And since I'm in a
24 marking kind of mode here, you also brought
25 with you some handwritten notes. Can you --

**Page 16**

1  and you have them on a -- when you brought them
2  in, they were on a -- it's part of a note pad.
3  And there was one page of that note pad that
4  you copied for us before we started.
5     Can you tell me what notes, handwritten
6  notes, are contained on this page?
7     A   These are the notes I took that day
8  from that case, what I did, just notes for me
9  to keep to jar my memory when I came back.
10    Q   Okay.
11    A   And for information so I could put it
12 in the chart.
13    Q   And so -- and I think you may have
14 answered my next question. In terms of when
15 these notes were taken, were these notes taken
16 by you at the scene or were these notes that
17 you jotted down once you returned to the
18 office?
19    A   Both. They started at 5:53, as
20 you'll notice up in the top right-hand corner.
21 That's the time I got the call.
22    Q   Okay.
23    A   And then off to the side, when you
24 see 1097, that's the time I arrived at the
25 scene. 1098 is the time I left the scene.

**Page 17**

1        MR. EVANS: Wait a minute. Let's do
2        this. You're actually looking now -- let
3        me go ahead and let me do this right here.
4        Let me mark a copy of these notes as
5        deposition Exhibit No. 2.
6        (EXHIBIT NO. 2 WAS MARKED FOR
7        IDENTIFICATION.)
8  BY MR. EVANS:
9     Q   Okay. Can you -- let's do this then.
10 Can you walk us through kind of what we're
11 looking at when we look at the notes from the
12 top going down?
13    A   Sure. At the very top -- I guess it
14 would be the corner.
15    Q   The top right corner?
16    A   Yeah, there you go.
17    Q   Okay.
18    A   It says 8628510, dash 8510. That's
19 dispatch's number. And they could page me at
20 5:53 that morning. Over here it says 04-1575.
21 I assigned it a case number.
22    Q   Okay. So you assign the case number?
23 Yes?
24    A   Yes.
25    Q   Okay.

Page 18

1    A    Sorry.
2    Q    That's all right.
3    A    Of course the decedent's name, his
4    age.
5    Q    Okay.
6    A    I didn't write his race and sex. I
7    normally write that down. I didn't write that
8    down.
9    Q    Tell me something. Just the --
10   the -- the name and the age -- and is that the
11   date of birth, that 1/4?
12   A    Yes.
13   Q    Was it 1/4/20 --
14   A    25.
15   Q    25. Is that information that you got
16   before you arrived at the scene or is that
17   information you got at the scene?
18   A    Since ya'll have copies, you can't
19   see the difference in color. When I took the
20   initial call, it was in red. And then I had a
21   black pen. So that's when I got out to the
22   scene I had a different pen.
23   Q    Okay.
24   A    So you can see my initial notes.
25   Q    Well, let's just for the record, so

Page 19

1    it's clear that in terms of the things that are
2    in red, it's the dispatch phone number and
3    time. You also have --
4    A    Location.
5    Q    -- the 1443 Janie Avenue also in red?
6    A    And the officer at the scene.
7    Q    Okay. And that is --
8    A    Well, no. It's off of Murray and
9    McGavock Pike.
10   Q    Okay. So those are the cross streets
11   for the address?
12   A    Yes, sir.
13   Q    Okay. And everything else -- so
14   those are notes that you made when you got the
15   call. Everything else that is in black are
16   notes that you would have made at the scene?
17   A    At the scene.
18   Q    Okay.
19   A    Or when I got back.
20   Q    Or when you got back. Are you able
21   to distinguish between the notes that you made
22   at the scene and the notes you made when you
23   got back?
24   A    Pretty much I can tell by my writing
25   most of my notes were done at the scene. The

Page 20

1    case number, since it's in blue, it was
2    probably when I got back.
3    Q    Okay. You can keep working.
4    A    All right. So we've got the
5    decedent's name, Richard H. Smith. He was at
6    1443 Janie Avenue in Inglewood, 37216 Zip code.
7    The Complaint No. 04-240830, that's the Metro
8    Police complaint number. And if you look about
9    midway down the page on the left-hand side.
10   Q    Right.
11   A    It says, 0545 --
12   Q    Yes.
13   A    -- MPD. That's what time they got
14   the call.
15   Q    And is that information -- who do you
16   get that information from?
17   A    Either dispatch or the detective on
18   the scene.
19   Q    Okay.
20   A    And back to the top of the page on
21   the left-hand side, you see 738, 1098 below it?
22   That's the code for leaving the scene. So
23   that's the time I left that scene, 738.
24   Q    Okay.
25   A    Below that says 640, 1097. That's

