# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MASSACHUSETTS
 3    ----------------------------------x
 4    In re: NEURONTIN MARKETING, SALES
 5    PRACTICES AND PRODUCTS LIABILITY
 6    LITIGATION
 7    ----------------------------------x
 8    THIS DOCUMENT RELATES TO:          MDL Docket No. 1629
 9    PRODUCTS LIABILITY LITIGATION      NO. 04-10981
10    ----------------------------------x
11    SUPREME COURT OF THE STATE OF NEW YORK
12    COUNTY OF NEW YORK
13    ----------------------------------x
14    IN RE: NEW YORK NEURONTIN          CONTAINS CONFIDENTIAL
                                         INFORMATION
15    PRODUCTS LIABILITY LITIGATION
16    ----------------------------------x
17    THIS DOCUMENT APPLIES TO:
18    ALL CASES
19    ----------------------------------x
20              The Videotaped deposition of CYNTHIA MCCORMICK,
21    M.D., was held on Thursday, February 14, 2008, commencing at
22    9:04 a.m., at the law offices of Shook, Hardy & Bacon, 600
23    Fourteenth Street, Northwest, Washington, D.C., before Karen
24    Geddes, CSR, and notary public.
25    REPORTED BY: Karen Geddes, CSR
```

```
 1  APPEARANCES:
 2
 3      ON BEHALF OF THE PLAINTIFFS:
 4        W. MARK LANIER, ESQUIRE
 5        ROBERT LEONE, ESQUIRE
 6        KENNETH SOH, ESQUIRE
 7        The Lanier Law Firm, P.C.
 8        6810 FM 1960 West
 9        Houston, Texas 77069
10        (713)659-5200 Phone
11        (713)659-2204 Fax
12
13      ON BEHALF OF THE PRODUCT LIABILITY PLAINTIFFS:
14        ANDREW G. FINKELSTEIN, ESQUIRE
15        Finkelstein & Partners
16        436 Robinson Avenue
17        Newburgh, NY 12550
18        (800)634-1212 ext. 9451
19        (845)562-3492 Fax
20
21
22
23
24
25  (APPEARANCES continued on next page.)
```

```
 1  (APPEARANCES continued.)
 2
 3      ON BEHALF OF THE DEFENDANTS, PFIZER:
 4        SCOTT W. SAYLER, ESQUIRE
 5        VINCENT E. GUNTER, ESQUIRE
 6        Shook, Hardy & Bacon, LLP
 7        2555 Grand Blvd.
 8        Kansas City, Missouri 64108
 9        (816)474-6550 Phone
10        (816)421-5547 Fax
11
12  ALSO PRESENT:
13
14  Mr. Keith Altman
15  Mr. Vijay V. Bondada
16  Mr. Ari Kresch
17  Mr. Hans Jorgensen, The Videographer
```

```
 1              P R O C E E D I N G S
 2        THE VIDEOGRAPHER: On the record at
 3  9:04 a.m., Thursday, February 14, 2008. This is the
 4  videotaped deposition of Dr. Cynthia McCormick taken
 5  by Mark Lanier, Esquire, with offices at 6810 Farm
 6  Market 1960 West, in Houston, Texas.
 7        The caption in the case is in re:
 8  Neurontin Marketing Sales Practices and Products
 9  Liability Litigation MDL, Docket Number 1629 in the
10  United States District Court, District of
11  Massachusetts.
12        The deposition is being conducted in the
13  offices of Shook Hardy & Bacon located at 600
14  Fourteenth Street, N.W., Washington, D.C.
15        I'm Hans Jorgensen, videographer for
16  Veritext. The court reporter is Karen Geddes also
17  with Veritext.
18        Would Counsel please introduce themselves.
19        MR. SAYLER: Scott Sayler, Shook Hardy &
20  Bacon, representing the Pfizer Defendants.
21        MR. GUNTER: Vince Gunter, Shook Hardy &
22  Bacon, for the Pfizer Defendants.
23        MR. BONDADA: Vijay Bondada, Pfizer Legal.
24        MR. FINKELSTEIN: Andrew Finkelstein,
25  Finkelstein & Partners, product liability
```

```
 1  Plaintiffs.
 2        MR. LEONE: Bob Leone, Lanier Law Firm.
 3        MR. ALTMAN: Keith Altman, non-attorney,
 4  Finkelstein & Partners.
 5        MR. KRESCH: Ari Kresch, Finkelstein &
 6  Partners.
 7        MR. SOH: Ken Soh, Lanier Law Firm, for
 8  the Plaintiffs.
 9        MR. LANIER: And I'm Mark Lanier. I will
10  be taking the deposition for the Plaintiffs.
11        THE VIDEOGRAPHER: Will the court reporter
12  please swear in the Witness.
13  Whereupon,
14        CYNTHIA MCCORMICK, M.D.,
15  having been first duly sworn, testified as follows:
16        EXAMINATION BY COUNSEL FOR PLAINTIFFS
17  BY MR. LANIER:
18    Q   Are you Cynthia McCormick?
19    A   Yes.
20        (McCormick Deposition Exhibit Number 1
21  was marked for identification.)
22  BY MR. LANIER:
23    Q   I'm going to hand you a document,
24  Deposition Exhibit No. 1. Did you write this safety
25  update that was put out, I think November 2nd of
```

Page 26

1 MR. LANIER: Yes or no?
2 THE WITNESS: -- I really believe that
3 I -- I did answer that. And I think that you're
4 probably asking a question -- maybe we're
5 answering -- we're talking about two different
6 things. I think that what I -- what I wrote down
7 and when I wrote the review was that looking ahead
8 that we need to watch this adverse event because it
9 may -- it may turn out to be a problem.
10 Time has -- has passed and another
11 application has been approved, another database has
12 been reviewed, and actually, probably, a third
13 database has been reviewed that I'm not as familiar
14 with, and that has not turned out to be the case.
15 Now, I think that, you know, you can look
16 at this FDA alert very superficially and try to make
17 something of it, but there's a lot more here than --
18 than I think you are acknowledging.
