# EXHIBIT D

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3
 4    In re:  NEURONTIN MARKETING,
 5    SALES PRACTICES AND PRODUCTS
 6    LIABILITY LITIGATION
 7    _____/
 8    THIS DOCUMENT RELATES TO:    MDL Docket No. 1629
 9    Bulger v. Pfizer, et al.   Master File No. 04-10981
10    07-11426-PBS
11       .
12    Smith v. Pfizer, et al.
13    05-CV-11515-PBS
14    Crone v. California State Court
15    _____/
16
17             The videotaped deposition of SHEILA WEISS
18    SMITH, PH.D. was held on Monday, December 22, 2008,
19    commencing at 9:17 A.M., at the Law Offices of Goodell,
20    DeVries, Leech & Dann, LLP, 20th Floor Commerce Place,
21    One South Street, Baltimore, Maryland  21202,
22    before Ronda J. Thomas, a Notary Public.
23
24    Job No.: 183061
25    REPORTED BY:  Ronda J. Thomas, RPR, CLR
```

```
 1  APPEARANCES:
 2
 3     ON BEHALF OF THE PLAINTIFFS, PRODUCTS LIABILITY
 4     STEERING COMMITTE AND CRONE:
 5        KEITH ALTMAN, ESQUIRE
 6        Finkelstein & Partners
 7        436 Robinson Avenue
 8        Newburgh, New York 12550
 9        Telephone: 845.562.0203
10        Facsimile: 845.562.3492
11        Email: Kaltman@lawampmmt.com
12
13     ON BEHALF OF PFIZER AND MDL:
14        RICHARD M. BARNES, ESQUIRE
15        MICHAEL J. WASICKO, ESQUIRE
16        Goodell, DeVries, Leech & Dann, LLP
17        One South Street, 20th Floor
18        Baltimore, Maryland 21202
19        Telephone: 410.783.4000
20        Facsimile: 410.783.4040
21        Email: Rmb@gdldlaw.com, mjw@gdldlaw.com
22
23
24
25  (APPEARANCES continued on next page.)
```

```
 1  (APPEARANCES continued.)
 2
 3     ON BEHALF OF RAYMOND JENNINGS, M.D.:
 4        ELANA GOLD, ESQUIRE (via teleconference)
 5        Law Offices of Steven D. Hillyard, APC
 6        345 California Street, Suite 1770
 7        San Francisco, California 94104
 8        Telephone: 415.334.6880
 9        Facsimile: 415.334.6967
10        Email: Egold@hdmlaw.com
11
12  ALSO PRESENT: Robert Kowalchik, Videographer
```

```
 1                    INDEX
 2           Deposition of SHEILA WEISS SMITH, Ph.D.
 3                  December 22, 2008
 4
 5  EXAMINATION BY:                            PAGE
 6  Mr. Altman                                   6
 7  Mr. Barnes                                 329
 8  Mr. Altman                                 331
 9
10  EXHIBIT NUMBER:                           MARKED
11  18   Supplemental Report                     5
12  19   Materials considered                    5
13  20   Current CV                              5
14  21   Materials relied on by Dr. Weiss Smith  5
15  22   Gabapentin Related Clinical Study Cases 155
16  23   Statement by Janet Woodcock, M.D.       195
17  24   3 page document Pfizer_MHauben_0000123-125  210
18  25   Cumulative Percentage Reports of
19       Suicidal and Self-Injurious Behavior    228
20  26   FDA letter                              265
21  27   Chart - Percentage of Serious Reports   280
22  28   Invoices                                328
23  29-32 CD's (retained)                        332
```

```
 1              P R O C E E D I N G S
 2           (Whereupon, documents were premarked as
 3  Deposition Exhibit Number 18, 19, 20 and 21.)
 4           THE VIDEOGRAPHER:  We are on the record.
 5  The time is 9:17 a.m.  My name is Robert Kowalchik of
 6  Nationwide Video Production.  The date today is
 7  December 22, 2008.  This deposition is being held in
 8  the office of Goodell DeVries located at One South
 9  Street, Baltimore, Maryland.
10           The caption of the case is in Re: Neurontin
11  Marketing Sales Practices and Products Liability
12  Litigation in the United States District Court,
13  District of Massachusetts.  MDL Docket No. 1629 Master
14  File No. 04-10981.
15           This document relates to Bulger v. Pfizer,
16  et al. 07-11426-PBS and Smith v. Pfizer, et al.
