# EXHIBIT J

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 2

 3   In re:  NEURONTIN MARKETING, SALES  MDL DOCKET NO:  1629
             PRACTICES, AND PRODUCTS
 4           LIABILITY LITIGATION        Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7           ALL PRODUCTS LIABILITY
             ACTIONS
 8   _____/

 9
             VIDEOTAPED
10           DEPOSITION OF:      CHERYL D. BLUME, Ph.D.

11           DATE:               November 12, 2007

12           TIME:               9:25 a.m. to 6:07 p.m.

13           PLACE:              13902 North Dale Mabry Highway
                                 Suite 122
14                               Tampa, Florida

15           PURSUANT TO:        Notice by counsel for
                                 Defendants for purposes
16                               of discovery, use at
                                 trial or such other
17                               purposes as are permitted
                                 under the Federal Rules
18                               of Civil Procedure

19           BEFORE:             VALERIE A. HANCE, RPR
                                 Notary Public, State of
20                               Florida at Large

21                               Volume 1
                                 Pages 1 to 370
22

23

24

25
```

## Page 2

```
 1  APPEARANCES:
 2  KENNETH B. FROMSON, ESQUIRE
    Finkelstein & Partners
 3  785 Broadway
    3rd Floor
 4  Kingston, New York  12401
    (800) 634-1212 Ext. 2755
 5      Attorney for Plaintiffs
 6  RICHARD M. BARNES, ESQUIRE
    MICHAEL J. WASICKO, ESQUIRE
 7  Goodell, DeVries, Leech & Dann, LLP
    One South Street
 8  20th Floor
    Baltimore, Maryland  21202
 9  (410) 783-4000
10  -and-
11  VINCENT E. GUNTER, ESQUIRE
    LORI C. McGRODER, ESQUIRE (via telephone)
12  Shook, Hardy & Bacon, LLP
    2555 Grand Boulevard
13  Kansas City, Missouri  64108-2613
    (816) 474-6550
14      Attorneys for Defendant, Pfizer, Inc.
15  ANNAMARIE A. DALEY, ESQUIRE (via telephone)
    Robins, Kaplan, Miller & Ciresi L.L.P.
16  2800 LaSalle Plaza
    800 LaSalle Avenue
17  Minneapolis, Minnesota  55402
    (612) 349-8500
18      Attorney for Plaintiff, Assurant
19  ELANA GOLD, ESQUIRE (via telephone)
    Law Office of Steven Hillyard
20  345 California Street
    Suite 1770
21  San Francisco, California  94104
    (415) 334-6880
22      Attorney for Raymond Jennings, M.D.
23  ALSO PRESENT:
    KEITH ALTMAN, Finkelstein & Partners
24  DAVID LEGGETT, Videographer
25
```

## Page 3

```
 1              INDEX
                                              PAGE
 2  DIRECT EXAMINATION BY MR. BARNES...............   6
 3  CERTIFICATE OF OATH............................ 369
 4  REPORTER'S CERTIFICATE......................... 370
 5
 6           EXHIBITS
                                       ID    MARK
 7   1  First Amended Notice of .........   9     9
        Videotaped Deposition Duces Tecum of
 8      Cheryl D. Blume, Ph.D.
 9   2  Hard Drive (Retained by counsel)...  13    13
10  2A  Directory of Contents on Hard Drive... 14
11   3  Disk of Neurontin/gabapentin ......  14    14
        Bibliography
12
    3A  Directory of Documents Found on Disk.... 15   14
13
     4  Exhibit Number Skipped...............  35
14
     5  Notebook.............................  36    36
15
     6  Correspondence and Communications ...  36    36
16      Removed from Notebook (Exhibit 4)
17   7  Disk In Re:  Neurontin Keith Altman .... 45   45
        ADE Files (10/28/07)
18
     8  Yellow Legal Paper for Requested ....  117  117
19      Formula
20   9  Guidance for Industry, Good .........  118  118
        Pharmacovigilance Practices and
21      Pharmacoepidemiologic Assessment,
        March 19th, 2005, Clinical Medical
22
    10  Map of Terms for Suicidal and ......  160  159
23      Self-Injurious Behaviors
24  11  Pharmacopeidemiology, Fourth Edition, .. 164  164
        by Brian Strom (Page 171)
25
```

## Page 4

