# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RUTH SMITH, Individually and as Widow | ) | |
| for the Use and Benefit of Herself and the | ) | |
| Next of Kin of RICHARD SMITH, Deceased, | ) | **Case #: 3:05-00444** |
| | ) | **Judge Trauger** |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| PFIZER INC., PARKE-DAVIS, | ) | |
| a division of Warner-Lambert Company | ) | |
| and Warner-Lambert Company LLC, | ) | |
| WARNER-LAMBERT COMPANY, | ) | |
| WARNER-LAMBERT COMPANY LLC and | ) | |
| JOHN DOE(S) 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF CHARLES KING III, Ph.D.

1.      My name is Charles  King III.  I am an expert witness on marketing and economics in *Smith v Pfizer Inc.,* one of the cases in MDL-1629, *In Re Neurontin Marketing, Sales Practices and Products Liability litigation.*  I prepared and submitted a report of my study on October 22, 2007, in MDL-1629, *In Re Neurontin.*  I was deposed by the defendants in MDL-1629, *In Re Neurontin.*  I testified as an expert witness in *Shearer v Pfizer Inc.* in April, 2010.

2.      My qualifications as an expert witness include:

   a.      As an economist, I specialize in marketing, industrial organization, microeconomics and econometrics.  I have taught economics, marketing and statistical methods in economics; conducted marketing and economic research; and provided economic and marketing consulting in my areas of specialization. As an Assistant Professor in Marketing at the Harvard Business School from 1997 to 2003, I taught courses in marketing, information and network economics, and organizational economics in the Masters' and Doctoral programs.

   b.      I also taught in Harvard Business School's executive education program for pharmaceutical companies and in IBM's Premier Program on competitive strategy. Since 1981, I have consulted to private corporations, nonprofit corporations, law firms, consulting companies and research organizations. From 2001 through 2009, I have served as a member of the Editorial Review Board for Journal of Public Policy & Marketing. I have been and continue to be a research referee for a variety of academic journals and have been a program reviewer for

the Robert Wood Johnson Foundation. I am the author of various refereed journal articles, working papers and consulting reports.

c.  My research activities include issues concerning health care and the pharmaceutical industry. For example, I have written an academic working paper[1] analyzing marketing, product differentiation and competition in the pharmaceutical drug market and published a case study[2] evaluating Pepcid's race against Zantac and other competitors to enter the over-the-counter market. I have published a variety of peer-reviewed articles and cases,[3] including applications of marketing and economic analyses to health care and pharmaceutical issues.

d.  I have experience in applying economic and marketing theories to the pharmaceutical industry. I have submitted testimony and consulted in litigation involving health care and pharmaceutical markets and industries including:

* Consulting in the litigation brought by the Massachusetts Attorney General against the tobacco companies. Working with a team of health care experts, I submitted written testimony assessing and measuring the impacts of smoking on Medicaid health costs in The Commonwealth of Massachusetts.[4]

* Serving as an expert witness for the plaintiffs in Daniels v. Philip Morris Cos.[5] In that assignment I examined the magazine advertising patterns of cigarette manufacturers.

* Testifying before the United States Senate on the effect of the Master Settlement Agreement on the potential exposure of young people to cigarette advertising in magazines.[6]

* Testifying on the issues of liability and market definition in an antitrust case involving the prescription drug Relafen.[7]

---

[1] C. King, "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Harvard Business School, Working Paper No. 0-014 (Sept. 2000).

[2] E.R. Berndt, C. King, L. Klein and A.J. Silk, "Pepcid AC: The Race to Enter the OTC Market," (9-500-073), Harvard Business School. Also published in *Problems and Cases in Health Care Marketing*, edited by J.T. Gourville, J.A. Quelch and V.K. Rangan, McGraw-Hill Irwin, 2003.

[3] *See* C. King and D. Narayandas, "Coca-Cola's New Vending Machine (A): Pricing To Capture Value, or Not?" (9-500-068), Harvard Business School; E.R. Berndt, C. King, L. Klein and A.J. Silk, "Pepcid AC: The Race to Enter the OTC Market," (9-500-073), Harvard Business School (also published *in Problems and Cases in Health Care Marketing*, edited by J.T. Gourville, J.A. Quelch and V.K. Rangan. McGraw-Hill Irwin, 2003).

[4] The results of this work are described in D. Cutler, A. Epstein, R. Frank, R. Hartman, C. King, J. Newhouse, E. Richardson and M. Rosenthal, "How Good a Deal was the Tobacco Settlement?: Assessing Payments to Massachusetts," *Journal of Risk and Uncertainty* (2000), 21 (2/3).

[5] *Daniels v. Philip Morris Cos.*, 18 F. Supp. 2d 1110 (S.D. Cal. 1998).

[6] C. King, Statement Before the Committee on Governmental Affairs, Subcommittee on Oversight of Government Management, Restructuring and the District of Columbia, United States Senate, May 14, 2002 (available at <http://hsgac.senate.gov/051302king.pdf> as accessed October 2007).

