# EXHIBIT I

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4   IN RE:                                    )
     NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
 5   AND PRODUCTS LIABILITY LITIGATION     ) Pages 107 - 360

 6

 7

 8
                    DAUBERT HEARING - DAY TWO
 9
            BEFORE THE HONORABLE PATTI B. SARIS
10               UNITED STATES DISTRICT JUDGE
                             and
11               JUSTICE MARCY S. FRIEDMAN
                   NEW YORK SUPREME COURT
12

13

14

15
                              United States District Court
16                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
17                            June 20, 2008, 9:10 a.m.

18

19

20

21

22
                         LEE A. MARZILLI
23                    OFFICIAL COURT REPORTER
                   United States District Court
24                 1 Courthouse Way, Room 3205
                       Boston, MA   02210
25                        (617)345-6787
```

## Page 152

1  A. Well, they were asking to be educated.
2  Q. Well, I will direct the questions, and you may answer my
3  questions "yes" or "no," okay? If you have to explain, if
4  you really need to explain, the Court will interrupt me.
5      Now, I want to ask you about Mr. Altman's
6  participation. You understand that Mr. Altman has been in
7  active participation in this litigation in behalf of
8  plaintiffs, correct?
9  A. Yes.
10 Q. And knowing that, wouldn't you agree that Mr. Altman and
11 his employees have a financial interest in the outcome of
12 this litigation?
13     JUDGE SARIS: You know, this isn't a jury.
14     MR. BARNES: Well, no, I understand, but, your
15 Honor, it goes to her autonomy as an expert witness and
16 having a law firm prepare a general causation report
17 wholesale. May I make a proffer?
18     MR. FINKELSTEIN: This is ridiculous, Judge. It's
19 absolutely --
20     JUDGE SARIS: I mean, if you want to use your hour
21 this way. I'd much prefer to get to the science. We keep
22 harping on that.
23     So let me just understand this chart. A PRR is a
24 proportional reporting ratio? What does that mean?
25     THE WITNESS: If I want to compare two drugs and

## Page 153

1  see if one drug is different than another one in causing a
2  bad effect, one way I can do it is to say, okay, for Drug A
3  I'm going to divide its bad effects by the total number of
4  effects that that drug has; and then I'm going to compare
5  drug B, how many bad effects does it cause divided by its
6  total number of adverse events? So if one causes 10
7  headaches out of 100, it would be 10 over 100. If the other
8  one causes 7 headaches and they have 100, it would be 10 over
9  100 versus 7 over 100. And by doing that, you can say, in a
10 common family of drugs, is there a difference in the
11 percentage of headaches reported with one drug compared to
12 the other? It's a simple way of comparing across families.
13 And if you divide the one ratio by the other ratio, it's
14 called a PR ratio.
15     JUDGE SARIS: And all these numbers on the bottom
16 on the X axis, what do those denote?
17     THE WITNESS: Those represent different points in
18 time of adverse events collected. So one of the things that
19 I tried to do --
20     JUDGE SARIS: Oh, so it says 1998, 19 -- so those
21 are dates?
22     THE WITNESS: Yes. They're reporting periods for
23 these data, yes.
24     JUDGE SARIS: And I guess what you're being
25 criticized for is that you yourself didn't go through to make

## Page 154

1  sure, to use your analogy, that there was a headache?
2  Mr. Altman did that?
3      MR. BARNES: I'm sorry, your Honor, I didn't hear
4  your question.
5      JUDGE SARIS: You yourself didn't go through each
6  adverse report and determine whether there was a headache, to
7  use your metaphor?
8      THE WITNESS: Mr. Altman filtered the FDA database
9  to generate these data. And the reason I used him is, he
10 does the same work for me when I'm submitting applications to
11 the FDA. FDA has reviewed his work in this manner, has
12 approved new drugs based on his work. So because FDA has
13 found his material acceptable, I also use it for this work.
14     JUDGE SARIS: So how much of it is subjective in
15 this kind of analysis? In other words, if someone says they
16 have a headache, is that used as a proxy for depression?
17     THE WITNESS: No, it's not subjective because we
18 use the terms exactly as they appear in the FDA's database.
19     JUDGE SARIS: So the FDA database will say
20 "depression" or "suicide"? What did you use to generate
21 these numbers? What adverse -- what did you call them,
22 substitute end points?
23     THE WITNESS: I did not use those in this database,
24 your Honor. If you look at the top of the table, these
25 represent the high-level terms in the database of suicidal

## Page 155

1  and self-injurious behavior.
2      JUDGE SARIS: And suicidal is suicidal attempts,
3  completions?
4      THE WITNESS: Yes.
5      JUDGE SARIS: And suicidal ideation?
6      THE WITNESS: Yes.
7      JUDGE SARIS: And self-injurious means, would that
8  be like cutting?
9      THE WITNESS: Yes. FDA defines a series of
10 self-injurious behaviors. It would include that as well,
11 yes.
12     JUDGE SARIS: So you've taken whatever the FDA has
13 said?
14     THE WITNESS: How FDA has coded the database.
15     JUDGE SARIS: So assuming for a minute --
16     MR. BARNES: A couple of points. I'll just proffer
