```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3   In re:  NEURONTIN MARKETING, SALES   MDL DOCKET NO: 1629
             PRACTICES, AND PRODUCTS
 4           LIABILITY LITIGATION         Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7        ALL PRODUCTS LIABILITY
          ACTIONS
 8   _____/

 9
              VIDEOTAPED
10            DEPOSITION OF:     CHERYL D. BLUME, Ph.D.

11            DATE:              November 12, 2007

12            TIME:              9:25 a.m. to 6:07 p.m.

13            PLACE:             13902 North Dale Mabry Highway
                                 Suite 122
14                               Tampa, Florida

15            PURSUANT TO:       Notice by counsel for
                                 Defendants for purposes
16                               of discovery, use at
                                 trial or such other
17                               purposes as are permitted
                                 under the Federal Rules
18                               of Civil Procedure

19            BEFORE:            VALERIE A. HANCE, RPR
                                 Notary Public, State of
20                               Florida at Large

21                               Volume 1
                                 Pages 1 to 370
22

23

24

25
```

Page 22

1  Mr. -- prepared by Mr. Altman in connection with that
2  NDA?
3      A. The only thing that is publicly available from
4  a new drug application is the information that the FDA
5  provides relating to that new drug application. And I
6  don't know if the FDA's release of the clinical data
7  section includes an overview of the postmarketing
8  pharmacovigilance. I don't know.
9      Q. And what's the name of that drug?
10     A. I just can't share this with you.
11     Q. Well, just so I understand, you did work on
12 behalf of a pharmaceutical company in regard to a new
13 drug application, correct?
14     A. Yes.
15     Q. And that your -- your client submitted that
16 information to the Food and Drug Administration in
17 connection with seeking FDA approval for a drug?
18     A. Yes.
19     Q. And now is it your testimony that the drug was
20 subsequently approved by the Food and Drug
21 Administration?
22     A. Yes.
23     Q. And you're claiming that the work that you
24 submitted to the United States Government is somehow
25 confidential in connection with that approval of -- of a

Page 23

1  drug for marketing to the United States?
2      A. Yes.
3      Q. I'm asking you -- so you're just refusing to
4  provide me with the name of the drug?
5      A. All the work that I provide goes to the client
6  and is embedded within their new drug application.
7      Q. What's confidential with the name of the drug?
8          MR. FROMSON: Just note my objection as to
9  form.
10         THE WITNESS: I am not permitted to talk about
11 the clients nor their drug products.
12 BY MR. BARNES:
13     Q. By whom?
14     A. By the client.
15     Q. Are you relying on any of your experience
16 working with these pharmaceutical clients in forming
17 your opinions in this case?
18         MR. FROMSON: Note my objection as to form.
19         THE WITNESS: My opinions in this case are --
20 are predicated upon my 25 years in the
21 pharmaceutical industry as well as the work that I
22 have continued over the last six years.
23 BY MR. BARNES:
24     Q. Are you relying on any of the work you've done
25 with the Food and Drug Administration in connection with

Page 24

1  pharmaceutical clients in expressing any of your
2  opinions in this case, including the methods that
3  Mr. Altman employed on your behalf in making these
4  submissions?
5      A. No. Not specifically, no.
6      Q. Not specifically. How about generally?
7      A. He does the same general types of searches in
8  both litigation and as well as in the product
9  development assignments.
10     Q. It's not my question.
11         MR. BARNES: Would you read back that last
12 question, please.
13         (The reporter read the portion requested.)
14         THE WITNESS: It is the same methods that he
15 uses for both our litigation work as well as
16 pharmaceutical development work. So I'm relying on
17 the experience I have gained with him in the
18 litigation for my work in this case.
19 BY MR. BARNES:
20     Q. Please list every drug pharmaceutical client
21 that Mr. Altman has assisted you with --
22         (Brief Interruption.)
23         MR. FROMSON: Did you finish the question?
24         MR. BARNES: I did not. Thank you.
25         MR. FROMSON: Okay.

Page 25

1  BY MR. BARNES:
2      Q. Please list for me each pharmaceutical client
3  with whom you have provided services and have engaged
4  the services of Mr. Altman of Finkelstein &
5  Associates --
6          MR. FROMSON: Object --
7  BY MR. BARNES:
8      Q. -- for me.
9          MR. FROMSON: Okay. Now, just note my
10 objection again to the extent that she's already
11 indicated that confidentiality agreements from
12 those pharmaceutical companies --
13         MR. BARNES: Make your record.
14         MR. FROMSON: I thank you.
15         -- prevent her from answering that question.
16         THE WITNESS: Yes, I can't answer it.
17 BY MR. BARNES:
18     Q. Would you please -- you're refusing to answer
19 the question?
20     A. Well, I'm refusing because I am not permitted
21 to answer the question.
22     Q. Would you please provide me with
23 confidentiality agreements with these companies with the
24 names redacted?
25         MR. FROMSON: Just note my -- my same

1  THE WITNESS: I don't know if I can answer
2  that question. I can answer that he was identified
3  in the courtroom one time at a Phen-Fen trial. So
4  I can identify that one. But other than that, I
5  don't know if I'm permitted to answer that.
6  BY MR. BARNES:
7  Q. Let's do it this way. You've -- you've
8  identified Mr. Altman as someone with whom you have
9  worked on pharmaceutical litigation in the past?
10  A. Yes.
11  Q. Okay. And he's obviously -- do you know, if
12  in doing so, was he engaged with Finkelstein &
13  Associates or is it something that he was freelancing
14  on --
15  MR. FROMSON: Just note --
16  BY MR. BARNES:
17  Q. -- when he did these -- when he did his work
18  with you?
19  MR. FROMSON: Just note my objection as to
20  form in terms of time, as well as whether it was
21  one or the other or both.
22  MR. BARNES: Well, let's -- let's -- let's
23  just break it down.
24  MR. FROMSON: Okay.
25  BY MR. BARNES:

1  Q. And you've worked with Mr. --
2  Mr. Finkelstein's firm in the past, correct?
3  A. Yes.
4  Q. On how many cases, different litigations, have
5  you been engaged by the Finkelstein law firm in
6  pharmaceutical litigation?
7  A. Have I been engaged by the Finkelstein law
8  firm?
9  Q. For -- yes, we'll do engaged first.
10  A. One other.
11  Q. What --
12  A. One other case besides this.
13  Q. What's that?
14  A. I have no idea if I'm permitted to answer
15  that.
16  Q. Are you -- are you refusing to answer the
17  prior cases you've handled with the Finkelstein law
18  firm?
19  A. I also have an agreement and confidentiality
20  agreement with them --
21  Q. Will you produce that confidentiality
22  agreement?
23  A. -- in our contract, yes.
24  If they permit me to do that, I will ask them
25  at the break.