Page 21

1    the code that I arrived at the scene. That's
2    what time I got there.
3    Q    Okay. So you were at the scene for
4    about an hour?
5    A    Yes, sir. And then, like you already
6    distinguished, it was off Murray and McGavock
7    Pike.
8    Q    All right. And then we have after --
9    kind of underneath that, under the -- the --
10   the, um, -- kind of the cross streets. You've
11   got some notes here. One year ago hip/knee
12   replacement. Talked in March of suicide. Can
13   you -- and there's some other notes here. I'm
14   not trying to just focus on those. But reading
15   down, there's some other notes.
16        Can you tell me where -- from what source
17   you would have obtained this information?
18   A    Initially from I believe Danny
19   Satterfield was out there. The
20   officers/detectives on the scene.
21        And then I would have, more than likely --
22   which I did talk to the wife in the living room
23   with the daughter present. I would have
24   confirmed that they did talk.
25        I would have made it quick because that

6 (Pages 18 to 21)

Page 22

1  scene was -- the family was having a hard time
2  with it.
3    Q  Okay. Now, you said you did talk to
4  the wife, Ruth Brown Smith?
5    A  Yes, sir.
6    Q  Okay. And you said the daughter was
7  present?
8    A  Yes, sir.
9    Q  And which daughter was that?
10   A  Cindy Smith.
11   Q  Okay. And just to I guess sort of
12 figure out whether or not because there is, you
13 know, probably, you know, ten or 11 items of
14 information that's here in kind of this middle
15 set of notes, just are you able to say, okay,
16 well, this item of information is information I
17 got directly from Ruth Brown Smith and Cindy
18 Smith and this other information is information
19 I got from talking to Detective Satterfield or
20 one of the other officers on the scene?
21   A  No.
22   Q  Okay. All right. And do you have
23 any specific recollection of the substance of
24 your conversation with Ruth Brown Smith and her
25 daughter Cindy Smith?

Page 23

1    A  Yes.
2    Q  Okay.
3    A  I talked to her at 7:35 a.m. That's
4  on our order for autopsy. Should be in the
5  file. And I explained that we, you know -- we
6  have to do an autopsy since the type of death
7  he experienced.
8       And more than likely, because I know how I
9  operate, I would have asked about the suicide
10 talk in the past or the attempts in the past,
11 to confirm that. And, basically, confirm the
12 story or just maybe ask little, quick
13 questions, because she was devastated. And the
14 daughter was there more of a protective kind of
15 role, which that's understandable.
16      And I asked everybody else to stay in the
17 kitchen. And I pulled her off to the living
18 room.
19   Q  Okay. You pulled her and Cindy Smith
20 off to the living room --
21   A  Yeah.
22   Q  -- when you spoke to them?
23   A  Yes. You come in the front door.
24 And to the right was a living room area, and
25 then the kitchen was back that way. So

Page 24

1  everybody -- I just asked to talk to them
2  alone.
3    Q  And so you would have -- you would
4  have -- that's part of your normal working
5  protocol; one of the things you would have
6  confirmed was the talk of -- previous talk of
7  suicide?
8    A  Yes, sir.
9    Q  Okay. And in terms of -- were you --
10 was there any information that you can recall
11 that came from Cindy Smith versus Ruth Smith?
12   A  No, sir.
13   Q  All right. And in terms of your
14 confirming the information contained in your
15 notes here, if you had gotten a response that
16 the information that you had -- that you had,
17 you know, regarding the previous talk of
18 suicide or some of the other information was
19 incorrect, is that something you would have
20 noted in your written --
21   A  Yeah. I would have changed my note.
22   Q  Okay. All right. And -- okay. And
23 you said it was at seven -- 7:35 when you spoke
24 to -- to Ruth Smith and her daughter?
25   A  Yes.

Page 25

1    Q  Okay. One of the things you talked
2  to them about was the -- was the autopsy one of
3  the things you talked to them about, as well?
4    A  Yes.
5    Q  What were their thoughts about an
6  autopsy?
7    A  They were strongly opposed.
8    Q  Okay.
9    A  And I documented that in my senior
10 investigator report.
11   Q  And we're going to -- we'll go
12 through those in a second. Um --
13   A  And it's on the side of my notes.
14   Q  Right. Yeah. I think you noted here
15 on the left-hand margin, opposed to autopsy.
16      In terms of the normal protocol for a --
17 the investigation of a death like Mr. Smith's
18 death, a gunshot wound to the head, is it a
19 normal part of the protocol to request an
20 autopsy?
21   A  Repeat your question.
22   Q  I'm sorry. Yeah. I'm just trying to
23 figure out, is it standard protocol for the
24 Medical Examiner's Office to do an autopsy in a
25 case like this?