19 So, you know, this is not a
20 black-and-white yes or no, was I wrong then and
21 right now? was I right then and wrong now? It's not
22 about that. It's about this is a process in
23 evolution. We didn't have the advantage of time in
24 1991 and time in the market. All we had was
25 basically a database that consisted of controlled

Page 27

1 information and some open-label exposure, and we got
2 a lot of reports in the open-label exposure that
3 really we didn't have any capacity or capability
4 to -- to really interpret.
5 So I don't think that the views are
6 inconsistent. I think you're trying to make them
7 inconsistent, but I don't see them as inconsistent.
8 MR. LANIER: Objection, nonresponsive.
9 BY MR. LANIER:
10 Q Ma'am, I'm just asking a very simple
11 question that you seem to think is more complicated
12 than it is. My question is this: As we sit here
13 today, do you believe that depression may become
14 worse and require intervention or lead to suicide as
15 a --
16 A In general, yes.
17 Q -- serious event that may limit
18 Neurontin's widespread usefulness?
19 MR. SAYLER: Objection, asked and
20 answered; it's also argumentative.
21 MR. LANIER: So your answer is yes?
22 MR. SAYLER: No, that's not what she said.
23 THE WITNESS: You know, I think I --
24 MR. LANIER: She just said yes.
25 THE WITNESS: I didn't say yes.

Page 28

1 MR. SAYLER: No, she didn't say yes.
2 MR. LANIER: It says "In general, yes."
3 She typed it up.
4 MR. SAYLER: Well, she violated your rule
5 and said yes to a phrase within the entire question.
6 So ask the entire question, wait until he has
7 finished asking the question and give a response to
8 the question.
9 MR. LANIER: I'm satisfied with her
10 answers.
11 Or did you tell me the truth just now when
12 you said general --
13 MR. SAYLER: You obviously --
14 MR. LANIER: Excuse me.
15 MR. SAYLER: No. I can make my --
16 MR. LANIER: Excuse me. Excuse me. Not
17 while I'm talking. If you're making an objection,
18 you're allowed to say objection to form or you're
19 allowed to instruct her not to answer or you're
20 allowed to make an objection to responsiveness.
21 You're not allowed to sit here and coach her.
22 MR. SAYLER: My objection --
23 MR. LANIER: Y'all are paying her. She
24 doesn't need your coaching.
25 MR. SAYLER: My objection for the

Page 29

1 record is you're misstating what she has testified.
2 BY MR. LANIER:
3 Q Ma'am, I'm not misstating anything. I'm
4 just asking you -- the court reporter has typed it
5 up. You and I have been through the fuss. You've
6 said you're going to answer my questions when I'm
7 done. Are you sticking by your answer or do you
8 need to backtrack?
9 A I believe I've answered it.
10 Q Great. Now, let's go back to Exhibit 3-A.
11 A Which is what?
12 Q That's the one you've got right in front
13 of you. It's got that exhibit and that's where the
14 numbers are. All right.
15 Am I reading this right, that "In the
16 FDA's analysis, patients receiving antiepileptic
17 drugs" -- have I read it right so far?
18 A Where are you reading from?
19 Q The FDA Alert.
20 A Yes.
21 Q It starts --
22 A That's not what I'm reading here.
23 Q Okay.
24 A "The FDA has analyzed reports --"
25 Q "In the FDA's analysis" --

8 (Pages 26 to 29)

Page 30

1  A  Thank you.
2  Q  Do you see where that is?
3  A  Yes, I do.
4  Q  All right. Tell me if I'm reading right:
5  "In the FDA's analysis, patients receiving
6  antiepileptic drugs" -- have I read it right so far?
7  A  Yes, you have.
8  Q  And would you agree with me that the
9  antiepileptic drugs being talked about in this paper
10 include Neurontin?
11 A  Uh-huh.
12 Q  Is that a yes answer?
13 A  Yes, it is.
14 Q  All right. So "patients receiving
15 antiepileptic drugs" -- including Neurontin, we've
16 agreed?
17 A  Yes.
18 Q  Tell me if I read correctly: "had
19 approximately" --
20 A  No, you're not reading correctly, because
21 it doesn't say "Neurontin" in this line.
22 Q  That's right. But you'd --
23 A  It doesn't say any specific drug in this
24 line.
25 Q  Okay. Let me backtrack because that's

Page 31

1  what I was trying to say just now.
2      "Patients receiving antiepileptic drugs,"
3  I've read that portion correctly, right?
4  A  Yes.
5  Q  And you and I know from reading the whole
6  paper that when they say "antiepileptic drugs" here,
7  the FDA is including Neurontin in that, right?
8  A  It was definitely included in the
9  analysis.
10 Q  So when it says "patients receiving
11 antiepileptic drugs," they're including there
12 Neurontin, right?
13 A  Uh-huh.
14 Q  Is that a yes answer?
15 A  Yes.
16 Q  Then, now tell me if I'm reading
17 correctly, quote, "had approximately twice the risk
18 of suicidal behavior or ideation --" and it gives
19 the statistic.
20     MR. SAYLER: Go ahead and give the
21 statistic.
22     MR. LANIER: Are you going to take the
23 depo for me?
24     MR. SAYLER: No. I'm objecting to the
25 incompleteness of just saying it gives the

Page 32

1  statistic.
2      MR. LANIER: I assume you've been doing
3  this long just by looking at your age. Okay? Yeah.
4  Now, you and I both know that's not polite attorney
5  etiquette to be interrupting a lawyer with this kind
6  of stuff.
7      MR. SAYLER: Well, it doesn't say give the
8  statistics --
9      MR. LANIER: Now, if you're hurting that
10 bad that you need to, I'll cut you slack, but I'm
11 not hurting you that bad yet. Wait until I cut you
12 to start being rude.
13 BY MR. LANIER:
14 Q  Okay. Now, ma'am, let me go back to what
15 I was saying. Tell me if I'm reading this
16 correctly, quote, "had approximately twice the risk
17 of suicidal behavior or ideation --" Have I read it
18 correctly so far?
19 A  Yes. If you'd like to, you can read the
20 whole sentence.
21 Q  And then -- hold on. I'm breaking it
22 apart.