17  05-CV-11515-PBS and cross noticed in the case of Crone
18  v. Pfizer.
19           The name of the witness is Sheila Weiss
20  Smith.  At this time the attorneys will identify
21  themselves and the parties they represent, after which
22  our court reporter, Ronda Thomas of Doerner and
23  Goldberg, will swear in the witness and we can proceed.
24           MR. ALTMAN:  Keith Altman on behalf of
25  Finkelstein & Partners for the Plaintiffs Products
```

## Page 30

1 label.
2  Q  You're not a clinician?
3      MR. BARNES: Are you finished your answer?
4  A  But I think that's where I'm narrowing it
5 to that. So not the whole label. I also did a lot of
6 work in pregnancy registries and the labeling for drugs
7 and pregnancy.
8  Q  Okay. You're not a clinician, correct?
9  A  That is correct.
10 Q  Have you ever written a pharmaceutical
11 label from scratch?
12 A  No, I have not.
13 Q  Have you ever written any portion of a
14 pharmaceutical label?
15 A  No.
16 Q  Have you ever corresponded with the FDA
17 concerning a label?
18 A  What do you mean by corresponded?
19 Q  Have you ever, in any of your work, have
20 you ever been responsible for corresponding with the
21 FDA about the adequacy of the label or whether a label
22 needs to be changed or anything concerning a product
23 label?
24     MR. BARNES: Does your question concern her
25 work on Pfizer committees as well to correspond --

## Page 31

1      MR. ALTMAN: No. Outside of that --
2 outside of the FDA.
3      MR. BARNES: Outside of your work with the
4 FDA, have you corresponded with the FDA about labeling?
5  A  That hasn't been my position to be the
6 correspondent. I worked and advised the FDA and I've
7 worked for companies that have been working on labeling
8 issues, but I'm on an advisory role, not as a person
9 that would be the contact person.
10 Q  And I think you said your advisory role is
11 limited to epidemiology and pharmacoepidemiology
12 issues?
13     MR. BARNES: As it relates to label.
14 Q  With respect to labeling?
15 A  As it relates to labeling, some organ risk
16 management. So I'm using the broad drug safety issues.
17 Q  But they would all have in commonality,
18 they would be epidemiologic or pharmacoepidemiologic
19 issues, correct?
20 A  Based on those issues, yes.
21 Q  Have you ever reviewed a label to decide
22 whether the label had a -- was accurate from a clinical
23 perspective?
24     MR. BARNES: What do you mean by clinical
25 perspective?

## Page 32

1  Q  To a doctor?
2  A  Isn't it all the same thing?
3  Q  No, it's not all the same thing.
4      MR. BARNES: Objection. Assuming facts not
5 in evidence. Vague.
6  Q  Are you qualified to take a look at a label
7 and decide whether the label accurately represents all
8 of the -- all of the risks known about the product?
9      MR. BARNES: Objection.
10 A  I'm not sure any one person can know if one
11 label has every single thing in there. Those labels
12 are huge and there's not one person with all the
13 expertise.
14 Q  Have you ever written to the FDA suggesting
15 the labeling change?
16 A  No, I don't typically write to the FDA.
17 Q  Have you ever been part of a group
18 assessing whether a label should be changed?
19 A  Yes, I have.
20 Q  When was that?
21 A  On a number of occasions I have served
22 either on an advisory committee or worked as a
23 consultant to the FDA. On a couple occasions for
24 companies dealing with particular risks and risk
25 management programs. So I've worked on both sides

## Page 33

1 consulting with them about the risks.