```
 1            EXHIBITS (Continued)
                                       ID    MARK
 2  12  Composite, Graphs (7)............... 178   175
 3  13  Photograph.......................... 196   196
 4  14  Photograph.......................... 197   197
 5  15  PDG Financials...................... 249   249
 6  16  Collins-McFarland Research Report - .... 346   346
        Divalproex, lithium and suicide among
 7      Medicaid patients with bipolar
        disorder
 8
```

## Page 5

 1       THE VIDEOGRAPHER:  This is the videotaped
 2  deposition of Cheryl Blume, Ph.D., being held in
 3  the offices of Pharmaceutical Development Group
 4  located at 13902 North Dale Mabry Highway in Tampa,
 5  Florida, on November 12th, 2007.  The time is
 6  9:25 a.m.
 7       My name is David Leggett.  I'm the videotape
 8  specialist.  And the court reporter is
 9  Valerie Hance.  Will counsel introduce themselves.
10       MR. BARNES:  Richard Barnes on behalf of
11  Pfizer.
12       MR. GUNTER:  Vince Gunter on behalf of Pfizer,
13  defendants.
14       MR. WASICKO:  Michael Wasicko on behalf of
15  Pfizer.
16       MR. FROMSON:  Kenneth Fromson on behalf of the
17  product liability plaintiffs in the MDL, liaison
18  counsel in the New York coordinated litigation, and
19  counsel for plaintiffs in the action of Nicolette
20  Crone vs. Pfizer, Lake County, California.
21       MR. ALTMAN:  Keith Altman, nonattorney with
22  Finkelstein & Partners.
23       MR. BARNES:  Counsel on the phone, please
24  identify themselves.
25       MS. DALEY:  Annamarie Daley, counsel for

1  necessity during different time periods.
2      I believe the first time period that we will
3  be interested in is in the period 1994 to 1996. And
4  I'll get to that in just a second.
5      Now, the adverse events that are noted in this
6  report that appear in either quarterly or annual reports
7  or in PSURs, we are able to access those and address
8  those in our office.
9      Where I turn to Mr. Altman's expertise are in
10 the -- are in the large databases that are relied upon
11 in doing -- conducting pharmacovigilance work. So that
12 would include the Pfizer's -- Pfizer's internal
13 database. And, for example, he would have been involved
14 in the work that we did in -- the first time period of
15 relevance is '94 to '96.
16     Q. Would you please tell me the charts which he
17 pulled for you, please.
18     A. He filtered the data that would have been
19 involved in -- on page 69 of my report, page 70, 71, 72,
20 which are the filter of the top 25 adverse events during
21 that relevant time period in the database across all
22 body systems. And that would proceed to 72, 73, 74.
23     Beginning on page 75, which is paragraph 117,
24 we turn then to the various available databases,
25 independent available databases. During this timeframe

1  with the U.S. Government, it would have been the SRS --
2      Q. Who did --
3      A. -- system.
4      Q. Who -- who pulled the data on -- and did the
5  analysis for paragraph 117 on page 75?
6      A. Mr. Altman.
7      Q. Mr. Altman did?
8      A. Yes. This is from the FDA's database. It's
9  maintained by -- I think it's maintained by NTIS.
10     Q. So just so I understand, the tables on 69, 70,
11 71, 72, 73, 74, and page 75 were prepared by Mr. Altman,
12 correct?
13     A. He provided me with the numbers of events.
14 The tables were actually prepared here.
15     Q. What did you do -- let's just take page 75.
16 What -- describe what you personally did to prepare
17 Table -- the table on page 75.
18     A. Okay. This is in 1994, which would have been
19 the first marketed year of Neurontin in the
20 United States, so Pfizer would be submitting quarterly
21 reports during that timeframe. So we pulled the terms
22 that we were interested in having filtered by Mr. --
23 Mr. Altman from the FDA's database. We gave him the
24 terms that we were interested in. He gave me the number