---

- ◆ Submitting written testimony regarding discovery and class certification and consulting to counsel for the plaintiffs regarding damages in a case involving the prescription drugs Celebrex and Vioxx.[8]

- ◆ Submitting written testimony analyzing impact and class certification and consulting to counsel for the plaintiffs regarding damages for the class of direct purchasers of the anti-depressant Paxil[9] and for the class of individual purchasers of the prescription drug Vioxx in two separate cases.[10]

- ◆ Submitting written testimony on behalf of Teva Pharmaceuticals USA, Inc., as defendant, determining whether Abbott Laboratories would suffer immediate "irreparable" harm unless granted an injunction.[11]

- ◆ Submitting written testimony concerning issues pertaining to class certification, liability and product market definition, and damages and consulting to counsel for the plaintiffs for the class of end payors of the prescription drug TriCor.[12]

- ◆ Consulting to Greylock McKinnon Associates on litigation involving a broad range of markets, including agricultural, financial[13] and pharmaceutical[14] markets, and legal issues. This consulting related to the following additional drug products: Augmentin,[15] Cipro,[16] K-Dur,[17] Lipitor,[18] Lupron,[19] Neurontin,[20] Relefan[21] and Remeron.[22]

---

[7] *In re Relafen Antitrust Litigation*, United States District Court, D. Mass. Master File No. 01-CV-12222-WGY.

[8] *Heindel et al. v. Pfizer et al.*, United States District Court, D. New Jersey, Civil Action, Case No. 02-3348 (GEB).

[9] *The Stop & Shop Supermarket Company et al. v. SmithKline Beecham Corporation*, United States District Court, Eastern District of Pennsylvania, C.A. No. 03-4578.

[10] *Kleinman et al. v. Merck & Co., Inc.*, Superior Court of New Jersey Law Division: Camden County, Docket No. ATL-L-7894-04-MT and *Anderson et al. v. Merck & Co., Inc.*, Superior Court of the State of California, County of Los Angeles, Central Civil West, Case No. BC 324384.

[11] *Abbott Laboratories v. Teva Pharmaceuticals USA Inc.*, United States District Court for the Northern District of Illinois, Eastern Division, C.A. No. 07 C 2213.

[12] *In re: TriCor Indirect Purchaser Litigation*, United States District Court, District of Deleware, C.A. No. 05-360.

[13] *Lynne A. Carnegie v. Household International, Inc., Household Bank, f.s.b., successor in interest to Beneficial National Bank, Household Tax Masters Inc., formerly known as Beneficial Tax Masters, Inc., Beneficial Franchise Company, Inc., H&R Block, Inc., H&R Block Services, Inc., H&R Block Tax Services, Inc., H&R Block Eastern Tax Services, Inc., Block Financial Corp. and HRB Royalty, Inc.*, No. 98 C 2178, United States District Court for the Northern District of Illinois Eastern Division.

[14] *In re Pharmaceutical Industry Average Wholesale Price Litigation,* United States District Court for the District of Massachusetts, MDL, No. 1456, CIVIL ACTION: 01-CV-12257-PBS.

[15] *In re Augmentin Antitrust Litigation*, United States District Court for the Eastern District of Virginia, No. 02-CV-442.

[16] *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, Master File No. 1:00-MD-1383, United States District Court for the Eastern District of New York.

[17] *In re K-Dur Antitrust Litigation*, Civil Action No. 01-1652 (JAG), (Consolidated Cases), MDL No. 1419, United States District Court for the District of New Jersey.

3.     I received a bachelor's degree in astronomy (*magna cum laude*) from Harvard University in 1974. I received a *juris doctor* degree in law from the Yale Law School in 1979 and a Ph.D. in economics from M.I.T. in 1997. Details of my professional experience, publications, and past testimony are described in my *curriculum vitae*, a copy of which is attached to this report as Exhibit A.

4.     My assignment was to review case materials, company documents, sales and marketing data and reports, published academic studies and other materials and to compile, synthesize and analyze these materials as they apply to the marketing of Neurontin. The outcome of my review culminated in my written expert report and opinions. In forming my opinions, I applied standard methods and my expertise and experience in marketing and economics. I systematically looked for materials, both case materials and academic research, relevant to the issues in the case. In addition, when appropriate, I considered other alternative explanations for my conclusions to determine their validity. These methods are similar to those commonly used in refereed academic publications undertaking similar analysis. For example:

- ◆ See the Steinman article, "Narrative Review: The Promotion of Gabapentin: An Analysis of Internal Industry Documents," which appeared in the scientific journal, *Annals of Internal Medicine*, which undertook identical methods in reaching their conclusion that "[a]ctivities traditionally considered independent of promotional intent, including continuing medical education and research, were extensively used to promote gabapentin. New strategies are needed to ensure a clear separation between scientific and commercial activity."[23]

- ◆ See Scherer, "The Pharmaceutical Industry" which was published in the Handbook of Health Economics. The methods used in this review article are to analyze, compile and synthesize published academic research and to form opinions about health care economics.[24]

- ◆ See the Fung article, "Systematic Review: The Evidence that Publishing Patient Care Performance Data Improves Quality of Care." The purpose of this research

---

[18] *In re American Federation of State, County and Municipal Employees, et al., Plaintiffs, vs. GlaxoSmithKline plc, and SmithKline Beecham Corporation, Defendants*, Docket No. 2:02cv442, United States District Court Eastern District of Virginia Norfolk Division.