17 what my concern is. Dr. Blume is using a method, as she has
18 described it up here, where Mr. Altman has been -- this
19 method, this approach has been specifically excluded in a
20 prior case as being unreliable on issues of --
21     JUDGE SARIS: No offense to him. Isn't it like
22 asking my secretary, "Take everything from the reports that
23 says suicide or self-injury, and, like, type it in"? I mean,
24 no offense to him, but, I mean, isn't that what we're talking
25 about?

1  MR. BARNES: Not at all. Not at all. Not at all.
2  And let me tell you -- let me just --
3  MR. FINKELSTEIN: We submitted this, your Honor.
4  JUDGE SARIS: Well, let me ask you. Is that your
5  understanding of what it is?
6  THE WITNESS: The FDA adverse event database is a
7  huge database that requires filtering across its various
8  hierarchy terms. My understanding is that Mr. Altman has
9  developed a method, has a method to filter those, and that's
10 what he does. There is no subjective interpretation. We use
11 the terms as FDA defines them.
12 MR. BARNES: Your Honor, I'll make a proffer here.
13 Even under the method -- and I'll show you in the
14 pharmacovigilance document -- all this -- assume this is in
15 fact what they are purporting it to be. All it is is
16 evidence of a signal. It is explicitly prohibited to be
17 considered on issues of causation by the very document they
18 cite, the pharmacovigilance document in 2005, and I can show
19 it to you.
20 JUDGE SARIS: Maybe. I just wanted to understand
21 your point about Altman.
22 MR. BARNES: The point about Mr. Altman is that --
23 JUDGE SARIS: I got the whole thing now, okay.
24 MR. BARNES: I will give you a cite on this point
25 that I think is important. It's In Re: Meridia Products

Page 157
1  Liability Litigation, 328 F. Supp. 791, and the Court held
2  after a similar hearing, "Even readers with only a casual
3  understanding of statistics can recognize that this evidence
4  does not speak to the issue of causation, and therefore
5  cannot create a genuine issue of causation --"
6  JUDGE SARIS: Excuse me. That's a legal argument.
7  We'll get to that. I just want factually I understand the
8  dispute, so why don't we just move on.
9  MR. BARNES: Okay.
10 JUSTICE FRIEDMAN: I would like to ask Dr. Blume a
11 question. Are you currently involved in obtaining approvals
12 for pharmaceutical products from the FDA?
13 THE WITNESS: Absolutely. Our last approval was in
14 February of this year.
15 JUSTICE FRIEDMAN: And this was not for -- it had
16 nothing to do with any litigation?
17 THE WITNESS: No. Eighty percent of our practice
18 is devoted to working with pharmaceutical companies with FDA.
19 JUSTICE FRIEDMAN: And when you submit these
20 approvals, you are working with FDA directives or regulations
21 that tell you what you have to submit, correct?
22 THE WITNESS: Yes.
23 JUSTICE FRIEDMAN: But you are not making findings
24 of causation, are you?
25 THE WITNESS: As I noted earlier, our Code of

Page 158
1  Federal Regulations specifically notes that causation isn't
2  required. In fact, causation is not required for product
3  effectiveness, so it's certainly not required for product
4  safety.
5  JUSTICE FRIEDMAN: No, I understand that, and I
6  recall that testimony, but it is not part of what you do in
7  your regular course of business outside of litigation to make
8  assessments of causation, is it?
9  THE WITNESS: If we have a study, a randomized
10 clinical trial study, that shows the drug has a significant
11 improvement in whatever we're looking at over placebo, we
12 will say that it appears that this drug is associated with a
13 clinical improvement. If it's statistically significant, you
14 can argue that it caused that improvement, the drug was
15 responsible for that improvement.
16 JUSTICE FRIEDMAN: But you're not making the
17 determination as to whether the individual studies are
18 statistically significant, are you?
19 THE WITNESS: Well, we have a biostatistician who
20 does that.
21 JUSTICE FRIEDMAN: You're calling them to the
22 attention of the FDA, but somebody else is determining their
23 statistical significance? Is that correct? You just said
24 there's a biostatistician?
25 THE WITNESS: Yes, we have a biostatistician who

Page 159
1  runs the statistics. And then our disks, our tapes,
2  statistical tapes, are submitted to FDA along with our
3  applications; and FDA statisticians use our tapes to either
4  confirm, or if they have a question, to ask us a question.
5  JUSTICE FRIEDMAN: Thank you.
6  Q. One other point. Approvals in your line of work are
7  based upon randomized controlled clinical trials, correct?
8  A. Well, if it's possible to do them, yes, they are.
9  Q. And every one of your new drug applications has been
10 supported by randomized controlled clinical trial to get
11 approval?
12 A. While I was still at Mylan, we did an orphan drug where
13 it was not permitted to allow patients to have a placebo, so
14 that NDA, of course, could not be based upon a
15 placebo-controlled trial. But other than cancer trials, AIDS
16 types of trials, orphan drugs, most of them are
17 placebo-controlled.
18 Q. Randomized controlled trials, right?
19 A. Well, yes, if it's possible to do it, it is the gold
20 standard for effectiveness.
21 JUDGE SARIS: Do you have any explanation about why
22 Neurontin jumps up so dramatically?
23 MR. BARNES: Well, that's what I want to talk
24 about, okay?
25 JUDGE SARIS: If you can just go back one second.