1  Q. So you are -- you are refusing to identify the
2  litigations that you are involved with with the
3  Finkelstein law firm in this deposition; is that
4  correct?
5  MR. FROMSON: Just note my objection as to
6  form, to the extent that you're not only harassing
7  her. She said she would consult with counsel.
8  MR. BARNES: Well, we have -- we have -- we --
9  we have a limited period of time. It's been not
10  the most convenient spot to do a deposition. We're
11  trying to accommodate you. Are you instructing her
12  not to identify the cases which she's --
13  MR. FROMSON: Did I make an objection?
14  MR. BARNES: No, you -- I just --
15  MR. FROMSON: I did not make an objection.
16  BY MR. BARNES:
17  Q. So are you refusing to answer that question?
18  A. I simply don't know if I'm permitted to answer
19  that question. If I am permitted, I will answer it.
20  Q. Who would you have to speak with to find out
21  if you're permitted to answer the question about the
22  Finkelstein associate relationship?
23  A. Well, I would -- I would think that I could
24  ask Mr. Fromson that question.
25  Q. I would -- I would -- Is Mr. Fromson in this

1  room?
2  A. Yes.
3  Q. And is he seated right to your left?
4  A. Yes.
5  MR. BARNES: Okay. Mr. Fromson, are you --
6  would you permit her to identify the litigations
7  with your law firm that she is currently working on
8  or has worked on in the past?
9  MR. FROMSON: I think it's entirely
10  appropriate that at a break I simply speak with the
11  witness to identify the case that she believes
12  she's referencing, and then I can confer with you
13  after.
14  BY MR. BARNES:
15  Q. Do you recall providing a list of litigation
16  cases you've testified in in the past?
17  A. Yes.
18  Q. Okay. Let's go through it that way.
19  Name the pharmaceutical products with whom you
20  have -- you provided consulting services in the past ten
21  years.
22  MR. FROMSON: Just note my objection to form.
23  Can you -- I just want to have that question
24  read back for one second.
25  So you want to know about consulting services

## Page 66

1   Q. You may answer.
2       THE WITNESS: Do I answer?
3   BY MR. BARNES:
4   Q. Yes.
5   A. Mr. Altman is hired to do this because he has
6   a specialty in filtering, or whatever more sophisticated
7   term that should be applied to it, these databases. He
8   is used for this in our -- in our work and in other
9   people's work.
10      He was asked by the FDA years ago to validate
11  his efforts, and FDA confirmed his method. I would not
12  be able to completely validate what he does. But once
13  the FDA statisticians and epidemiologists approved NDA's
14  using his method, I have accepted his method.
15  Q. How do you know that --
16  A. And --
17  Q. I'm sorry.
18  A. And as you will know through my discussions of
19  the data, my opinions are certainly not predicated upon
20  these individual databases any more than they are on
21  other events in this database. So while the information
22  is important and while it agrees with other opinions, it
23  is not the ultimate opinion, but I accept his work based
24  on persons far more knowledgeable and skilled in this
25  area than I.

## Page 67

1   Q. Did FDA review his work in this case?
2   A. No.
3   Q. In the Neurontin case?
4   A. No.
5       MR. FROMSON: Just note my objection as to
6   form.
7       THE WITNESS: He -- they -- they reviewed and
8   validated his approach of the FDA databases and
9   other databases.
10  BY MR. BARNES:
11  Q. Which you won't produce to me yet at this
12  point for me to examine you on?
13  A. Well, I'm certainly willing to ask if I may do
14  that, but you would certainly not ask me to violate my
15  confidentiality or contracts.
16  Q. Not today. I'm not going to ask you to do
17  that today. I've asked -- we'll take it up with the
18  court if we have to.
19      But have you --
20  A. No, I have not validated his work.
21  Q. Okay. And so you don't know the rate of error
22  in his work in the report, do you?
23      MR. FROMSON: Objection as to form.
24      THE WITNESS: If -- if there is any errors. I
25  don't know if there is any errors.

## Page 68

1   BY MR. BARNES:
2   Q. One way --
3   A. The error -- the error rate was acceptable
4   when he did a far more difficult assignment.
5       He -- the -- the NDA work that he does for us
6   is far more difficult than this work. And the rate of
7   errors were -- if any, were certainly acceptable.
8   Q. That's not my question.
9   A. I know, but I'm trying to answer your
10  question.
11  Q. I understand you are, but listen to my
12  question, okay, and we'll just keep moving on.
13      My question is in connection with the work he
14  has done on pages -- in your report -- 60 -- you've
15  identified Pages 69, 70, 71, 72, 73, 74, 75. We don't
16  know about 76.
17      For example, you have not gone back and -- and
18  established the error -- any -- the rate of error in the
19  filtering he did for you prior to this deposition,
20  correct?
21      MR. FROMSON: Objection to the extent that it
22  hasn't already been asked and answered.
23      THE WITNESS: Correct, I have not done that.
24  He may well have underestimated the reports. No,
25  I'm kidding. He -- I have not checked anything.

## Page 69

1   I'm not capable of validating his work.
2   BY MR. BARNES:
3   Q. So it is your testimony that you have never
4   specifically done anything to validate his data in 2007
5   on his work in Neurontin?
6       MR. FROMSON: Same objection, to the extent
7   that it hasn't already been asked and answered.
8       THE WITNESS: Yes, I have not -- I am not
9   capable of independently validating his extraction
10  of data from -- from these databases.
11  BY MR. BARNES:
12  Q. At any time in this litigation, correct?
13      MR. FROMSON: Same objection to the extent
14  that it has not already been asked and answered.
15      THE WITNESS: Yes.
16  BY MR. BARNES:
17  Q. Okay. Now, let's -- let's finish going
18  through your report and identify other tables that
19  Mr. Altman --
20  A. Okay.
21  Q. -- filtered for you.
22  A. Okay. And, again, I don't -- I don't mean
23  to -- to limit what he does as filtering. That's simply
24  my shorthand way of referring to it.
25      The Pfizer database --

Page 90

1   Q. Is -- are -- is -- is -- are the analyses that
2   Mr. Altman prepared for you, as you've defined it in
3   this litigation, important to your opinion in this case?
4       MR. FROMSON: Just note my objection as to the
5   form. That's an ambiguous question.
6       THE WITNESS: Well, I think that everything I
7   have in here is important. I mean, the World
8   Health Organization database is important to me.
9   Yes, they're all important to me.
10  BY MR. BARNES:
11  Q. So if -- if Mr. -- is it your testimony that
12  if you extracted the SRS database analysis and the
13  analysis based on the internal Pfizer databases that
14  your opinion would be the same with regard to the signal
15  analysis?
16  A. Well, the Pfizer database was also repeated in
17  the 2004 NDA records. So, I mean, even if I lost the
18  Pfizer databases, I would still have their analyses of
19  those databases in the NDA submission.
20      Yeah, my opinion would still be the same,
21  because there -- there was an amazing similarity in
22  signals and conclusions across SRS and WHO and even the
23  Health Canada database.
24  Q. Just so I understand though, you -- so your --
25  the absence -- you do not need the SRS database analysis