Page 26

1  A  Yes, sir.
2  Q  Okay. Why?
3  A  Because they have a projectile still
4  in their body. So you have to remove the
5  projectile. And that's -- basically, several
6  reasons.
7     But the main one is what about if it came
8  back later and it was a homicide? So then you
9  would have to bury somebody and have to exhume
10 them to get the projectile out.
11 Q  Okay.
12 A  But Dr. Li can go into more about it.
13 Q  Yeah. No. We -- yeah. We're going
14 to talk to him in a bit. Let me ask you this:
15 Obviously, given what happened earlier, that,
16 you know, Mrs. Smith, Ruth Smith, was upset?
17 A  (Nods head.)
18 Q  Correct?
19 A  Yes, sir.
20 Q  Okay. Was she able to talk to you
21 and give you the answers that you were trying
22 to -- the answers to the questions that you
23 were asking of her?
24 A  Yes.
25 Q  Okay.

Page 27

1  A  But I was quick with it.
2  Q  Okay.
3  A  Normally, when they're upset, I just
4  get what I need to do really quickly and let
5  them ask me any questions before I leave and
6  then I leave.
7  Q  Do you recall any questions that Ruth
8  Smith asked of you?
9  A  No.
10 Q  Okay. All right. And you said that
11 Cindy Smith was there in more of in a
12 protective role?
13 A  Yeah.
14 Q  Okay. Was she -- to the extent that
15 you directed questions toward her, was she able
16 to answer the questions that you were asking of
17 her?
18     MR. SOH: Objection to form.
19     MR. EVANS: You can answer.
20     MR. SOH: Go ahead. Vague.
21     MR. EVANS: Yeah, you can answer.
22     THE WITNESS: Now, what was your
23 question?
24     MR. EVANS: Yeah. No --
25     MR. SOH: Yeah, that's what usually

Page 28

1  happens.
2  BY MR. EVANS:
3  Q  It's just to the extent that you
4  asked questions of Cindy Smith -- and do you
5  recall asking any questions of Cindy Smith?
6  A  I don't recall asking Cindy Smith.
7  Q  Okay. All right.
8  A  I directed my questions to the wife.
9  Q  Okay. All right.
10     MR. SOH: Over my objection. Thank
11 you, sir.
12     THE WITNESS: And the only -- and the
13 reason why is because I was trying to make
14 it quick. And I said, she came in there
15 more of a protective role. And that
16 happens. There are some times when the --
17 the decedent's family members are
18 distraught and then other family members
19 will step up and that's fine.
20     I just wanted to make it quick and help
21 them get their grieving process started.
22     MR. EVANS: Okay. Okay. So we're
23 going to put this -- right. And then I --
24 oh, let me just while we're -- since I
25 have this, I'm going to go ahead and mark

Page 29

1  this.
2     You brought your fee schedule with you,
3  the charge. And it says, Gary W. Biggs, Sr.,
4  Medical Investigator, and a charge schedule for
5  a private consultation. I'm going to mark this
6  as deposition Exhibit No. 3.
7     (EXHIBIT NO. 3 WAS MARKED FOR
8  IDENTIFICATION.)
9  BY MR. EVANS:
10 Q  And just to be clear, you are being
11 compensated today for your time in this
12 deposition, correct?
13 A  Yes, sir.
14 Q  Okay. And the going rate for your
15 time giving a deposition is -- is $250 an hour,
16 plus any travel expenses if you have to travel
17 somewhere for the deposition, correct?
18 A  Yes, sir.
19 Q  And you set your minimum a two-hour
20 minimum?
21 A  Yes, sir.
22 Q  Okay. So, essentially, if the --
23 even if the deposition went one hour, your fee
24 would be $500?
25 A  Yes, sir.

8 (Pages 26 to 29)

Page 30

1  Q  Okay. All right. And you also -- on
2  this fee schedule there's some charges for
3  court testimony, as well.
4      And just to be clear, we have agreed --
5  Pfizer has agreed to compensate you for --
6  according to your fee schedule for your time
7  today, correct?
8  A  Yes, sir.
9      MR. SOH: If they stiff you, sir,
10 we'll be glad to send you -- we'll be glad
11 to compensate you, as well.
12     MR. EVANS: Thanks for that. I have
13 the check with me. But, nice, appreciate
14 that.
15     MR. SOH: Do you want to hand it to
16 him on the video, Cedric?
17     MR. EVANS: No, no, no. No, no, no.
18 No, no, no. Ever.
19     MR. SOH: (inaudible.) -- am I
20 correct? (Inaudible.)
21 BY MR. EVANS:
22 Q  Can you -- can you -- and you've
23 talked some about this, just in terms of your
24 role.
25     So you said you arrived at the Smith home

Page 31

1  at 0640, so that's 6:00 -- I'm sorry.
2  6:40 a.m., correct?
3  A  Yes, sir.
4  Q  Okay. What was your role in the
5  investigative process at the Smith home?
6  A  My role is twofold. It is to look at
7  the victim. I can say victim, right?
8  Q  Sure.
9  A  Because I got in trouble for it
10 before. To look at the decedent and do a body
11 examination, document the scene with
12 photography, correlate the decedent to the
13 scene, and if anything appears different from
14 what we're looking at -- we start off as
15 everything is a homicide, and you go from
16 there.
17    This was very consistent with a suicide
18 and we -- do you want me to go on and tell what
19 I saw at the scene?
20 Q  No, no. We'll talk about that in a
21 second.
22 A  Okay. So, anyway, document the
23 scene. Do a body exam. Prepare the decedent
24 for transport. Make sure transport arrives in
25 a timely manner and have him released from the