23 A  If you'd like, I can read the whole
24 sentence.
25 Q  That's okay. I'd like to break it apart.

Page 33

1  I'll do this my way. Thank you, though. I
2  appreciate the offer.
3      And then it gives the statistic of
4  0.43 percent, right?
5  A  Yes.
6  Q  Then it says "compared to patients
7  receiving placebo," true?
8  A  True.
9  Q  Then it gives the statistic there, doesn't
10 it?
11 A  Yes.
12 Q  It says, quote, "The increased risk of
13 suicidal behavior and suicidal ideation was observed
14 as early as one week after starting the
15 antiepileptic drug...," doesn't it?
16 A  Yes.
17 Q  It says it also, quote, "continued through
18 24 weeks," close quote, doesn't it?
19 A  Yes.
20 Q  And then it says, "The results were
21 generally consistent among the eleven drugs,"
22 doesn't it?
23 A  Yes.
24 Q  And again, those eleven different
25 antiepileptic drugs include -- bless you -- include

Page 34

1  Neurontin; isn't that true?
2  A  True.
3  Q  And it -- look at the last page. This
4  says specifically, quote: The FDA expects the
5  increased risk of suicidality is shared by all AEDs,
6  doesn't it?
7  A  Yes.
8  Q  By the same token, there is more to it
9  than we've just read, isn't there?
10  A  Yes.
11  Q  So we can look, for example, at page 2,
12  right?
13  A  Right.
14  Q  Page 2, you see that big bold black print
15  in the middle of the page that says "Healthcare
16  professionals..."?
17  A  Yes.
18  Q  Up above it, is a paragraph that starts
19  out with "All patients..." Do you see that?
20  A  Yes.
21  Q  It says, "All patients treated with
22  antiepileptic drugs should be monitored for
23  suicidality and other unusual changes in behavior,"
24  doesn't it?
25  A  Yes, it does.

Page 35

1  Q  It says that "Healthcare professionals who
2  prescribe antiepileptic drugs..." -- that'd be like
3  Neurontin, right?
4  A  Yes.
5  Q  -- that they should "Balance the risk for
6  suicidality with the clinical need for the drug,"
7  don't they?
8  A  Yes.
9  Q  Now, this is an FDA Alert, isn't it?
10  A  Yes.
11  Q  You know what an FDA Alert is, don't you?
12  A  Yes.
13  Q  That's an important matter that's coming
14  out: Bam, alert, right?
15  A  Yes.
16  Q  And this information that we have, this
17  reflects the FDA's current analysis of the available
18  data, all of it, concerning these drugs, doesn't it?
19  A  Yes.
20  Q  Looks like you were right back in 1992,
21  doesn't it?
22  A  Yes.
23  Q  All right. New subject. I want to talk
24  to you about your qualifications and who you are.
25     You're a medical doctor, right?

Page 36

1  A  Yes.
2  Q  Do you practice medicine?
3  A  No, not any longer.
4  Q  I looked at your training. It looks to me
5  like you're trained as a pediatrician; is that
6  right?
7  A  Yes.
8  Q  That's a baby and kid doctor, right?
9  A  (No verbal response.)
10  Q  A yes answer?
11  A  Yes, it is.
12  Q  "Nods," the same problem. If we ever
13  lose --
14  A  I understand.
15  Q  -- the video --
16  A  I understand.
17  Q  -- all right -- can't tell the difference
18  between nodding that way and that way when she types
19  it.
20  A  Thank you.
21  Q  Now, in addition to your training as a
22  pediatrician, you worked for the FDA, didn't you?
23  A  Yes.
24  Q  And in the FDA, you did most of your work
25  in new drugs?

Page 37

1  A  Yes.
2  Q  You weren't part of the post-marketing
3  division, were you?
4  A  No.
5  Q  The post-marketing division is the
6  division in the FDA that monitors drugs after
7  they've been approved, right?
8  A  Correct.
9  Q  You were in the part that just -- that
10  worked up the approval of the drug?
11  A  Uh-huh.
12  Q  Is that a yes?
13  A  Yes, it is.
14  Q  You're not a neuropsychiatrist, true?
15  A  That's true.
16  Q  You're not an epidemiologist?
17  A  That's true.
18  Q  Epidemiologists are those numbers doctors
19  who figure out percentages and associations based
20  on -- on whether a study shows adequate power and
21  things like that, right?
22  A  Well, I don't think I would characterize
23  it quite like that, but if that's how you understand
24  it, that's fine.
25  Q  Well, that's probably the way it's been

Doerner & Goldberg -- A Veritext Company
Florham Park, NJ -- Shrewsbury, NJ (973) 740-1100

**Page 38**

1  presented to the jury. The jury will hear from
2  epidemiologists and the jury is going to hear them
3  talking about the power of studies and associations
4  and 95 percent degree of confidence intervals and a
5  doubling of the risk and -- and rate ratios; those
6  are epidemiology terms, by in large, fair?
7     A   They are statistical terms, and yes,
8  epidemiologists use those terms.
9     Q   All right. You're not an epidemiologist?
10    A   I am not an epidemiologist.
11    Q   How much is Pfizer paying you to testify
12 in this case?
13       MR. SAYLER: Objection.
14       MR. LANIER: Why?
15       MR. SAYLER: Paying her for her time.
16       MR. LANIER: Time testifying, right?
17       MR. SAYLER: Time doing whatever she's
18 doing.
19 BY MR. LANIER:
20    Q   They don't pay you to eat breakfast, do
21 they?
22    A   No, they don't.
23    Q   Do they pay you to sleep?
24    A   No, they don't.
25    Q   Do they pay you to testify?

**Page 39**

1     A   I hope so.
2     Q   Okay. So how much are they paying you to
3  testify?
4     A   Actually, we haven't discussed that.
5     Q   You hadn't sent them a bill yet?
6     A   Not for this, because we haven't finished.
7     Q   All right. You tell them it was grueling,
8  okay, and make them pay you.
9        How much are they paying you in general to
10 work on this case?