2  Q  Do you know about how many times you've
3 done this? And I don't mean, like, I'm not asking you
4 if a project involved, you know, 20 different
5 interactions. I mean, let's break them up into
6 projects. Do you know about how many projects you
7 worked on in that capacity?
8  A  Probably about a dozen.
9  Q  When you were on the advisory committee,
10 how many of those products involved you being on the
11 FDA advisory committee?
12 A  I probably been on about six or eight
13 advisory committees.
14 Q  When you were on the advisory committee --
15 were you ever on the advisory committee for the
16 approval of a product?
17 A  Yes, I was.
18 Q  Which products?
19 A  The most recent one, which was before I
20 started on this case, was a -- it was a antiviral drug,
21 it was a Pfizer antiviral drug, Maraviroc.
22 Q  Okay. Before that?
23 A  Before I started any of this.
24 Q  And before that?
25 A  MT100.

Page 286

1  psychiatric conditions had an event of suicidal and
2  self-injurious behavior?
3      A    Higher than what?
4      Q    Than the other indications on this chart?
5           MR. BARNES: The issue here, maybe you can
6  help us, just for the record, when you look up -- all
7  the percentages here do not add up to 100 percent. So
8  it's difficult for -- to answer that question. When
9  you look at it, you only have, like, 25 percent of
10 the -- you add up all these things and you've got much
11 less than --
12     Q    I'll go at it a different way. If you take
13 a look at 2000 June 30, 6/30?
14     A    Okay.
15     Q    This chart shows that 9 percent of the
16 serious reports where the indication was psychiatric
17 conditions with suicidal and self-injurious behavior.
18     A    Were these only among the psychiatric
19 conditions?
20     Q    9 percent of the people who took it for
21 psychiatric indications, where that was indicated in
22 the database, is for a psychiatric condition. Okay?
23     A    Not yet.
24     Q    All right.
25     A    Not yet.

Page 287

1      Q    I'm telling you that at 2000, 6/30,
2  June 30, 2000, 9 percent of the serious adverse event
3  reports where the indication was a psychiatric
4  condition contained a term for suicidal and
5  self-injurious behavior. Okay?
6      A    In which the indication was specified as
7  psychiatric.
8      Q    As psychiatric?
9      A    That is what I believe this is telling me.
10     Q    And for antiepileptic at the same time in
11 point it appears to be about 1.6 percent; is that
12 correct?
13     A    Antiepileptic? It's hard to say, but yeah,
14 somewhere about 1 percent maybe.
15     Q    I'm sorry, you're right, a little above
16 1 percent, correct?
17     A    1 percent of the serious reports had HL --
18 one of these HLTs in there.
19     Q    Right.
20     A    Among those who specified an outcome,
21 antiepilepsy.
22     Q    Right.
23     A    Okay.
24     Q    Now if you look at this chart, what it
25 shows is that the percentage for psychiatric conditions

Page 288

1  is higher than any of the other conditions, correct?
2      A    Well, because I don't know the N's and --
3      Q    Just the percentage, I'm not asking about
4  N's. The percentage is higher, correct?
5      A    But it could be one out of 2 or 1 out of
6  10. So it may not be meaningful.
7      Q    But the percentages are higher?
8      A    The percentage are different. I don't know
9  how meaningful they are because I don't have access.
10     Q    But is the percentage higher for
11 psychiatric conditions than the other conditions?
12     A    The percentage is different, yes.
13     Q    Are they higher?
14     A    9 percent is higher than 1 percent, yes.
15     Q    And at the data point before is it also
16 higher at June 30th of '99?
17     A    Again, I'm not sure about the significance
18 of it. Whether it's statistically significant, the
19 underlying N's. We could be talking about three cases
20 here. But the numbers -- the percentages are
21 different.