25 of reports.

1      I also asked him to give me the total number
2  of events in the database so we could do the standard
3  calculation of the percent of total.
4      Q. So on page 75, you look at abnormal dreams,
5  that -- that percentage, the numerator is -- let's say
6  on 1996 Q2, the numerator would be one, and then the
7  denominator would be all events in the database
8  pertaining to having been reported to Neurontin?
9      A. That would be yes.
10     Q. Okay.
11     A. Oh, yeah. And it would only be the Pfizer
12 database, of course, because it was a sole source
13 product at that time.
14     Q. Okay. Continue after '75 as to what -- what
15 Mr. Altman prepared versus to what -- as to what you
16 prepared.
17     A. Okay. So the --
18     Q. Who accessed Health Canada on page 76?
19     A. Well, that's World Health Organization.
20     Q. I'm sorry.
21     A. That's not Health Canada.
22     Q. I made a mistake. I apologize.
23     A. We generally access the WHO database. Now,
24 whether we did it in this case or Mr. Altman accessed
25 it, I don't specifically recall.

1      Q. You don't know who prepared this. Who
2  provided the terms?
3      A. We provided the terms.
4      Q. You directed the terms and he went -- he or
5  you -- on this, on page 76 -- went into the database to
6  extract it?
7      A. Yes, it's a little different with the World
8  Health Organization. When you receive the database from
9  them, they send you the entire database, so it's a
10 matter of going through and extracting from a whole --
11 you don't -- you don't have the opportunity to do it by
12 body systems. They send you everything.
13     Q. Do you have -- okay.
14     Do you have the database that was provided to
15 you from World Health Organization in your possession;
16 that was used to create this table on page 76?
17     A. Yes, and I have put that on this disk as well.
18     Q. And that would be referring to Exhibit No. 3?
19     A. Yes.
20     Q. Thank you very much.
21     All right. Why don't you continue to review
22 the report just as to what you -- so -- what you
23 prepared.
24     Right now, we have Mr. Altman preparing 69,
25 70, 71, 72, 73, 74, 75, and 76, correct?

Page 54

1  MR. FROMSON: Just note my objection as to the
2  form in terms of the use of the word "prepare."
3  MR. BARNES: "Filtered" was her room -- word.
4  "Filtered." I'll --
5  THE WITNESS: Yes. And just to clarify, I
6  would have to check if we -- if we did the World
7  Health Organization or if he did it.
8  BY MR. BARNES:
9  Q. You'll check on that for me?
10 A. Yes, I will.
11 Q. Okay. Now, when you -- Mr. Fromson noted an
12 objection. What do you mean by Mr. -- by using the
13 phrase Mr. Altman filtered the information for you, what
14 does that mean?
15 A. Well, my understanding of the FDA and some of
16 these other databases is they are huge databases. The
17 word "filter" is simply my way of asking him to apply
18 the rules and the conditions that he has established in
19 evaluating the database and calculating the number of
20 specific events at -- at this designated time periods.
21 Q. What are the rules that Mr. Altman established
22 in querying the databases to get the number of events?
23 A. Well, we out -- we outline these. When we
24 submit, for example, to the Food and Drug
25 Administration, we give a complete list of what he does.

Page 55

1  But my understanding is that care is taken to
2  take into consideration when there is an initial report
3  versus a follow-up report so it is not counted twice.
4  We filter -- I believe he filters the database so that
5  we are getting all of the information. We take the last
6  reports so that it includes all the cumulative
7  information. He checks for duplicates. He is able to
8  filter them for us by suspect status, nonsuspect status.
9  If we ask, he can filter it by various demographics.
10 For example, if the patient were on other meds, were not