[19] *In re Lupron Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL No. 1430, CA No. 01-CV-10861.

[20] *In re Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts.

[21] *In re Relafen Antitrust Litigation,* United States District Court, District of Massachusetts, Master File No. 01-CV-12222-WGY.

[22] *In re Remeron End-Payer Antitrust Litigation*, United States District Court for the District of New Jersey, Master Docket No. 02-CV-2007.

[23] See Steinman, M., L. Bero, M. Chren and C. Landefeld, "Narrative Review: The Promotion of Gabapentin: An Analysis of Internal Industry Documents," *Annals of Internal Medicine*, Vol. 145(4), 2006.

[24] Scherer, "The Pharmaceutical Industry," in A. Culyer and J. Newhouse eds., *Handbook of Health Economics*, Vol. 1, 2000.

---

was "to synthesize the evidence for using publicly reported performance data to improve quality." Based on this, the authors conclude that "[e]vidence suggests that publicly releasing performance data stimulates quality improvement activity at the hospital level."[25]

◆ See Rosenthal and Frank, "What is the Empirical Basis for Paying for Quality in Health Care?" where "[t]he authors review the empirical literature on paying for quality in health care and comparable interventions in other sectors. They find little evidence to support the effectiveness of paying for quality."[26]

5.    In summary, these are just a few examples of methods commonly used and accepted in academic research and in health care economics. I use these same standard methods in my report to reach my conclusions.

6.    Part of my review included an extensive review of materials provided by Defendants. As I testified, I was provided a computer hard drive with what was represented to be all Warner-Lambert and Pfizer documents that had been disclosed by those companies in legal discovery. There were hundreds of thousands of documents. Many of the Warner-Lambert and Pfizer documents are not self-explanatory and certainly not to a lay person. For example, many of their marketing documents, such as operating plans, operating goals, marketing plans, publication plans, sales tracking statistics, or prescription tracking statistics, are not uniform from year-to-year and employed technical concepts and terminologies.

7.    As part of my analysis, I reviewed Verispan and other sales and marketing data which were furnished by the Defendants. These data were compiled under my direction and supervision by Mr. Altman. I note that to my knowledge, Defendants have not challenged the accuracy of the data that were compiled by Mr. Altman and indeed company records corroborate these data. For example, compare Bates Numbered document Pfizer_RGlaszman_0000665 (Neurontin Drug Uses – 1994-2000) with Figure 6 in my report (On-label and Off-label Uses of Neurontin). Both are reproduced below.

8.    In addition, I also relied on Dr. Blume, another expert, for certain Verispan data on numbers of prescriptions. It is normal and reasonable for economists and marketing experts to rely on persons with technical knowledge for specific data compilations.

---

[25] Fung , C., Y. Lim, S. Mattke, C. Damberg and P. Shekelle, "Systematic Review: The Evidence that Publishing Patient Care Performance Data Improves Quality of Care," *Annals of Internal Medicine*, Vol. 148, 2008.

[26] Rosenthal, M. and R. Frank, "What is the Empirical Basis for Paying for Quality in Health Care?" Medical Care Resarch and Review, Vol. 63(2), April 2006.

# Pfizer_RGlanzman_0000665 (enlarged)





9.      It is not true that I did not consider the proportion of off-label prescriptions of Neurontin that could be attributed to legitimate versus not-legitimate promotion. As I stated in my report, between five and ten per cent of Neurontin's total prescriptions were for on-label uses, that is, epilepsy or, after FDA-approval in 2002, post-herpetic neuralgia. See, for example, page 17, paragraph 18, and narrative summary in footnote 39.   See also Figure 8 in my report. As I also stated in my report, Neurontin had the highest percentage of off-label use of any of 160 commonly-prescribed drugs and an especially high percentage of prescriptions without scientific support.   The percentage of Neurontin's off-label usage greatly exceeds the average for commonly prescribed drugs. See, for example, Page 17, paragraph 18, and also the narrative summaries in footnotes 40-44.

I declare under penalty of perjury that the foregoing is true and correct.

Signed under penalties of perjury this day:

April 27, 2010

Charles King III, Ph.D.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 27th day of April, 2010, I electronically filed the foregoing document with the Clerk of the Court, United States District Court for the Middle District of Tennessee, using the CM/ECF system. True and correct copies of the foregoing documents are being served via the Court's CM/ECF system on the following:

Aubrey B. Harwell, Jr., Esq.
W. David Bridgers, Esq.
Gerald D. Neenan, Esq.
Robert A. Peal, Esq.
Neal & Harwell, PLC
2000 One Nashville Place
150 Fourth Avenue, North
Nashville, TN 37219

Prince C. Chambliss, Jr., Esq.
Evans & Petree, PC
1000 Ridgeway Loop Road, Suite 200
Memphis, TN 38120

Mark S. Cheffo, Esq.
Catherine B. Stevens, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

                                                     **/s/ Kenneth B. Fromson**
                                                      Kenneth B. Fromson