Page 91

1   to form your opinions with regard to signals?
2   A. Well, it's almost an impossible question to
3   answer. We are required to assess the SRS database for
4   signals. I mean, FDA has criteria on how one data mines
5   the database. So, yes, it's important to me, but we
6   additionally mined the WHO database and we looked at the
7   mining efforts of your client in their internal database
8   and in the materials they redid in 2004. So my opinion
9   is not dependent on any one issue.
10      And if, as you read the conclusions, I go
11  across -- I conduct pharmacovigilance across databases,
12  not dependent on one database. Now, if one database
13  were remarkably different than the other one, we might
14  go back and check that again.
15  Q. Okay. Let's move on. One --
16  A. What page are you on?
17  Q. 120, I think, is my next table. Who prepared
18  that?
19  A. This is the internal database, and I believe
20  this was Mr. Altman on through 120 -- let's see -- 127.
21  Q. So from 120 to 127 are various tables of
22  reports of adverse events that Mr. Altman extracted from
23  the Pfizer internal database between 1996 and 2002,
24  correct?
25  A. Yes.

Page 92

1   Q. And, again, did you audit or in any way
2   validate the work product you received from Mr. Altman
3   on pages 120 to 127?
4   A. No.
5   Q. Okay. What's on 128? This is PSURs, annual
6   reports? Or is this the internal Pfizer adverse event
7   database?
8   A. No, this is not -- this isn't PSUR. These
9   are -- this is the internal database.
10  Q. So then, again, this is Mr. Altman's work,
11  correct, on 128?
12  A. Yes. And these are for -- well, in part.
13      Your client did a partial amplification of
14  their label in '96 to include some additional
15  postmarketing events. And the ones listed on the page
16  are the ones that Pfizer chose to put into the package
17  insert at that timeframe.
18  Q. You say the word "Pfizer" in 1997. Is it your
19  testimony that Pfizer, Inc., modified the label in 1997?
20  A. Well, I think they -- I'm using "Pfizer" to
21  refer to them all. I think Pfizer came in around 2000,
22  but when I say "Pfizer," I'm referring to Parke-Davis
23  and Warner-Lambert.
24  Q. Is it important to you to be accurate in the
25  way you -- you testify in terms of what corporation,

Page 93

1   what party conducted certain analyses?
2   A. I think in the report I talk about the
3   different -- who submitted the different reports, when
4   they were submitted, at different time points. But for
5   the purposes of discussion, I have been just using the
6   term "Pfizer."
7   Q. Well, for purposes of this deposition, when I
8   use the term "Pfizer" and I use the term
9   "Parke-Davis/Warner-Lambert," they're two different
10  corporations. Do you understand that?
11  A. I do, but I also looked in the database and
12  couldn't find anywhere when Pfizer did -- did assume
13  control that they corrected anything that Parke-Davis
14  did.
15  Q. That's not -- that's not the question.
16  A. So since that time, I have just referred to
17  everything as "Pfizer."
18  Q. Well, what -- so is it your view that you just
19  lump everybody together no matter who's actually
20  involved as a matter of fact?
21      MR. FROMSON: Just note my objection as to
22  form.
23      THE WITNESS: I don't -- I don't understand.
24  BY MR. BARNES:
25  Q. Well, when you say the word -- when you say

24 (Pages 90 to 93)

Page 94

1  "Pfizer," Pfizer -- you understand that to be Pfizer,
2  Inc., a corporation, right?
3      A.  I guess, yes.
4      Q.  And if Pfizer -- so -- so you're willing to
5  say "Pfizer," just lump the defendants together under
6  the rubric Pfizer even if it's inaccurate or misleading
7  or unfair?
8      MR. FROMSON:  Just note my objection as to
9  form.
10     THE WITNESS:  That's just simply the way it's
11 been referred.  I've just referred it as to the
12 last one.  If you want, I can go back and at
13 various time points specifically note which one it
14 is, but my understanding of the -- of the concern
15 has gone from the beginning until now.
16 BY MR. BARNES:
17     Q.  Well, where you understand it's Pfizer, Inc.,
18 that has prepared the table or have -- has provided
19 analysis or not used the -- I'd appreciate if you'd use
20 the word "Pfizer, Inc.," so I can ask you questions that
21 way.  And if it's a prior -- if it's Parke-Davis or
22 Warner-Lambert that is responsible for the preparation
23 of the event, to the extent you -- you can say that, I
24 would appreciate it.  It would make our -- it would make
25 the deposition go quicker, because I'm going to ask you

Page 95

1  these questions:  "What is the basis on Pfizer, Inc.,
2  dated?"
3      "Oh, I just lumped them all together."
4      So to the extent you're capable of actually
5  differentiating between corporations and parties in this
6  litigation as to who did what, that would be
7  appreciated.
8      MR. FROMSON:  Just note my objection as to the
9  form of the last question.
10     THE WITNESS:  Right.  Well, I can make it even
11 easier than that.  I have all of the annual reports
12 and the PSURs and IND annual reports in the room,
13 so when you ask the question, I will get up and
14 actually get the annual report --
15 BY MR. BARNES:
16     Q.  Well --
17     A.  -- so I answer it specifically.
18     Q.  When -- when did Pfizer -- do you understand
19 when Pfizer, Inc., acquired an interest and
20 Warner-Lambert acquired the company?
21     MR. FROMSON:  Just note my objection as to the
22 form of the question, in terms of it having a legal
23 conclusion when you use the term "acquire
24 interest."
25     THE WITNESS:  I think it's 2000.

Page 96

1  BY MR. BARNES:
2      Q.  Okay.  So -- okay.
3      In 1996, who had the -- the approval by the
4  Food and Drug Administration to market Neurontin in the
5  United States?
6      A.  Oh, I don't -- I don't know if one was
7  marketing.  I don't know the difference between the
8  Parke-Davis and Warner-Lambert issue.  I don't know.
9      Q.  Just say Warner-Lambert, who --
10     A.  Okay.  Warner-Lambert.  I don't know.  I have
11 no idea.  But I have the report, so if you want a --
12     Q.  No, I -- do you --
13     A.  If you want a correct answer, I will get up
14 and get the reports.
15     Q.  Why don't we do this.
16     You don't know who filed the data in fourth
17 quarter of 1996, do you?  You don't know what company
18 filed it, do you?
19     A.  I -- I think it's Parke-Davis, but I'm not
20 sure.  But I have the reports, so why don't I get up --
21     Q.  You know it's not Pfizer, correct?
22     A.  Well, I think -- I think Pfizer is 2000.  But
23 I have the reports, so I don't know why you're
24 questioning me this way when I can get up and get them.
25     Q.  Just when you say "Pfizer," you should be