Page 32

1  scene. And --
2  Q  And when you say --
3  A  -- and --
4     COURT REPORTER: I'm sorry. Released
5  from the scene?
6     THE WITNESS: Yes, ma'am. And talk
7  to the families if they're on the scene
8  and explain our procedures, protocols,
9  that we have to do.
10 Q  And you said document the scene.
11 What does document the scene entail?
12 A  We take notes. We take photographs.
13 And then we come back and we type up the scene
14 description and the report.
15 Q  Would your focus -- I mean, beyond
16 the conversation that you had with Ruth Smith
17 and Cindy Smith, have been on -- and we talked
18 about the scene. Obviously, the entire home
19 was a scene.
20    But in particular in the Smith home that
21 day, was there a -- was there an area of the
22 home that was the focus of the investigation?
23 A  Yes, sir.
24 Q  And what area was that?
25 A  When you come in the door, the best I

Page 33

1  remember, you go to the left. And then there
2  was a bedroom off this room to the left. And
3  that might have been another -- that might have
4  been a living room. That might have been a den
5  to the right.
6     But, anyway, there's a bedroom. You go
7  through that door. And that's where the
8  decedent's bedroom was.
9  Q  And so was that the -- that's
10 where -- is that where he -- he took his own
11 life?
12 A  Yes, sir.
13 Q  Okay. And so was that the area of
14 your primary focus was on that bedroom?
15 A  Yes, sir.
16 Q  Do you know -- and there was also --
17 obviously, there were police officers from the
18 Metro Nashville Police Department there,
19 correct?
20 A  Yes, sir.
21 Q  Detective Satterfield was there?
22 A  Yes, sir.
23 Q  Do you have any specific recollection
24 of what his role in the investigation was?
25 A  Danny is like me. He's making sure

**Page 34**

1  that it's not a homicide. He's interviewing
2  the family, getting the story. And then he has
3  to go back and do a report.
4      Q   All right. And do you recall a
5  gentleman named David Crowder being at the
6  scene?
7      A   Yes, sir.
8      Q   Okay. Who is David Crowder?
9      A   David Crowder is a retired metro
10 officer. But at the time he worked for the
11 I.D. Unit of Metropolitan Police Department.
12     Q   And what does the I.D. unit do?
13     A   They collect the evidence. They take
14 the pictures. We take dual pictures.
15     Q   It is essentially -- it's a
16 concurrent responsibility? His responsibility
17 is essentially the same for the police
18 department as yours is for the Medical
19 Examiner's Office?
20     A   Mine is more on the decedent, where
21 his is more on the scene.
22     Q   Okay. All right. And do you have a
23 specific recollection of -- was it -- do you
24 have a specific recollection of Mr. Crowder
25 actually having taken pictures at the scene?

**Page 35**

1      A   I just remember David being there.
2      Q   Okay.
3      A   Now, if he was the only -- I don't
4  remember if he was the only I.D. officer there,
5  because -- the reason I know David was there,
6  because we came back. David told me he
7  personally knew this family and we talked
8  outside.
9      Q   So you would defer to David on what
10 activities he actually did while he was --
11 while he was there at the scene?
12     A   Right.
13     Q   And did you -- in terms of -- when
14 you did your interview with the family, you did
15 it, it was just you interviewing Ruth Smith and
16 Cindy Smith; is that correct?
17     A   I'm sure Danny and them were right
18 behind me.
19     Q   Okay. I'm just trying to figure if,
20 whether or not the -- so were you
21 interviewing --
22     A   I wasn't interviewing, per se.
23     Q   When you talked to the family --
24     A   Okay.
25     Q   Fair enough. When you talked to the

**Page 36**

1  family, I'm just trying to figure out whether
2  or not it was, you know, was it you talking
3  with Detective Satterfield and the police
4  officers or whether or not when you had your
5  conversation it was a conversation that was,
6  you know, between yourself and Ruth Smith and
7  Cindy Smith?
8      A   I had two separate conversations,
9  with the detective, and then with Ruth Smith
10 and Cindy off in the room to the right as you
11 come in the door.
12     Q   And when you say the detective,
13 you're talking about Detective Satterfield?
14     A   Yes, sir.
15     Q   And are you aware of whether or not
16 Detective Satterfield had a separate -- had
17 separate discussions with the family?
18     A   No. I would be speculating.
19     Q   Okay. Let's -- let's do this:
20 Let's --
21     A   Because I get my information from
22 everybody at the scene.
23     Q   I understand. I understand. Let's
24 kind of talk about some of the reports that are
25 contained in the file. There is one document