11    A   My usual consulting fee.
12    Q   And what is that?
13    A   $500 an hour.
14    Q   And do you have a clue how much time
15 you've spent so far?
16    A   I have -- you've actually brought the
17 records that you have subpoenaed, so you have those
18 at your access. I don't -- I can't tell you right
19 now how many hours I've spent in the past few days.
20 It's been a few hours yesterday, six hours
21 yesterday, roughly, and whatever time we spend
22 today.
23       MR. LANIER: All right. Why don't we take
24 a break for a minute, and let me have the documents
25 that we need, and I'll look at those and then we'll

**Page 40**

1  start back up.
2        THE VIDEOGRAPHER: Off the record
3  9:40 a.m.
4        (Recess 9:40 a.m. to 9:51 a.m.)
5        THE VIDEOGRAPHER: On the record 9:51 a.m.
6  BY MR. LANIER:
7     Q   Ma'am, I got a chance to look at your
8  bills. Looks to me like as of September 14th of '07
9  or so, you billed somewhere around, oh, $17,000 or
10 so, maybe a little more. Does that seem about
11 right?
12    A   I -- those are the documents, so -- I
13 haven't added it up.
14    Q   Well, why don't we mark them as Exhibit 10
15 and I'll ask you, is that an accurate reflection of
16 all of the time spent and money you've made on this
17 case, through the time period covered by that --
18 those invoices?
19       (McCormick Deposition Exhibit Number 10
20 was marked for identification.)
21    A   Some of this was reimbursed travel
22 expenses.
23 BY MR. LANIER:
24    Q   Okay. But you've got your time and your
25 money there, don't you?

**Page 41**

1     A   It's not separated.
2     Q   Okay. In addition to that, I assume you
3  have spent some time since last September, right?
4     A   Yes.
5     Q   I mean, I've looked through your box of
6  file materials and you've got the same FDA document
7  that you read here to the jury and it's highlighted,
8  which tells me you'd read it before, right?
9     A   Yes.
10    Q   Do you have -- how do you keep your time?
11 Do you have current time entries or anything?
12    A   Not at the moment. I keep them in a -- in
13 a handwritten book, although I have to say I have
14 not updated it in the past couple of weeks since
15 this has been active.
16    Q   You just go back and reconstruct it
17 afterwards or something?
18    A   I have a calendar. I know when I've been
19 downtown, I know, roughly, you know, what time I
20 have spent each day.
21    Q   Don't destroy your handwritten book,
22 please, or your calendar sheets, because I'd like to
23 see those.
24    A   My calendar sheet does not just contain
25 this work.

Doerner & Goldberg -- A Veritext Company
Florham Park, NJ -- Shrewsbury, NJ (973) 740-1100

Page 62

1  A  Uh-huh. This is actually a syndrome that
2  follows shingles.
3  Q  Yeah.
4  A  But yeah, you've got the -- you've got the
5  right idea.
6  Q  So the FDA --
7  A  Chronic neuropathic pain following
8  shingles.
9  Q  All right. Now, the advisory committee
10 that met that we were discussing on this drug back
11 in '92 --
12 A  Yes.
13 Q  -- met only to consider the risk-benefit
14 for this portion of the epilepsy population, right?
15 A  That's correct.
16 Q  The approval that was ultimately given,
17 the initial approval, was only for this subgroup
18 within the epilepsy population, right?
19 A  In the adults with epilepsy, yes. And in
20 fact, specifically there is the indication -- it is
21 indicated as adjunctive therapy in the treatment of
22 partial seizures with and without secondary
23 generalization in adults with epilepsy.
24 Q  Were you in on the label negotiations with
25 the drug company?

Page 63

1  A  Yes.
2  Q  Y'all never negotiated labeling for other
3  uses for this drug beyond that epilepsy group?
4  A  True; not at this time.
5  Q  Now, the FDA never did any of its own
6  studies?
7  A  That's correct.
8  Q  The FDA has always relied on the drug
9  company for the actual studies of the drug
10 Neurontin, right?
11 A  I believe so. Occasionally, the FDA will
12 conduct its own studies, but I don't believe in this
13 case -- it's generally not clinical studies anyway,
14 but I believe in this case, none of them were done
15 by FDA.
16 Q  Yeah. It's very, very rare for the FDA to
17 actually conduct its own clinical studies for --
18 A  Oh, yes.
19 Q  -- a new drug application?
20 A  Yes.
21 Q  Okay. New subject. I want to talk about
22 just the drug in general. You went to medical
23 school?
24 A  Yes.
25 Q  Got a doctor's degree?

Page 64

1  A  Yes.
2  Q  You worked at the FDA?
3  A  Yes.
4  Q  You consult now with drug companies?
5  A  Yes.
6  Q  You would agree with me as a general
7  principle that if you change brain chemistry, it has
8  potential to lead to behavioral changes, right?
9  A  Yes.
10 Q  And there's a whole class of drugs that
11 are geared toward changing brain chemistry to help
12 behavior changes, right?
13 A  Yes.
14 Q  There are mood elevators, antidepressants,
15 lots of drugs that work on brain chemistry trying to
16 change the -- the way people are functioning
17 behaviorally, fair?
18 A  Yes.
19 Q  All right. By the same token, you would
20 agree with me as a scientific principle or medical
21 principle, that a decrease in serotonin and
22 norepinephrine levels can lead or be associated
23 with, I should say, psychotic events?
24    MR. SAYLER: Objection, overly broad --
25    THE WITNESS: Now, I think that you're --

Page 65

1     MR. SAYLER: -- misstates the facts.
2     THE WITNESS: -- you know, you really need
3  to talk to a neurochemist if you are going to start
4  talking about mechanism of action of the drug and
5  neurochemistry. I have not -- I haven't been asked
6  to --
7  Q  I just left your area?
8  A  Yeah.
9  Q  Okay. Fair enough. I appreciate that.
10 So you don't know whether or not a decrease in
11 serotonin and norepinephrine has been associated
12 with --
13 A  You know, I think that --
14 Q  Excuse me.
15 A  -- you didn't hear me in the first place.
16 Q  Excuse me. You cannot talk over me,
17 ma'am.