22     Q    And, in fact, at every point after 1999 on
23 this chart the psychiatric conditions is higher than
24 the other curves, correct?
25     A    Was this zero over zero or? You have some

Page 289

1  zeros here. Zero percentages.
2      Q    No, that means there are no suicidal and
3  self-injurious reports -- no serious for psychiatric
4  conditions at that point in time?
5      A    Thank you.
6      Q    It's zero. It's not zero over zero. It
7  means zero. It's not undefined. It's zero.
8           Anyway, but at every point after 1999 the
9  percentage for psychiatric conditions is higher,
10 correct, than any of the other indications?
11     A    After 1999?
12     Q    June 30th of '99, that data point.
13 Everything is higher, correct?
14     A    The percentages are higher for that
15 subgroup.
16     Q    Now, is one explanation for that
17 observation that these are people with psychiatric
18 conditions and people with psychiatric conditions tend
19 to commit suicide more than people with these other
20 conditions?
21     A    I would say very strong possibility.
22     Q    That's one possibility?
23     A    That they have a lot of underlying
24 conditions. They may be treated because of that very
25 reason.

Page 290

1  Q   That's correct.
2  A   High risk.
3  Q   That's what we talk about with confounding
4  indication, correct, confounding by indication; is that
5  correct? That's what you were talking about?
6  A   Yes.
7  Q   Now, is another possible explanation that
8  Neurontin had no efficacy for these people and so
9  basically you were dealing with people who had
10 psychiatric conditions who were not receiving any
11 treatment and they committed suicide?
12      MR. BARNES: Objection. Assumes facts not
13 in evidence and --
14 A   It's way beyond what I can take from this
15 chart. We don't have anything about efficacy. We
16 don't have anything about whether they're on other
17 treatments. And I would expect a lot of them are on
18 other drugs, from what I've seen.
19 Q   I just asked if one possibility is that
20 Neurontin is not efficacious for these people?
21 A   It's so far beyond what this shows, that's
22 a real big leap.
23 Q   Is it a possibility?
24      MR. BARNES: If you --
25 A   For everybody? I can't imagine.

Page 291

1  Q   Is it a possible that that's what's going
2  on, that Neurontin has no efficacy?
3      MR. BARNES: Objection.
4  A   It's not a reasonable assumption based on
5  this chart.
6  Q   Is it possible that Neurontin actually is
7  causing harm?
8      MR. BARNES: Objection.
9  A   Based on all of the data that I've seen,
10 there is no evidence at all that Neurontin is causing
11 harm.
12 Q   But you've never looked at the data by
13 indication, correct?
14 A   I looked at the FDA analysis which they
15 looked at the indications for the trial and this is
16 absolutely not what they saw.
17 Q   They did not look at spontaneous data,
18 correct?
19 A   Right, because they don't believe that the
20 spontaneous data has any validity for looking at this
21 outcome because of the confounding indication which is
22 probably what you're seeing here.
23 Q   But that's speculation --
24      MR. BARNES: Objection.
25 Q   -- that's probably what you've seen,

Page 292

1  correct?
2  A   Confounding by indication is the biggest
3  problem we have in pharmacoepidemiology, and it's the
4  first thing one considers when they're looking at
5  spontaneous data or observational data in general. So
6  it's a pretty good guess. This looks pretty clear.
7  Q   Is it also possible that the drug is
8  actually causing people to commit suicide based on this
9  chart?
10      MR. BARNES: Objection.
11 A   Based on this chart, you can't take that
12 leap.
13 Q   But you can take the leap that it's
14 confounding by indication?
15 A   That is the first explanation that I would
16 consider when I look at this because if it's biological
17 you would expect the rates to be up on all the groups.
18 Q   What?
19 A   You would expect the rates to be elevated
20 on all the groups. Why would you expect --
21 Q   So is it your opinion that drugs affect
22 every population of people the same way. That they
23 don't have different effects depending on a particular
24 population?