11 on other meds.
12 If we're given information generally, whatever
13 fields -- it is my understanding, whatever fields are in
14 the intake form, he would be able to filter by those
15 forms -- fields. Excuse me.
16 Q. Are you -- is it your testimony that that's
17 what he did in this case?
18 A. Well, what I asked for -- and there are
19 certain -- there are certain precautions that he
20 undertakes for all tables. For example, he is very
21 careful that we don't double count. He is very careful
22 that we put the event when the event was -- when the
23 event occurred, not necessarily when reported.
24 Q. How do you know he was careful? What did you
25 do to -- did you do anything to audit his work in this

Page 56

1  case to verify that he was exercising care?
2  A. We have used his -- the method that he has
3  developed has been provided to the FDA. FDA has queried
4  him independently on the way in which he analyzes these
5  data. FDA has -- has approved our applications using
6  these data. I understand that Mr. Altman communicates
7  with the FDA on projects other than mine, as well, on
8  these database assignments, so --
9  Q. My question is, what did you do in this
10 particular case to verify that Mr. Altman exercised care
11 in preparing these tables and filtered it in an accurate
12 and reliable way --
13 A. Well, I under --
14 Q. -- in this case?
15 A. Yes. I understood he used the same system
16 that has been previously found to be acceptable. I
17 cannot tell you over the last four years of whether I
18 did any other independent checking or not. I just don't
19 recall.
20 Q. In this case, did you do any independent
21 checking of Mr. Altman?
22 A. That's what I'm saying. In the last four
23 years, I just don't recall if I did or not.
24 Q. Well, when were you retained in this matter?
25 A. 2003. 2003, I think.

Page 57

1  Q. 2003.
2  And who called you?
3  A. Wow. I think I was contacted by
4  Andrew Finkelstein.
5  Q. Okay. So is there any documentation that you
6  have reviewed to verify that the material provided to
7  you and the analysis provided to you by Mr. Altman was
8  done in -- in a scientifically-rigorous and reliable
9  manner?
10 MR. FROMSON: Just note my objection as to
11 form.
12 THE WITNESS: I -- over the years, I don't
13 recall if I did any of that on this case. I accept
14 his work because it has been accepted and -- and
15 validated to FDA satisfaction.
16 BY MR. BARNES:
17 Q. Would you de- -- would you please describe to
18 me the -- the cases that Mr. Altman worked --
19 Mr. Altman's work has been validated by the Food and
20 Drug Administration.
21 A. Well, I -- I can tell you that NDAs have been
22 approved using his database work, but I -- it's the same
23 answer I gave you earlier. I can't identify those
24 clients.
25 Q. Has any of Mr. Altman's work been published in

15 (Pages 54 to 57)

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 90

1  Q. Is -- are -- is -- is -- are the analyses that
2  Mr. Altman prepared for you, as you've defined it in
3  this litigation, important to your opinion in this case?
4    MR. FROMSON: Just note my objection as to the
5    form. That's an ambiguous question.
6    THE WITNESS: Well, I think that everything I
7    have in here is important. I mean, the World
8    Health Organization database is important to me.
9    Yes, they're all important to me.
10 BY MR. BARNES:
11 Q. So if -- if Mr. -- is it your testimony that
12 if you extracted the SRS database analysis and the
13 analysis based on the internal Pfizer databases that
14 your opinion would be the same with regard to the signal
15 analysis?
16 A. Well, the Pfizer database was also repeated in
17 the 2004 NDA records. So, I mean, even if I lost the
18 Pfizer databases, I would still have their analyses of
19 those databases in the NDA submission.
20    Yeah, my opinion would still be the same,
21 because there -- there was an amazing similarity in