Page 97

1  intentional as to what you're saying about Pfizer.  And
2  if another company filed it, then I'd appreciate if
3  you'd -- you direct your --
4      A.  Well --
5      Q.  -- your -- your -- your answers to that.
6      A.  I will --
7      Q.  We'll proceed.  I'll correct you every time if
8  I have to.  Okay?
9      A.  Okay.
10     Q.  So this is an Altman analysis on 1996, 1997,
11 correct?
12     A.  Page?
13     Q.  Page 128.
14     MR. FROMSON:  Hold on.  Just note my objection
15 to the form of the question as "Altman analysis."
16     THE WITNESS:  Yes.
17 BY MR. BARNES:
18     Q.  Okay.  And did you -- again, you didn't
19 validate this work, did you?
20     A.  No.
21     Q.  Is it fair to say -- just so we don't have to
22 ask this every time you identify Mr. Altman as the
23 source of the -- of the tables, is it fair to say
24 that -- that you've not independently validated or
25 tested any of the tables that Mr. Altman provided to

Case 3:05-cv-00444   Document 232-2   Filed 05/12/10   Page 6 of 17 PageID #: 5032

Page 98

1  you, correct?
2  A. That is correct.
3  Q. Okay. When's the next one? What's the next
4  table? I have one on 130. And this is the World Health
5  Organization.
6  A. Yes, I see on it -- just getting back to your
7  previous criticism, I see on the front page that I have
8  specifically noted that "Pfizer defendants" will refer
9  to Warner-Lambert, Parke-Davis, and Pfizer. And I think
10 the tables do -- are coded as "Pfizer defendants."
11     So if it makes it easier, I will say "Pfizer
12 defendants" instead of "Pfizer."
13 Q. Well, now -- but I -- but I think -- do -- do
14 you think it's misleading to have -- to say the word
15 "Pfizer defendants" to -- which includes Pfizer in -- in
16 a report or a regulatory activity or a marketing
17 practice that predated their -- their ownership of the
18 company? That's -- that's --
19     MR. FROMSON: Just note my objection as to
20 form.
21     THE WITNESS: I think that I referred to all
22 three clients and I -- no, I don't think it makes a
23 bit of difference as to what my conclusions are.
24 No.
25 BY MR. BARNES:

Page 99

1  Q. So accuracy as to -- as to which entity
2  actually submitted the report is not important to you as
3  a scientist or regulatory affairs professional?
4  A. Well, of course -- of course.
5     MR. FROMSON: Just note my objection as to the
6  form of the question. Misstates her testimony.
7     THE WITNESS: Yes, of course that's important,
8  but I specifically said here I was accessing and
9  reviewing data from all three. And I was very
10 careful to say "Pfizer defendants."
11    But I don't see "Pfizer" in here. I say
12 "Pfizer defendants."
13 BY MR. BARNES:
14 Q. Well, what if you would -- are definitions
15 important to you as a scientist and regulatory affairs
16 professional?
17 A. Of course they are.
18 Q. And if your definition is somehow misleading
19 or biased or inaccurate, wouldn't you think it would be
20 important to correct it on the record here today if you
21 have a chance?
22 A. If I'm referred --
23     MR. FROMSON: Note my objection as to form.
24     THE WITNESS: I'm referring to it as "Pfizer
25 defendants." "Pfizer defendants" include all

Page 100

1  three.
2  BY MR. BARNES:
3  Q. Okay. All right. Then let's go to page 132.
4     Who prepared that?
5  A. PDG.
6  Q. And next one, please. Next table.
7  A. PDG for pages 132, 133, and 134.
8  Q. Okay.
9  A. And 135.
10 Q. How about 137? These are the Poison Control
11 Center reports.
12 A. Yes. And there was a journal article that
13 accessed all of this information. And I believe this
14 table derives directly from the AGEM (sic), American
15 Journal of Emergency Medicine Report.
16 Q. And who prepared this table?
17 A. PDG.
18 Q. Okay. How about the DAWN table on page 143?
19 A. I believe PDG did that.
20 Q. How about the tables on 145 and 147 -- 6?
21 A. Okay. The -- this was done by PDG and these
22 refer back -- this is similar to what we have already
23 discussed. These refer back to research reports that
24 were generated during this time period.
25 Q. How about 165?

Page 101

1  A. Okay. We've now moved into the fourth
2  category, June 2002 to present.
3  Q. This is PSUR, so I assume PDG did it, on 166?
4  A. 163, I think was skipped. That was PDG.
5  Q. Uh-huh. (Indicates affirmatively.)
6     Thank you.
7  A. 165 would be PDG. 166. And then we're back
8  to the AERS database on page 167.
9  Q. And -- okay. 167, 168 would be work that
10 Mr. Altman provided to you, correct?
11 A. Correct.
12 Q. These are SR -- these are AERS database --
13 A. Yes.
14 Q. -- tables, correct?
15 A. Correct.
16 Q. And then World Health Organization would be
17 PGD?
18 A. Would be PDG.
19 Q. PDG.
20    Okay. And then the next table I have is
21 two -- really, maybe you can explain to me what they
22 are. Going to page 193, 194, and 195.
23 A. One, these tables relate to a dany (sic) -- a
24 data mining effort recognized by the agency, recommended
25 by the agency, called PRRs or percent comparison across

Page 102

1  products as percent reports. Both of these tables were
2  done by Mr. Altman.
3  Q. Who directed that these tables be prepared?
4  A. The table in 194 is a table across comparisons
5  of different antiepileptic drugs. It's a standard way
6  that we have tried to pictorially present the data that
7  we looked at earlier in comparison to other sister
8  drugs. I asked that that be done.
9  Q. And so you directed this analysis?
10 A. Yeah, this is a routine analysis for us in our
11 work when we're — when we have drugs that are part of a
12 class.
13     And I had — page 195 is a comparison from
14 another trial -- another project that I guess Mr. Altman
15 is working on. But it illustrated the same sort of
16 separation within a class.
17 Q. So Mr. Altman prepared this chart on page 195,
18 correct?
19 A. Yeah, well, he did 194 and 195.
20 Q. Did both of them?
21 A. Right.
22 Q. Okay. Did you do any independent work to
23 validate the graph on page 194 or on page 195?
24 A. No.
25 Q. And so you don't know if there is a rate of

Page 103

1  error for the data depicted on page 194 which is
2  entitled "PRR Over Time, Suicidal and Self-Injurious
3  Behavior HLT," correct?
4  A. I don't know if there is any rate of error and
5  I —
6  Q. One way or the other?
7  A. I don't have a — no, I did not validate it.
8  Q. Did you -- did you — you said something about
9  this is how — at page 194, 195 — this is how you
10 routinely do these analyses for other -- other clients?
11 A. No, for pharmacovigilance work.
12     What this does is, we're interested in this
13 case in Neurontin, so Neurontin will be on the chart,
14 but as pharmacovigilance assignments, you're always
15 interested if a particular adverse event is simply
16 part of the -- is part of what is observed with that
17 class of drugs or whether there is something unique
18 with —
19     (Phone ringing.)
20     THE WITNESS: Somebody is calling in.
21     -- whether there is something unique with your
22 drug.
23     So what one does, what we are — what is
24 suggested, what we are taught to do is to do these
25 PRR ratios. Because if there is something unique