**Page 37**

1  called a report of investigation by County
2  Medical Examiner, which is -- for the record,
3  it's pages seven and eight of deposition
4  Exhibit No. 1.
5      And just -- and there's also a preliminary
6  report of investigation by County Medical
7  Examiner.
8      Can you tell me how these -- this document
9  gets constructed or created?
10     A   I create it.
11     Q   You create it. Okay.
12     A   We create the preliminary, which is
13 the first report we create. And that's that
14 initial date. And then when -- every -- all
15 the toxicology and everything else comes back,
16 all the tests they ran, then the report of the
17 investigation of County Medical Examiner is
18 created because that's the final report that
19 goes with the autopsy report.
20     Q   And if we look here at your -- and
21 I'm going to go through this -- but, obviously,
22 manner of death, you've noted that it was
23 suicide, correct? Type of death and manner of
24 death?
25     A   Yes, sir.

10 (Pages 34 to 37)

## Page 38

1  Q  Okay. And then the second page of
2  that document.
3  A  Which one are you looking at?
4  Q  No. I was looking at the final one.
5  So we're looking at the same one now. On the
6  last page, which I guess it's going to be, it
7  says narrative summary of circumstances
8  surrounding death?
9  A  Yes.
10 Q  Is that -- when you -- do you
11 complete this form once you get back to the
12 office?
13 A  Yes, sir.
14 Q  And is the information that's
15 contained in that narrative summary, is that
16 information that you would have taken from your
17 notes and created that narrative summary?
18 A  Notes and memory.
19 Q  Notes and memory. All right. And
20 before you finalized this report -- which you
21 have, you know, reviewed the narrative summary
22 to ensure that it matches up with your memory
23 and with your notes and that it's accurate?
24 A  The narrative --
25 Q  Yes.

## Page 39

1  A  -- is done that day. The final
2  report I don't see unless I go back and pull it
3  back up.
4  Q  Oh, okay. So you complete your
5  narrative and then the final report gets -- it
6  becomes part of the report and then the -- the
7  report is finalized later?
8  A  The preliminary report, that
9  information automatically goes into the final
10 report and then Dr. Levy and them finish that.
11 Q  And Dr. Levy is the medical examiner?
12 A  Yes, sir.
13 Q  And so that signature that's on the
14 bottom of the page -- the first page of that,
15 that's his signature?
16 A  Bruce P. Levy, yes, sir. At least
17 that's what it looks like.
18 Q  There is another document entitled
19 order of autopsy which is, just for the record,
20 is page 15.
21 A  Yeah. That's the -- the notification
22 for order of autopsy.
23 Q  And is that a document that you
24 create, as well?
25 A  Yes, sir. It automatically puts the

## Page 40

1  narrative in there. It's all done -- we're
2  computerized.
3  Q  Can you tell me this: Because it
4  notes here at the bottom of this, in the part
5  two, next of kin notification, it says, served
6  on next of kin, 5/13/2004 at 7:35 a.m.
7  So this would have been served on the
8  family prior to the time you left the scene?
9  A  Yes, sir.
10 Q  Okay.
11 A  Not the paper.
12 Q  Okay. That's -- that was the
13 question. So what is -- what was served on the
14 family at 7:35 a.m.?
15 A  I verbally informed them.
16 Q  Okay. All right. And later on,
17 then, once you get back to the office, that's
18 when this document is created?
19 A  Yes.
20 Q  Okay. And then is it physically
21 served on the family?
22 A  No.
23 Q  No. All right. Okay.
24 A  But I generated that document. I can
25 tell you how I know that.

## Page 41

1  Q  How do you know that?
2  A  Even though I didn't sign it, I know
3  it because the computer generates my name as
4  Gary Biggs. I go in there and manually change
5  it to Gary W. Biggs, Sr.
6     MR. SOH: You are OCD.
7  A  I never lie. At least I try not to.
8     (COURT REPORTER ASKS EVERYONE TO
9  SPEAK UP.)
10    (DISCUSSION WAS HAD OFF THE RECORD.)
11 BY MR. EVANS:
12 Q  Okay. Let's talk now about the scene
13 investigation report which is also part of your
14 file, correct?
15 A  Yes, sir.
16 Q  Okay. Tell me how the scene -- this
17 is a document that's created by you?
18 A  Yes, sir.
19 Q  Okay. Tell me when in the process of
20 your investigation this document would have
21 been created.
22 A  When I get back to the office.
23 Q  So it would have been created that
24 morning?
25 A  More than likely. I would have to