18 A  All right.
19 Q  So you're not in a position to testify
20 about whether or not a decrease in serotonin or
21 norepinephrine would be associated with psychotic
22 events; that's outside your area?
23 A  It's not that it's -- I'm not -- I have
24 not been asked to discuss anything besides the
25 record and I think that if you need an expert

Page 66

1  witness to do neurochemistry with you, you feel
2  that, you know, that's an area you want to go into,
3  that's your option, but I'm not your person.
4      Q   I don't feel a need for that because I've
5  got experts to do that.
6      A   Good.
7      Q   I'm trying to figure out if the lady who
8  wrote the section that said that gabapentin, the
9  Neurontin drug, has more serious events that may
10 limit its usefulness including depression, I'm
11 trying to figure out if you knew at the time that a
12 decrease in serotonin and norepinephrine might be
13 associated with psychotic events?
14         MR. SAYLER:  Objection, misstates facts.
15         THE WITNESS:  Whether it is or not is not
16 the way you'd get an answer to that question.  And
17 again, if you want to talk neurochemistry on a
18 theoretical basis, I'm not your person.
19 BY MR. LANIER:
20     Q   So you had no knowledge --
21     A   No.  That's -- no.  You're distorting what
22 I said.
23     Q   Okay.  Did you know at the time you
24 reviewed this drug that a decrease in serotonin or
25 norepinephrine levels might be associated somehow

Page 67

1  with psychotic behavior?
2          MR. SAYLER:  Objection.
3          THE WITNESS:  I think that's irrelevant.
4  BY MR. LANIER:
5      Q   You may think it's irrelevant.  I don't.
6  That's not our call.  That will be the judge's call.
7      A   Okay.
8      Q   My question is just a simple one:  Did you
9  have in your brain at the time an association
10 between decrease in serotonin and norepinephrine and
11 psychotic events?
12         MR. SAYLER:  Objection.
13         THE WITNESS:  I probably at the time did,
14 but I think that there's -- you know, again, you are
15 oversimplifying again this area and if you want to
16 get into details, I don't want to discuss this with
17 you.
18     Q   All right.  Fair enough.  So as a
19 general --
20     A   This would not be my approach.  Okay?
21     Q   Okay.
22     A   Drugs have actions that are widespread and
23 to select out one specific neurotransmitter and
24 think you've got a handle on the mechanism of action
25 of the drug or its adverse events is -- is -- takes

Page 68

1  a lot of hubris, and I -- again, I choose not to go
2  there with you, and so, you know, if you want an
3  expert to discuss this with you, fine.
4      Q   I'm not trying to go there and I'm
5  certainly not trying to be "Johnny Hubris" or make
6  you "Sally Hubris."  Okay.  All I'm trying to do is,
7  I would assume that when you're doing a review,
8  you've got kind of red flags or cautions or ideas
9  that -- that come up that you keep in your brain to
10 be on the lookout for.  Am I right or wrong in that?
11     A   I think that you probably don't have a
12 good feel for what's entailed in an FDA review.
13 Sure, there are a lot of factors you consider, but
14 frankly, you know, at an early stage -- at this --
15 at the early stage with this drug, the mechanism of
16 action was not known, although a lot of potential
17 mechanisms were considered, and whether or not the
18 putative mechanism of action that would have been
19 put forth was the correct one is irrelevant, because
20 what really matters are the data and that's what you
21 make your decisions upon, the clinical data.
22         MR. LANIER:  Objection, nonresponsive.
23         THE WITNESS:  No.  That was quite
24 responsive, actually.
25 BY MR. LANIER:

Page 69

1      Q   No, ma'am.  You put in a bunch of stuff I
2  wasn't talking about.  I wasn't even talking about
3  this drug.
4      A   Well, you should have been --
5      Q   No.  That's --
6      A   Because --
7      Q   I promise you, I do my job pretty good.
8  I'm not some schlock lawyer.  I've actually done
9  this before.
10     A   Well, I don't care whether you're a
11 schlock lawyer or not, but --
12     Q   Okay.  Well, then --
13     A   -- we are here to discuss this drug in
14 this application and, you know --
15     Q   But in the process --
16     A   -- if you want to discuss general
17 neurochemistry and think great thoughts, go get
18 yourself an expert.
19     Q   Okay.  Ma'am, just calm down.  In the
20 process --
21     A   I'm calm.
22     Q   In the process, I've got to ask some
23 background information, sometimes they're tough
24 questions.  If you don't feel qualified to answer
25 them, just tell me, "Mark, I'm not qualified to

18 (Pages 66 to 69)

Page 98

1  an example. Before you wrote those prescriptions,
2  did you run clinical trials, yourself --
3    A    No.
4    Q    -- on those drugs?
5    A    No.
6    Q    Before you wrote those drugs off-label,
7  did you go out and do any epidemiological studies?
8    A    No.
9    Q    Did you do any randomized clinical trials?
10   A    No. There had been trials done by other
11 investigators in -- in pediatrics and, you know, I
12 guess that's what I'm saying, that when a -- you
13 know, a medical specialty decides to explore the use
14 of a drug in a condition, it's not infrequent that
15 that -- that investigators in that field might
16 explore the dosing and the -- you know, the effect
17 of that drug in that population, and oftentimes that
18 will lead to further off-label use.
19        You know, as I said, most of the drugs
20 that are approved for -- in the United States in the
21 past have not been approved in pediatrics, so
22 pediatricians have had little choice but to either
23 extrapolate from the adult experience and rely upon
24 the investigators in pediatrics to help to define
25 what the parameters of dosing are and so on.

Page 99

1         So there's a lot of -- I guess acceptance
2  in the medical community that when a drug is
3  approved, you don't know everything about it, that
4  that information base will evolve over time,
5  hopefully, this will lead to the company seeking --
6  doing further formal studies and seeking an
7  indication, but that's not always the case, and
8  certainly has not been the case in pediatrics.
9        MR. LANIER: Objection, nonresponsive.
10 BY MR. LANIER:
11   Q    Ma'am, my question was simple --
12   A    I thought it was quite responsive,
13 actually.