25 A   Can you clarify that.

Page 293

1  Q   Sure. Are some drugs contraindicated to
2  people are who allergic to a substance within the drug?
3  A   They can be.
4  Q   So for that particular population, there is
5  a risk that is different in using the drug than for
6  people who are not allergic to the drug, correct?
7  A   An allergic response, yeah.
8  Q   The risk is different for that population,
9  right?
10 A   The risk of having an allergic response is
11 different. It's not zero in the people that haven't
12 had a previous allergy, but it is lower.
13 Q   But there's a different risk, correct,
14 there's a risk differential?
15 A   Right. Everyone has the risk, but the
16 likelihood may be different.
17 Q   How do you know that people who are
18 bi-polar don't have a different risk in using Neurontin
19 than people who are epileptic?
20      MR. BARNES: Objection.
21 A   I have no evidence to base that on.
22 Q   But you don't know one way or the other,
23 correct?
24      MR. BARNES: Objection.
25 A   I know from the literature that there's

Page 318

1 MR. ALTMAN: This is a signal.
2 MR. BARNES: Well, objection. Vague.
3 A Yeah, within the context, I'm not quite
4 sure what you're talking about.
5 Q That's fine. Do you agree with spontaneous
6 reporting has been designed as a system for hypothesis
7 generation in the first place. As a rule for the study
8 using the most appropriate and usually different method
9 is needed to put the hypothesis to the test?
10 A Let's break it up. I agree with the first
11 sentence. What's the second sentence.
12 Q As a rule further study using the most
13 appropriate and usually different method used is needed
14 to put the hypothesis to the test?
15 A I agree that if you see an alert, or
16 clinically relevant signal, you need to follow-up with
17 another method to test the hypothesis in almost every
18 case.
19 Q I think one thing we never finally finished
20 up this morning. And I think I asked you. If you
21 observe an alert, under what conditions is it okay to
22 do nothing with the alert. Can you give me some
23 examples of when it would be okay?
24 A An alert is purely statistic.
25 Q Okay. Does an alert need to be evaluated

Page 319

1 whether it has clinical significance?
2 A There are and there should be, within the
3 company and within the FDA, protocol beforehand on how
4 one deals with statistical alerts from data mining and
5 what the triage procedure would be.
6 Q Understood. Does there have to be some
7 triage procedure?
8 MR. BARNES: At what time? As of today's
9 standards? As of today or different times? You're
10 talking about a period of time here that is long. So
11 if it's as presently defined or as understood in 2001.
12 I mean, it's a completely vague as to time.
13 MR. ALTMAN: I'm asking her opinion on
14 that.
15 Q Whether an alert needs to be followed up?
16 Does something need to be done with an alert or is it
17 okay to simply ignore it?
18 MR. BARNES: Objection. She's testified
19 that you don't even have to do -- you're not even
20 required to do anything with an alert under your own
21 premise.
22 MR. ALTMAN: You're messing up the
23 question.
24 Q If you see an alert, is it acceptable to do
25 nothing?

Page 320

1 A In what context?
2 Q To do simply nothing. You observe an
3 alert. You run some kind of data mining analysis, you
4 come up with an alert as we have discussed.
5 A For me or you?
6 Q I'm not asking for me or you. A company --
7 A A company.
8 Q -- defines an alert.
9 A For their drug?
10 Q For their drug. Is it okay to do simply
11 nothing?
12 A I don't know what their SOPs are or their
13 legal requirements. Is the alert evaluated clinically
14 immediately? Is it separate? So, I mean, it really
15 would depend on what's going on.
16 Q Does some kind of evaluation need to take
17 place on the alert to decide whether to go further?
18 A I believe that it needs some clinical
19 evaluation to see if the alert is actually a signal or
20 if it is something that uninterpretable or something
21 that may not be relevant.