22 signals and conclusions across SRS and WHO and even the
23 Health Canada database.
24 Q. Just so I understand though, you -- so your --
25 the absence -- you do not need the SRS database analysis

Page 91

1  to form your opinions with regard to signals?
2  A. Well, it's almost an impossible question to
3  answer. We are required to assess the SRS database for
4  signals. I mean, FDA has criteria on how one data mines
5  the database. So, yes, it's important to me, but we
6  additionally mined the WHO database and we looked at the
7  mining efforts of your client in their internal database
8  and in the materials they redid in 2004. So my opinion
9  is not dependent on any one issue.
10    And if, as you read the conclusions, I go
11 across -- I conduct pharmacovigilance across databases,
12 not dependent on one database. Now, if one database
13 were remarkably different than the other one, we might
14 go back and check that again.
15 Q. Okay. Let's move on. One --
16 A. What page are you on?
17 Q. 120, I think, is my next table. Who prepared
18 that?
19 A. This is the internal database, and I believe
20 this was Mr. Altman on through 120 -- let's see -- 127.
21 Q. So from 120 to 127 are various tables of
22 reports of adverse events that Mr. Altman extracted from
23 the Pfizer internal database between 1996 and 2002,
24 correct?
25 A. Yes.

Page 92

1  Q. And, again, did you audit or in any way
2  validate the work product you received from Mr. Altman
3  on pages 120 to 127?
4  A. No.
5  Q. Okay. What's on 128? This is PSURs, annual
6  reports? Or is this the internal Pfizer adverse event
7  database?
8  A. No, this is not -- this isn't PSUR. These
9  are -- this is the internal database.
10 Q. So then, again, this is Mr. Altman's work,
11 correct, on 128?
12 A. Yes. And these are for -- well, in part.
13    Your client did a partial amplification of
14 their label in '96 to include some additional
15 postmarketing events. And the ones listed on the page
16 are the ones that Pfizer chose to put into the package
17 insert at that timeframe.
18 Q. You say the word "Pfizer" in 1997. Is it your
19 testimony that Pfizer, Inc., modified the label in 1997?
20 A. Well, I think they -- I'm using "Pfizer" to
21 refer to them all. I think Pfizer came in around 2000,
22 but when I say "Pfizer," I'm referring to Parke-Davis
23 and Warner-Lambert.
24 Q. Is it important to you to be accurate in the
25 way you -- you testify in terms of what corporation,

Page 93

1  what party conducted certain analyses?
2  A. I think in the report I talk about the
3  different -- who submitted the different reports, when
4  they were submitted, at different time points. But for
5  the purposes of discussion, I have been just using the
6  term "Pfizer."
7  Q. Well, for purposes of this deposition, when I
8  use the term "Pfizer" and I use the term
9  "Parke-Davis/Warner-Lambert," they're two different
10 corporations. Do you understand that?
11 A. I do, but I also looked in the database and
12 couldn't find anywhere when Pfizer did -- did assume
13 control that they corrected anything that Parke-Davis
14 did.
15 Q. That's not -- that's not the question.
16 A. So since that time, I have just referred to
17 everything as "Pfizer."
18 Q. Well, what -- so is it your view that you just
19 lump everybody together no matter who's actually
20 involved as a matter of fact?
21    MR. FROMSON: Just note my objection as to
22    form.
23    THE WITNESS: I don't -- I don't understand.
24 BY MR. BARNES:
25 Q. Well, when you say the word -- when you say

24 (Pages 90 to 93)

Page 102

1 products as percent reports. Both of these tables were
2 done by Mr. Altman.
3   Q.  Who directed that these tables be prepared?
4   A.  The table in 194 is a table across comparisons
5 of different antiepileptic drugs. It's a standard way
6 that we have tried to pictorially present the data that
7 we looked at earlier in comparison to other sister
8 drugs. I asked that that be done.