Page 104

1  about a drug, it will look different in a PRR time,
2  time-derived data, than will the other drugs in the
3  class.
4  BY MR. BARNES:
5  Q. Who chose the drugs on page 194 for
6  comparison?
7  A. Oh, I -- I don't know if we did these. I — I
8  think I mentioned in my report Gabitril. I know we talk
9  about carbamazepine. I don't — I don't know if we did
10 that collectively or if I sent the list one. I don't
11 know.
12 Q. So it's possible that Mr. Altman chose the
13 comparator drugs --
14 A. Well —
15     MR. FROMSON: Just note my objection.
16 BY MR. BARNES:
17 Q. — on this graph?
18 A. I —
19     MR. FROMSON: I'm sorry. Just note my
20 objection as to form.
21     THE WITNESS: I don't recall how we did this.
22 We had to do it in a — we had to pick drugs that
23 would have data across the relevant time period, so
24 we couldn't use an -- an AED that were approved in
25 2003 or 2004, because it wouldn't have the data.

Page 105

1  So I -- I don't -- whether we collectively did
2  this or not, I just don't recall.
3  BY MR. BARNES:
4  Q. So it's possible that Mr. Altman chose the
5  comparator drugs, correct, without your supervision?
6     MR. FROMSON: Note my objection as to form.
7     THE WITNESS: I recall the discussion of
8  including Gabitril in there. I know that I
9  remember that. Now, I just don't recall.
10 BY MR. BARNES:
11 Q. You say "class of drugs." What do you mean by
12 a class of drugs?
13 A. Well, when you look at pharmacovigilance data,
14 you're interested, of course, in the -- in the drug in
15 question for that particular NDA, but you're also
16 interested in other drugs that are chemically similar to
17 that drug, whether it's used for the same indication or
18 not, so you do that comparison. You compare the adverse
19 event of interest with other drugs that are approved for
20 the same indication, and you also approve drugs that
21 have the same mechanism of action. So there is
22 different ways that you canvas pharmacovigilance data.
23     In this particular table or this particular
24 graph, what we have here are the PRRs for the
25 suicide-related events, the high-level term

27 (Pages 102 to 105)

Page 206

1  an answer to that question.
2      (The reporter read the portion requested.)
3      MR. FROMSON: I just note my objection as it
4  misstates her testimony.
5      MR. BARNES: That doesn't relate to her
6  testimony.
7  BY MR. BARNES:
8      Q.  Can you answer that question, please?
9      A.  There were multiple reasons why we picked the
10 cuts that we did.
11     Q.  What was -- was one of them the notoriety bias
12 from publicity surrounding Neurontin that occurred after
13 2002?
14     A.  I recall that we specifically discussed that
15 in a -- in a variety of ways. Whether I was
16 specifically thinking about that when we made the cut in
17 2002, I think I was. But at the end of the day, the
18 2002 data support that there was an increase in suicide,
19 it has nothing to do with these ads or with
20 Dr. Franklin's findings.
21     So I have covered the period of time that
22 precedes any of these notoriety biases you are concerned
23 with.
24     Q.  What other reasons other than notoriety bias
25 caused you -- that was one reason, correct? Just make

Page 207

1  sure I have that understood, that one of the reasons you
2  chose the end of 2002 was because of the effect of
3  notoriety bias on adverse event reporting, correct?
4      A.  No.
5      MR. FROMSON: Objection as to form.
6      THE WITNESS: What I said was, I had to find
7  some ways to cut this huge amount of time. 2002
8  reflects a postherpetic neuralgia approval and
9  the -- and the ANDA -- or the NDAs include the
10 postherpetic neuralgia.
11     When we were deciding on the times, I recall
12 the discussion about the advertisements. There was
13 a big influx in the number of events and the
14 Franklin revelation became public. So by cutting
15 it in 2002, we were able to resolve all of those
16 concerns with the 2002 date.
17 BY MR. BARNES:
18     Q.  So let me -- that's fine. Let me make sure I
19 understand the two points.
20     One was, in 2002, there was a new indication
21 that was approved for postherpetic neuralgia, correct?
22     A.  Yes.
23     Q.  The other thing that caused you concern was
24 the notoriety bias due to publicity between Neurontin
25 and a -- a guilty plea concerning off-label promotion as

Page 208

1  well as attorney advertising, correct?
2      MR. FROMSON: Objection, form.
3      THE WITNESS: Well, I'll repeat it again.
4      I recall that we had a discussion regarding
5  the advertisements, regarding the guilty plea, and
6  how we were going to divide up the database.
7  BY MR. BARNES:
8      Q.  Were there advertisements regarding the guilty
9  plea?
10     A.  No, regarding advertising in 2003, The
11 ramifications in early -- in 2004 with the guilty
12 plea -- I think it was in May -- and the postherpetic
13 neuralgia was approved in 2002.
14     There was some comment that postherpetic
15 neuralgia does not have a very big database, so it
16 really wouldn't make that big of a contribution to a
17 database that was already 90 percent driven by off-label
18 uses. But by cutting it at 2002, we will be able to
19 avoid any of these influences or notoriety bias. So,
20 luckily, in 2002, we've avoided this problem.
21     Q.  Okay. And -- and -- and after 2002, did you
22 make any effort to quantify the effect of notoriety bias
23 on adverse event reporting that occurred after January
24 1, 2003?
25     MR. FROMSON: Objection to the -- it's been

Page 209

1  asked and answered.
2      THE WITNESS: Yeah, I -- I -- no. I made no
3  attempt either -- for either of the instances that
4  could have impacted notoriety bias.
5      MR. BARNES: Okay. Let's take a short break.
6  I'm going to clean up from my exhibits and go on to
7  the next area. Thanks.
8      THE VIDEOGRAPHER: Off the record 2:25.
9      (Recess taken.)
10     THE VIDEOGRAPHER: On the record at 2:38 p.m.
11 BY MR. BARNES:
12     Q.  Dr. Blume, I want to go back to some of your
13 qualifications in this case, if we might. Okay?
14     Dr. Blume, are you a medical doctor?
15     A.  No.
16     Q.  Are you permitted to prescribe medicines in
17 the United States to patients?
18     A.  No. I have a Ph.D.
19     Q.  Okay. And your Ph.D. is in what?
20     A.  Pharmacology and toxicology.
21     Q.  And in the course of your career as a
22 toxicologist and pharmacologist, have you ever had to
23 read a prescription drug label for the purposes of
24 balancing potential risks and benefits of the medication
25 for an actual patient?