## Page 42

1 check the computer. But I believe it was.
2 Q And is this -- in the terms of the
3 scene description, is this like the narrative
4 summary, where it's created based upon your
5 notes and also based upon your memory of the
6 scene?
7 A Yes, sir. And this is usually an
8 internal document that is not released out to
9 the family. So it can't -- it won't -- like I
10 said, that day I was here for a while. So I
11 would have done that that day. But there are
12 occasions that we do them like that night when
13 we return or later.
14 Q Now, can you tell me this, because
15 this -- this scene description appears to have
16 more information than the narrative summary.
17 Is there a reason for that?
18 A The narrative summary you don't put
19 all the information in there. This is more for
20 the doctors to read, to give them more of the
21 story.
22 You don't want to -- I personally do not
23 want the family to remember certain aspects of
24 the scene, so I'm not going to put that in
25 there, because it needs to be more generalized,

## Page 43

1 as opposed to this needs to be more in depth,
2 when you talk about the report of the County
3 Medical Examiner.
4 Q So is the thought that the report of
5 the County Medical Examiner was going to end up
6 with the family?
7 A If they request it.
8 Q So you're more -- a little bit more
9 selective about the information that you put in
10 there?
11 A Yes, sir.
12 Q All right. I want to --
13 A Thus, it's totally different from
14 a --
15 Q I wanted to ask you a few questions
16 about some of the information that is contained
17 in the scene investigation report.
18 You mentioned that you -- you also took
19 photographs of the scene, correct?
20 A Yes, sir.
21 Q Okay. Do you look at the -- tell me
22 this: When you're completing the scene
23 description, in that part of the scene
24 investigation report, do you also review your
25 photographs to assist you with that?

## Page 44

1 A Several times, yes, sir.
2 Q Okay.
3 A But not all the time. But a lot of
4 times.
5 Q Okay. Do you have a recollection of
6 whether or not you would have reviewed the
7 photographs for this?
8 A I don't know.
9 Q I know that's a while ago.
10 A We download the photographs into the
11 computer system, so I have them right there, so
12 I can look at them a lot.
13 Q Now you have -- you've got a copy of
14 you -- of the photographs that you took in
15 front of you?
16 A Yes, sir.
17 Q All right. Now what I'm interested
18 in is in the scene description, coming down
19 kind of toward the -- toward the end of that
20 last paragraph, it says, what appeared to be --
21 do you see that part?
22 A Yes, sir.
23 Q Okay. What appeared to be several
24 prescriptions on the dresser were noted. Wait
25 a minute. I'm sorry. Let me read it.

## Page 45

1 What appeared to be several prescriptions
2 on a dresser were noted. The victim appeared
3 to have been prescribed Hydrocodone,
4 cyclobenzaprine, and Neurontin.
5 Do you see that?
6 A Yes, sir.
7 Q Okay. In terms of this information,
8 would this have been based upon your
9 observations of the bedroom?
10 A Well, yes. But we also collect the
11 medication at the scene.
12 Q Okay. All right. And if, for
13 example -- and I assume that if -- we're going
14 to look at the photographs in a second. But I
15 assume if you saw -- you know, you could see a
16 pill bottle that, you know, contained
17 medication and a pill bottle that did not
18 contain medication?
19 A Yes, sir.
20 Q If you had a pill bottle, even though
21 on the outside it said that it was, for
22 example, hydrocodone, if it didn't contain any
23 medication, would you note on your scene
24 description that there was hydrocodone at the
25 scene?

12 (Pages 42 to 45)

## Page 46

1  A  I would still put that the pill
2  bottle was there.
3  Q  Okay.
4  A  But I would more than likely note
5  that it was empty.
6  Q  Okay. All right. Now, looking at
7  the photographs -- and I've got a version of
8  photographs that actually has the number -- the
9  numbers that were assigned that was part of the
10 file. And I have the 04-1575-01. Yours may --
11 A  That's fine.
12 Q  -- they may be a little clearer than
13 mine. And I want to look first at
14 photographs 6 and 14. And I'm going to mark as
15 deposition Exhibit No. 4 photograph 6, and
16 deposition Exhibit No. 5 photograph 14.
17     (EXHIBIT NOS. 4 AND 5 WERE MARKED FOR
18     IDENTIFICATION.)
19 BY MR. EVANS:
20 Q  Now, looking at these two
21 photographs, there are a number of -- well,
22 fair to say there are a number of medication
23 bottles on the dresser?
24 A  Uh-huh.
25 Q  Yes?