14   Q    Okay. Well, I'm missing it, because here
15 was my question -- and we can go back and reread it,
16 but word for word, it was this: Before you
17 prescribed those drugs, did you do randomized
18 clinical trials?
19        And you are talking to me about all sorts
20 of things; I just want to know, did you?
21   A    No, I did not.
22   Q    Oh, okay. Thank you.
23        MR. SAYLER: Do you want to take a break?
24        MR. LANIER: I think I am almost done, if
25 I can -- I'm either passing the witness or I'm going

Page 100

1  to ask one more question. If you want to take a
2  break, let's take a break because I've got describes
3  right --
4         THE WITNESS: Thank you.
5         MR. LANIER: -- encyclopedic questions.
6         THE VIDEOGRAPHER: Off the record
7  10:57 a.m.
8         (Recess 10:57 a.m. to 11:15 a.m.)
9         THE VIDEOGRAPHER: On the record
10 11:15 a.m. This begins Tape 2 of the deposition.
11        EXAMINATION BY COUNSEL FOR PFIZER DEFENDANTS
12 BY MR. SAYLER:
13   Q    Good morning, Dr. McCormick.
14   A    Good morning.
15   Q    I would like to begin by clarifying when
16 you were employed by the FDA what your titles and
17 general responsibilities were. When were you first
18 employed at the FDA?
19   A    1991; I believe it was July that I
20 started.
21   Q    When did you leave the FDA?
22   A    October of 2002.
23   Q    From July of 1991 to October of 2002, were
24 you continuously employed by the FDA?
25   A    Yes.

Page 101

1    Q    What were your titles while you were
2  employed at the FDA from 1991 to 2002?
3    A    My initial title was medical officer and
4  that was designated by series -- a series. Any --
5  any physician for the most part was -- was
6  designated as a medical officer. I was not
7  initially in a supervisory position, so basically it
8  was medical officer and then the informal title was
9  clinical reviewer or medical reviewer.
10        Subsequently, I was promoted to a
11 supervisory medical officer and the informal title
12 was division director, Division of Anesthetics,
13 Critical Care and Addiction Drug Products.
14   Q    How long were you in the first role of
15 being a medical officer?
16   A    About five years.
17   Q    So from, roughly, 1991 to '96, '97?
18   A    Yes. Uh-huh.
19   Q    What were your general responsibilities as
20 a medical officer?
21   A    The review of investigational new drug
22 applications.
23        THE WITNESS: I wonder if you could put
24 the BlackBerry down. It's a little bit distracting.
25 Thank you.

1  MR. LANIER: Well, this is the way I'm
2  communicating with my expert on the phone. I'm
3  sorry. I'll try and do it under the table. Would
4  that be better?
5      THE WITNESS: Yes.
6      MR. LANIER: Okay. I don't mean to
7  distract you.
8  A    The question is --
9  BY MR. SAYLER:
10 Q    You were talking about your
11 responsibilities during your six or so years as a
12 medical officer.
13 A    Okay. Initially, review of applications
14 that came in called "IND"s, or Investigational New
15 Drug Applications or Exemptions to study drugs that
16 were not -- that are not approved to do clinical
17 trials in -- in human beings to explore new
18 indications. Some of those were submitted by
19 companies, some of them were submitted by individual
20 investigators, to determine if a drug might have
21 usefulness in a new indication or an off-label use.
22     THE REPORTER: Or a what?
23     MR. LANIER: An off-label use.
24     THE WITNESS: Off-label use.
25     THE REPORTER: Speak up a little.

1      THE WITNESS: I'm sorry.
2  A    And so in addition to that, all of the
3  responsibilities that an IND application carried
4  with it, which would be attending meetings,
5  reviewing safety reports that came in, clinical
6  study reports and a whole host of responsibilities
7  that went along with shepherding a drug through that
8  process prior to approval. In addition --
9  BY MR. SAYLER:
10 Q    Okay. So would that -- would that scope
11 of responsibilities then fall under the umbrella of
12 your IND review responsibilities?
13 A    Right. That's right.
14 Q    What were your other responsibilities as a
15 medical officer?
16 A    And let me just state that the -- my
17 responsibilities at the time as a medical officer
18 extended to epilepsy drugs, sleep drugs, drugs that
19 were under investigation by the army and neuropathic
20 pain. I also had some assorted INDs that overlapped
21 with other conditions, but that was the bolus of
22 what I had.
23     In addition to that, there were occasional
24 consults that were -- that I was assigned to, some
25 of which were consults to other parts of the agency

1  that may have involved epilepsy drugs, for example,
2  issues that came up around those, and then finally,
3  the review of I -- of NDAs, new drug applications.
4  Q    So new drug application review was another
5  element of your medical officer responsibilities --
6  A    Right.
7  Q    -- is that right?
8      THE WITNESS: That's correct.
9      MR. LANIER: Objection, leading.
10 BY MR. SAYLER:
11 Q    Was it within the context of those
12 responsibilities, IND review responsibilities or NDA
13 review responsibilities that you performed your work
14 in the first six years you were at the FDA with
15 regard to Neurontin?
16 A    I'm sorry. I was still listening to his
17 comment.
18 Q    Well, was it as part of your NDA review
19 responsibilities that you performed your work with
20 respect to Neurontin during those first six years
21 you were at the FDA?
22 A    Yes, initially. I saw Neurontin again
23 later in my subsequent responsibilities.
24 Q    And I want to get to that.
25 A    Okay.

1  Q    Okay. So after you were a medical officer
2  for approximately six years, you then were promoted
3  to a division director --
4  A    Correct.
5  Q    -- title or role, correct?
6  A    Correct.
7  Q    Okay. What were your roles and
8  responsibilities as division director from
9  approximately 1996 to the -- the end of your tenure
10 at FDA in 2002?
11 A    The responsibilities were basically
12 supervising all aspects of the portfolio within that
13 division both under the investigational new drug
14 application, consults to other divisions, and new
15 drug applications for all of the drugs that were in
16 our portfolio which included anesthetics. We had
17 for a period of time responsibility for drug
18 scheduling recommendations, abuse liability
19 evaluation, drugs of addiction and pain medications,
20 and as well as consulting to other parts of the
21 agency.