22 Q Okay. So something has to happen. You see
23 an alert. You got to do something. You may conclude
24 that it's not relevant, you may conclude it's
25 uninterpretable, you may do something. But what's not

Page 321

1 okay is run your data mining and simply put your stuff
2 on the shelf --
3 MR. BARNES: If you have an opinion.
4 A I can't make an opinion like that because
5 you're talking in general and things are evolving even
6 as we speak on how data mining is best used.
7 So things are evolving now and that's a
8 good question that I don't think we have been able to
9 answer yet as an industry on how to deal with data
10 mining.
11 Q For your -- when you access Q Scan, is that
12 through a web site? Do you go into your log-in and you
13 can run your analyses?
14 A That's correct.
15 Q And you can download some of that data or
16 computations or whatever that it produces?
17 A It's an application. It has software on it
18 to do statistics, that's all it is.
19 Q How is the output given to you?
20 A It depends on what you're looking at.
21 Q The first time you provided us some Excel
22 spreadsheets of data that formed part of the basis of
23 your report, do you recall that?
24 A I believe I gave you the raw counts that
25 were used to calculate the PRRs, yes.

## Page 322

1  Q  Did you generate charts similar to that
2  when you did your analyses in your supplemental report?
3  A  Did I for here? No.
4  Q  For your supplemental report?
5  A  No, I didn't. Raw data.
6  Q  How did you actually -- the charts that are
7  in your supplemental report, did those come straight
8  from Q Scan or do you actually have to make those
9  charts? I'm talking about ones on the PRR?
10 A  Which -- give me an example, which one?
11 Q  Your supplemental report. Let's take on
12 page 22?
13 A  Figure 1?
14 Q  Figure 1, yes.
15 A  So I get the statistic, the PRR statistic,
16 and I put it in an Excel spreadsheet and I plotted it
17 in Excel.
18 Q  I mean, did you hand write that stuff from
19 Q Scan or did you download a chart or something?
20 A  I believe I downloaded a delimited file to
21 a data file.
22 Q  Do you still have those files?
23 A  Probably not. They're raw files. I would
24 just recalculate it.
25 Q  Okay. Did you write out a formal protocol

## Page 323

1  when you did these analyses?
2  A  I put the protocol in my report. So yes, I
3  decided beforehand what I was going to do.
4  Q  Do you know whether Dr. Blume did a similar
5  thing before she had analyses run?
6  A  Based on the number of tables and runs that
7  you did that were available on the CD that I reviewed,
8  I suspect not.
9  Q  Do you know if Dr. Blume said to run all
10 adverse event terms at all MedDra levels?
11 A  That's what it looks like to me that was
12 done.
13 Q  Is there something wrong with doing that,
14 running all adverse event terms on all MedDra levels?
15 A  Depends on what context.
16 Q  Well, in this context here you make the
17 suggestion that -- frankly, I think you make the
18 suggestion that there's something wrong with doing
19 that.
20    If the practice is to run every single
21 adverse event term that actually occurs at all four
22 MedDra levels, is there something fundamentally wrong
23 with doing every possible term and generating those
24 data?
25 A  But what you -- you can look at whatever

## Page 324

1  you want to look at. But what is the intent and if
2  you're going to do statistical analysis, you have to
3  predefine what is your threshold.
4     I don't think it's a legitimate exercise to
5  do the analysis and then afterwards to say, okay,
6  here's my cut off. I like this cut off because this
7  gives me what I want. You have to define your cut off
8  threshold, algorithm statistic ahead of time.
9  Q  Do you know whether Dr. Blume did that or
10 not?
11 A  She mentioned nothing about any statistic,
12 any threshold, any significance level. I saw nothing
13 in any report.
14 Q  But that doesn't mean that she didn't do
15 that, correct?
16    MR. BARNES: Objection.
17 A  If I saw nothing in all the pages of all of
18 these reports that she put together, she didn't bother
19 to mention that and she mentioned everything else, I
20 would assume that she didn't do it.
21 Q  Did you put your thresholds in here?
22 A  Yes, I did.
23 Q  Where are they? Is that what you used on
24 page 21?