9   Q.  And so you directed this analysis?
10  A.  Yeah, this is a routine analysis for us in our
11 work when we're -- when we have drugs that are part of a
12 class.
13      And I had -- page 195 is a comparison from
14 another trial -- another project that I guess Mr. Altman
15 is working on. But it illustrated the same sort of
16 separation within a class.
17  Q.  So Mr. Altman prepared this chart on page 195,
18 correct?
19  A.  Yeah, well, he did 194 and 195.
20  Q.  Did both of them?
21  A.  Right.
22  Q.  Okay. Did you do any independent work to
23 validate the graph on page 194 or on page 195?
24  A.  No.
25  Q.  And so you don't know if there is a rate of

Page 103

1 error for the data depicted on page 194 which is
2 entitled "PRR Over Time, Suicidal and Self-Injurious
3 Behavior HLT," correct?
4   A.  I don't know if there is any rate of error and
5 I --
6   Q.  One way or the other?
7   A.  I don't have a -- no, I did not validate it.
8   Q.  Did you -- did you -- you said something about
9 this is how -- at page 194, 195 -- this is how you
10 routinely do these analyses for other -- other clients?
11  A.  No, for pharmacovigilance work.
12      What this does is, we're interested in this
13 case in Neurontin, so Neurontin will be on the chart,
14 but as pharmacovigilance assignments, you're always
15 interested if a particular adverse event is simply
16 part of the -- is part of what is observed with that
17 class of drugs or whether there is something unique
18 with --
19      (Phone ringing.)
20      THE WITNESS: Somebody is calling in.
21      -- whether there is something unique with your
22 drug.
23      So what one does, what we are -- what is
24 suggested, what we are taught to do is to do these
25 PRR ratios. Because if there is something unique

Page 104

1 about a drug, it will look different in a PRR time,
2 time-derived data, than will the other drugs in the
3 class.
4 BY MR. BARNES:
5   Q.  Who chose the drugs on page 194 for
6 comparison?
7   A.  Oh, I -- I don't know if we did these. I -- I
8 think I mentioned in my report Gabitril. I know we talk
9 about carbamazepine. I don't -- I don't know if we did
10 that collectively or if I sent the list one. I don't
11 know.
12  Q.  So it's possible that Mr. Altman chose the
13 comparator drugs --
14  A.  Well --
15      MR. FROMSON: Just note my objection.
16 BY MR. BARNES:
17  Q.  -- on this graph?
18  A.  I --
19      MR. FROMSON: I'm sorry. Just note my
20 objection as to form.
21      THE WITNESS: I don't recall how we did this.
22 We had to do it in a -- we had to pick drugs that
23 would have data across the relevant time period, so
24 we couldn't use an -- an AED that were approved in
25 2003 or 2004, because it wouldn't have the data.

Page 105

1 So I -- I don't -- whether we collectively did
2 this or not, I just don't recall.
3 BY MR. BARNES:
4   Q.  So it's possible that Mr. Altman chose the
5 comparator drugs, correct, without your supervision?
6       MR. FROMSON: Note my objection as to form.
7       THE WITNESS: I recall the discussion of
8 including Gabitril in there. I know that I
9 remember that. Now, I just don't recall.
10 BY MR. BARNES:
11  Q.  You say "class of drugs." What do you mean by
12 a class of drugs?
13  A.  Well, when you look at pharmacovigilance data,
14 you're interested, of course, in the -- in the drug in
15 question for that particular NDA, but you're also
16 interested in other drugs that are chemically similar to
17 that drug, whether it's used for the same indication or
18 not, so you do that comparison. You compare the adverse
19 event of interest with other drugs that are approved for
20 the same indication, and you also approve drugs that
21 have the same mechanism of action. So there is
22 different ways that you canvas pharmacovigilance data.
23      In this particular table or this particular
24 graph, what we have here are the PRRs for the
25 suicide-related events, the high-level term