53 (Pages 206 to 209)

Page 226

1  A. Same answer. I'm not a prescriber, so I
2  cannot be an expert in psychiatry.
3  Q. Are you an expert in suicide?
4  A. Same answer. Not a pre- -- not a physician,
5  not a prescriber, not a psychiatrist, not a
6  suicidologist.
7  Q. Are you an expert in pain management?
8  A. Same, not a prescriber.
9  Q. Well, will you answer --
10 A. Not a pain management expert.
11 Q. Are you an expert in the field of
12 epidemiology?
13 A. Well, I'm not an epidemiologist, but, of
14 course, as you can tell from all the work we've done
15 today, I use epidemiologic assignments and principles in
16 our work with our pharmaceutical clients.
17 Q. Are you a qualified epidemiologist?
18 A. No, I'm not an epidemiologist by training.
19 Q. Okay. And when you do epidemiological
20 research, you often employ Mr. Altman to assist you in
21 running certain inquiries to FDA databases and other
22 databases, correct?
23 A. Well --
24    MR. FROMSON: Objection as to form.
25    THE WITNESS: -- Mr. Altman does run databases

Page 227

1  for us in our epidemiology work; that is correct.
2  BY MR. BARNES:
3  Q. Okay. Now, are you an expert in the field of
4  epilepsy?
5  A. No, not a -- not a physician, not a
6  prescriber, not a neurologist, so I'm not an
7  epileptologist.
8  Q. Same question as to neuropathic pain.
9  A. Same answer.
10 Q. You're not an expert, correct?
11 A. Not a physician, not a prescriber, not a
12 neurologist, so I'm not in neuropathic pain.
13 Q. What is neuropathic pain?
14 A. My understanding of neuropathic pain is pain
15 secondary to a nerve-induced neuropathy. It can come
16 from a variety of -- can come from diabetic
17 neuropathies, injury neuropathy, chemotherapy
18 neuropathy, viral neuropathy, postherpetic neuropathies.
19 Oftentimes intermixed with neuralgic pain.
20 Q. How many drugs in the United States are
21 approved for the treatment of neuropathic pain?
22 A. I don't know. I don't know.
23 Q. Are there any?
24 A. I don't know.
25 Q. Are there any drugs approved in the

Page 228

1  United States for diabetic neuropathy, for the treatment
2  of diabetic neuropathy?
3  A. I don't know.
4  Q. Are there any drugs approved in the
5  United States for the treatment of postherpetic
6  neuralgia?
7  A. Neurontin is the only one that I know of.
8  Q. Okay. Are you an expert in the field of
9  biostatistics?
10 A. We use biostatistics, of course, in -- in all
11 of our assignments, but we hire a biostatistician to
12 design the statistical components of our studies and to
13 represent us, come with us to FDA for biostatistical
14 issues.
15 Q. My question is as to you, Dr. Blume. Are
16 you -- do you hold yourself out as a biostatistician?
17 A. Well, I thought I answered it. No, by
18 training, I'm not a biostatistician. We do
19 biostatistical work, but we ally ourselves with a
20 biostatistician for that.
21 Q. So "we," being the PDG --
22 A. Yes.
23 Q. -- hires biostatisticians to help in the
24 biostatistical analyses that you do for your clients,
25 correct?

Page 229

1  A. In the -- I mean, we don't hire
2  biostatistician to interpret literature article, but we
3  do hire a biostatistician to help us design the power of
4  a clinical study or to help us evaluate animal data with
5  regard to statistical issues, yes.
6  Q. And how about human data, do you -- do you
7  personally run the biostatistical analyses of human data
8  or do others do that in your practice?
9  A. Well, I thought I said clinical studies before
10 I said animal. No, we use an outside biostatistician
11 for clinical issues.
12 Q. In your report that was provided in this case,
13 which is contained within Exhibit 5, were there any
14 biostatistical analyses conducted to -- with regard to
15 the relationship between Neurontin and suicidal
16 behavior?
17 A. No, I did not. We do not do any statist- --
18 no. We do not do statistics on the pharmacovigilance
19 data, no.
20    There were statistics done in your client's
21 research reports in the studies that reported
22 psychobiological events or suicide-related events, but
23 we did not run any additional statistics on pharm --
24 pharmacovigilance work, no.
25 Q. Did you run any biostatistics on randomized

58 (Pages 226 to 229)

1  clinical trials; any analyses on that data?
2      A.  No, but we report -- we reported the
3  differences.  We reported the -- the data that your
4  client reported for those trials.
5      Q.  But you, Dr. Blume, and Dr. -- or the PDG
6  Group did not do biostatistical analyses of the clinical
7  trial data as referenced in your report of --
8      A.  Oh, no, I assumed the -- no, I just accepted
9  the Pfizer numbers.
10     Q.  Fine.
11         And do you know if Mr. Altman did any
12 biostatistical analyses in connection with addressing
13 the question of Neurontin and its association with
14 suicide or suicidal behavior?
15         MR. FROMSON:  Just note my objection as to
16 form.
17         THE WITNESS:  Well, yeah, I'm not aware of it.
18 BY MR. BARNES:
19     Q.  Okay.  Going on to neurobiology, do you hold
20 yourself out as a neurobiologist?
21     A.  No, I'm a pharmacologist.  My -- my -- my
22 specialty was -- our department in training was -- was
23 neurobiology and endocrine biology.  No, I don't hold
24 myself out to be a neurobiologist.
25         I have several patents in neurobiology and

1  much of my work has been done with neurobiological end
2  points, especially with the selegiline and
3  desmethylselegiline.  But notwithstanding those patents
4  and that background, I would not consider myself a basic
5  neuropharmacologist.
6      Q.  Okay.  And as to treatment of depression -- I
7  know we've talked about -- about psychiatry.  Do you
8  hold yourself as an expert in the treatment of
9  depression?
10     A.  Well, not to be repetitive, but I'm not a
11 physician, not a prescriber, not a psychiatrist, so, no,
12 I don't hold myself out to be a depression expert.  I
13 mean, I've worked on NDAs with depression and -- and --
14 and --
15     Q.  But you're not -- you don't treat it nor do
16 you diagnose it, correct?
17     A.  No, I'm not a physician.
18     Q.  Okay.  Now, when is the last time you
19 published article in the peer-reviewed medical
20 literature?
21     A.  Not since I left -- not since Mylan, not since
22 we finished the Mylan work.
23     Q.  Can you tell me the date of your last
24 peer-reviewed publication?
25     A.  Literature publication, not the patent

1  literature?
2      Q.  Peer-reviewed medical.
3      A.  I think it was 10, 15 years ago.  I don't have
4  my CV in here.
5      Q.  Let me find your CV.  The CV you gave us
6  had -- your report had more than that.
7          Now, let me hand you the same one.  I'm going
8  to hand you this.  We won't mark it because I believe
9  it's already in Exhibit 5, but that may help you answer
10 the question.
11     A.  1990.
12     Q.  So just so I understand, the last article
13 published in the peer-reviewed medical literature by
14 Cheryl Blume was in April of 1990; is that correct?
15     A.  Yes.
16     Q.  And you are listed as the fifth author on a
17 medical article entitled "Absorption and Disposition of
18 Low-Dose Combination Formulation of Hydrochlorothiazide
19 and Triamterene;" is that correct?
20     A.  No, it's Triamterene.
21     Q.  Triamterene.  Thank you.
22         That was published in "Biopharmacology Drug
23 Dispositions"?
24     A.  "Biopharmaceutics and Drug Disposition."
25     Q.  Okay.  Why haven't you published since 1990?