## Page 47

1  A  Yes, sir.
2  Q  All right.
3  A  Sorry.
4  Q  Are you able to tell me from looking
5  at these photographs which pill bottle the
6  Neurontin was contained in?
7  A  The one that says courtesy refills,
8  Eckerd on top, the big one.
9  Q  Okay. The big one that's --
10 A  Right there.
11 Q  -- kind of in the center of -- next
12 to the cell phone?
13 A  It was between the cell phone and the
14 watch.
15 Q  So to the right of the cell phone.
16 All right.
17     And how is it that you know that that's
18 the bottle that contained Neurontin?
19 A  Because you can see it on the pill
20 bottle.
21     MR. SOH:  You can see it on the what?
22 A  You can see it on the pill bottle. I
23 see Neurontin all the time and plus I was
24 prescribed it in the past.
25 BY MR. EVANS:

## Page 48

1  Q  Okay. All right. So it's your
2  belief that bottle contains the Neurontin, the
3  big pill bottle?
4  A  Yes, sir.
5  Q  Okay. Are you -- are you -- is that
6  something that you're certain of?
7  A  I'm pretty sure of that because it
8  looks like you can see the writing right there
9  on the capsule, Gabapentin, Neurontin.
10     MR. SOH:  Can I see your copy?
11     MR. EVANS:  His is a little clearer.
12     THE WITNESS:  And here's another one
13 that you can see. Do you see what I'm
14 talking about?
15     MR. SOH:  No.
16     THE WITNESS:  Trust me on these
17 pills.
18     MR. SOH:  Okay. That's all right.
19 That's all right.
20     THE WITNESS:  All right.
21 BY MR. EVANS:
22 Q  And can you tell me -- you said
23 something about the collection of medications
24 at the scene.
25     Are you able to tell me one way or the

## Page 49

1  other whether or not there was a collection
2  made of the medications, the cyclobenzaprine,
3  the Hydrocodone, and Neurontin at the Smith
4  home?
5  A  Did I collect them?
6  Q  Yes.
7  A  Yes.
8  Q  You did? Okay.
9  A  As best I remember.
10 Q  Okay. And why -- do you have a
11 specific recollection of collecting the pill
12 bottles?
13 A  As best I remember, I collected them.
14 Q  Okay. All right. And then what
15 happens to the pill bottles once they're
16 collected?
17 A  You transport them back here. We
18 usually use two forms, a medication log, which
19 basically logs the medication that was there.
20 And we have a medication list, which we put the
21 type of drug, when it was prescribed, how many
22 were left, who prescribed it, such like that.
23 Q  Okay.
24 A  So I probably didn't do that. And
25 the reason is because I couldn't find it,

Page 54

1  A  No, sir.
2  Q  Okay.
3  A  What I would have told them was I
4  will document the opposition, but it's up to
5  the medical examiner to make the determination.
6  Q  Okay. And the last thing that I
7  wanted to talk to you about was the personal
8  effects for Case No. 04-1575.
9  A  Okay.
10 Q  Oh, you have it right there. Okay.
11 It looks like here under personal effects that
12 the only -- and you correct me if I'm wrong.
13 But it looks like the only personal effects
14 that were collected for Mr. Smith were the
15 articles of clothing on his body?
16 A  Looks that way, yes, sir.
17 Q  All right. For example, there are a
18 number of other personal effects that we see
19 when we look at deposition Exhibits No. 4 and 5
20 that are on the dresser in his bedroom.
21     Those items, other than the pill bottles,
22 were not collected?
23 A  No, sir.
24 Q  Okay. And is that -- is that
25 standard?

Page 55

1  A  Yes, sir.
2  Q  Okay.
3  A  The family was there at the scene.
4  Q  Okay. All right.
5  A  Usually the only thing we collect at
6  the scene, other than what's with the decedent,
7  on the decedent, would be the pill bottles or
8  just something relating to the death. Like a
9  noose or something, a rope, if it's related to
10 the death.
11 Q  All right. Now -- and we had this
12 week. We took Detective Satterfield's
13 deposition yesterday. And I know that this is
14 something that as a police officer he thinks
15 about and I'm just trying to figure out.
16     As part of your job responsibilities, and
17 I know you're attempting -- you're assessing
18 the scene. You're taking photographs. You're
19 documenting. You're talking to witnesses or to
20 family. And that the ultimate goal of the
21 Medical Examiner's Office is to, I think as you
22 said earlier, is determine the -- the -- is it
23 the --
24 A  My ultimate goal?
25     MR. SOH: Manner and cause.

Page 56

1  BY MR. EVANS:
2  Q  Manner and cause, okay. I'm sorry.
3  Manner and cause.
4     Are you at all in your investigation
5  interested in the question of why the
6  individual may have committed suicide? Is that
7  a question?
8  A  That's part of manner and cause.
9  Q  Okay. All right. And so is that
10 something that in your manner and cause
11 determination related to Richard Smith that you
12 would have -- you would have contemplated?
13 A  As to why he did it?
14 Q  Yes, sir.
15 A  Yes, sir.
16 Q  Okay. And is that something that not
17 only you would do, you did in Mr. Smith's case,
18 but in the other, you know, 250 to 500 suicide
19 cases that you investigated; that's something
20 that you did in those cases, as well?
21 A  Yeah. You have to try, as best you
22 can, as to why somebody would take their own
23 life. Most -- there's a lot that do not leave
24 notes and then you -- you're out there and
25 you've got to figure out that this is a suicide