22     Then I was on some committees, as well,
23 and, you know, that basically -- I mean, we could go
24 into more detail on what that meant, what that
25 entailed, but basically, a review team consists of a

Page 106

group of people who are assigned from various specialties to -- to the review and evaluation of data or -- or proposals, protocols, and so on, and the team consisted of chemists and toxicologists, biopharmaceutics experts, clinicians and statisticians and project managers. Not all of those were under my direct supervisory responsibility in terms of performance, however, the performance of the team at large was my responsibility; and I also had direct responsibility for drug approval for certain types of applications that were not primarily new molecular entities but reformulations, that sort of things, or new indications.

Q  We'll get into it in more detail, but was it in your role as division director that you were involved in the review and the ultimate approval of Neurontin as a treatment for post-herpetic neuralgia in the spring of 2002?

A  Yes.

Q  Dr. McCormick, while you were at the FDA from 1991 to 2002, did you ever conclude that Neurontin increases the risk of or is causally associated with depression?

MR. FINKELSTEIN: Objection.

Page 107

MR. LANIER: Objection, form.

THE WITNESS: Did I ever conclude that it was causally related? No, I did not.

BY MR. SAYLER:

Q  While you were employed at the FDA from 1991 to 2002, did you ever conclude that Neurontin increases the risk of or is causally associated with any type of suicidal thinking or suicidal behavior?

MR. FINKELSTEIN: Objection --

MR. LANIER: Objection, form.

MR. FINKELSTEIN: -- form.

THE WITNESS: In the documents that I reviewed, both in my responsibility as a medical officer in epilepsy and also in my review of the Neurontin application for post-herpetic neuralgia, I did not see anything that would suggest an increased risk of suicidality.

MR. LANIER: Objection, responsiveness.

BY MR. SAYLER:

Q  To this day, as you sit here today taking into account everything you know, have you ever reached a conclusion that Neurontin increases the risk of or is causally associated with depression, any other psychiatric adverse event, or any type of suicidal thinking or behavior?

Page 108

MR. LANIER: Objection, form.

MR. FINKELSTEIN: Objection.

THE WITNESS: I have not. I have to say that the recent FDA Alert that I am aware of states that there is a risk of increased suicidality with the initiation of anticonvulsants in general, and I have not seen the data myself. I have seen some data on -- I have seen the data on Neurontin from the -- the marketing applications, and the two don't comport with each other. I think that, you know, they may have more data than I do.

BY MR. SAYLER:

Q  Again, back to my question with respect to Neurontin specifically: As you sit here today, have you ever concluded that Neurontin increases the risk of or causes any type of suicidal thinking or behavior?

MR. LANIER: Objection, form.

MR. FINKELSTEIN: Objection, form.

THE WITNESS: Affirmatively concluded, no. I have not affirmatively concluded that it does either.

BY MR. SAYLER:

Q  While you were at the FDA, to the best of your knowledge, did any individual within the FDA or

Page 109

the FDA generally, ever conclude that Neurontin is associated with or increases the risk of depression or any type of suicidal thinking or behavior?

MR. FINKELSTEIN: Objection, form.

THE WITNESS: No. I mean, if it had -- if we had, we would have put it in the label.

MR. LANIER: Objection, responsiveness.

BY MR. SAYLER:

Q  If FDA had concluded that Neurontin increased the risk of depression or any type of suicidal thinking or behavior, what based on your experience would the FDA had done?

MR. FINKELSTEIN: Objection.

THE WITNESS: If we had -- I'm sorry.

MR. FINKELSTEIN: Objection, calls for speculation, but you can answer it.

MR. SAYLER: Go ahead.

MR. FINKELSTEIN: Go ahead.

THE WITNESS: Well, you know, I -- you know, we can -- you can call it speculation, but I was in a position to do something, so it's not really speculative.

I think that, you know, the first -- the first opportunity was when the NDA was reviewed in the first place and presented to the advisory

28 (Pages 106 to 109)

Page 118

1  Deposition Exhibit 12. Do you see that this is a
2  document dated March 21, 2005, with the "Finkelstein
3  & Partners" letterhead at the top of the first page?
4      A    Yes.
5      Q    And do you see that the -- this appears to
6  be a letter to a Dr. Russell Katz, Director of
7  Neuropharmacological Drug Products Division of the
8  Food and Drug Administration?
9      A    Right. Yes.
10     Q    And you see the signature on the last page
11 of "Andrew G. Finkelstein"; do you see that?
12     A    Yes.
13     Q    I want to direct your attention to the
14 third paragraph on the first page of this letter.
15 It states:
16          Recently we obtained the FDA's analysis of
17 the new drug application filed by Parke-Davis and
18 found shocking information during your -- meaning
19 FDA's -- during your evaluation of serious adverse
20 events that occurred during original clinical
21 trials, the risk of Neurontin causing suicide was
22 both known and a major concern. The FDA clinical
23 reviewer from your division specifically stated in
24 December 1992 serious adverse events may limit the
25 drug's widespread usefulness. Depression, while it

Page 119

1  may not be an infrequent occurrence in the epileptic
2  population, may become worse and require
3  intervention or lead to suicide as it has resulted
4  in some suicidal attempts during clinical trials.
5          Did I read that correctly?
6      A    Yes.
7      Q    And do you recognize that the clinical
8  review language being quoted there is the language
9  that comes from your medical review that you did in
10 1992?
11     A    Yes, with the emphasis added, by the
12 person who wrote the letter.