25    MR. BARNES: Take your time. Maybe in your

## Page 325

1  first report.
2  A  That's what I'm looking at.
3  Q  I'm looking at page 21 of your supplemental
4  report.
5  A  I'm looking at page 21 of my first report
6  using the full data set as a background, I calculated
7  accumulated series of proportional reporting rates with
8  a threshold PRR of greater than 2 with a chi-squared
9  greater than equal to 2 commonly cited --
10    THE COURT REPORTER: Say that again.
11    THE WITNESS: Can I just reference you
12 where it is?
13    THE COURT REPORTER: Whatever you'd like.
14    THE WITNESS: This is the first report. Do
15 you know what it's labeled?
16    MR. BARNES: I don't think he marked it an
17 exhibit.
18    THE WITNESS: Okay. I apologize. In my
19 original report on page 21 I state the criteria that I
20 used to do my analysis. The threshold that I used.
21 BY MR. ALTMAN:
22 Q  If somebody decides to monitor specific
23 adverse event information going forward for some
24 reason, is that still data -- would you still consider
25 that to be data mining?

1 A It depends on how they're monitoring it.
2 Q If I want to -- if I decide that I'm
3 concerned about a particular adverse event based on for
4 whatever reason. I've done some review. I've made
5 clinical judgment that these particular adverse events
6 are of concern to me, and I want to monitor those going
7 forward and see what I see. Do you still consider that
8 to be data mining in terms of looking at particular
9 adverse events going forward?
10 A Not necessarily.
11 Q So that's more of a data -- can we call
12 that a data -- can we call that monitoring, I mean
13 simply a directed monitoring?
14 A It's some form of post-marketing
15 surveillance.
16 Q Do you have any opinion whether there was
17 any information in the possession of the company in
18 1994 that said it should have suggested to the company
19 that they should perform any kind of enhanced
20 monitoring of any particular adverse events associated
21 with the use of Neurontin?
22 A Based on my review of the clinical trials
23 that they submit to the FDA and the epidemiological
24 literature and the spontaneous reports, I don't see
25 that at all.

1 Q I'm talking about in 1994 when the drug was
2 first put on the market. You wouldn't have had
3 spontaneous reports and you wouldn't have had
4 epidemiologic data?
5 MR. BARNES: Objection. Asked and
6 answered.
7 A Based on all the information I reviewed,
8 even today, I do not see any signal, any signal of
9 disproportional reporting, any statistical
10 associations, even today. So I cannot imagine that
11 there would be anything available into 1994 if there's
12 nothing available even to this point after it's been
13 used so extensively.
14 Q Once again, your opinion is limited to not
15 involving somebody's clinical judgment that there is
16 something that should be monitored, correct?
17 MR. BARNES: Objection. She stated several
18 times what she's based her opinion on, so state it
19 again.
20 A I relied on the clinical judgment of the
21 experts that put together the reports, the Parson's
22 report, the FDA analysis which had a number of clinical
23 experts on it, the medical literature which has
24 clinical experts writing paper.
25 So based on the preponderance of evidence

1 that I reviewed, the epidemiological literature and the
2 clinical literature, I do not see any information even
3 today that would make one believe or even suggest that
4 there would be a statistical association with Neurontin
5 and suicidality.
6 Q Just quickly, I have these invoices here.
7 I'll mark these. This is the only copy. I guess we'll
8 just mark it as an exhibit. I just want you to review
9 this and see if these appear to be your invoices in
10 this case?
11 MR. BARNES: Up through today or?
12 MR. ALTMAN: Up to today. I mean, those
13 are the invoices I was handed. I have no basis of
14 knowing anything else.
15 A These are the invoices from the last -- the
16 deposition, the last deposition. It's not prior to
17 that. Except for this one because they didn't pay
18 until afterwards. So this is things received in 2008.