1      A.  Working in industry, it's not very easy to
2  publish, especially working in a small company.  And
3  just -- just haven't.
4      Q.  Okay.  Did any of your -- your published
5  articles deal with postmarket surveillance techniques?
6      A.  I doubt it.  Well, there might be
7  postmarketing information comparing the two products,
8  but I doubt if there were surveillance techniques in
9  those articles.
10     Q.  The answer to my question is no --
11     A.  I doubt it.
12     Q.  You doubt it.
13         The best you can tell, you've never published
14 on postmarket surveillance techniques, correct?
15     A.  I -- I do -- I do not think so.
16     Q.  Okay.  Now, do any of these articles deal with
17 the treatment of -- or diagnosis of epilepsy, that
18 you've published?
19     A.  No.
20     Q.  Do any of them deal with the treatment and
21 diagnosis of depression?
22     A.  I think it's woven in our patents, depression,
23 but it's not --
24     Q.  Peer --
25     A.  -- in publications.

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3   In re: NEURONTIN MARKETING, SALES    MDL DOCKET NO: 1629
            PRACTICES, AND PRODUCTS
 4          LIABILITY LITIGATION          Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7        ALL PRODUCTS LIABILITY
          ACTIONS
 8   _____/

 9
          VIDEOTAPED
10        DEPOSITION OF:      CHERYL D. BLUME, Ph.D.

11        DATE:               November 13, 2007

12        TIME:               9:06 a.m. to 6:08 p.m.

13        PLACE:              13902 North Dale Mabry Highway
                              Suite 122
14                            Tampa, Florida

15        PURSUANT TO:        Notice by counsel for
                              Defendants for purposes
16                            of discovery, use at
                              trial or such other
17                            purposes as are permitted
                              under the Federal Rules
18                            of Civil Procedure

19        BEFORE:             VALERIE A. HANCE, RPR
                              Notary Public, State of
20                            Florida at Large

21                            Volume 2
                              Pages 371 to 722
22

23

24

25
```

Page 568

1  similarity to gabapentin.
2      Q. That isn't my question. Listen to my question
3  and you can answer this question, I would appreciate it.
4      My question is, do you have any factual basis
5  to state that FDA would have approved the language
6  concerning reduction of monoamine neurotransmitters
7  after 2002 had Pfizer submitted it?
8      A. I have no information either way because I
9  could find no records where they attempted to submit it
10 again and have their labeling match pregabalin.
11     Q. So even if they -- but my question is, even
12 had they submitted it, you have no basis to say that FDA
13 would have acted favorably upon the submission, do you?
14         MR. FROMSON: Objection as to form.
15         THE WITNESS: Nor any reason to say they
16     wouldn't have, especially since they've already
17     approved that for pregabalin with the same
18     mechanism.
19 BY MR. BARNES:
20     Q. Either way?
21     A. No, I have no information either way that they
22 would have done that.
23     Q. Okay. Thank you.
24         Do you agree with Dr. McCormick's statement in
25 her affidavit that the information regarding reduction

Page 569

1  of monoamine neurotransmitters was not clinically
2  important --
3          MR. FROMSON: Object --
4  BY MR. BARNES:
5      Q. -- so as to be included in -- in the language
6  of the labeling?
7          MR. FROMSON: Objection.
8          THE WITNESS: I don't know where that comes
9      from. It's not in the FDA record why it was
10     struck. And other NDA's in other labeling clearly
11     discuss the importance of neurotransmitters and
12     perturbations in those transmitters, so I don't
13     know what -- to what she's referring there.
14 BY MR. BARNES:
15     Q. Other than her -- her statement that it
16 wasn't -- she's making the statement that in her view
17 that deletion of the language regarding monoamines and
18 GABA is supported by the conclusion that this
19 information had little importance to a clinician for
20 prescribing decisions. Do you see that?
21         MR. FROMSON: Objection.
22         THE WITNESS: Upon what she is relying, I do
23     not know.
24 BY MR. BARNES:
25     Q. You're not a clinician or a prescribing

Page 570

1  physician, correct?
2      A. Yeah, I think we discovered that.
3      Q. Yeah.
4      A. But I have no idea upon why -- upon what she's
5  basing that nor how you can correlate that sentence with
6  all of the other labelings that do exactly the opposite.
7      Q. And do you agree that -- do you have any
8  reason to disagree with her statement there based upon
9  your review of the Neurontin record?
10     A. Well --
11         MR. FROMSON: Objection.
12         THE WITNESS: -- I would say that it's -- her
13     statement is somewhat incongruous with the labeling
14     for other projects -- products that have the same
15     actions and have amplified the labeling in the last
16     couple years.
17 BY MR. BARNES:
18     Q. Let's go to another subject.
19         We've spoken about the biological
20 plausibility, correct, in context of your opinions
21 regarding Neurontin causing suicide, correct?
22     A. Yes.
23     Q. Are you aware of the average -- we're talking
24 about the mechanism of action. We just spoke about
25 GABA.

Page 571

1      Are you an expert in the effect of GABA on the
2  normal human brain?
3      A. No. I think I told you yesterday that I don't
4  consider my neuropharmacologist and I know that there
5  are other experts in this case that have been
6  specifically asked to do that. I have read their
7  reports. I would certainly defer to them in this, but I
8  have a basic understanding of the role of
9  neurotransmitters on various disease states and on
10 behaviors and correction of disturbances and
11 amelioration of certain disease states.
12     Q. Well, are -- do you -- are you going to
13 express opinions concerning the mechanisms of action as
14 to how Neurontin causes suicide from a pharmacol- --
15 pharmacology or toxicology point of view; the actual
16 step by-step mechanism by which it occurs?
17         MR. FROMSON: Objection, form.
18         THE WITNESS: Okay. Is the question: Am I
19     going to offer a pharmacologic opinion on the
20     step -- the pharmacologic mechanism of action
21     opinion on the step-by-step mechanism by which
22     Neurontin pharmacologically step-by-step leads to
23     suicide?
24 BY MR. BARNES:
25     Q. Yeah.

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 572

1  A. I don't think that's the definition of
2  biologic plausibility, but I don't think I'll be
3  offering that specific opinion because there are
4  other — there are people who are going to be doing
5  that.
6  Q. Okay. So define biological plausibility for
7  me, as you use it in your testimony.
8  A. Biologic plausibility are those situations for
9  which there are experimental, research, or other data
10 which establish a relationship between an action and a
11 either mediated event or a endpoint.
12     So there is a biologic plausibility for
13 penicillin to cure certain infections because we
14 understand that penicillin will destroy certain
15 bacterial cell walls.
16 Q. Has any article in the published medical or
17 scientific literature stated that it is biologically
18 plausible that Neurontin causes suicide or suicide
19 attempt?
20     MR. FROMSON: Just note my objection to the
21 extent it may have been asked and answered.
22     THE WITNESS: Well, I think I have answered
23 that article about — articles relating to causing
24 suicide, but I will share with you the information
25 I provided relating to Neurontin's actions on

Page 573

1  transmitters that have been established to address
2  mood and its — the impact of those transmitters,
3  the correction of those problems on the changes in
4  mood.
5  BY MR. BARNES:
6  Q. So you've cited those in your report, correct?
7  A. There is quite a lengthy section on that.
8  Q. Okay. What are the average concentrations of
9  GABA in the normal human brain?
10 A. If I've cited it, I don't recall right now.
11 But we know from other data that the average
12 concentration in a brain is not a reflection for
13 neurotransmitter activity in — in targeted tissue.
14     Certainly, the work with serotonin is — is
15 quite exhaustive. But serotonin levels, either the
16 drugs that perturbate or serotonin systemic levels, are
17 no — are no prediction for events in relating to mood
18 disturbances.
19 Q. Move to strike as unresponsive. That's not
20 what I asked you. I asked you if you knew the average
21 concentrations of GABA in the normal human brain.
22 A. No. And my answer is I do not.
23 Q. Okay. And how about the average
24 concentrations of dopamine in the normal human brain?
25 A. Actually, I think I did quote the GABA levels.

Page 574

1  Q. What is your opinion?
2  A. I think I did quote the GABA 10 to a hundred
3  microliters in here.
4  Q. What paragraph?
5  A. 299. I start quoting. I need to review
6  these. I think I do quote levels.
7     Okay. "Pfizer defendants acknowledge that the
8  effects" — this is quoting — "effects of gabapentin on
9  neurotransmitter release occur at drug concentrations
10 that are relevant for pharmacologic actions of
11 gabapentin in the employed animal models, 10 micromolar
12 or translating that to 1.5 micrograms per mL."
13     THE REPORTER: A little slower, please.
14     THE WITNESS: Okay. I'll read it to you
15 again. This is a quote.
16     "Pfizer defendants acknowledge that the
17 effects of gabapentin on neurotransmitter" — all
18 one word — "release occur at drug concentrations
19 that are relevant for pharmacologic actions of
20 gabapentin in animal models." Then in parentheses,
21 "Approximately ten micromolar or 1.5 micrograms per
22 mL."
23 Q. My question was in relationship to GABA. That
24 document does not pertain to GABA, does it?
25 A. Oh, I thought you said "gabapentin." Let me

Page 575

1  keep work — let me keep working through this.
2  Q. My question was as to GABA.
3  A. Okay. Well, then we'll keep going.
4     MR. GUNTER: I tell you what. He needs to
5  change the tape, so while she's looking, let's take
6  a break.
7     MR. FROMSON: We can change the tape.
8     MR. BARNES: Look at GABA and look at dopamine
9  and Norepinephrine — Norepinephrine and —
10    MR. FROMSON: What's — what's the specific
11 question, Rick?
12    MR. BARNES: I just wanted to know — I mean,
13 she's going to talk about this mechanism of action,
14 so I want to know what she knows about these
15 neurotransmitters in the brain.
16    Norepinephrine, dopamine, GABA as an enzyme,
17 as well as serotonin.
18    MR. FROMSON: Well, I appreciate your candor.
19 Let's go off.
20    MR. BARNES: Yeah.
21    THE VIDEOGRAPHER: Off the record 2:13 p.m.
22 (Recess taken.)
23    THE VIDEOGRAPHER: On record 2:27.
24 BY MR. BARNES:
25 Q. You mentioned penicillin as being

52 (Pages 572 to 575)