Page 57

1  as opposed to a homicide or an accidental
2  death.
3  Q  Okay. And in terms of your -- your
4  opinions on the why of Mr. Smith's suicide,
5  what does your -- what did your investigation
6  reveal to you in terms of why you believe he
7  committed suicide?
8  A  He just got tired. He got tired of
9  hurting.
10 Q  Okay. And what is it that tells you
11 that?
12 A  His note. He has medication that
13 shows that he's being treated for pain. And
14 just from the -- they said that he had it in
15 the past. But from the scene, he's laid
16 everything out and -- let's see. I think -- if
17 you'll give me a moment?
18 Q  Oh, sure thing.
19 A  A lot of times on suicides they'll
20 lay all their personal effects out and stuff,
21 on the dresser, as you see in the pictures.
22 Q  Let's figure out which photograph you
23 have there. That's one we already marked. I
24 think what you're showing here is Exhibit
25 No. 5.

15 (Pages 54 to 57)

## Page 58

1  A  And if you'll see in the background,
2  he's marked the circle around pain.
3  Q  Okay. Can you -- what are you -- oh,
4  you're looking at -- okay. I see.
5      Just for the record, you're referring
6  to -- there is a -- is that the pamphlet that's
7  toward the back?
8  A  The pamphlet next to the mirror --
9  Q  Okay.
10 A  -- says pain. He circled it. He has
11 a written note. He talked to his wife. He got
12 tired of hurting. That's an opinion, though.
13 Q  Of course. I understand that. But
14 that's your opinion based upon your experience
15 as a -- as a forensic investigator?
16 A  That and the wound.
17 Q  And the what?
18 A  The wound.
19 Q  The wound?
20 A  Yes, sir.
21 Q  What about the wound tells you that?
22 A  He's got a contact GSW at the right
23 temple region. That means he put the gun to
24 his head. He would have fought -- anybody
25 would have fought. If they didn't do it

## Page 59

1  themselves, they would have fought. There
2  would have been signs of a struggle.
3  Q  Okay. All right. That's what tells
4  you it's suicide?
5  A  That and everything else at the
6  scene.
7      MR. EVANS: All right. Okay. I
8      think that those are probably all the
9      questions I have for you for right now.
10     I'll pass the witness.
11          EXAMINATION
12 BY MR. SOH:
13 Q  Do I call you Investigator Biggs,
14 Detective; what should I call you?
15 A  Call me Gary.
16 Q  Mr. Biggs, let me just go through a
17 couple of issues with you here. You expressed
18 your opinion that Mr. Smith committed suicide
19 because of the pain, correct?
20 A  Yes, sir.
21 Q  Okay. But that's not a formal -- is
22 that a -- would you consider that a formal
23 opinion from the Medical Examiner's Office?
24 A  That would be up to the medical
25 examiner to say that.

## Page 60

1  Q  Okay. But it's your personal --
2  A  It's my personal.
3  Q  That's your personal opinion. All
4  right. Let me ask you this: And I know that
5  you probably -- your friends and family think
6  that what you do is a lot like CSI, but it
7  really isn't what it's like at CSI, correct?
8  A  No. They have all the good stuff.
9  Q  I mean, but, for example, if there
10 was a drug that caused suicides, you would not
11 go back and review like medical literature
12 showing an increased risk of suicide and make a
13 determination if that drug caused a role in the
14 suicide, would you?
15 A  Not unless my medical examiner,
16 Dr. Bruce Levy, tells me to do so.
17 Q  Okay. Have you ever done that in
18 your years as an investigator for the Medical
19 Examiner's Office?
20 A  No, sir. We turn that over to
21 Consumer Affairs Product or whatever.
22 Q  Like you wouldn't review, let's say,
23 an FDA warning about -- that a drug would
24 double the risk of suicide; you wouldn't review
25 that as part of your investigation, would you?

## Page 61

1      MR. EVANS: Object to the form.
2  A  We knew about it, like the Vioxx or
3  whatever, we could like of look forward to that
4  when that came out.
5  BY MR. SOH:
6  Q  Okay. Oh, okay. You mentioned
7  Vioxx. Let's give you an example.
8      So you're saying that if someone died of a
9  heart attack while taking Vioxx, you would
10 investigate whether or not Vioxx might have
11 caused that heart attack?
12 A  If we found Vioxx, we would bring it
13 back in and document it.
14 Q  Okay. But you didn't do that in this
15 case with the Smith Family and the Neurontin?
16 A  We did bring -- I did document the
17 drug.
18 Q  That he was on Neurontin. But you
19 didn't go and document any kind of scientific
20 literature or anything like that to maybe show
21 a link between Neurontin and suicide?
22 A  No, sir.
23 Q  Okay. Let me ask you. I got a
24 little confused about your answers, and I just
25 want to maybe try and make it clearer, okay?

16 (Pages 58 to 61)