13     Q    Do you agree with the characterization of
14 your words that these -- these words establish that
15 the risk of Neurontin causing suicide was known and
16 a major concern; stated otherwise, in -- in those
17 words, are you intending to state that you believe
18 Neurontin causes suicide?
19         MR. LANIER: Objection, form.
20         THE WITNESS: No. I think that it doesn't
21 say that at all. What it says is that while
22 depression is an infrequent occur -- it's not an
23 infrequent occurring with this -- common in this
24 population, particularly in the complex partial
25 seizure population, in the context of the clinical

Page 120

1  trial with -- particularly in the uncontrolled
2  database, there were patients who got worse and
3  required treatment. There were some people who -- I
4  mean, basically the numbers that you see in the
5  review are the treatment emergent depression --
6  treatment emergent adverse events in general, those
7  are patients who either had new onset or worsening
8  of their symptoms during the clinical trial and, you
9  know, as a general statement, yes, depression can
10 sometimes lead to suicide. It doesn't say that
11 Neurontin causes suicide.
12         MR. LANIER: Objection, nonresponsive.
13     Q    While you were at the FDA -- while you
14 were at the FDA, did you ever conclude or intend to
15 suggest that you believe Neurontin causes suicide?
16     A    No, never.
17     Q    Do you believe that this letter accurately
18 characterizes your intentions and your statements?
19         THE WITNESS: No.
20         MR. LANIER: Objection.
21 BY MR. SAYLER:
22     Q    Did Mr. Finkelstein or anybody else --
23     A    I mean, let me just elaborate. The risk
24 of Neurontin causing suicide was known and a major
25 concern is simply not true.

Page 121

1      Q    Did Mr. Finkelstein or anybody else
2  affiliated with Mr. Finkelstein ever contact you and
3  say: Hey, we are going to send a letter to the FDA
4  stating that your words establish your belief that
5  Neurontin causes suicide; would that be an accurate
6  statement?
7      A    They didn't contact me.
8      Q    Were you ever contacted with that
9  question?
10     A    No.
11     Q    Has anybody from Mr. Finkelstein's firm or
12 Mr. Finkelstein himself ever contacted you and asked
13 you to sit down and discuss your analyses and your
14 findings during the time you were at the FDA?
15     A    While I was at the FDA, no.
16     Q    No. Has --
17     A    Or my findings at the FDA --
18     Q    Has anybody ever from Mr. Finkelstein's
19 firm --
20     A    No.
21     Q    -- ever contacted you and said I'd like to
22 sit down and talk to you about what you have
23 concluded?
24     A    No, not that I'm aware. I mean, I have to
25 say that I get random calls from -- from attorneys

1  A   Zero.
2  Q   Next is preparatory acts; which code would
3  that be?
4  A   Code three.
5  Q   How many preparatory acts toward imminent
6  suicide behavior were there in the gabapentin
7  population?
8  A   Zero.
9  Q   And then finally is suicidal ideation;
10 which code would that be?
11 A   Code five.
12 Q   And how many cases of suicidal ideation
13 were there in the gabapentin population?
14 A   There were two.
15 Q   And how many -- and what percentage did
16 that add up to?
17 A   .039 percent.
18 Q   .039 percent?
19 A   Uh-huh.
20 Q   And how many cases of suicidal ideation
21 were there in the placebo population?
22 A   There was one.
23 Q   And what percentage did that add up to?
24 A   .037.
25 Q   Now, the FDA Alert states that when this

1  data is pooled for all 11 antiepileptic drugs, we
2  have a -- a incidence of 0.43 percent in the pooled
3  drug population versus an incidence of 0.22 percent
4  in the placebo population.
5          Do you see that --
6  A   Yes, I do.
7  Q   -- in the FDA's alert?
8  A   Yes, I do.
9  Q   Whereas, if we look at the data in the
10 gabapentin-only population and we add up the
11 percentages in codes one, two, three and five, what
12 are the percentages in gabapentin versus placebo?
13 A   Sorry. So one, two, three, four and five?
14 Q   One, two, three and five.
15 A   One, two, three and five. Well, it's
16 still two -- .037 -- .039 percent, because there's a
17 zero in the other categories.
18          MR. FINKELSTEIN: I just want to object to
19 this whole line of questioning and set forth that at
20 no point in time has Dr. McCormick ever been put
21 forth as an expert and it seems that you are seeking
22 to elicit expert testimony. You can go forward with
23 your line of questioning. I'm just reserving my
24 right to make the appropriate application related to
25 it.

1  BY MR. SAYLER:
2  Q   You testified earlier that the FDA Alert
3  does not change as you sit here today the fact that
4  you have never concluded that Neurontin increases
5  the risk of or causes suicide-related behavior; is
6  that your testimony?
7          MR. LANIER: Objection, form.
8          THE WITNESS: That's correct.
9  BY MR. SAYLER:
10 Q   And can you --
11 A   That's correct. I mean, these data are
12 largely --
13 Q   Let me ask a question.
14 A   Okay.
15 Q   Can you -- can you explain why your
16 conclusion has not changed as you sit here today
17 notwithstanding the FDA Alert?
18         MR. FINKELSTEIN: Objection.
19         THE WITNESS: Because the -- there was no
20 signal in the controlled database in both NDAs.
21 This is simply -- this is basically the same data.
22 BY MR. SAYLER:
23 Q   And when you say "both NDAs," you are
24 talking about --
25 A   Both, the NDA and --

1  Q   -- Neurontin NDAs?
2  A   -- and the SNDA, the supplemental NDA for
3  a new indication.
4          This is basically the same data. You
5  know, I have some -- some problems with the way this
6  was done taking into account the -- I mean, even if
7  you were to take out the post-herpetic neuralgia and
8  look at just the epilepsy. Let's assume for a
9  minute that -- you know, that this is going to, you
10 know, tighten up the analysis. The numbers are only
11 going to get smaller. It's hard to get much smaller
12 than two or one, but in the controlled database
13 there just is no signal. There was not then and
14 there still isn't; no surprise, it's the same data.
15 Q   How does the analysis contained in the
16 June 2006 submission marked as Deposition
17 Exhibit 13, how does that affect the fact that you
18 never concluded that Neurontin increases the risk of
19 or causes suicide-related behavior?
20         MR. LANIER: Objection, form.
21         THE WITNESS: It reinforces it. It
22 reinforces it. You know, this tells me that
23 something else is driving this analysis. We
24 obviously don't have a full analysis, because it
25 doesn't -- they don't -- these documents don't talk