19 Q Let's mark that as the next exhibit.
20 (Whereupon, a document was marked as
21 Deposition Exhibit Number 28.)
22 Q I guess we'll mark as -- these are the
23 disks that you brought with you today?
24 A Yes, I brought those with me today.
25 Q Why don't we mark these as 29 through 32.

1 And I believe we are out of time much to your chagrin.
2 I thank you for your time and I just want to put on the
3 record that, once again, I did not have the opportunity
4 to access Q Scan data. I don't know what that access
5 would do in terms of my desire to ask questions of this
6 witness and so under the MDL we're entitled to two days
7 and under the California rules there's no time limit.
8 And therefore I'll hold this deposition or I'll adjourn
9 this deposition for now pending my review of that
10 information which may require some further examination
11 of this witness.
12 MR. BARNES: Okay. Well, I think what I
13 would ask you to do is put your request -- precise
14 request to us in writing and we will respond as to the
15 Q Scan data, what your current request is and we'll are
16 consider it and go from there.
17 MR. ALTMAN: That's good.
18 EXAMINATION BY MR. BARNES:
19 Q One question of the witness before we
20 conclude. Very early in the deposition Mr. Altman
21 asked you a question regarding the scientific rigor in
22 which you prepared your report and you stated that you
23 used the same, I'll paraphrase, it, the same scientific
24 rigor that you would use in doing your other
25 professional work except you didn't have as many hands

Page 330

1  to look at the references, what did that mean?
2  A   It means that this did not go through a
3  formal peer review process. So if I write a paper,
4  one, I'll have usually many co-authors. So everyone
5  gets to review that and then I have a -- an editor
6  in-house that will go through and edit. And then when
7  I submit it to a journal for publication, it gets sent
8  out to at least two, three, four peers that go through
9  every aspect of the paper.
10 Q   In that process from time to time do they
11 find typos and errors within the draft manuscript?
12 A   No matter how many times you write and
13 rewrite it, there's always something, yes. They are
14 noticed. Then also if it's accepted the journal has
15 editorial staff that again go through it and sometimes
16 you'll find them.
17 Q   So that's the difference?
18 A   And then proofs. There's many, many steps
19 in the process to make sure.
20 Q   So the error that Mr. Altman pointed out
21 this afternoon is something that would perhaps come to
22 light during the normal peer review and editing process
23 that you do in your normal scientific and research
24 activities, correct?
25 A   Absolutely. Very minor typos or things

Page 331

1  like that would be caught and corrected. Absolutely.
2        MR. BARNES: Thank you. No further
3  questions.
4        EXAMINATION BY MR. ALTMAN:
5  Q   I have to ask a brief follow-up. You don't
6  know how many errors there are in either your
7  supplemental report or your original report if you
8  didn't go through that process, correct?
9  A   I went and did this as thoroughly and as
10 carefully as I could. I found errors in everybody's
11 reports on this case, including a couple of typos on my
12 own report.
13 Q   But you don't know if there are other
14 errors in your report, correct?
15 A   I know there's a couple of typos.
16 Q   I'm not talking typos, numerical errors?
17       MR. BARNES: She said that was a typo.
18 A   I know there's some typos in it.
19 Q   Is that --
20 A   But, I mean, I am going to assume that
21 there are not unless I find something. I've gone
22 through and worked this very hard to make sure that
23 this is accurate and correct.
24 Q   Okay.
25       MR. BARNES: No further questions. Thank

Page 332

1  you. We will read and sign.
2        (Whereupon, CD's were marked as Deposition
3  Exhibit Numbers 29 through 32.)
4        (Deposition concluded at 6:30 p.m.)

Page 333

CERTIFICATE OF DEPONENT

I hereby certify that I have read and
examined the foregoing transcript, and the same is a
true and accurate record of the testimony given by me.

Any additions or corrections that I feel
are necessary, I will attach on a separate sheet of
paper to the original transcript.

_____
SHEILA WEISS SMITH, Ph.D.