```
                                                                    1
 1        IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF TENNESSEE,
 2                 NASHVILLE DIVISION
 3
 4
 5
   RUTH SMITH, Individually and as
 6 Widow for the Use and Benefit
   of Herself and the Next Kin of
 7 Richard Smith, deceased,
 8           Plaintiff,
 9 vs.                          Civil No.  3:05-0444
                                Judge Aleta
10                              A. Trauger
   PFIZER, INC. et al,
11
             Defendants.
12 _____/
13
14
           DEPONENT:     Dr. Cheryl Blume
15
           DATE:         May 7, 2010
16
           PLACE:        Pharmaceutical
17                       Development Group
                         13902 N. Dale Mabry Hwy
18                       Suite 230
                         Tampa, FL 33618
19
20
           TAKEN:        Pursuant to Notice by
21                       Counsel for Defendants
22         TIME:         Began:   10:03 a.m.
                         Ended:    1:50 p.m.
23
24         REPORTED BY:  PHILIP RYAN, RPR
                         Notary Public
25                       State of Florida at Large
```

```
 1  Gabapentin can cause suicidal behavior?
 2      A.   Yes, I believe that.  But whether
 3  specific causation is shown is not necessary for
 4  information, labeling, and regulatory purposes.
 5  Specific causation is neither required for
 6  efficacy nor safety communications.
 7      Q.   Going back to my question, then, do
 8  you -- do you agree with the author's statement
 9  which you quote in your direct statement, that
10  there is no clear understanding of a mechanism
11  of action that could lead to suicidal behavior
12  in patients taking antiepileptic medication.
13      A.   Yes, I agree with that statement from
14  my perspective.  Of course there's other people
15  who are going to be directly speaking to
16  mechanism of causation.
17      Q.   Do you agree with the authors'
18  statement that the existing theories are not
19  consistent and often derived from small trials
20  generally performed against placebo in
21  populations mainly including epileptic
22  patients.
23      A.   Well, again, I would agree that you
24  read it correctly, but they are referring to
25  very specific articles for which I have not
```

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Case 3:05-cv-00444   Document 232-2   Filed 05/12/10   Page 16 of 17 PageID #: 5042

42
1 properties but at the same time are noting that
2 conflicting behavior is reported in both
3 children and adults in the form of aggression
4 and stimulated or hyperactivity behavior.
5    Q.   You would -- you would you agree the
6 aggression and hyperactivity that they quote
7 does not include suicide or suicide attempts;
8 correct?
9    A.   Again, I don't have those articles in
10 front of me.  Certainly aggression can lead to
11 self-injurious behavior.  But without having
12 reviewed those references, I'm not -- I'm not
13 sure I can answer the question.
14    Q.   Do you agree that children are, in
15 terms of average effect, are different from
16 adults -- adults who are in the general
17 population?
18    A.   With respect to antiepileptic
19 therapies?
20    Q.   With respect to adverse events.
21    A.   I read that adverse events may have --
22 may present differently or in different
23 magnitudes or frequency in adults and children.
24    Q.   And would you agree that adults with
25 learning disabilities and cognitive impairment